**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| NAV CONSULTING, INC., an Illinois Corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) ) | |
| ABHISHEK KUMAWAT, an individual, and SUDRANIA FUND SERVICES, CORP., an Illinois Corporation, | ) ) ) ) | |
| Defendants. | ) ) | |

## VERIFIED COMPLAINT

Plaintiff NAV Consulting, Inc. ("NAV") for its Verified Complaint against Defendants Abhishek Kumawat ("Kumawat") and Sudrania Fund Services, Corp. ("SFS"), states as follows:

## INTRODUCTION

1.      In direct violation of a valid and reasonable contract, Kumawat, NAV's Vice President of Fund Accounting & Compliance, resigned from NAV prior to completion of his agreed-to fixed term of employment to join a direct competitor, SFS. Given the competitive nature of the two companies and Kumawat's role with SFS, he will necessarily rely upon and utilize the confidential information and specialized training he acquired while employed by NAV to SFS's benefit and to NAV's significant detriment.

2.      SFS provides the same exact hedge fund administration services NAV provides. NAV and SFS compete for the same clients in the hedge fund arena. NAV only seeks to enforce the terms of Kumawat's Employment Agreement (the "Agreement") and to prohibit Kumawat from working for a competitor in a role that is violative of the Agreement and one which will require him to inevitably use and disclose NAV's trade secrets and proprietary and confidential information.

3.     In his role with SFS, Kumawat will use and/or disclose NAV's hard-earned confidential and proprietary information and trade secrets for SFS's benefit. Kumawat's presence will allow SFS to unfairly compete with NAV. This is precisely what Kumawat agreed not to do when he executed his Agreement with NAV.

4.     Kumawat's efforts to contravene his contractual obligations to NAV will irreparably harm NAV, diminish the value of NAV's confidential and proprietary information and trade secrets, harm NAV's relationships with its clients, and undermine NAV's competitive edge in the hedge fund administration space.

5.     SFS, for its part, intentionally induced Kumawat to breach his post-employment commitments to NAV by knowingly hiring him in violation of his non-competition obligations. This is not the first time SFS has unfairly poached an employee from NAV in contravention of a valid and enforceable agreement. SFS continues its attempts to unfairly compete with NAV in a competitive and specialized marketplace.

6.     Kumawat's and SFS's unlawful actions must be enjoined before they can cause further harm to NAV's legitimate business interests, including its trade secrets, proprietary and confidential information, and customer and employee relationships.

## PARTIES

7.     NAV Consulting, Inc. is an Illinois corporation with its principal place of business in Oakbrook Terrace, Illinois.

8.     Abhishek Kumawat is a citizen and a resident of Illinois.

9.     Sudrania Fund Services, Corp. is an Illinois corporation with its principal place of business in Downers Grove, Illinois.

## JURISDICTION AND VENUE

10. Jurisdiction is proper in this District pursuant to 28 U.S.C. § 1331 because NAV asserts a cause of action under federal law. Specifically, NAV asserts a cause of action under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq*.

11. Venue is proper in this district under 28 U.S.C. § 1391, *et seq.*, because Kumawat entered into a contract directly connected to Illinois and breached his contractual duties, the effects of which NAV felt in Illinois, and because SFS tortiously interfered with a contract in Illinois governed by Illinois law.

## GENERAL ALLEGATIONS

**NAV's Business**

12. Nav Gupta ("Gupta") founded NAV in 1991. NAV is a hedge fund administrator providing services in fund accounting and registrar and transfer agency ("RTA") functions, including portfolio accounting, bookkeeping, record keeping, net asset value calculation, daily reconciliation, daily reporting, investor statement distribution, preparation of U.S. Federal and state tax returns, preparation of financials, anti-money laundering, and other regulatory reporting and support. NAV's clients are located around the world, and it provides its services globally.

13. NAV's U.S. based employees who deal directly with NAV's clients, including account managers, senior account managers, and vice presidents, are the "face" of NAV and form direct relationships with clients while providing NAV's services.

14. NAV has a back office operation in Jaipur, India, NAV Back Office, that it utilizes to provide support to NAV's U.S. operations as related to its client relations and performance of services NAV offers and provides clients. NAV Back Office employees work directly with NAV's U.S. based employees to fulfill client requests, perform tasks, and service NAV's clients.

15.     NAV has invested an extraordinary amount of time and millions of dollars building and growing its business.  NAV is well known in the hedge fund administration services industry for its competitive pricing, unique processes, and outstanding customer service.  NAV's business is based on proprietary software, processes, and algorithms, which it has spent numerous years and countless dollars developing internally.  Unlike most of its competitors, NAV uses its unique software, processes, and algorithms, rather than standardized offerings and systems, to offer its clients competitive pricing and efficient services.

16.     NAV heavily invests in maintaining, adapting, and updating its software, processes, and algorithms in order to improve its output capabilities, processing time, features, enhancements, updates, and systems so as to be able to continually offer its clients cutting-edge offerings and services that meet the needs of the always-changing hedge fund landscape.

17.     NAV's clients are the center of its business, and it works diligently to provide its clients the most competitive pricing.  In addition to its unique software, processes, and algorithms and competitive pricing, NAV ensures customer service is the focus of its employees' work.  This has allowed NAV to retain nearly 99% of its clients.

18.     NAV goes to great lengths and expense to keep up to date with new types of funds and fund administration innovation.  In late 2016 and early 2017, NAV became a leader in providing specialized services and offerings to cryptocurrency ("crypto") funds, which differ vastly from standard hedge funds.  In particular, the crypto market is open 24/7 while the traditional market closes at 5:00 PM, crypto does not have a broker statement at the end of the day or month like the traditional market, requiring an individual to connect with different exchanges to pull data, the crypto market's 24/7 nature provides many challenges in valuation because the crypto market never closes with a price, unlike the traditional market, and crypto requires in-kind contribution

(*i.e.*, subscribing into the fund with a form of crypto currency).

19.     NAV has expanded its offerings and services to keep up with changing laws, regulations, and requirements.  For example, it provides anti-money laundering compliance services in order for funds to meet the requirements of different jurisdictions, such as the Cayman Islands.

**Kumawat's Employment with NAV**

20.     Kumawat served as NAV's Vice President of Fund Accounting & Compliance from May 2020 until his voluntary resignation on July 11, 2022.  In this role, and his prior roles, Kumawat had direct contact with NAV's clients and had intimate knowledge of NAV's clients' assets under management ("AUM"), strategies, needs, and desired service levels and NAV's product and service offerings.  NAV entrusted Kumawat with sensitive confidential and proprietary information, such as its pricing models and business plans, to help him perform his duties.

21.     In particular and as required by his leadership role in compliance, Kumawat worked closely with sensitive client information to run due diligence on prospective clients and prospective investors and perform risk assessments.  Kumawat was required to have an extensive understanding of clients' businesses and operations.  To ensure NAV's own compliance with applicable requirements and in connection with NAV's provision of anti-money laundering services, Kumawat acquired a deep understanding of NAV's clients' personal information, processes, structures, investment strategies, and plans as it related to their funds.

22.     Kumawat also had direct access to and intimate knowledge of NAV's confidential checklists and workflow procedures used by NAV in the provision of anti-money laundering services, including the provision of anti-money laundering officer services for clients, for example,

the anti-money laundering officer workflow checklist and procedures, which Kumawat used in his capacity as multiple NAV clients' deputy money laundering reporting officer. The anti-money laundering checklists and procedures were created in-house by NAV and allowed the development of highly customized and efficient processes for service delivery, some of which are specialized and proprietary to NAV. As the deputy money laundering reporting officer for multiple NAV clients, Kumawat used his knowledge of NAV's pricing models and strategy to independently determine pricing and fees for the anti-money laundering compliance officer and money laundering reporting officer services offered to NAV's clients. He also prepared the service agreements for all anti-money laundering officer and money laundering reporting officer services, which included the granular details of the terms and scope of the business relationships between NAV and its clients. Kumawat maintained the list of NAV's customers requiring anti-money laundering officer services.

23. Kumawat was also responsible for business development, which included cross-selling NAV's services to existing and prospective clients, and participating in development of new solutions to meet client needs. As part of these duties, Kumawat coordinated presentations and demos for existing and prospective clients on NAV's systems, applications, and other services. Kumawat developed an in-depth knowledge of NAV's client and investor portals. Kumawat also prepared client proposals and service agreements, and had intimate knowledge of the terms of such agreements.

24. Prior to his role as Vice President of Fund Accounting & Compliance, Kumawat worked as a Senior Account Manager from November 2015 to April 2020 and an Account Manager from December 2007 to November 2015. In these roles, Kumawat served as the "face" of NAV for nearly 206 accounts. Kumawat was responsible for managing, maintaining, and

building these critical relationships. Both of these roles required Kumawat to form deep relationships with NAV's clients. Kumawat learned NAV's proprietary software, processes, and algorithms to provide NAV's clients the most competitive offerings.

25.     In order to maintain his relationships with NAV clients, NAV exposed Kumawat to and he became familiar with, among other things, NAV's clients' needs, expectations, fund accounting strategies, and desired service levels. He also had knowledge of sensitive client information such as clients' AUMs and strategies. His intimate knowledge of NAV's pricing models and strategy allowed him to negotiate and offer pricing to clients based on a client's AUM, strategy, needs, and desired service levels and NAV's offerings. This confidential information allowed Kumawat to maintain his relationship with NAV's clients so that he could provide them with efficient solutions and services.

26.     Kumawat had access to NAV's unique software, processes, and algorithms, pricing models, business development plans, and competitive strategies and techniques. This information is highly confidential, and only a select set of employees at NAV have access to this information. Kumawat worked directly with NAV's leadership to develop strategies and processes to grow NAV's business and client relations. Kumawat used this information to further advance NAV's growth and expansion plans as well as its offerings in order to acquire an advantage over its competitors and a larger share of the hedge fund administration services market.

27.     Kumawat also had access to and knowledge of NAV's proprietary, confidential and trade secret information as it relates to NAV's subsidiary, NAV Fund Services (Cayman) Ltd., including certain financial information and business plans.

28.     In addition to the information to which Kumawat was exposed in performing his duties, Kumawat also participated in multiple high-level meetings where specific performance,

revenue related to anti-money laundering officer services, client, and strategy details were discussed with NAV's key leaders. Through these confidential meetings with NAV's leaders, Kumawat further learned about NAV's precise pricing models, growth and development plans, and competitive strategy to acquire more market share.

29.     Kumawat actively participated in helping mold NAV's plans and strategies by using his role as NAV's compliance leader and experience dealing with all of NAV's clients' needs, particularly in the compliance sphere, to provide insight and shape NAV's future processes and endeavors.

30.     Kumawat directly oversaw 130 employees on the Back Office compliance team.

31.     NAV took reasonable measures to keep the business and client information discussed above known by Kumawat confidential. Access to such information is tightly controlled by NAV. Each NAV computer contains software that prohibits any external hardware, such as storage devices, from being connected to the computer to download documents or other data and information. Additionally, all NAV devices are password-protected, and NAV monitors all its systems to ensure no unauthorized activity occurs. And, only certain employees were allowed in leadership meetings and given access to certain competitive and confidential information.

32.     NAV also requires its employees, including Kumawat, to sign confidentiality agreements in which they promise not to disclose or use NAV's trade secret, proprietary, and confidential information.

**Kumawat's Agreement with NAV**

33.     Kumawat held a critical role in NAV's business as its Vice President of Fund Accounting & Compliance. Further, Kumawat's role was a key component of NAV's plans to build and grow its business. NAV knew it would be difficult to replace Kumawat based on the

nature of his role, his time with the company, and the critical function he served for NAV. Based on these considerations, NAV presented Kumawat with the Agreement in November 2020 for his consideration. A true and correct copy of the Agreement is attached hereto as <u>Exhibit A</u>.

34.     NAV presented Kumawat with the option to sign a four (4) or five (5) year fixed-term agreement.   The Agreement also included post-employment restrictive covenants.

35.     Kumawat negotiated a $17,500 raise (effective January 1, 2021) in exchange for a five (5) year fixed-term Agreement.

36.     NAV presented the Agreement to Kumawat in exchange for a $2,000 signing bonus, access to NAV's trade secrets and proprietary and confidential information, and guaranteed employment for a period of five (5) years. In exchange for this valuable consideration, as well as the increase in his yearly salary, Kumawat executed the Agreement on November 10, 2020.

37.     The fixed term provision provides, in pertinent part, as follows:

> I. **<u>Term</u>**. The term of this Agreement shall be from December 15, 2020 until November 30th, 2025 (the "Term").
>
> . . .
>
> If Employee's employment terminates for any reason other than those set forth in clauses (i) through (iv) of paragraph 2(a) before the fifth anniversary of the commencement of the Term, including the voluntarily resignation of Employee's employment or an involuntary termination of the Employee by the Company for Cause, Employee shall pay an early termination fee to the Company in the amount equal to four (4) months of Employee's then base salary at the time of the termination of Employee's employment ("Early Termination Fee") within thirty (30) days of the effective date of Employee's termination of employment with the Company, not as a penalty but as a reasonable estimate of the damages suffered by the Company.

*See* <u>Exhibit A</u>, ¶¶ 1, 2(b).

38.     Kumawat further agreed not to compete against NAV following his separation from NAV.   Kumawat agreed to be bound by a twenty-four (24) month post-employment narrowly

tailored non-competition provision which states, in pertinent part, as follows:

> (c) <u>Covenant Not to Compete</u>. Employee acknowledges the Company's legitimate interest in protecting its Confidential Information, customer relationships, and goodwill for a reasonable period of time following the termination of his employment. Employee further acknowledges that the Company, including its affiliate Back Office, has spent substantial money, time and effort on the development of the proprietary software and operational systems, that use of the proprietary software and operational systems puts the Company at a competitive advantage compared to its competitors and the Company has a legitimate interest in protecting that competitive advantage. Accordingly, Employee agrees that during the Restricted Period, Employee will not (*i*) engage in, (*ii*) own, (*iii*) manage, (*iv*) operate, (*v*) finance, (*vi*) control or (*vii*) represent, advise, or work with (whether as an officer, director, shareholder, owner, co-owner, affiliate, partner, agent, representative, employee, consultant, independent contractor, advisor, or in any other manner), in a role substantially similar to any of the duties, responsibilities and services provided by Employee to the Company at any time during the last twenty-four (24) months of his employment with the Company, a Competitive Business.
>
> . . .
>
> The term "***Competitive Business***" means an entity or person that sells or provides products or services that are competitive with those products and services (*i*) sold or provided by the Company or any of its affiliates at any time during the last twelve (12) months of Employee's employment with the Company or (*ii*) actively and demonstrably being planned by the Company on the effective date of Employee's termination and (*A*) for which Employee had any involvement on behalf of the Company or one of its affiliates at any time during the last twelve (12) months of Employee's employment with the Company or (*B*) for which Employee has Confidential Information; provided, where an entity has distinct organizational divisions, only those organizational divisions that are a Competitive Business shall be subject to the restrictions in this paragraph. A "Competitive Business" includes, but is not limited to, Sudrania Fund Services Corp. . . .

*See* <u>Exhibit A</u>, ¶ 7(c).

      39.    As it relates to NAV's Confidential Information, the Agreement provides:

> 4. Confidential Information and Nondisclosure
>
> . . .
>
> (a) Employee will not, at any time during or after Employee's employment with the Company, disclose, use or permit others to use any Confidential

Information, except as required in the course of Employee's employment for the benefit of the Company.

*See* Exhibit A, ¶ 4(a).

40.     Per the Agreement, Confidential Information is defined as:

(*A*) any information for which the Company has a contractual obligation with a customer, prospective customer or other third-party to treat as confidential or to not disclose outside of the Company; (*B*) any information for which the Company has a statutory obligation to treat as confidential or to not disclose outside of the Company; (*C*) any information designated as trade secrets or which would be considered trade secrets under the Illinois Trade Secrets Act or other applicable law; (D) any information pertaining to the customized, proprietary software, methodologies, know-how, and trade secrets developed by Back Office for the benefit of NAV Consulting, Inc. and its customers; and (*E*) information relating to the following: (*i*) the Company's production practices and methods of doing business; (*ii*) sales, marketing, and service strategies, programs, and procedures; (*iii*) customers and prospective customers, including, but not limited to, their particularized requirements and preferences, their product or service specifications, the identity and authority of their key contact persons, payment methods, and service histories and patterns; (*iv*) mail lists and e-mail lists; (*v*) pricing lists; (*vi*) pricing policies and pricing methodologies; (*vii*) prices and fees negotiated with customers and proposed to prospective customers; (viii) pricing structures; (*ix*) service, product and material costs; (*x*) profit margins; (*xi*) bids and responses to requests for proposals; (*xii*) vendors and sources of supply; (*xiii*) financial position and business plans; (xiv) computer programs, applications, databases; (*xv*) research projects; (*xvi*) new product and service developments; (*xvii*) compositions, formulas, patterns, compilations, programs, techniques, devices, processes, plans, designs, and drawings; and (*xvii*) any other information of the Company or any of its vendors, customers and prospective customers, which the Company informs Employee, or which Employee should know by virtue of Employee's position or the circumstances in which Employee learned it, is to be kept confidential.

*See* Exhibit A, ¶ 4.

41.     The Agreement also contains a tolling provision regarding the covenants set forth in Section 7, and Kumawat agreed the "Restricted Period applicable to paragraphs 7(a) through 7(d) shall be tolled until such breach or violation has been cured." *See* Exhibit A, ¶ 7(e).

42.     Kumawat acknowledged the covenants within the Agreement were reasonable and

necessary to preserve NAV's strong business interests, its present and potential business activities, and the economic benefits derived therefrom. *See* Exhibit A, ¶ 7.

43.     Kumawat also agreed that violations of his contractual obligations would cause permanent, irreparable injury to NAV for which there would be no adequate remedy at law. He further agreed NAV would be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper if he violated or threatened to violate his contractual obligations to NAV. *See* Exhibit A, ¶ 9.

44.     Kumawat further agreed that if NAV was successful in enforcing any portion of the Agreement pursuant to its Injunctive Relief provision, it would be entitled to all of its reasonable attorneys' fees and costs incurred as a result of enforcing the Agreement. *See* Exhibit A, ¶ 9.

45.     Kumawat acknowledged the Agreement would be governed by Illinois law, and he irrevocably consented to the exclusive personal and subject matter jurisdiction of the federal and state courts located in Illinois. He further agreed that the forum for any disputes arising out of the Agreement would be in the federal and state courts in Illinois. *See* Exhibit A, ¶¶ 11, 12.

46.     The Agreement also contains a severability clause. *See* Exhibit A, ¶ 10.

**Kumawat's Resignation from NAV**

47.     Kumawat announced his resignation via email on May 12, 2022, and provided sixty (60) days' notice to NAV. His official last day of employment was July 11, 2022.

48.     Kumawat also told Gupta he intended to join SFS following his last day with NAV, though he refused to provide information regarding the role in which he would be working for SFS and would not confirm it was in a non-competitive role.

49.     Gupta offered Kumawat a substantial raise to stay at NAV, which he refused. Kumawat also disclosed to Gupta that SFS had offered him stock options in addition to his salary.

50.     Following the announcement of his resignation, NAV reminded him of his post-employment contractual obligations under the Agreement.

51.     On May 16, 2022, days after announcing his intent to resign from NAV and join direct competitor SFS, Kumawat accessed NAV's "take-over file" housed in a shared NAV Outlook mailbox, which houses confidential and proprietary information regarding client funds which NAV is in the process of taking over as fund administrator from a competing fund administrator, such as SFS. Kumawat searched this database using the term "Sudrania." Kumawat had no legitimate reason to access this database and conduct a search for "Sudrania." Based on the information present in this database, Kumawat accessed information regarding pricing options made to funds moving from SFS to NAV (and others). Such information is incredibly sensitive and would significantly damage NAV if provided to a competitor like SFS. With this information, SFS would have direct knowledge of the pricing NAV is offering current and prospective funds and could use this information to improperly compete with NAV for such funds.

52.     One of the customer leads that a search for "Sudrania" uncovered during Kumawat's May 16, 2022 search activity was an SFS customer who subsequently decided to stay with SFS and not move over to NAV.

53.     On June 6, 2022, Kumawat searched the shared NAV Outlook mailbox for a specific colleague's lead, which had previously informed NAV it was not interested in moving its fund accounting services to NAV. Kumawat had no prior relationship with this lead and was not copied on emails with this lead. Even if a lead does not become a NAV client, lead files contain intimate details on prospective clients, such as contact information, needs, and desired pricing, which may be used in later discussions with the lead should they wish to explore changing administrators again. A competitor, such as SFS, could use this information to undercut NAV and

unfairly steal its prospective clients.

54.     On July 11, 2022, NAV had a meeting with Kumawat to again remind him of and discuss his post-employment commitments to NAV, including the non-disclosure, non-solicitation, and non-compete provisions in his Agreement. Throughout the meeting, Kumawat was uncooperative and refused to provide NAV further details about his plans following his resignation from NAV. Kumawat again refused to confirm he was taking a non-competitive role with direct competitor SFS. .

55.     In the days prior to his last day of employment, Kumawat contacted at least two clients to inform them that he was leaving NAV and asked them to "keep in touch" on LinkedIn

56.     At the time of his resignation, Kumawat's base salary was $207,000. He was also eligible for and received various bonus payments at NAV throughout his career. To date, Kumawat has not paid the Early Termination Fee as required under Section 2(b) of the Agreement.[1]

**SFS's Competitive Business**

57.     SFS, like NAV, is a hedge fund administrator. SFS was founded in June 2015 by a former NAV employee, Nilesh Sudrania ("Sudrania"). SFS was originally established as Sudrania, LLC. The company was converted to Sudrania Fund Services, Corp. in December 2019, per the Illinois Secretary of State website.

---

[1] NAV has simultaneously filed a Demand for Arbitration with the American Arbitration Association ("AAA") pursuant to Section 15 of the Agreement seeking damages for breach of contract as it relates to Kumawat's failure to fulfill his Term. *See* Exhibit A, ¶¶ 1, 2(b). As provided in the Agreement, "all disputes arising from or relating to Employee's employment with the Company, the termination of that employment, this Agreement or any other dispute between the parties that might otherwise be subject to litigation in a civil court or administrative hearing or tribunal, including, without limitation, claims alleging discrimination, harassment, the failure to pay overtime premiums as required by the Fair Labor Standards Act or analogous state laws, breach of a contractual obligation, and breach of a fiduciary duty ("Claims") must be resolved" via arbitration with the AAA. *See* Exhibit A, ¶ 15. However, the Agreement expressly carves out "actions seeking equitable relief (*e.g.*, emergency, preliminary or permanent injunctive relief) . . ." *See* Exhibit A, ¶ 15. NAV seeks equitable relief through this Verified Complaint as set forth herein.

58.     Like NAV, SFS provides hedge fund administration services such as fund accounting, net asset value calculation, daily reconciliation, daily reporting, investor statement distribution, preparation of U.S. Federal and state tax returns, preparation of financials, anti-money laundering and other regulatory reporting and support.

59.     SFS is NAV's direct competitor as both companies compete for the same hedge fund clients to provide the same hedge fund administration services.

60.     SFS, similar to NAV, has a back office operation in India.  SFS's structure, like NAV's structure, includes employees based in the U.S. who work directly with SFS's clients to form relationships and provide direct support, meanwhile employees in SFS's back office operations in India work to support SFS's U.S. based employees to provide multiple hedge fund administration services.

61.     NAV has historically considered SFS to be one of its primary competitors, and, in fact, explicitly lists SFS as a Competitive Business in its employment agreements.  *See* Exhibit A, ¶ 7(c).

62.     SFS has targeted NAV in the past and has hired NAV's employees to increase its own competitive edge and to harm NAV.

63.     SFS has engaged in unfair and deceptive acts to unfairly compete with NAV, some of which are the subject of other ongoing litigation.

64.     SFS offers fund administration services to specialized crypto funds, developing technology specifically for such funds.[2]

65.     SFS also provides specialized compliance support services, like NAV, and offers anti-money laundering services.[3]

---

[2] *See* https://sudrania.com/unveils-cryptocurrency.html (last visited July 12, 2022).
[3] *See* https://sudrania.com/services.html (last visited July 12, 2022).

66.     Recently, SFS claims to have entered into a "hyper-growth" mode as it expands and experiences rapid growth, continuing to hire employees to provide its clients fund administration services.[4]

67.     SFS recently "rebranded" as Formidium, which has "two sub-brands": Formidium Fund Services and Formidium Technologies.  The "rebrand" will be "rolled out across the globe in coming weeks."[5]

68.     As of July 13, 2022, Formidium is not registered with the Illinois Secretary of State and Sudrania Fund Services, Corp. remains the active operating entity.

69.     While working for NAV, Sudrania worked directly and closely with Kumawat. Sudrania, just like Kumawat, also signed an employment agreement while at NAV containing similar restrictive covenants to those in the Agreement at issue here.  Through his years of employment and his role as Vice President, Sudrania and SFS are well aware that NAV's employment agreements contain post-employment obligations and restrictive covenants.  And, on July 11, 2022, counsel for NAV sent SFS a letter summarizing the terms of Kumawat's Agreement and attached a copy thereto.  A true and correct copy of the letter is attached hereto as Exhibit B. Sudrania did not respond to the letter.

70.     Through years of experience, trial and error, and research and development, NAV has developed unique software, processes, and algorithms, pricing models, anti-money laundering checklists and procedures, business development plans, and competitive strategies and techniques that allow it to provide superior, efficient, and cost-effective fund administration and RTA services to clients.  Kumawat not only had access to this information, but he helped develop much of it

---

[4] *See* https://sudrania.com/Blockchain_Laboratory.html (last visited July 12, 2022).
[5] *See* https://www.globenewswire.com/news-release/2022/07/06/2474749/0/en/Sudrania-Fund-Services-Rebrands-As-Formidium.html (last visited on July 12, 2022).

based on his intimate knowledge of his clients' confidential information, including their AUMs, strategies, needs, desired service levels, and pricing structure that has worked for them, especially as related to anti-money laundering compliance officer and money laundering reporting officer services.

71.     Kumawat will necessarily use his knowledge of NAV's plans and strategies, including how to price services and offerings for clients based on their particular circumstances and needs as well as business development plans in order to maintain a competitive advantage against other fund administrators, to help SFS compete directly and indirectly with NAV for hedge fund clients.

72.     In the days following his notice of resignation, Kumawat accessed a NAV shared Outlook mailbox containing highly sensitive information regarding "take-over files" for funds NAV was taking over, or attempting to take over, from other fund administrators, like SFS. Kumawat searched these files for "Sudrania," and, upon information and belief, accessed information regarding the pricing NAV provided to certain funds for which NAV and SFS compete.  Kumawat had no legitimate reason to access this database and conduct a search for "Sudrania."

73.     Also following his resignation, Kumawat accessed leads for other fund accounting account managers through NAV shared Outlook mailbox.  Kumawat accessed information covering intimate details on prospective clients, such as contact information, needs, and desired pricing.  This is the exact information a competitor, such as SFS, could use to undercut NAV and unfairly steal its prospective clients.

74.     Kumawat's expressly told Gupta he was leaving NAV to join SFS.  Upon information and belief,  Kumawat joined SFS in a role substantially similar to the role he held for

NAV.  Kumawat would not confirm he was taking a non-competitive role.

75.     Kumawat's role at SFS will necessarily use and reference his knowledge of NAV's trade secrets and proprietary and confidential information.  It is virtually impossible for Kumawat not to rely on the wealth of information he learned and accessed during his employment at NAV while working for a direct competitor.  SFS will undoubtedly advance its efforts by using Kumawat to reference or use NAV's pricing strategy as well as undercut NAV's business development plan Kumawat has helped mold.

**COUNT I**
**Breach of Contract – Non-Compete**
**(Injunctive Relief and Damages)**
**Against Kumawat**

76.     NAV realleges and incorporates by reference Paragraphs 1 through 75 as though fully set forth herein.

77.     The Agreement is a valid and enforceable contract.

78.     In consideration for entering into the Agreement, NAV provided Kumawat a $2,000 signing bonus, access to NAV's trade secrets and proprietary and confidential information, and guaranteed employment for a five-year term.

79.     Kumawat also negotiated and received a $17,500 raise in exchange for signing the Agreement.

80.     Among other obligations under the Agreement, Kumawat agreed and was obligated, for a period of twenty-four (24) months following the separation of his employment, not to be employed by an entity in competition with NAV, specifically including SFS.

81.     The restriction is narrowly tailored and only applies to a role "substantially similar" to that of Kumawat's role at NAV based on the duties, responsibilities, and services provided by Kumawat at any time during the twenty-four (24) month period prior to his last day of employment.

The non-competition restriction is limited to businesses that sell or provide products or services that are competitive with NAV's products or services sold or provided during the last twelve (12) months of Kumawat's employment with NAV or was being actively and demonstrably planned by NAV for which Kumawat had involvement at any time during the last twelve (12) months of his employment or for which Kumawat has Confidential Information.

82.     The temporal scope of twenty-four (24) months is reasonable and limited to the extent necessary to protect NAV.

83.     The terms of the Agreement are not greater than required for the protection of NAV's legitimate business interests, including its trade secrets and proprietary and confidential information, and the valuable relationships it has cultured with its clients, which were developed at considerable expense, time, and difficulty.

84.     Kumawat breached the Agreement by leaving NAV to join SFS, a direct competitor of NAV, in a position with responsibilities substantially similar to his position at NAV. Kumawat will be acting in a competing role for a competing business. Kumawat's position at SFS will involve the use or disclosure, or the likelihood of the use or disclosure, of NAV's confidential information.

85.     SFS and NAV provide the same hedge fund administration services, and SFS competes against NAV for the same clients in the hedge fund administration arena.

86.     Kumawat knew he had a duty not to compete against NAV, and NAV reminded Kumawat of his post-employment obligations prior to his resignation.

87.     NAV has fully performed its contractual obligations to Kumawat under the Agreement.

88.     NAV has and will continue to suffer damages as a result of Kumawat's breach of

contract, including without limitation, diminishing value of NAV's trade secrets and confidential and proprietary information, harm to NAV's relationships with its clients by unfairly competing for the same clients with whom Kumawat has deep relationships, and undermining NAV's competitive edge in the hedge fund administration arena.

89.     NAV's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

90.     Kumawat's actions will continue to cause harm to NAV if not restrained.

91.     NAV has demonstrated that Kumawat, unless enjoined, has already and will continue to engage in conduct that breaches the Agreement.

92.     The terms of the Agreement do not pose an undue hardship on Kumawat.

93.     The Agreement is not injurious to the public.

94.     Should this Court grant injunctive relief to NAV, the burden on Kumawat would be slight compared to the injury to NAV if it is not granted. No injury to Kumawat would result from an order requiring him to comport his actions under the Agreement.

95.     The grant of an injunction will not disserve the public interest.

**WHEREFORE**, NAV prays for judgment against Kumawat and requests the Court grant the following relief:

A. Entry of a Preliminary Injunction against Kumawat, consistent with the relief as requested in Plaintiff's Motion for a Preliminary Injunction and Memorandum in Support;

B. Upon final disposition, entry of a Permanent Injunction against Kumawat, enjoining Kumawat from breaching his non-competition obligations contained in the Agreement, and any other applicable relief as set forth in Plaintiff's Motion for a Preliminary

Injunction and Memorandum in Support;

C. For actual, compensatory and exemplary damages to be determined at trial;

D. For reasonable attorneys' fees, costs and expenses incurred in enforcing the Agreement; and

E. Such other and further relief the Court deems as just.

**COUNT II**
**Violation of the Illinois Trade Secrets Act**
**(Injunctive Relief and Damages)**
**Against Kumawat**

96.     NAV realleges and incorporates by reference Paragraphs 1 through 95 as though fully set forth herein.

97.     The Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq.*, prohibits the misappropriation of trade secrets.  Under the Act, a trade secret means "information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means, by others who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Id.*

98.     Under the Act, misappropriation means any of the following: "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; (2) Disclosure or use of a trade secret of another without the express or implied consent by a person who: (a) Used improper means to acquire knowledge of the trade secret; (b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (1) Derived from or through a person who had utilized improper means to acquire it; (2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;

(3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (4) Acquired by accident or mistake." *Id.*

99.     Kumawat had access to NAV's unique software, processes, and algorithms, pricing models, anti-money laundering checklists and procedures, client lists, and growth strategy. Kumawat also had knowledge of and access to sensitive client data, including clients' identities, historical client relationships, AUMs, strategies, needs, desired service levels, and pricing structure that has worked for them, especially as related to anti-money laundering compliance officer and money laundering reporting officer services.   NAV collected this information about all of its clients, and it worked to constantly update this information as it changed.   These granular confidential client details were only known to the individuals who worked on the clients' accounts and were used to provide customized and competitive offerings, services, and price estimates for each specific client.   Kumawat helped develop and had knowledge of NAV's plans for expansion and growth, access to which is limited to NAV's top leadership.   Kumawat also had access to and knowledge of NAV's business plans and financials for certain of its subsidiaries.

100.     Prior to his resignation, Kumawat accessed NAV's "take-over file" housed in a shared NAV Outlook mailbox, which houses confidential and proprietary information regarding client funds which NAV is in the process of taking over as fund administrator from a competing fund administrator, such as SFS.   Kumawat searched these files for "Sudrania," and, upon information and belief, accessed information regarding the pricing NAV provided to certain funds in competition with SFS.   This information contains intimate details on prospective clients, such as contact information, needs, and desired pricing.   Kumawat had no legitimate reason to access this database and conduct a search for "Sudrania."   This information is highly sensitive, confidential, and could significantly damage NAV if provided to a competitor like SFS.   This

Case: 1:22-cv-03624 Document #: 1 Filed: 07/13/22 Page 23 of 87 PageID #:23

information contains independent economic value if given to a competitor.

101.    On June 6, 2022, Kumawat searched NAV shared Outlook mailbox for a specific colleague's lead, which had previously informed NAV it was not interested in moving its fund accounting services to NAV.  Kumawat had no prior relationship with this lead and was not copied on emails with this lead.  Even if a lead does not become a NAV client, lead files contain intimate details on prospective clients, such as contact information, needs, and desired pricing, which may be used in later discussions with the lead should they wish to explore changing administrators again.  A competitor, such as SFS, could use this information to undercut NAV and unfairly steal its prospective clients.

102.    This information constitutes trade secrets under Illinois law because it provides independent economic value from not being generally known to others, such as SFS, who can obtain economic value from its use.  If a competitor, such as SFS, obtained this information, it could target NAV's current and prospective clients and, among other things, unfairly diminish NAV's market share in the hedge fund administration arena.

103.    This information also gives NAV a competitive edge over its competitors, including SFS.

104.    One of the customer leads that a search for "Sudrania" uncovered during Kumawat's May 16, 2022 search activity was an SFS customer who subsequently decided to stay with SFS and not move over to NAV.

105.    NAV takes reasonable measures to protect the secrecy of its trade secrets.

106.    NAV's employees, including Kumawat, are required to enter into comprehensive confidentiality agreements to protect NAV's trade secret, confidential, and proprietary information.

-23-

107.    Access to the information is tightly controlled by NAV.  Each NAV computer contains software that prohibits any external hardware, such as storage devices, from being connected to the computer to download documents or other data and information.  Additionally, all NAV devices are password-protected, and NAV monitors its systems to ensure no unauthorized activity occurs.

108.    Other information is restricted by level of employee, including information shared at senior leadership meetings and in certain shared databases.

109.    Kumawat knew he had a duty to maintain the secrecy and confidentiality of NAV's trade secrets due, in part, to his obligations under the Agreement.  NAV reminded Kumawat, prior to his resignation, of his post-employment obligations.

110.    Kumawat also knew he had a duty to maintain the secrecy and confidentiality of NAV's trade secrets due to his position as NAV's Vice President of Fund Accounting & Compliance.

111.    In his role with SFS, Kumawat will be performing in a substantially similar role as he held with NAV.

112.    In his role at SFS, it will be virtually impossible for Kumawat to not rely and draw from the knowledge he learned about NAV's trade secrets and proprietary and confidential information, including NAV's unique software, processes, and algorithms, pricing models, anti-money laundering checklists and procedures, client lists, business development plans, and competitive strategies and techniques.  He further will not be able to separate himself from the intimate client information he learned throughout the course of his tenure with NAV, including the clients' identities, AUMs, strategies, needs, desired service levels, and pricing structure that has worked for them, especially as related to the compliance officer and money laundering

reporting officer services.

113.     Kumawat poses a direct threat to immediately use and continue to use NAV's trade secret information relating to NAV's pricing models and strategy, development plans, and granular client information for the benefit of SFS, NAV's direct competitor.  Kumawat will inevitably and immediately use NAV's trade secrets without consent of any kind for SFS's financial gain.

114.     Kumawat's extensive knowledge of NAV's confidential and proprietary information relating to its pricing models and strategy, development plans, and granular client information will allow a competitor, including SFS, to irreparably harm NAV's business because NAV and SFS provide the same hedge fund administration services and compete for the same clients in the hedge fund administration arena.

115.     Kumawat is armed with the technical and insider knowledge to help a competitor, particularly SFS, develop and enhance its services and offerings and target clients to unfairly compete against NAV.

116.     Kumawat's actions constitute threatened misappropriation in violation of the ITSA.

117.     Kumawat's actions constitute a willful and malicious violation of the ITSA.

118.     NAV has suffered and will continue to suffer damages and irreparable harm as a result of Kumawat's actions, including without limitation, diminishing value of NAV's trade secret, confidential, and proprietary information, harm to NAV's relationships with its clients by unfairly competing for the same clients with whom Kumawat developed deep relationships while at NAV, and undermining NAV's competitive edge in the hedge fund administration arena.

119.     NAV is entitled to actual damages and punitive damages from Kumawat as well as attorneys' fees.

120.     NAV's damages cannot be adequately compensated through remedies at law alone,

thereby requiring equitable relief in addition to compensatory relief.

121.    Kumawat's actions will continue to cause irreparable harm and damages to NAV and its trade secret information if not restrained.

**WHEREFORE**, NAV prays for judgment against Kumawat and requests the Court grant the following relief:

A.  Entry of a Preliminary Injunction against Kumawat, consistent with the relief as requested in Plaintiff's Motion for a Preliminary Injunction and Memorandum in Support;

B.  Upon final disposition, entry of a Permanent Injunction against Kumawat, enjoining Kumawat from using, referencing or disclosing Plaintiff's trade secrets under the Illinois Trade Secrets Act, and any other applicable relief as set forth in Plaintiff's Motion for a Preliminary Injunction and Memorandum in Support;

C.  For actual, compensatory and exemplary damages to be determined at trial;

D.  For reasonable attorneys' fees, costs and expenses; and

E.  Such other and further relief the Court deems as just.

**COUNT III**
**Violation of the Defend Trade Secrets Act**
**(Injunctive Relief and Damages)**
**Against Kumawat**

122.    NAV realleges and incorporates by reference Paragraphs 1 through 121 as though fully set forth herein.

123.    The Defend Trade Secrets Act ("DTSA") of 2016, Pub. L. No. 114-153, 130 Stat. 376, which was passed into law on May 11, 2016 and amends chapter 90 of Title 18 of the U.S. Code, forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C.

§ 1836(b)(1).

124.    Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3) (as amended).

125.    Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired

by accident or mistake." 18 U.S.C. § 1839(5) (as amended).

126.     Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6) (as amended).

127.     Kumawat had access to NAV's unique software, processes, and algorithms, pricing models, anti-money laundering checklists and procedures, client lists, and growth strategy. Kumawat also had knowledge of and access to sensitive client data, including clients' identities, AUMs, strategies, needs, desired service levels, and pricing structure that has worked for them, especially as related to the compliance officer and money laundering reporting officer services. Kumawat helped develop and had knowledge of NAV's plans for expansion and growth, access to which is limited to NAV's top leadership.     Kumawat also had access to and knowledge of NAV's business plans and financials for certain of its subsidiaries.

128.     Prior to his resignation, Kumawat accessed NAV's "take-over file" housed in a shared NAV Outlook mailbox, which houses confidential and proprietary information regarding client funds which NAV is in the process of taking over as fund administrator from a competing fund administrator, such as SFS. Kumawat searched this database using the term "Sudrania." Kumawat had no legitimate reason to access this database and conduct a search for "Sudrania." Based on the information present in this database, Kumawat accessed information regarding pricing options made to funds moving from SFS to NAV (and others). Such information is incredibly sensitive and would significantly damage NAV if provided to a competitor like SFS. With this information, SFS would have direct knowledge of the pricing NAV is offering current and prospective funds and could use this information to improperly compete with NAV for such

funds.

129.    One of the customer leads that a search for "Sudrania" uncovered during Kumawat's May 16, 2022 search activity was an SFS customer who subsequently decided to stay with SFS and not move over to NAV.

130.    On June 6, 2022, Kumawat searched NAV shared Outlook mailbox for a specific colleague's lead, which had previously informed NAV it was not interested in moving its fund accounting services to NAV.  Kumawat had no prior relationship with this lead and was not copied on emails with this lead.  Even if a lead does not become a NAV client, lead files contain intimate details on prospective clients, such as contact information, needs, and desired pricing, which may be used in later discussions with the lead should they wish to explore changing administrators again.  A competitor, such as SFS, could use this information to undercut NAV and unfairly steal its prospective clients.

131.    This information derives independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  If a competitor, particularly SFS, obtained this information, it could target NAV's current and prospective clients and, among other things, unfairly diminish NAV's market share in the hedge fund administration arena.

132.    NAV took reasonable steps to keep this information secret.

133.    Kumawat knew he had a duty to maintain the secrecy of NAV's trade secrets and proprietary information, and NAV reminded Kumawat, prior to his resignation, of his obligations to maintain the secrecy of this information.

134.    NAV employees, including Kumawat, are required to enter into comprehensive

confidentiality agreements to protect NAV's trade secret, confidential, and proprietary information.

135.    Access to the information is tightly controlled by NAV. Each NAV computer contains software that prohibits any external hardware, such as storage devices, from being connected to the computer to download documents or other data and information. Additionally, all NAV devices are password-protected, and NAV monitors all its systems to ensure no unauthorized activity occurs.

136.    Other information is restricted by level of employee, including information shared at senior leadership meetings and in certain shared databases.

137.    Kumawat also knew he had a duty to maintain the secrecy and confidentiality of NAV's trade secrets due to his position as NAV's Vice President of Fund Accounting & Compliance.

138.    Kumawat's role with SFS features substantially the same or similar duties and responsibilities as his role with NAV.

139.    In his role at SFS, it will be impossible for Kumawat not to rely on or draw upon the knowledge he learned about NAV's trade secrets and proprietary and confidential information, including NAV's unique software, processes, and algorithms, pricing models, an anti-money laundering checklists and procedures, client lists, business development plans, and competitive strategies and techniques. He further will not be able to separate himself from the intimate client information he learned throughout the course of his tenure with NAV, including the clients' identities, AUMs, strategies, needs, desired service levels, and pricing structure that has worked for them, especially as related to the compliance officer and money laundering reporting officer services.

140.    In violation of the Agreement, Kumawat will improperly use NAV's trade secret information in his capacity as an employee of SFS, a direct competitor to NAV, with parallel responsibilities and duties to his role at NAV.  By working at SFS to develop the same strategies to acquire the hedge fund clients for which NAV and SFS compete.  Kumawat will be using the data and information he learned and helped develop at NAV to unfairly compete for the same clients and to develop SFS's competitive edge against NAV.

141.    Kumawat will improperly use and disclose NAV's trade secret information for the purpose of unlawfully using this information to benefit himself and SFS to NAV's detriment.  SFS competes against NAV for the same clients in the hedge fund administration arena.

142.    Kumawat's actions constitute threatened misappropriation in violation of the DTSA.

143.    Kumawat's actions constitute a willful and malicious violation of the DTSA.

144.    As a result of Kumawat's conduct, NAV has suffered and will continue to suffer damages and irreparable harm, including without limitation, diminishing the value of NAV's trade secret, confidential, and proprietary information, harm to NAV's relationships with its clients by unfairly competing for the same clients with whom Kumawat developed deep relationships while at NAV, and undermining NAV's competitive edge in the hedge fund administration arena.

145.    NAV's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

146.    Kumawat will continue to cause irreparable harm and damages to NAV and its trade secrets and proprietary information if not restrained.

**WHEREFORE**, NAV prays for judgment against Kumawat and requests the Court grant the following relief:

A. Entry of a Preliminary Injunction against Kumawat, consistent with the relief as requested in Plaintiff's Motion for a Preliminary Injunction and Memorandum in Support;

B. Upon final disposition, entry of a Permanent Injunction against Kumawat, enjoining Kumawat from using, referencing or disclosing Plaintiff's trade secrets under the Defend Trade Secrets Act, and any other applicable relief as set forth in Plaintiff's Motion for a Preliminary Injunction and Memorandum in Support;

C. For actual, compensatory and exemplary damages to be determined at trial;

D. For reasonable attorneys' fees; and

E. Such other and further relief the Court deems as just.

**COUNT IV**
**Tortious Interference with Contractual Relations**
**(Injunctive Relief and Damages)**
**Against SFS**

147.　　NAV realleges and incorporates by reference Paragraphs 1 through 146 as though fully set forth herein.

148.　　Kumawat signed a valid and enforceable Agreement in which Kumawat promised, among other things, not to compete and not to disclose NAV's trade secrets and confidential information.

149.　　Kumawat resigned from NAV to join SFS in a competing role.

150.　　SFS had knowledge of Kumawat's Agreement and his contractual obligations to NAV. SFS knew that its employment of Kumawat would cause him to breach his Agreement with NAV.

151.    SFS nevertheless intentionally interfered with the contractual relationships between NAV and Kumawat by inducing him to breach his contract by joining SFS, a competitive business and in a competing role, and by disclosing trade secrets and Confidential Information.

152.    SFS's intentional interference with the contractual relationships between NAV and Kumawat was improper and without justification.   SFS knew Kumawat was bound by the restrictive covenants in his Agreement yet, nevertheless, improperly induced and knowingly and intentionally employed him in violation of those covenants.

153.    SFS's actions were improper, unjustified, malicious, and in reckless disregard for NAV's rights, entitling NAV to injunctive relief and damages.  SFS induced Kumawat to violate his Agreement, in furtherance of SFS's plan to unfairly compete with NAV, expand its business, gain more clients, and generate more revenue at the expense of NAV's business and with the help of Kumawat's knowledge of NAV's unique software, processes, and algorithms, pricing models, anti-money laundering checklists and procedures, client lists, business development plans, and competitive strategies and techniques as well as his deep relationships with and intimate knowledge of the granular details of NAV's clients, especially as related to the compliance officer and money laundering reporting officer services.

154.    NAV has suffered and will continue to suffer damages and irreparable harm as a direct result of SFS's tortious interference with contractual relations, including diminished value of its confidential information, harm to its goodwill and reputation, and loss of its competitive advantage.

155.    NAV's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

156.    SFS's actions will continue to cause irreparable harm and damages to NAV if not restrained.

**WHEREFORE**, NAV prays for judgment against SFS and requests the Court grant the following relief:

A.  Entry of a Permanent Injunction against SFS, enjoining it from interfering with NAV's contractual relationships with Kumawat;

B.  For actual, compensatory, and exemplary damages to be determined at trial; and

C.  Such other and further relief the court deems as just.

## JURY DEMAND

NAV hereby asserts its right to a trial by jury.

Dated:  July 13, 2022                           Respectfully submitted,

                                                NAV CONSULTING, INC.


                                                By:  /s/ Kevin M. Cloutier
                                                        One of Its Attorneys

                                                Kevin M. Cloutier (6273805)
                                                Mikela T. Sutrina (6311408)
                                                **SHEPPARD MULLIN RICHTER & HAMPTON LLP**
                                                70 West Madison Street, 48th Floor
                                                Chicago, Illinois 60602
                                                Tel: (312) 499-6300
                                                Fax: (313) 499-6301
                                                kcloutier@sheppardmullin.com
                                                msutrina@sheppardmullin.com

## **VERIFICATION**

I, Nav Gupta, am the Chief Executive Officer for NAV Consulting, Inc. and am authorized to make this verification for and on Plaintiff's behalf. I declare that I have read the Complaint and know the contents thereof. The matters and things set forth therein are true to the best of my knowledge, except as to those matters set forth upon information and belief and, as to those, I believe them to be true; however, in compiling this information, information has been supplied by others, and I am relying in part upon their representations.

I declare under penalty of perjury that the aforesaid is true and correct.

Executed on July 13, 2022 _____
Nav Gupta
Chief Executive Officer
NAV Consulting, Inc.

# Exhibit A

## EMPLOYMENT AGREEMENT

THIS AGREEMENT is made effective on the December 1st, 2020 between Abhishek Kumawat of 1335 Bayou Path Ct, Naperville, IL 60563 (hereinafter called "the Employee") and NAV Consulting Inc., an Illinois corporation, having its office at 1 Trans Am Plaza Drive, Suite 400, Oakbrook Terrace, Illinois 60181, United States of America.

### RECITALS

WHEREAS, NAV Consulting, Inc. desires to continue to employ Employee, and Employee agrees to accept continued employment by NAV Consulting, Inc., on the terms and conditions set forth herein;

WHEREAS, The term "Company" as used in this Agreement shall mean NAV Consulting, Inc., and any of its present or future parents, subsidiaries, affiliates or organizations controlled by it, controlling it, or under common control with it, including but not limited to Back Office IT Solutions, Pvt. Ltd. ("Back Office"), and each of their respective successors and assigns;

WHEREAS, Employee acknowledges that Employee has received or will receive specialized knowledge and/or training in the Company's business, at considerable time and expense to the Company, and through such training Employee will acquire increased skills and value in the market place and will have the opportunity to gain close knowledge of and possible influence over customers and employees of the Company by reason of and during the course of Employee's employment with the Company, and will in such capacity possess the goodwill of the Company, and that this Agreement is necessary in part to protect the Company against unfair loss of said customers, employees, or goodwill;

WHEREAS, in connection with Employee's continued employment Employee will have opportunities to obtain wage increases, promotions, favorable job assignments or other improvements in compensation, benefits or responsibilities subject to the Company's discretion;

WHEREAS, Employee acknowledges and agrees that each of the provisions of this Agreement are reasonable and necessary to preserve the very strong business interest of the Company, its present and potential business activities, and the economic benefits derived therefrom; that they will not prevent him from earning a livelihood in Employee's chosen profession of accounting and are not an undue restraint on the trade of Employee, or any of the public interests which may be involved. Employee agrees and acknowledges that the relationships between the Company and its customers are of a near-permanent nature, that but for the Employee's employment by the Company, the Employee would not have had contact with the Company's customers, and that the information in which Employee has had and will have access to is of a confidential and proprietary nature, and the goodwill of the Company and/or customer relationships which the Employee has enjoyed and will enjoy while employed by the Company are significant and valuable to the Company and that the relationships between the Company and its Employees are valuable assets of the Company deserving of protection from solicitation to assist the Company in its interest in maintaining a stable work force;

WHEREAS, Employee expressly acknowledges that without the benefit of the suite of covenants of the Employee set forth in paragraphs 4 through 7 herein, the Company would not continue to employ Employee; and

WHEREAS, the restrictive covenant contained in paragraph 7 and the nondisclosure/confidentiality clause contained in paragraph 4 have been bargained for and are specifically supported by the Employee's continued employment upon the terms and conditions contained herein, including a signing bonus and a severance payment benefit in certain circumstances, and by any specialized training and knowledge Employee may hereafter receive, and the parties agree that each of the foregoing specifically enumerated items of consideration are, in and of themselves, sufficient consideration to support the covenants contained in paragraphs 4 and 7 herein;

NOW, THEREFORE, in consideration of the premises contained in this Agreement, as well as the foregoing Recitals, a cash payment of $2,000.00, and Employee's continued employment by the

Company pursuant to the terms and conditions contained herein (all of which have been specifically provided as an inducement to Employee to agree to paragraphs 4 and 7 herein below), and the other provisions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Term.** The term of this Agreement shall be from December 1st, 2020 until November 30th, 2025 (the "Term"). While employed by the Company hereunder, Employee covenants to the Company that Employee will devote Employee's entire business time, energy, attention and skill to the Company (except for permitted vacation periods and reasonable periods of illness or other incapacity), and use Employee's good faith best efforts to promote the interests of the Company. During the term of this Agreement, Employee shall not engage in employment or otherwise render services for any other person or entity, including Employee, whether as an employee, or independent contractor or otherwise, without the express written authorization of the Company. Nothing in the foregoing shall be construed as prohibiting Employee from spending such time as may be reasonably necessary to attend to Employee's personal and family affairs and investments so long as such activities do not conflict or interfere with Employee's obligations and/or timely performance of Employee's duties to the Company.

2. **Termination.**

(a) This Agreement shall terminate (*i*) on the date Employee is no longer authorized to work in the United States; (*ii*) on the date the Company determines that Employee is otherwise unable to adequately perform his essential job duties with or without a reasonable accommodation that does not impose an undue hardship on the Company, (*iii*) upon Employee's death; (*iv*) upon a termination by the Company without Cause; (*v*) upon a termination by the Company for Cause; or (*vi*) upon the voluntary termination of Employee's employment by Employee.

(b) Employee acknowledges that the Company's customers prefer continuity with their contacts at the Company and have requested to maintain one person as the primary contact for their

needs. Employee acknowledges that one of the ways the Company can provide competitive pricing to long-term customers is by getting assurances that the account managers assigned to those multi-year contracts will remain employed during for a term of multiple years. Employee further acknowledges that the Company will be providing Employee with certain leadership training and mentorship to enable Employee to be involved in strategic leadership positions within the Company involving new multi-year projects and initiatives which require Employee's unique experience and continuity of service to oversee completion of such long-term projects. Employee recognizes that the Company is making a highly valuable investment in Employee's continued employment by entering into this Agreement and its investment would be lost were Employee to resign or otherwise terminate his employment prior to the expiration of the five-year Term, and that the Company would suffer other damages including, without limitation, losses of efficiency if Employee resigned or otherwise terminated his employment prior to the expiration of the five-year Term. But for Employee's agreement to work for the Company for the full duration of the five-year Term, the Company would not provide leadership training and mentorship, permit Employee to be the account manager for long-term customers or allow Employee to assume leadership positions on special projects. For the foregoing reasons, Employee's five-year commitment is a material term to this Agreement.

If Employee's employment terminates for any reason other than those set forth in clauses (i) through (iv) of paragraph 2(a) before the fifth anniversary of the commencement of the Term, including the voluntarily resignation of Employee's employment or an involuntary termination of the Employee by the Company for Cause, Employee shall pay an early termination fee to the Company in the amount equal to four (4) months of Employee's then base salary at the time of the termination of Employee's employment ("Early Termination Fee") within thirty (30) days of the effective date of Employee's termination of employment with the Company, not as a penalty but as a reasonable estimate of the damages suffered by the Company. For purposes of this Agreement, "Cause" shall mean any of the following: (*A*) misappropriation of any monies or assets or properties of the Company; (*B*) conviction

of a felony or a crime involving moral turpitude; (*C*) gross negligence or willful misconduct; (*D*) a material breach of this Agreement not capable of cure or, if curable, not cured within fifteen (15) days of notice; (*E*) the failure or refusal of Employee to comply with Company's policies, standards and regulations, as established from time to time, whether set forth in an employee handbook or otherwise; provided, if susceptible to cure, Employee shall have thirty (30) days to cure such failure or refusal to comply with Company's policies, standards and regulations after receiving written notice of such failure or refusal; (*F*) a violation of any fiduciary duty owed by Employee to the Company; (*G*) willful refusal to perform any lawful task or duty as directed by the Company; (*H*) the failure to perform Employee's assigned duties in a matter satisfactory to the Company; provided, Employee shall have thirty (30) days to cure such failure after receiving written notice of such failure; or (*I*) chronic alcoholism or drug addiction together with Employee's refusal to cooperate with or participate in counseling and/or treatment of same. Following the voluntary or involuntary termination of Employee's employment, the parties shall have no further financial obligations to one another except as required by law or as otherwise expressly provided in this Agreement; provided, in all cases except Employee's death, Employee's contractual post-employment confidentiality, nondisclosure, developments, nonsolicitation, noncompetition and nondisparagement obligations to the Company, whether set forth in this Agreement or elsewhere ("Contractual Post-Employment Obligations"), as well as any statutory or common law post-employment obligations, shall survive and remain in full force and effect.

(c) The Parties acknowledge and agree that due to the Company's substantial investment in Employee's training and development, Employee's involvement in long term strategic projects and Employee acting as the primary account manager for several long-term customer accounts, if Employee does not continue working for the Company for the full five-year Term, the Company's business will be substantially disrupted. Due to the unknown cost of business disruption (including the delaying or disrupting special projects Employee or others in the Company are working on and

the disruption caused to customer relationships when their primary contact person unexpectedly leaves the Company) together with the uncertainties and costs involved in identifying, recruiting, hiring, and training a replacement employee, the Company's harm caused by Employee's termination prior to the expiration of the five-year Term would be impossible or very difficult to accurately estimate, and that the Early Termination Fee is a reasonable estimate of the anticipated or actual harm that might arise under those circumstances.

(d) In the event of Employee's voluntary termination of employment, Employee shall provide reasonable cooperation with Company during any resignation notice period as requested by the Company. The Company reserves the right to accelerate the effective date of Employee's voluntary termination of employment by foregoing any notice provided by Employee; provided, the acceleration of the effective date of Employee's voluntary termination of employment shall still be treated as a voluntary termination of Employee's employment by Employee, but shall not, in itself, trigger the obligation of Employee to pay the Early Termination Fee.

(e) In the event of termination without Cause prior to the completion of the Term, the Company shall continue to pay Employee his then-current monthly Gross Salary for six (6) months following the effective date of termination ("Pre-Term Salary Continuation Payments"). The Pre-Term Salary Continuation Payments shall be paid monthly, shall be reduced by any state unemployment allowance received by the Employee during the month, shall be subject to all required withholding and shall be paid on the last business day of the month. In the event of termination without Cause after the completion of the Term, the Company shall pay Employee the lesser of fifty percent (50%) of his then-current monthly Gross Salary or $5,000.00 per month, for four (4) months following the effective date of termination ("Post-Term Salary Continuation Payments"). The Post-Term Salary Continuation Payments shall be paid monthly, shall be reduced by any state unemployment allowance received by the Employee during the month, shall be subject to all required withholding, shall be paid on the last business day of the month, and shall cease if Employee begins new employment prior to the end of the

six (6) month period of time. The Pre-Term Salary Continuation Payments and the Post-Term Salary Continuation Payments are collectively referred to as the "Salary Continuation Payments." As a condition of receiving the Salary Continuation Payments, Employee shall provide the Company with a general release of claims in favor of the Company and its affiliates, and each of their predecessors and successors, and each of their respective members, shareholders, partners, directors, managers, officers, employees, agents, benefit plans, benefit plan trustees and insurers, on a form supplied by the Company ("General Release"). Further, Employee acknowledges that the Salary Continuation Payments shall also serve as partial consideration for Employee's Contractual Post-Employment Obligations. In the event Employee elects not to enter into a General Release, the Company shall pay Employee $500, less required withholding, as consideration for Employee's Contractual Post-Employment Obligations.

(f) Effective with the fifth anniversary of the commencement of the Term, the provisions in paragraphs (2)(a) through 2(e) shall no longer be in effect and the Company may terminate the employment relationship at any time, for any reason, without notice, warning or cause and Employee may terminate Employee's employment for any reason, upon sixty (60) days' written notice to the Company; provided, Employee's Post-Employment Obligations shall continue to remain in force following the expiration of the Term and shall become effective upon the termination of Employee's employment.

3. **Compensation**

The Company shall pay Employee an annual base salary during the Term as set forth in Exhibit A, subject to all required and authorized withholdings, in equal installments in accordance with the Company's regular payroll schedule. Employee shall be entitled to participate in the Company's benefits and benefit plans pursuant to the terms of and eligibility requirements of those benefits and plans.

4. **Confidential Information and Nondisclosure**

Employee recognizes that by virtue of Employee's employment with the Company, Employee will be granted otherwise prohibited access to trade secrets and other confidential and proprietary information which is not known to the Company's competitors or within the Company's industry generally, which was developed by the Company, Company affiliate Back Office, the Company's customers and the Company's prospective customers over a long period of time and/or at substantial expense, and which is confidential in nature or otherwise of great competitive value to the Company, the Company's affiliates including Back Office, and/or the Company's customers and prospective customers. Employee further recognizes that the Company has contractual confidentiality and nondisclosure obligations with its customers and prospective customers as well as statutory confidentiality and nondisclosure obligations. Employee agrees that the Company, including its affiliate Back Office, has a legitimate interest and need to maintain this information in confidence during and subsequent to his employment.

"*Confidential Information*" includes, but is not limited to, (*A*) any information for which the Company has a contractual obligation with a customer, prospective customer or other third-party to treat as confidential or to not disclose outside of the Company; (*B*) any information for which the Company has a statutory obligation to treat as confidential or to not disclose outside of the Company; (*C*) any information designated as trade secrets or which would be considered trade secrets under the Illinois Trade Secrets Act or other applicable law; (D) any information pertaining to the customized, proprietary software, methodologies, know-how, and trade secrets developed by Back Office for the benefit of NAV Consulting, Inc. and its customers; and (*E*) information relating to the following: (*i*) the Company's production practices and methods of doing business; (*ii*) sales, marketing, and service strategies, programs, and procedures; (*iii*) customers and prospective customers, including, but not limited to, their particularized requirements and preferences, their product or service specifications, the identity and authority of their key contact persons, payment methods, and service histories and

patterns; (*iv*) mail lists and e-mail lists; (*v*) pricing lists; (*vi*) pricing policies and pricing methodologies; (*vii*) prices and fees negotiated with customers and proposed to prospective customers; (*viii*) pricing structures; (*ix*) service, product and material costs; (*x*) profit margins; (*xi*) bids and responses to requests for proposals; (*xii*) vendors and sources of supply; (*xiii*) financial position and business plans; (*xiv*) computer programs, applications, databases; (*xv*) research projects; (*xvi*) new product and service developments; (*xvii*) compositions, formulas, patterns, compilations, programs, techniques, devices, processes, plans, designs, and drawings; and (*xvii*) any other information of the Company or any of its vendors, customers and prospective customers, which the Company informs Employee, or which Employee should know by virtue of Employee's position or the circumstances in which Employee learned it, is to be kept confidential. Confidential Information does not include information that is publicly available or otherwise known in the industry but not as a result of Employee's violation of Employee's obligations under this Agreement. The parties agree that Confidential Information is an extremely valuable Company asset and shall be deemed to be a "Trade Secret" pursuant to the Illinois Trade Secrets Act. Employee agrees that he has acquired Trade Secrets and other Confidential Information as a consequence of his employment with the Company and that in the event of employment by Employee in contravention to paragraph 7 below, Employee hereby covenants that he anticipates using to the Company's detriment such Trade Secrets or other Confidential Information.

(a) Employee will not, at any time during or after Employee's employment with the Company, disclose, use or permit others to use any Confidential Information, except as required in the course of Employee's employment for the benefit of the Company.

(b) Employee will take all reasonable measures during and after Employee's employment with the Company to protect the Confidential Information from any accidental or unauthorized disclosure or use.

(c) Employee shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (*1*) is made (*A*) in confidence to a federal, state, or

local government official, either directly or indirectly, or to an attorney; and (*B*) solely for the purpose of reporting or investigating a suspected violation of law; or (*2*) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Employee acknowledges that an individual suing an employer for retaliation based on the reporting of a suspected violation of law may disclose a trade secret to his or her attorney and use the trade secret information in the court proceeding, so long as any document containing the trade secret is filed under seal and the individual does not disclose the trade secret except pursuant to court order.

(d)      Employee agrees to protect, indemnify and hold the Company, and its affiliates including Back Office, harmless from and against any and all claims, demands, losses, judgments, costs, expenses, or liabilities incurred by the Company, and its affiliates including Back Office, arising out of or in connection with the breach of any representation, warranty or covenant of Employee contained in this Paragraph 4.

(e) Employee will, at any time upon the request of the Company, and in any event upon the termination of his employment, for whatever reason, immediately return and surrender to the Company originals and all copies of all records, notes, memoranda, information and documents and other property belonging to the Company, created or obtained by Employee as a result of or in the course of or in connection with Employee's employment with the Company hereunder, including Confidential Information and "Developments" (as defined herein). Employee acknowledges that all such materials are, and will always remain, the exclusive property of the Company.

5. **Developments**

Employee agrees as follows with regard to any developments that relate to the Company's business or Confidential Information, or that Employee conceives, makes, develops or acquires within the scope of his employment by the Company, including, but not limited to, any trade secrets, discoveries, inventions, improvements, ideas, programs, formulas, diagrams, designs, plans and drawings, whether or not reduced to writing, patented, copyrighted or trademarked ("***Developments***"):

(a)     Employee shall promptly and fully disclose all Developments to the Company, and shall prepare, maintain, and make available to the Company adequate and current written records of such Developments and all modifications, research, and studies made or undertaken by Employee with respect thereto.

(b)     All Developments and related records shall become and remain the exclusive property of the Company and, to the extent Employee has any rights thereto, Employee hereby assigns all such rights, title, and interest to the Company and waives any moral rights he may have in any Developments.

(c)     Upon request by the Company, Employee, at any time, whether during or after his employment by the Company, shall execute, acknowledge and deliver to the Company all assignments and other documents which the Company deems necessary or desirable to: (i) vest the Company with full and exclusive right, title, and interest to such Developments, and (ii) enable the Company to file and prosecute an application for, or acquire, maintain or enforce, all letters of patent, trademark registrations, and copyrights covering such Developments.

(d)     Employee understands that the foregoing provisions regarding assignments do not apply to any Developments for which no equipment, supplies, facility or trade secret information of the Company was used, and which were developed entirely on Employee's own time, unless the Developments: (*i*) relate to the Company's business or to its actual or demonstrably anticipated research or development, or (*ii*) result from any work performed by Employee for the Company.

(e)     Employee hereby consents to any and all uses and displays, by the Company and its agents, of the Employee's name, voice, likeness, image, appearance, and biographical information in, on or in connection with any pictures, photographs, audio and video recordings, digital images, websites, television programs and advertising, other advertising, sales, and marketing brochures, books, magazines, other publications, CDs, DVDs, tapes, and all other printed and electronic forms and media throughout the world, at any time during or after the period of Employee's employment by

the Company, for all legitimate business purposes of the Company ("Permitted Uses"). Employee hereby forever releases the Company and its directors, officers, employees, and agents from any and all claims, actions, damages, losses, costs, expenses, and liability of any kind, arising under any legal or equitable theory whatsoever at any time during or after the period of Employee's employment by the Company, in connection with any Permitted Use.

6. **Non-Disparagement**

Employee shall not (a) at any time during Employee's employment with the Company, make any disparaging, demeaning or negative remarks about the products and services offered by the Company and (b) following the termination of Employee's employment with the Company, make any disparaging, demeaning or negative remarks regarding the products or services offered by the Company or any of the Company's (including Back Office's) owners, officers, employees, consultants or other agents of the Company (collectively, "Disparaging Remarks"), whether orally in a written or digital format, including on any social media outlets. Filing a charge of discrimination with, reporting unlawful conduct to, or participating in an investigation by, the U.S. Equal Employment Opportunity Commission, the Illinois Department of Human Rights, another state or local fair employment practices agency, or another governmental agency shall not be considered a Disparaging Remark.

7. **Nonsolicitation and Noncompetition Activity Restrictions**

Employee acknowledges and agrees that each of the provisions of this Agreement are reasonable and necessary to preserve the very strong business interests of the Company, and its affiliates including Back Office, its present and potential business activities, and the economic benefits derived therefrom; that they will not prevent him from earning a livelihood in his chosen occupation and are not an undue restraint on the trade of Employee, or any of the public interests which may be involved. The provisions of this paragraph 7 have been the subject of specific bargaining between Employee and the Company, and that while it is true that it is possible that these covenants may temporarily prevent Employee from earning a livelihood at a Competitive Business (as defined herein),

they will not prevent Employee from earning a livelihood in his chosen profession of accounting or fund administration generally, and in any event: (A) they are not an undue restraint on the trade of Employee, and (B) they are not contrary to any public interests, but rather, advance public interests by enabling the Company to continue to employ Employee without undue risk to the Company which would otherwise have precluded the Company from employing or continuing to employ Employee; and Employee further expressly acknowledges the inevitability of his disclosure of the Company's Confidential Information if Employee engages in competition with the Company. Therefore, and as further protection against the unauthorized disclosure by the Employee of Confidential Information and as a further inducement for the Company to continue to employ the Employee under the terms and conditions of this Agreement, Employee agrees and acknowledges:

(a) <u>Non-Solicitation of Employees</u>. Employee agrees that the relationships between the Company (including Back Office) and the Company's and Back Office's respective employees are valuable assets of the Company and Back Office deserving of protection from solicitation to assist the Company and Back Office in their interest in maintaining a stable work force. Employee agrees that, during Employee's employment with the Company and for a period of twenty-four (24) months following the voluntary or involuntary termination of Employee's employment with the Company for any reason (the "***Restricted Period***"), Employee will not, directly or indirectly, hire, employ, engage, or attempt to hire, employ or engage any "Company Employee" (as defined herein), or otherwise solicit, request, entice, or induce any Company Employee to terminate employment or engagement with the Company. The term "***Company Employee***" means an employee of, or independent contractor engaged by, the Company, including its affiliate Back Office, with whom Employee interacted for business purposes at any time during Employee's employment with the Company and who was employed or engaged by the Company, including its affiliate Back Office, at any time within the last one hundred eighty (180) days of Employee's employment with the Company.

(b) <u>Non-Solicitation of Customers</u>. Employee acknowledges that the Company has a legitimate interest in protecting its relationship with its customers for a reasonable period of time following the termination of Employee's employment. Accordingly, Employee agrees that during the Restricted Period, Employee will not, directly or indirectly, solicit or accept business from, or provide products or services to, any Company Customer, where such business, products or services would be competitive with the Company's business, products or services. For purposes of this paragraph, the term "**Company Customer**" means (*i*) a customer of the Company to whom Employee sold, rendered or provided the Company's products or services or at any time during the twenty-four (24) month period immediately preceding the termination of Employee's employment; (*ii*) any entity for which Employee orchestrated, developed, supervised, coordinated or participated in bid submissions; or responses to requests for proposals on behalf of the Company at any time during the twelve (12) month period immediately preceding the termination of Employee's employment; or (*iii*) any entity as to which Employee acquired Confidential Information at any time during his/her employment with the Company.

(c) <u>Covenant Not to Compete</u>. Employee acknowledges the Company's legitimate interest in protecting its Confidential Information, customer relationships, and goodwill for a reasonable period of time following the termination of his employment. Employee further acknowledges that the Company, including its affiliate Back Office, has spent substantial money, time and effort on the development of the proprietary software and operational systems, that use of the proprietary software and operational systems puts the Company at a competitive advantage compared to its competitors and the Company has a legitimate interest in protecting that competitive advantage. Accordingly, Employee agrees that during the Restricted Period, Employee will not (*i*) engage in, (*ii*) own, (*iii*) manage, (*iv*) operate, (*v*) finance, (*vi*) control or (*vii*) represent, advise, or work with (whether as an officer, director, shareholder, owner, co-owner, affiliate, partner, agent, representative, employee, consultant, independent contractor, advisor, or in any other manner), in a role substantially similar to

any of the duties, responsibilities and services provided by Employee to the Company at any time during the last twenty-four (24) months of his employment with the Company, a Competitive Business. Nothing herein shall preclude Employee from owning less than one percent (1%) of any entity traded on a recognized stock exchange. Employee acknowledges that the Company markets and is capable of providing its services to customers throughout the world and that Competitive Businesses may operate throughout the world.

The term "*Competitive Business*" means an entity or person that sells or provides products or services that are competitive with those products and services (*i*) sold or provided by the Company or any of its affiliates at any time during the last twelve (12) months of Employee's employment with the Company or (*ii*) actively and demonstrably being planned by the Company on the effective date of Employee's termination and (*A*) for which Employee had any involvement on behalf of the Company or one of its affiliates at any time during the last twelve (12) months of Employee's employment with the Company or (*B*) for which Employee has Confidential Information; provided, where an entity has distinct organizational divisions, only those organizational divisions that are a Competitive Business shall be subject to the restrictions in this paragraph. A "Competitive Business" includes, but is not limited to, Sudrania Fund Services Corp., Ultimus Fund Solutions, Northern Trust Company, Alter Domus, SS&C GlobeOp Fund Administration, and Custom House Fund Services and any of their successors, assigns, affiliates, and subsidiaries that provide service and products competitive in whole or in part with the Company's products and services.

(d) <u>Non-Interference</u>. Employee agrees that during the Restricted Period, Employee will not, directly or indirectly, interfere, or attempt to interfere with any relationship the Company has with any of its vendors or suppliers.

(e) <u>Extension of Restricted Period/Tolling</u>. The Restricted Period applicable to paragraphs 7(a) through 7(d) shall be tolled until such breach or violation has been cured.

8. **<u>Survival</u>**

The parties agree that the provisions of paragraphs 2 and 4 through 7 of this Agreement survive the termination of this Agreement and Employee's employment for any reason.

9. **Injunctive Relief**

Employee acknowledges and agrees that the restrictions contained in this Agreement will not prevent or hinder him from obtaining gainful employment in the industry. Employee further acknowledges and agrees that the restrictions contained in this Agreement will not cause him any undue hardship and are reasonable and necessary in order to protect the Company's legitimate interests. Employee acknowledges and agrees that the Company has a right or interest which may be legally protected and that the benefits of granting injunctive relief to the Company would outweigh any possible injury to Employee as a result thereof. Employee acknowledges and agrees that a breach by him of his undertakings in paragraphs 4 through 7 of this Agreement will cause permanent, irreparable injury to the Company; that the actual damages incurred by Company as a result of any breach may be difficult to ascertain; and in such event the Company will have no adequate remedy at law. Therefore, in the event of any such breach, or threatened breach, in addition to such other remedies which may be provided by law or contained herein, the Company shall have the right to specific performance of the covenants contained in paragraphs 4 through 7 of this Agreement by way of temporary and/or permanent injunctive relief, as well as damages and an equitable accounting of all earnings, profits and other benefits arising from such breach, which rights shall be cumulative, all as the Company elects. Any such injunction shall be available without the posting of any bond or other security, and Employee hereby consents to the issuance of such injunction. Employee agrees that in the event the Company institutes any action to enforce and/or prosecute this Agreement in accordance with this paragraph 9, the Company shall be entitled to recover from Employee its reasonable attorneys' fees and costs if successful in such action.

10. **Severability**

The provisions of this Agreement are intended to be interpreted in a manner which makes them valid, legal, and enforceable. In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the extent and in the manner necessary to render it valid, legal and enforceable. It is expressly understood and agreed between Employee and the Company that such modification or restriction may be accomplished by mutual accord between the parties or, alternatively, by disposition of a court or arbitrator. If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any of the remaining provisions. If, in any judicial or arbitration proceeding, a judge or arbitrator should refuse to enforce any or all of the separate covenants included in Sections 7(a),(b),(c) and/or (d) because they are overly broad in scope, geographic or customer coverage, or excessive in time, then the judge or arbitrator shall modify the overly broad covenant(s) to make them reasonable and enforceable, and shall then enforce the covenant(s).

11. **Forum/Service of Process**

Employee hereby agrees that any suit, action or proceeding relating in any way to this Agreement shall be brought and enforced in the Circuit Court of Cook County, Illinois, the Circuit Court for the 18th Judicial Circuit, DuPage County, Illinois or the United States District Court for the Northern District of Illinois, Eastern Division, and Employee hereby submits to the jurisdiction of each such court. Employee hereby waives and agrees not to assert, by way of motion or otherwise, in any such suit, action or proceeding, any right of removal, any claim that Employee is not personally subject to the jurisdiction of the above-named courts, that the suit, action or proceeding is brought in an inconvenient forum or that the venue of the suit, action or proceeding is improper. Employee consents and agrees to service of process or other legal summons for purpose of any such suit, action or proceeding by registered mail addressed to Employee at Employee's address listed in the business records of the Company.

12. **Governing Law**

The construction and interpretation of Agreement and all disputes arising out of the subject matter of this Agreement shall be governed by the laws of the State of Illinois without regard to conflicts of law principles.

13. **Successors and Assigns**

This Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Company. Employee consents to the assignment by the Company or its successors of Employee's obligations under this Agreement to any other party without further consent of Employee. Employee shall not delegate his obligations under this Agreement.

14. **Entire Agreement/Modification and Amendment**

This Agreement supersedes all Company policies and practices, and all previous oral and written agreements, understandings and communications between Employee and the Company, with respect to the subject matter herein, except with respect to any other agreements or contracts imposing post-employment obligations on Employee, which shall remain in full force and effect. The failure by the Company to require the performance of any provision of this Agreement shall in no way affect the rights of the Company to enforce the same in the future, nor shall the waiver by the Company of any breach or evasion of any provision of this Agreement be interpreted as a waiver with respect to any subsequent breach or evasion. No waiver, modification or amendment of this Agreement shall be valid and enforceable unless it is in writing, is specifically designated as a waiver, modification or amendment of this Agreement, and is signed by Employee and the Company's President.

15. **Arbitration**

(a) The Company and Employee agree that, to the extent permitted by law and except as provided herein, all disputes arising from or relating to Employee's employment with the Company, the termination of that employment, this Agreement or any other dispute between the parties that might otherwise be subject to litigation in a civil court or administrative hearing or tribunal, including,

without limitation, claims alleging discrimination, harassment, the failure to pay overtime premiums as required by the Fair Labor Standards Act or analogous state laws, breach of a contractual obligation, and breach of a fiduciary duty ("Claims") must be resolved in accordance with these provisions. Employee and the Company agree that the arbitration process set forth herein shall be the exclusive means for resolving all Claims. Claims include disputes arising under federal statute or local statutes, regulations, the common law or a contract, except "Claims" do not include actions seeking equitable relief (e.g., emergency, preliminary or permanent injunctive relief), except Claims do include actions seeking declaratory relief. "Claims" also do not include proceedings before the National Labor Relations Board brought pursuant to the National Labor Relations Act or proceedings seeking benefits under a workers' compensation or unemployment insurance statute.

(b) In order to initiate the arbitration process, the party asserting the Claims must make a written demand for arbitration with the American Arbitration Association ("AAA") and serve the demand on the other party. The arbitration shall be conducted in accordance with the then existing Employment Arbitration Rules and Mediation Procedures of the AAA in effect when the demand for arbitration was served on the other party. Employee acknowledges that these Rules may be accessed from the AAA's website. The arbitration shall take place in Cook County or DuPage County, Illinois. One neutral arbitrator shall be used. No class or collective actions can be asserted in arbitration or otherwise. All Claims, whether in arbitration or otherwise, must be brought solely in Employee's or the Company's individual capacity, and not as part of a class or collective proceeding. The arbitrator shall apply the applicable law of the jurisdiction in which the Claims arose, including any statute of limitations. There shall be a stenographic record of the arbitration hearing, unless the parties agree to record the proceedings by other reliable means. The arbitrator shall issue a written decision and shall include a statement of the essential findings and conclusions upon which the decision is based. The arbitrator shall award, if appropriate, any form of individual relief, including damages and other remedies permitted by law. The arbitrator has exclusive authority to resolve any dispute relating to the

applicability or enforceability of this Agreement. However, the arbitrator may not add to, subtract or modify any of the terms of this Agreement, except as and only as expressly provided in paragraph 10 of this Agreement. The Company will pay all of the administrative costs of the arbitration, the fees and expenses of the arbitrator, the costs of recording the proceedings, and other expenses of the arbitration incurred or approved by the arbitrator. Except as otherwise provided by the applicable law for the Claims being arbitrated or as otherwise set forth herein, each party is solely responsible for that party's own individually incurred costs and attorney's fees in connection with the arbitration.

(c)     Except as may be required by law, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties. In the event that any Claims are brought by Employee or the Company in arbitration, Employee agrees that the fact that the parties are arbitrating, and the claims, defenses, counterclaims, statements made in connection with arbitration, testimony, documents produced or used in the arbitration, and all other filings and submissions shall not be disclosed directly or indirectly by Employee or Employee's attorneys or agents to third parties other than Employee's attorneys, non-party witnesses who testify in the arbitration proceedings, and the arbitrator. The parties shall take all necessary steps to facilitate the entry of a protective order by the arbitrator reflecting the provisions of this paragraph as soon as practicable in the arbitration.

16. **Counterparts**

This Agreement may be executed in one or more counterparts, all of which, taken together, shall constitute one and the same agreement.

17. **Construction**

The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party.

18. **Enforcement of Restrictive Covenants Detrimental to Back Office**

It is expressly understood and agreed by Employee that any material breach by Employee of Sections 4 or 7(a) of this Agreement which does, could or may have a detrimental impact on the Company's affiliate, Back Office (including Employee disclosing Confidential Information which was developed by Back Office for the benefit of Company in violation of Section 4 or Employee soliciting Back Office employees to separate from Back Office in violation of Section 7(a)), may be enforced by the Company on behalf of Back Office. In the event Back Office is not deemed to be a part of the Company for purposes of this Agreement, then the parties agree that Back Office shall be deemed to be a third-party beneficiary of this Agreement, with Back Office having the right to enforce the Agreement against Employee or to assign its third-party beneficiary rights, including the right to enforce Sections 4 and 7(a) of this Agreement, to the Company.

19. **Headings**

The headings in this Agreement are for the convenience of the parties but shall play no role in the interpretation of construction of the terms and provisions of this Agreement.

20. **Notification of New Employer**

In the event that Employee leaves the employ of the Company, to the extent permitted by law, Employee hereby consents to the notification of Employee's new employer of Employee's rights and obligations under this Agreement and acknowledges that the Company may send a copy or a redacted copy of this Agreement to Employee's new employer.

21. **Recitals**

The recitals contained on pages 1 and 2 of this Agreement are hereby incorporated by reference and made part of this Agreement, as if each such recital were fully restated herein.

22. **Voluntary Execution; Representations**

Employee acknowledges that (a) Employee has consulted with or has had sufficient time and the opportunity to consult with an independent attorney of Employee's own choosing concerning this Agreement; and (b) Employee has read and understands this Agreement, is competent and of sound

mind to execute this Agreement, is fully aware of the legal effect of this Agreement, and has entered into it freely based on Employee's own judgment and without duress. The Company and Employee are each sophisticated and capable of negotiating the provisions hereof.

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as dated below:

_____

Abhishek Kumawat

Dated: __11/10/2020__

NAV Consulting, Inc.

By: _____
      Nav Gupta, Its President

Dated: __11/10/2020__ (November 10, 2020)

## Exhibit A

Current Base Salary 168,000

# Exhibit B

**Sheppard**Mullin

Sheppard, Mullin, Richter & Hampton LLP
70 West Madison Street, 48th Floor
Chicago, Illinois 60602
312.499.6300 main
312.499.6301 fax
www.sheppardmullin.com

312.499.6304 direct
kcloutier@sheppardmullin.com

File Number: 81PL-359355

July 11, 2022

**VIA E-MAIL AND FEDEX OVERNIGHT**

Nilesh Sudrania
Chief Executive Officer
Sudrania Fund Services, Corp.
633 Rogers St., Suite 106
Downers Grove, IL 60515

E-Mail: nilesh.sudrania@sudrania.com

Re:    Abhishek Kumawat/Post-Employment Obligations to NAV Consulting, Inc.

Dear Mr. Sudrania:

Sheppard Mullin Richter & Hampton LLP represents NAV Consulting, Inc. and its affiliates and subsidiaries (collectively, "NAV"). It has come to our attention that Mr. Abhishek Kumawat, who resigned from NAV effective today, is planning to join Sudrania Fund Services, Corp. ("SFS"). Mr. Kumawat is subject to certain post-employment obligations to NAV pursuant to his Employment Agreement. NAV takes these obligations very seriously. The purpose of this letter is to notify you of those obligations.

Specifically, Mr. Kumawat agreed to certain ongoing restrictions and obligations in his NAV Employment Agreement, dated December 1, 2020 (the "Agreement"). The restrictions set forth in the Agreement remain in full force and effect for the restrictive periods set forth therein. To ensure SFS is on formal notice of Mr. Kumawat's Agreement, a copy is attached hereto for review and reference.

The Agreement, which Mr. Kumawat negotiated and voluntarily signed, contains several restrictions. In particular, the Agreement contains a five-year fixed term of employment (which Mr. Kumawat negotiated in exchange for a substantial raise) and prohibits Mr. Kumawat from engaging in certain competitive activity, interfering with customer and employee relationships, or disclosing proprietary and confidential information. In pertinent part, the Agreement states:

I. **Term**. The term of this Agreement shall be from December 15, 2020 until November 30th, 2025 (the "Term").

. . .

If Employee's employment terminates for any reason other than those set forth in clauses (i) through (iv) of paragraph 2(a) before the fifth anniversary

**Sheppard**Mullin

Nilesh Sudrania
July 11, 2022
Page 2

of the commencement of the Term, including the voluntarily resignation of Employee's employment or an involuntary termination of the Employee by the Company for Cause, Employee shall pay an early termination fee to the Company in the amount equal to four (4) months of Employee's then base salary at the time of the termination of Employee's employment ("Early Termination Fee") within thirty (30) days of the effective date of Employee's termination of employment with the Company, not as a penalty but as a reasonable estimate of the damages suffered by the Company.

Kumawat further agreed not to compete against NAV following his separation from NAV for a twenty-four (24) month period as follows, in pertinent part:

(c) <u>Covenant Not to Compete</u>. Employee acknowledges the Company's legitimate interest in protecting its Confidential Information, customer relationships, and goodwill for a reasonable period of time following the termination of his employment. Employee further acknowledges that the Company, including its affiliate Back Office, has spent substantial money, time and effort on the development of the proprietary software and operational systems, that use of the proprietary software and operational systems puts the Company at a competitive advantage compared to its competitors and the Company has a legitimate interest in protecting that competitive advantage. Accordingly, Employee agrees that during the Restricted Period, Employee will not (*i*) engage in, (*ii*) own, (*iii*) manage, (*iv*) operate, (*v*) finance, (*vi*) control or (*vii*) represent, advise, or work with (whether as an officer, director, shareholder, owner, co-owner, affiliate, partner, agent, representative, employee, consultant, independent contractor, advisor, or in any other manner), in a role substantially similar to any of the duties, responsibilities and services provided by Employee to the Company at any time during the last twenty-four (24) months of his employment with the Company, a Competitive Business.

. . .

The term "***Competitive Business***" means an entity or person that sells or provides products or services that are competitive with those products and services (*i*) sold or provided by the Company or any of its affiliates at any time during the last twelve (12) months of Employee's employment with the Company or (*ii*) actively and demonstrably being planned by the Company on the effective date of Employee's termination and (*A*) for which Employee had any involvement on behalf of the Company or one of its affiliates at any time during the last twelve (12) months of Employee's employment with the Company or (*B*) for which Employee has Confidential Information; provided, where an entity has distinct organizational divisions, only those organizational divisions that are a Competitive Business shall be subject to the restrictions in this paragraph. A "Competitive Business" includes, but is not limited to, Sudrania Fund Services Corp. . . .

**Sheppard**Mullin

Nilesh Sudrania
July 11, 2022
Page 3

As it relates to NAV's Confidential Information, the Agreement provides:

4.  Confidential Information and Nondisclosure

. . .

(a) Employee will not, at any time during or after Employee's employment with the Company, disclose, use or permit others to use any Confidential Information, except as required in the course of Employee's employment for the benefit of the Company.

Confidential Information is defined as:

(*A*) any information for which the Company has a contractual obligation with a customer, prospective customer or other third-party to treat as confidential or to not disclose outside of the Company; (*B*) any information for which the Company has a statutory obligation to treat as confidential or to not disclose outside of the Company; (*C*) any information designated as trade secrets or which would be considered trade secrets under the Illinois Trade Secrets Act or other applicable law; (D) any information pertaining to the customized, proprietary software, methodologies, know-how, and trade secrets developed by Back Office for the benefit of NAV Consulting, Inc. and its customers; and (*E*) information relating to the following: (*i*) the Company's production practices and methods of doing business; (*ii*) sales, marketing, and service strategies, programs, and procedures; (*iii*) customers and prospective customers, including, but not limited to, their particularized requirements and preferences, their product or service specifications, the identity and authority of their key contact persons, payment methods, and service histories and patterns; (*iv*) mail lists and e-mail lists; (*v*) pricing lists; (*vi*) pricing policies and pricing methodologies; (*vii*) prices and fees negotiated with customers and proposed to prospective customers; (viii) pricing structures; (*ix*) service, product and material costs; (*x*) profit margins; (*xi*) bids and responses to requests for proposals; (*xii*) vendors and sources of supply; (*xiii*) financial position and business plans; (xiv) computer programs, applications, databases; (*xv*) research projects; (*xvi*) new product and service developments; (*xvii*) compositions, formulas, patterns, compilations, programs, techniques, devices, processes, plans, designs, and drawings; and (*xvii*) any other information of the Company or any of its vendors, customers and prospective customers, which the Company informs Employee, or which Employee should know by virtue of Employee's position or the circumstances in which Employee learned it, is to be kept confidential.

NAV expects Mr. Kumawat to honor the contractual obligations in his Agreement and to refrain from unlawfully competing with NAV and disclosing proprietary and/or confidential

**Sheppard**Mullin

Nilesh Sudrania
July 11, 2022
Page 4

information.  Further, NAV expects SFS to not interfere with Mr. Kumawat's valid and enforceable Agreement by employing him.

Prior to his last day of employment, Mr. Kumawat informed NAV's Chief Executive Officer, Nav Gupta, he had accepted an offer with SFS, a direct competitor.  As set forth in the Agreement, Mr. Kumawat's employment with SFS is a direct violation of the Covenant Not to Compete set forth in Section 7(c).

You are hereby advised to take all necessary and appropriate steps to preserve documents, data and other evidence that may be relevant in any action relating to Mr. Kumawat's employment with SFS.  You are prohibited by law from destroying, secreting, modifying or otherwise spoliating any documents or other evidence that would have been discoverable in any dispute between or among NAV and SFS, including (but not limited to) any and all electronic or paper files, memos, correspondence, emails, social media postings/communications, texts or documents of any kind.

This letter confirms that NAV has not waived and hereby specifically reserves all rights and remedies available to it under the Agreement or otherwise under applicable law.  NAV intends to protect all of its rights, including, without limitation, under the Agreement referenced herein.

If you have questions, please contact me directly.  If you are represented by counsel, please forward this letter to your lawyer.  Thank you for your attention to this matter.


Very truly yours,

Kevin M. Cloutier
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


SMRH:4866-5571-0760.2
Enclosure

cc:     Mikela Sutrina
        Matthew Tobias
        Victoria Hubona
        Umar Sattar

## EMPLOYMENT AGREEMENT

THIS AGREEMENT is made effective on the December 1st, 2020 between Abhishek Kumawat of 1335 Bayou Path Ct, Naperville, IL 60563 (hereinafter called "the Employee") and NAV Consulting Inc., an Illinois corporation, having its office at 1 Trans Am Plaza Drive, Suite 400, Oakbrook Terrace, Illinois 60181, United States of America.

### RECITALS

WHEREAS, NAV Consulting, Inc. desires to continue to employ Employee, and Employee agrees to accept continued employment by NAV Consulting, Inc., on the terms and conditions set forth herein;

WHEREAS, The term "Company" as used in this Agreement shall mean NAV Consulting, Inc., and any of its present or future parents, subsidiaries, affiliates or organizations controlled by it, controlling it, or under common control with it, including but not limited to Back Office IT Solutions, Pvt. Ltd. ("Back Office"), and each of their respective successors and assigns;

WHEREAS, Employee acknowledges that Employee has received or will receive specialized knowledge and/or training in the Company's business, at considerable time and expense to the Company, and through such training Employee will acquire increased skills and value in the market place and will have the opportunity to gain close knowledge of and possible influence over customers and employees of the Company by reason of and during the course of Employee's employment with the Company, and will in such capacity possess the goodwill of the Company, and that this Agreement is necessary in part to protect the Company against unfair loss of said customers, employees, or goodwill;

WHEREAS, in connection with Employee's continued employment Employee will have opportunities to obtain wage increases, promotions, favorable job assignments or other improvements in compensation, benefits or responsibilities subject to the Company's discretion;

WHEREAS, Employee acknowledges and agrees that each of the provisions of this Agreement are reasonable and necessary to preserve the very strong business interest of the Company, its present and potential business activities, and the economic benefits derived therefrom; that they will not prevent him from earning a livelihood in Employee's chosen profession of accounting and are not an undue restraint on the trade of Employee, or any of the public interests which may be involved. Employee agrees and acknowledges that the relationships between the Company and its customers are of a near-permanent nature, that but for the Employee's employment by the Company, the Employee would not have had contact with the Company's customers, and that the information in which Employee has had and will have access to is of a confidential and proprietary nature, and the goodwill of the Company and/or customer relationships which the Employee has enjoyed and will enjoy while employed by the Company are significant and valuable to the Company and that the relationships between the Company and its Employees are valuable assets of the Company deserving of protection from solicitation to assist the Company in its interest in maintaining a stable work force;

WHEREAS, Employee expressly acknowledges that without the benefit of the suite of covenants of the Employee set forth in paragraphs 4 through 7 herein, the Company would not continue to employ Employee; and

WHEREAS, the restrictive covenant contained in paragraph 7 and the nondisclosure/confidentiality clause contained in paragraph 4 have been bargained for and are specifically supported by the Employee's continued employment upon the terms and conditions contained herein, including a signing bonus and a severance payment benefit in certain circumstances, and by any specialized training and knowledge Employee may hereafter receive, and the parties agree that each of the foregoing specifically enumerated items of consideration are, in and of themselves, sufficient consideration to support the covenants contained in paragraphs 4 and 7 herein;

NOW, THEREFORE, in consideration of the premises contained in this Agreement, as well as the foregoing Recitals, a cash payment of $2,000.00, and Employee's continued employment by the

Company pursuant to the terms and conditions contained herein (all of which have been specifically provided as an inducement to Employee to agree to paragraphs 4 and 7 herein below), and the other provisions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Term.** The term of this Agreement shall be from December 1st, 2020 until November 30th, 2025 (the "Term"). While employed by the Company hereunder, Employee covenants to the Company that Employee will devote Employee's entire business time, energy, attention and skill to the Company (except for permitted vacation periods and reasonable periods of illness or other incapacity), and use Employee's good faith best efforts to promote the interests of the Company. During the term of this Agreement, Employee shall not engage in employment or otherwise render services for any other person or entity, including Employee, whether as an employee, or independent contractor or otherwise, without the express written authorization of the Company. Nothing in the foregoing shall be construed as prohibiting Employee from spending such time as may be reasonably necessary to attend to Employee's personal and family affairs and investments so long as such activities do not conflict or interfere with Employee's obligations and/or timely performance of Employee's duties to the Company.

2. **Termination.**

(a) This Agreement shall terminate (*i*) on the date Employee is no longer authorized to work in the United States; (*ii*) on the date the Company determines that Employee is otherwise unable to adequately perform his essential job duties with or without a reasonable accommodation that does not impose an undue hardship on the Company, (*iii*) upon Employee's death; (*iv*) upon a termination by the Company without Cause; (*v*) upon a termination by the Company for Cause; or (*vi*) upon the voluntary termination of Employee's employment by Employee.

(b) Employee acknowledges that the Company's customers prefer continuity with their contacts at the Company and have requested to maintain one person as the primary contact for their

needs. Employee acknowledges that one of the ways the Company can provide competitive pricing to long-term customers is by getting assurances that the account managers assigned to those multi-year contracts will remain employed during for a term of multiple years. Employee further acknowledges that the Company will be providing Employee with certain leadership training and mentorship to enable Employee to be involved in strategic leadership positions within the Company involving new multi-year projects and initiatives which require Employee's unique experience and continuity of service to oversee completion of such long-term projects. Employee recognizes that the Company is making a highly valuable investment in Employee's continued employment by entering into this Agreement and its investment would be lost were Employee to resign or otherwise terminate his employment prior to the expiration of the five-year Term, and that the Company would suffer other damages including, without limitation, losses of efficiency if Employee resigned or otherwise terminated his employment prior to the expiration of the five-year Term. But for Employee's agreement to work for the Company for the full duration of the five-year Term, the Company would not provide leadership training and mentorship, permit Employee to be the account manager for long-term customers or allow Employee to assume leadership positions on special projects. For the foregoing reasons, Employee's five-year commitment is a material term to this Agreement.

If Employee's employment terminates for any reason other than those set forth in clauses (i) through (iv) of paragraph 2(a) before the fifth anniversary of the commencement of the Term, including the voluntarily resignation of Employee's employment or an involuntary termination of the Employee by the Company for Cause, Employee shall pay an early termination fee to the Company in the amount equal to four (4) months of Employee's then base salary at the time of the termination of Employee's employment ("Early Termination Fee") within thirty (30) days of the effective date of Employee's termination of employment with the Company, not as a penalty but as a reasonable estimate of the damages suffered by the Company. For purposes of this Agreement, "Cause" shall mean any of the following: (*A*) misappropriation of any monies or assets or properties of the Company; (*B*) conviction

of a felony or a crime involving moral turpitude; (*C*) gross negligence or willful misconduct; (*D*) a material breach of this Agreement not capable of cure or, if curable, not cured within fifteen (15) days of notice; (*E*) the failure or refusal of Employee to comply with Company's policies, standards and regulations, as established from time to time, whether set forth in an employee handbook or otherwise; provided, if susceptible to cure, Employee shall have thirty (30) days to cure such failure or refusal to comply with Company's policies, standards and regulations after receiving written notice of such failure or refusal; (*F*) a violation of any fiduciary duty owed by Employee to the Company; (*G*) willful refusal to perform any lawful task or duty as directed by the Company; (*H*) the failure to perform Employee's assigned duties in a matter satisfactory to the Company; provided, Employee shall have thirty (30) days to cure such failure after receiving written notice of such failure; or (*I*) chronic alcoholism or drug addiction together with Employee's refusal to cooperate with or participate in counseling and/or treatment of same. Following the voluntary or involuntary termination of Employee's employment, the parties shall have no further financial obligations to one another except as required by law or as otherwise expressly provided in this Agreement; provided, in all cases except Employee's death, Employee's contractual post-employment confidentiality, nondisclosure, developments, nonsolicitation, noncompetition and nondisparagement obligations to the Company, whether set forth in this Agreement or elsewhere ("Contractual Post-Employment Obligations"), as well as any statutory or common law post-employment obligations, shall survive and remain in full force and effect.

(c) The Parties acknowledge and agree that due to the Company's substantial investment in Employee's training and development, Employee's involvement in long term strategic projects and Employee acting as the primary account manager for several long-term customer accounts, if Employee does not continue working for the Company for the full five-year Term, the Company's business will be substantially disrupted. Due to the unknown cost of business disruption (including the delaying or disrupting special projects Employee or others in the Company are working on and

the disruption caused to customer relationships when their primary contact person unexpectedly leaves the Company) together with the uncertainties and costs involved in identifying, recruiting, hiring, and training a replacement employee, the Company's harm caused by Employee's termination prior to the expiration of the five-year Term would be impossible or very difficult to accurately estimate, and that the Early Termination Fee is a reasonable estimate of the anticipated or actual harm that might arise under those circumstances.

(d) In the event of Employee's voluntary termination of employment, Employee shall provide reasonable cooperation with Company during any resignation notice period as requested by the Company. The Company reserves the right to accelerate the effective date of Employee's voluntary termination of employment by foregoing any notice provided by Employee; provided, the acceleration of the effective date of Employee's voluntary termination of employment shall still be treated as a voluntary termination of Employee's employment by Employee, but shall not, in itself, trigger the obligation of Employee to pay the Early Termination Fee.

(e) In the event of termination without Cause prior to the completion of the Term, the Company shall continue to pay Employee his then-current monthly Gross Salary for six (6) months following the effective date of termination ("Pre-Term Salary Continuation Payments"). The Pre-Term Salary Continuation Payments shall be paid monthly, shall be reduced by any state unemployment allowance received by the Employee during the month, shall be subject to all required withholding and shall be paid on the last business day of the month. In the event of termination without Cause after the completion of the Term, the Company shall pay Employee the lesser of fifty percent (50%) of his then-current monthly Gross Salary or $5,000.00 per month, for four (4) months following the effective date of termination ("Post-Term Salary Continuation Payments"). The Post-Term Salary Continuation Payments shall be paid monthly, shall be reduced by any state unemployment allowance received by the Employee during the month, shall be subject to all required withholding, shall be paid on the last business day of the month, and shall cease if Employee begins new employment prior to the end of the

six (6) month period of time. The Pre-Term Salary Continuation Payments and the Post-Term Salary Continuation Payments are collectively referred to as the "Salary Continuation Payments." As a condition of receiving the Salary Continuation Payments, Employee shall provide the Company with a general release of claims in favor of the Company and its affiliates, and each of their predecessors and successors, and each of their respective members, shareholders, partners, directors, managers, officers, employees, agents, benefit plans, benefit plan trustees and insurers, on a form supplied by the Company ("General Release"). Further, Employee acknowledges that the Salary Continuation Payments shall also serve as partial consideration for Employee's Contractual Post-Employment Obligations. In the event Employee elects not to enter into a General Release, the Company shall pay Employee $500, less required withholding, as consideration for Employee's Contractual Post-Employment Obligations.

(f) Effective with the fifth anniversary of the commencement of the Term, the provisions in paragraphs (2)(a) through 2(e) shall no longer be in effect and the Company may terminate the employment relationship at any time, for any reason, without notice, warning or cause and Employee may terminate Employee's employment for any reason, upon sixty (60) days' written notice to the Company; provided, Employee's Post-Employment Obligations shall continue to remain in force following the expiration of the Term and shall become effective upon the termination of Employee's employment.

3. **<u>Compensation</u>**

The Company shall pay Employee an annual base salary during the Term as set forth in Exhibit A, subject to all required and authorized withholdings, in equal installments in accordance with the Company's regular payroll schedule. Employee shall be entitled to participate in the Company's benefits and benefit plans pursuant to the terms of and eligibility requirements of those benefits and plans.

4. **Confidential Information and Nondisclosure**

Employee recognizes that by virtue of Employee's employment with the Company, Employee will be granted otherwise prohibited access to trade secrets and other confidential and proprietary information which is not known to the Company's competitors or within the Company's industry generally, which was developed by the Company, Company affiliate Back Office, the Company's customers and the Company's prospective customers over a long period of time and/or at substantial expense, and which is confidential in nature or otherwise of great competitive value to the Company, the Company's affiliates including Back Office, and/or the Company's customers and prospective customers. Employee further recognizes that the Company has contractual confidentiality and nondisclosure obligations with its customers and prospective customers as well as statutory confidentiality and nondisclosure obligations. Employee agrees that the Company, including its affiliate Back Office, has a legitimate interest and need to maintain this information in confidence during and subsequent to his employment.

"*Confidential Information*" includes, but is not limited to, (*A*) any information for which the Company has a contractual obligation with a customer, prospective customer or other third-party to treat as confidential or to not disclose outside of the Company; (*B*) any information for which the Company has a statutory obligation to treat as confidential or to not disclose outside of the Company; (*C*) any information designated as trade secrets or which would be considered trade secrets under the Illinois Trade Secrets Act or other applicable law; (D) any information pertaining to the customized, proprietary software, methodologies, know-how, and trade secrets developed by Back Office for the benefit of NAV Consulting, Inc. and its customers; and (*E*) information relating to the following: (*i*) the Company's production practices and methods of doing business; (*ii*) sales, marketing, and service strategies, programs, and procedures; (*iii*) customers and prospective customers, including, but not limited to, their particularized requirements and preferences, their product or service specifications, the identity and authority of their key contact persons, payment methods, and service histories and

patterns; (*iv*) mail lists and e-mail lists; (*v*) pricing lists; (*vi*) pricing policies and pricing methodologies; (*vii*) prices and fees negotiated with customers and proposed to prospective customers; (*viii*) pricing structures; (*ix*) service, product and material costs; (*x*) profit margins; (*xi*) bids and responses to requests for proposals; (*xii*) vendors and sources of supply; (*xiii*) financial position and business plans; (*xiv*) computer programs, applications, databases; (*xv*) research projects; (*xvi*) new product and service developments; (*xvii*) compositions, formulas, patterns, compilations, programs, techniques, devices, processes, plans, designs, and drawings; and (*xvii*) any other information of the Company or any of its vendors, customers and prospective customers, which the Company informs Employee, or which Employee should know by virtue of Employee's position or the circumstances in which Employee learned it, is to be kept confidential. Confidential Information does not include information that is publicly available or otherwise known in the industry but not as a result of Employee's violation of Employee's obligations under this Agreement. The parties agree that Confidential Information is an extremely valuable Company asset and shall be deemed to be a "Trade Secret" pursuant to the Illinois Trade Secrets Act. Employee agrees that he has acquired Trade Secrets and other Confidential Information as a consequence of his employment with the Company and that in the event of employment by Employee in contravention to paragraph 7 below, Employee hereby covenants that he anticipates using to the Company's detriment such Trade Secrets or other Confidential Information.

(a)     Employee will not, at any time during or after Employee's employment with the Company, disclose, use or permit others to use any Confidential Information, except as required in the course of Employee's employment for the benefit of the Company.

(b)     Employee will take all reasonable measures during and after Employee's employment with the Company to protect the Confidential Information from any accidental or unauthorized disclosure or use.

(c)     Employee shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (*1*) is made (*A*) in confidence to a federal, state, or

local government official, either directly or indirectly, or to an attorney; and (*B*) solely for the purpose of reporting or investigating a suspected violation of law; or (*2*) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Employee acknowledges that an individual suing an employer for retaliation based on the reporting of a suspected violation of law may disclose a trade secret to his or her attorney and use the trade secret information in the court proceeding, so long as any document containing the trade secret is filed under seal and the individual does not disclose the trade secret except pursuant to court order.

(d)    Employee agrees to protect, indemnify and hold the Company, and its affiliates including Back Office, harmless from and against any and all claims, demands, losses, judgments, costs, expenses, or liabilities incurred by the Company, and its affiliates including Back Office, arising out of or in connection with the breach of any representation, warranty or covenant of Employee contained in this Paragraph 4.

(e) Employee will, at any time upon the request of the Company, and in any event upon the termination of his employment, for whatever reason, immediately return and surrender to the Company originals and all copies of all records, notes, memoranda, information and documents and other property belonging to the Company, created or obtained by Employee as a result of or in the course of or in connection with Employee's employment with the Company hereunder, including Confidential Information and "Developments" (as defined herein). Employee acknowledges that all such materials are, and will always remain, the exclusive property of the Company.

5. **Developments**

Employee agrees as follows with regard to any developments that relate to the Company's business or Confidential Information, or that Employee conceives, makes, develops or acquires within the scope of his employment by the Company, including, but not limited to, any trade secrets, discoveries, inventions, improvements, ideas, programs, formulas, diagrams, designs, plans and drawings, whether or not reduced to writing, patented, copyrighted or trademarked ("***Developments***"):

(a)     Employee shall promptly and fully disclose all Developments to the Company, and shall prepare, maintain, and make available to the Company adequate and current written records of such Developments and all modifications, research, and studies made or undertaken by Employee with respect thereto.

(b)     All Developments and related records shall become and remain the exclusive property of the Company and, to the extent Employee has any rights thereto, Employee hereby assigns all such rights, title, and interest to the Company and waives any moral rights he may have in any Developments.

(c)     Upon request by the Company, Employee, at any time, whether during or after his employment by the Company, shall execute, acknowledge and deliver to the Company all assignments and other documents which the Company deems necessary or desirable to: (i) vest the Company with full and exclusive right, title, and interest to such Developments, and (ii) enable the Company to file and prosecute an application for, or acquire, maintain or enforce, all letters of patent, trademark registrations, and copyrights covering such Developments.

(d)     Employee understands that the foregoing provisions regarding assignments do not apply to any Developments for which no equipment, supplies, facility or trade secret information of the Company was used, and which were developed entirely on Employee's own time, unless the Developments: (*i*) relate to the Company's business or to its actual or demonstrably anticipated research or development, or (*ii*) result from any work performed by Employee for the Company.

(e)     Employee hereby consents to any and all uses and displays, by the Company and its agents, of the Employee's name, voice, likeness, image, appearance, and biographical information in, on or in connection with any pictures, photographs, audio and video recordings, digital images, websites, television programs and advertising, other advertising, sales, and marketing brochures, books, magazines, other publications, CDs, DVDs, tapes, and all other printed and electronic forms and media throughout the world, at any time during or after the period of Employee's employment by

the Company, for all legitimate business purposes of the Company ("Permitted Uses"). Employee hereby forever releases the Company and its directors, officers, employees, and agents from any and all claims, actions, damages, losses, costs, expenses, and liability of any kind, arising under any legal or equitable theory whatsoever at any time during or after the period of Employee's employment by the Company, in connection with any Permitted Use.

6. **Non-Disparagement**

Employee shall not (a) at any time during Employee's employment with the Company, make any disparaging, demeaning or negative remarks about the products and services offered by the Company and (b) following the termination of Employee's employment with the Company, make any disparaging, demeaning or negative remarks regarding the products or services offered by the Company or any of the Company's (including Back Office's) owners, officers, employees, consultants or other agents of the Company (collectively, "Disparaging Remarks"), whether orally in a written or digital format, including on any social media outlets. Filing a charge of discrimination with, reporting unlawful conduct to, or participating in an investigation by, the U.S. Equal Employment Opportunity Commission, the Illinois Department of Human Rights, another state or local fair employment practices agency, or another governmental agency shall not be considered a Disparaging Remark.

7. **Nonsolicitation and Noncompetition Activity Restrictions**

Employee acknowledges and agrees that each of the provisions of this Agreement are reasonable and necessary to preserve the very strong business interests of the Company, and its affiliates including Back Office, its present and potential business activities, and the economic benefits derived therefrom; that they will not prevent him from earning a livelihood in his chosen occupation and are not an undue restraint on the trade of Employee, or any of the public interests which may be involved. The provisions of this paragraph 7 have been the subject of specific bargaining between Employee and the Company, and that while it is true that it is possible that these covenants may temporarily prevent Employee from earning a livelihood at a Competitive Business (as defined herein),

they will not prevent Employee from earning a livelihood in his chosen profession of accounting or fund administration generally, and in any event: (A) they are not an undue restraint on the trade of Employee, and (B) they are not contrary to any public interests, but rather, advance public interests by enabling the Company to continue to employ Employee without undue risk to the Company which would otherwise have precluded the Company from employing or continuing to employ Employee; and Employee further expressly acknowledges the inevitability of his disclosure of the Company's Confidential Information if Employee engages in competition with the Company. Therefore, and as further protection against the unauthorized disclosure by the Employee of Confidential Information and as a further inducement for the Company to continue to employ the Employee under the terms and conditions of this Agreement, Employee agrees and acknowledges:

(a) <u>Non-Solicitation of Employees</u>. Employee agrees that the relationships between the Company (including Back Office) and the Company's and Back Office's respective employees are valuable assets of the Company and Back Office deserving of protection from solicitation to assist the Company and Back Office in their interest in maintaining a stable work force. Employee agrees that, during Employee's employment with the Company and for a period of twenty-four (24) months following the voluntary or involuntary termination of Employee's employment with the Company for any reason (the "***Restricted Period***"), Employee will not, directly or indirectly, hire, employ, engage, or attempt to hire, employ or engage any "Company Employee" (as defined herein), or otherwise solicit, request, entice, or induce any Company Employee to terminate  employment or engagement with the Company. The term "***Company Employee***" means an employee of, or independent contractor engaged by, the Company, including its affiliate Back Office, with whom Employee interacted for business purposes at any time during Employee's employment with the Company and who was employed or engaged by the Company, including its affiliate Back Office, at any time within the last one hundred eighty (180) days of Employee's employment with the Company.

(b) <u>Non-Solicitation of Customers</u>. Employee acknowledges that the Company has a legitimate interest in protecting its relationship with its customers for a reasonable period of time following the termination of Employee's employment. Accordingly, Employee agrees that during the Restricted Period, Employee will not, directly or indirectly, solicit or accept business from, or provide products or services to, any Company Customer, where such business, products or services would be competitive with the Company's business, products or services. For purposes of this paragraph, the term "**Company Customer**" means (*i*) a customer of the Company to whom Employee sold, rendered or provided the Company's products or services or at any time during the twenty-four (24) month period immediately preceding the termination of Employee's employment; (*ii*) any entity for which Employee orchestrated, developed, supervised, coordinated or participated in bid submissions; or responses to requests for proposals on behalf of the Company at any time during the twelve (12) month period immediately preceding the termination of Employee's employment; or (*iii*) any entity as to which Employee acquired Confidential Information at any time during his/her employment with the Company.

(c) <u>Covenant Not to Compete</u>. Employee acknowledges the Company's legitimate interest in protecting its Confidential Information, customer relationships, and goodwill for a reasonable period of time following the termination of his employment. Employee further acknowledges that the Company, including its affiliate Back Office, has spent substantial money, time and effort on the development of the proprietary software and operational systems, that use of the proprietary software and operational systems puts the Company at a competitive advantage compared to its competitors and the Company has a legitimate interest in protecting that competitive advantage. Accordingly, Employee agrees that during the Restricted Period, Employee will not (*i*) engage in, (*ii*) own, (*iii*) manage, (*iv*) operate, (*v*) finance, (*vi*) control or (*vii*) represent, advise, or work with (whether as an officer, director, shareholder, owner, co-owner, affiliate, partner, agent, representative, employee, consultant, independent contractor, advisor, or in any other manner), in a role substantially similar to

any of the duties, responsibilities and services provided by Employee to the Company at any time during the last twenty-four (24) months of his employment with the Company, a Competitive Business. Nothing herein shall preclude Employee from owning less than one percent (1%) of any entity traded on a recognized stock exchange. Employee acknowledges that the Company markets and is capable of providing its services to customers throughout the world and that Competitive Businesses may operate throughout the world.

The term "*Competitive Business*" means an entity or person that sells or provides products or services that are competitive with those products and services (*i*) sold or provided by the Company or any of its affiliates at any time during the last twelve (12) months of Employee's employment with the Company or (*ii*) actively and demonstrably being planned by the Company on the effective date of Employee's termination and (*A*) for which Employee had any involvement on behalf of the Company or one of its affiliates at any time during the last twelve (12) months of Employee's employment with the Company or (*B*) for which Employee has Confidential Information; provided, where an entity has distinct organizational divisions, only those organizational divisions that are a Competitive Business shall be subject to the restrictions in this paragraph. A "Competitive Business" includes, but is not limited to, Sudrania Fund Services Corp., Ultimus Fund Solutions, Northern Trust Company, Alter Domus, SS&C GlobeOp Fund Administration, and Custom House Fund Services and any of their successors, assigns, affiliates, and subsidiaries that provide service and products competitive in whole or in part with the Company's products and services.

(d) <u>Non-Interference</u>. Employee agrees that during the Restricted Period, Employee will not, directly or indirectly, interfere, or attempt to interfere with any relationship the Company has with any of its vendors or suppliers.

(e) <u>Extension of Restricted Period/Tolling</u>. The Restricted Period applicable to paragraphs 7(a) through 7(d) shall be tolled until such breach or violation has been cured.

8. **<u>Survival</u>**

The parties agree that the provisions of paragraphs 2 and 4 through 7 of this Agreement survive the termination of this Agreement and Employee's employment for any reason.

9. **Injunctive Relief**

Employee acknowledges and agrees that the restrictions contained in this Agreement will not prevent or hinder him from obtaining gainful employment in the industry. Employee further acknowledges and agrees that the restrictions contained in this Agreement will not cause him any undue hardship and are reasonable and necessary in order to protect the Company's legitimate interests. Employee acknowledges and agrees that the Company has a right or interest which may be legally protected and that the benefits of granting injunctive relief to the Company would outweigh any possible injury to Employee as a result thereof. Employee acknowledges and agrees that a breach by him of his undertakings in paragraphs 4 through 7 of this Agreement will cause permanent, irreparable injury to the Company; that the actual damages incurred by Company as a result of any breach may be difficult to ascertain; and in such event the Company will have no adequate remedy at law. Therefore, in the event of any such breach, or threatened breach, in addition to such other remedies which may be provided by law or contained herein, the Company shall have the right to specific performance of the covenants contained in paragraphs 4 through 7 of this Agreement by way of temporary and/or permanent injunctive relief, as well as damages and an equitable accounting of all earnings, profits and other benefits arising from such breach, which rights shall be cumulative, all as the Company elects. Any such injunction shall be available without the posting of any bond or other security, and Employee hereby consents to the issuance of such injunction. Employee agrees that in the event the Company institutes any action to enforce and/or prosecute this Agreement in accordance with this paragraph 9, the Company shall be entitled to recover from Employee its reasonable attorneys' fees and costs if successful in such action.

10. **Severability**

The provisions of this Agreement are intended to be interpreted in a manner which makes them valid, legal, and enforceable. In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the extent and in the manner necessary to render it valid, legal and enforceable. It is expressly understood and agreed between Employee and the Company that such modification or restriction may be accomplished by mutual accord between the parties or, alternatively, by disposition of a court or arbitrator. If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any of the remaining provisions. If, in any judicial or arbitration proceeding, a judge or arbitrator should refuse to enforce any or all of the separate covenants included in Sections 7(a),(b),(c) and/or (d) because they are overly broad in scope, geographic or customer coverage, or excessive in time, then the judge or arbitrator shall modify the overly broad covenant(s) to make them reasonable and enforceable, and shall then enforce the covenant(s).

11. **Forum/Service of Process**

Employee hereby agrees that any suit, action or proceeding relating in any way to this Agreement shall be brought and enforced in the Circuit Court of Cook County, Illinois, the Circuit Court for the 18th Judicial Circuit, DuPage County, Illinois or the United States District Court for the Northern District of Illinois, Eastern Division, and Employee hereby submits to the jurisdiction of each such court. Employee hereby waives and agrees not to assert, by way of motion or otherwise, in any such suit, action or proceeding, any right of removal, any claim that Employee is not personally subject to the jurisdiction of the above-named courts, that the suit, action or proceeding is brought in an inconvenient forum or that the venue of the suit, action or proceeding is improper. Employee consents and agrees to service of process or other legal summons for purpose of any such suit, action or proceeding by registered mail addressed to Employee at Employee's address listed in the business records of the Company.

12. **Governing Law**

The construction and interpretation of Agreement and all disputes arising out of the subject matter of this Agreement shall be governed by the laws of the State of Illinois without regard to conflicts of law principles.

13. **Successors and Assigns**

This Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Company. Employee consents to the assignment by the Company or its successors of Employee's obligations under this Agreement to any other party without further consent of Employee. Employee shall not delegate his obligations under this Agreement.

14. **Entire Agreement/Modification and Amendment**

This Agreement supersedes all Company policies and practices, and all previous oral and written agreements, understandings and communications between Employee and the Company, with respect to the subject matter herein, except with respect to any other agreements or contracts imposing post-employment obligations on Employee, which shall remain in full force and effect. The failure by the Company to require the performance of any provision of this Agreement shall in no way affect the rights of the Company to enforce the same in the future, nor shall the waiver by the Company of any breach or evasion of any provision of this Agreement be interpreted as a waiver with respect to any subsequent breach or evasion. No waiver, modification or amendment of this Agreement shall be valid and enforceable unless it is in writing, is specifically designated as a waiver, modification or amendment of this Agreement, and is signed by Employee and the Company's President.

15. **Arbitration**

(a) The Company and Employee agree that, to the extent permitted by law and except as provided herein, all disputes arising from or relating to Employee's employment with the Company, the termination of that employment, this Agreement or any other dispute between the parties that might otherwise be subject to litigation in a civil court or administrative hearing or tribunal, including,

without limitation, claims alleging discrimination, harassment, the failure to pay overtime premiums as required by the Fair Labor Standards Act or analogous state laws, breach of a contractual obligation, and breach of a fiduciary duty ("Claims") must be resolved in accordance with these provisions. Employee and the Company agree that the arbitration process set forth herein shall be the exclusive means for resolving all Claims. Claims include disputes arising under federal statute or local statutes, regulations, the common law or a contract, except "Claims" do not include actions seeking equitable relief (e.g., emergency, preliminary or permanent injunctive relief), except Claims do include actions seeking declaratory relief. "Claims" also do not include proceedings before the National Labor Relations Board brought pursuant to the National Labor Relations Act or proceedings seeking benefits under a workers' compensation or unemployment insurance statute.

(b) In order to initiate the arbitration process, the party asserting the Claims must make a written demand for arbitration with the American Arbitration Association ("AAA") and serve the demand on the other party. The arbitration shall be conducted in accordance with the then existing Employment Arbitration Rules and Mediation Procedures of the AAA in effect when the demand for arbitration was served on the other party. Employee acknowledges that these Rules may be accessed from the AAA's website. The arbitration shall take place in Cook County or DuPage County, Illinois. One neutral arbitrator shall be used. No class or collective actions can be asserted in arbitration or otherwise. All Claims, whether in arbitration or otherwise, must be brought solely in Employee's or the Company's individual capacity, and not as part of a class or collective proceeding. The arbitrator shall apply the applicable law of the jurisdiction in which the Claims arose, including any statute of limitations. There shall be a stenographic record of the arbitration hearing, unless the parties agree to record the proceedings by other reliable means. The arbitrator shall issue a written decision and shall include a statement of the essential findings and conclusions upon which the decision is based. The arbitrator shall award, if appropriate, any form of individual relief, including damages and other remedies permitted by law. The arbitrator has exclusive authority to resolve any dispute relating to the

applicability or enforceability of this Agreement. However, the arbitrator may not add to, subtract or modify any of the terms of this Agreement, except as and only as expressly provided in paragraph 10 of this Agreement. The Company will pay all of the administrative costs of the arbitration, the fees and expenses of the arbitrator, the costs of recording the proceedings, and other expenses of the arbitration incurred or approved by the arbitrator. Except as otherwise provided by the applicable law for the Claims being arbitrated or as otherwise set forth herein, each party is solely responsible for that party's own individually incurred costs and attorney's fees in connection with the arbitration.

(c)     Except as may be required by law, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties. In the event that any Claims are brought by Employee or the Company in arbitration, Employee agrees that the fact that the parties are arbitrating, and the claims, defenses, counterclaims, statements made in connection with arbitration, testimony, documents produced or used in the arbitration, and all other filings and submissions shall not be disclosed directly or indirectly by Employee or Employee's attorneys or agents to third parties other than Employee's attorneys, non-party witnesses who testify in the arbitration proceedings, and the arbitrator. The parties shall take all necessary steps to facilitate the entry of a protective order by the arbitrator reflecting the provisions of this paragraph as soon as practicable in the arbitration.

16. **Counterparts**

This Agreement may be executed in one or more counterparts, all of which, taken together, shall constitute one and the same agreement.

17. **Construction**

The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party.

18. **Enforcement of Restrictive Covenants Detrimental to Back Office**

It is expressly understood and agreed by Employee that any material breach by Employee of Sections 4 or 7(a) of this Agreement which does, could or may have a detrimental impact on the Company's affiliate, Back Office (including Employee disclosing Confidential Information which was developed by Back Office for the benefit of Company in violation of Section 4 or Employee soliciting Back Office employees to separate from Back Office in violation of Section 7(a)), may be enforced by the Company on behalf of Back Office. In the event Back Office is not deemed to be a part of the Company for purposes of this Agreement, then the parties agree that Back Office shall be deemed to be a third-party beneficiary of this Agreement, with Back Office having the right to enforce the Agreement against Employee or to assign its third-party beneficiary rights, including the right to enforce Sections 4 and 7(a) of this Agreement, to the Company.

19. **Headings**

The headings in this Agreement are for the convenience of the parties but shall play no role in the interpretation of construction of the terms and provisions of this Agreement.

20. **Notification of New Employer**

In the event that Employee leaves the employ of the Company, to the extent permitted by law, Employee hereby consents to the notification of Employee's new employer of Employee's rights and obligations under this Agreement and acknowledges that the Company may send a copy or a redacted copy of this Agreement to Employee's new employer.

21. **Recitals**

The recitals contained on pages 1 and 2 of this Agreement are hereby incorporated by reference and made part of this Agreement, as if each such recital were fully restated herein.

22. **Voluntary Execution; Representations**

Employee acknowledges that (a) Employee has consulted with or has had sufficient time and the opportunity to consult with an independent attorney of Employee's own choosing concerning this Agreement; and (b) Employee has read and understands this Agreement, is competent and of sound

mind to execute this Agreement, is fully aware of the legal effect of this Agreement, and has entered

into it freely based on Employee's own judgment and without duress. The Company and Employee

are each sophisticated and capable of negotiating the provisions hereof.

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as dated below:

Abhishek Kumawat

Dated: 11 | 10 | 2020

NAV Consulting, Inc.

By: _____

Nav Gupta, Its President

Dated: _____ (November 10, 2020)

**Exhibit A**

Current Base Salary 168,000