**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| NAV CONSULTING, INC., an Illinois Corporation, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:22-cv-3624 |
| | ) | |
| v. | ) | |
| | ) | |
| ABHISHEK KUMAWAT, an individual, and | ) | |
| SUDRANIA FUND SERVICES, CORP., an | ) | |
| Illinois Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF NAV CONSULTING, INC.'S**
**MEMORANDUM IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................1

RELEVANT FACTUAL BACKGROUND................................................2

I.      NAV'S BUSINESS ...............................................................2

II.     KUMAWAT'S EMPLOYMENT WITH NAV ............................3

       A.    Kumawat's Agreement with NAV...............................5

       B.    Kumawat's Resignation ............................................8

III.    NAV AND SFS ARE DIRECT COMPETITORS. ......................10

ARGUMENT ..........................................................................................11

I.      LEGAL STANDARD............................................................11

II.     NAV HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS. ...................11

       A.    NAV is Likely to Succeed on the Merits of its Breach of Contract Claim Against Kumawat....................................................111

            (i)    Kumawat's Agreement Is a Valid and Enforceable Contract...................12

                   (1)    The Non-Competition Covenant in the Agreement is Ancillary to a Valid Relationship and Supported by Adequate Consideration...................12

                   (2)    The Non-Competition Covenant is Reasonable and Necessary to Protect NAV's Legitimate Business Interests. .........13

                   (3)    The Temporal and Geographic Limits Are Reasonable Given Kumawat's Knowledge and the Scope of NAV's Business. ..................15

            (ii)   NAV Satisfies the Remaining Elements of its Breach of Contract Claim..................17

       B.    NAV Is Likely to Succeed on the Merits of Its Misappropriation of Trade Secrets Claims Against Kumawat.........................200

            (i)    NAV's Pricing, Client Information, Products, Services, Business Plans and Strategies Constitute Trade Secrets. ............................21

            (ii)   Disclosure of NAV's Trade Secrets is Threatened and Imminent............25

       C.    SFS Tortiously Interfered With Kumawat's Agreement. ...................27

III.    NAV WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION.................288

IV.    NAV LACKS AN ADEQUATE REMEDY AT LAW.................29

V.    THE BALANCE OF HARDSHIPS FAVORS NAV AND THE ISSUANCE OF
      A PRELIMINARY INJUNCTION WILL NOT HARM THE PUBLIC
      INTEREST.................................................................................................................300

CONCLUSION.........................................................................................................................322

# TABLE OF AUTHORITIES

**Page(s)**

<u>Federal Cases</u>

*Allied Waste Servs. of N. Am., LLC v. Tibble*
177 F. Supp. 3d 1103 (N.D. Ill. 2016) ...................................................25

*Brunswick Corp. v. Jones*
784 F.2d 271 (7th Cir. 1986) ...............................................................32

*Computer Assocs. Int'l v. Quest Software, Inc.*
333 F. Supp. 2d 688 (N.D. Ill. 2004) .....................................................29

*Cumulus Radio Corp. v. Olson*
No. 15-cv-1067, 2015 U.S. Dist. LEXIS 199398
(C.D. Ill. Mar. 17, 2015) ....................................................................13

*E\*TRADE Fin. Corp. v. Pospisil*
2018 WL 4205401 (N.D. Ill. Sept. 4, 2018) ............................................30

*Fire 'Em Up, Inc. v. Technocarb Equipment (2004) Ltd.*
799 F. Supp. 2d 846 (N.D. Ill. 2011) .....................................................24

*Fisher/Unitech, Inc. v. Computer Aided Tech., Inc.*
2013 WL 1446425 (N.D. Ill. Apr. 9, 2013) .............................................15

*Groupon, Inc. v. Sung Shin*
21 C 6082, 2022 WL 60526 (N.D. Ill. Jan. 6, 2022) ....................... *passim*

*HCAFranchise Corp. v. Alisch*
2016 WL 10706285 (N.D. Ind. Aug. 12, 2016).........................................30

*IDS Fin. Servs., Inc. v. Smithson*
843 F. Supp. 415 (N.D. Ill. 1994) .........................................................29

*Inmar, Inc. v. Vargas*
2018 WL 6716701 (N.D. Ill. Dec. 21, 2018)............................................24

*Jabil Inc. v. Essentium, Inc.*
No. 19-cv-1567, U.S. Dist. LEXIS 258736
(M.D. Fla. May 29, 2020)....................................................................28

*Lucini Italia Co. v. Grappolini*
2003 WL 1989605 (N.D. Ill. April 28, 2003)............................................32

*Medcor, Inc. v. Garcia*
No. 21-cv-2164, 2022 U.S. Dist. LEXIS 6761
(N.D. Ill. Jan. 13, 2022) .....................................................................................25, 27, 28, 32

*Mickey's Linen v. Fischer*
2017 WL 3970593 (N.D. Ill. Sep. 8, 2017) ....................................................................15, 27

*Molon Motor & Coil Corp. v. Nidec Motor Corp.*
No. 16 C 03545, 2017 WL 1954531 (N.D. Ill. May 11, 2017) .............................................26

*My Favorite Muffin, Too, Inc. v. Maosheng Wu*
2002 WL 826483 (N.D. Ill. Apr. 29, 2002) .........................................................................17

*Nortek Prod. (Taicang) Ltd. v. FNA Grp., Inc.*
No. 10-cv-2813, 2011 WL 2110043 (N.D. Ill. May 24, 2011).............................................17

*Packaging Corp. of Am., Inc. v. Croner*
419 F. Supp. 3d 1059 (N.D. Ill. 2020) .................................................................................21

*PepsiCo, Inc. v. Redmond*
54 F.3d 1262 (7th Cir. 1995) ...............................................................................21, 24, 25

*RKI, Inc. v. Grimes*
177 F. Supp. 2d 859 (N.D. Ill. 2001) ...................................................................................25

*RKI, Inc. v. Grimes*
200 F. Supp. 2d 916 (N.D. Ill. 2002) .............................................................................27, 28

*Sabre Indus. v. Waller*
No. 18-CV-2111, 2021 U.S. Dist. LEXIS 248580
(C.D. Ill. Aug. 12, 2021) ......................................................................................................15

*Traffic Tech, Inc. v. Kreiter*
No. 14-cv-7528, 2015 U.S. Dist. LEXIS 169248
(N.D. Ill. Dec. 18, 2015) ......................................................................................................13

*Vendavo, Inc. v. Long*
397 F. Supp. 3d 1115 (N.D. Ill. 2019) .................................................................................25

*W. Capra Consulting Grp., Inc. v. Snyder*
No. 19-cv-4188, 2019 WL 3935045 (N.D. Ill. Aug. 20, 2019) ...................................17, 31, 32

State Cases

*Creative Entm't v. Lorenz*
638 N.E.2d 217 (Ill. App. Ct. 1994) ....................................................................................13

*Liebert Corp. v. Mazur*
  357 Ill. App. 3d 265 (2005) .................................................................22

*McElroy, Inc. v. Delaney*
  72 Ill. App. 3d 285 (Ill. App. Ct. 1st Dist. 1979) ...........................15, 17

*McInnis v. OAG Motorcycle Ventures, Inc.*
  35 N.E.3d 1076 (Ill. App. Ct. 2015) ...................................................13

*Millard Maint. Serv. Co. v. Bernero*
  566 N.E.2d 379 (Ill. App. Ct. 1990) ...................................................15

*Mohanty*,
  225 Ill. 2d at 78 ..................................................................................16

*Prairie Rheumatology Assocs., S.C. v. Francis*
  24 N.E.3d 58 (Ill. App. Ct. 3d Dist. 2014)..........................................12

*Reliable Fire Equip. Co. v. Arredondo*
  965 N.E.2d 393 (Ill. 2011) .....................................................12, 13, 14

*Scheffel Fin. Servs., Inc. v. Heil*
  16 N.E.3d 385 (Ill. App. Ct. 2014) .....................................................15

*Torrence v. Hewitt Assocs.*
  493 N.E.2d 74 (Ill. App. Ct. 1st Dist. 1986) .......................................17

*Wolff v. Bethany N. Suburban Grp.*
  2021 IL App (1st) 191858 (Ill. App. Ct. 1st Dist. 2021) .....................12

Docketed Cases

*Zabaneh Franchises LLC v. Walker*
  2012 Il App ...................................................................................14, 16

Federal: Statutes, Rules, Regulations, Constitutional Provisions

Defend Trade Secrets Act .........................................................11, 21, 22, 25

Federal Rules of Civil Procedure
  Rule 65 ...................................................................................................1

Title 18 United States Code
  § 1836(b)(1) .........................................................................................21
  § 1836(b)(3) .........................................................................................25
  § 1839(3).............................................................................................22

State: Statutes, Rules, Regulations, Constitutional Provisions

735 Illinois Compiled Statutes (ILCS)
    $ 1065/3(a)................................................................................................25
    § 1065/2(d)...............................................................................................22

Illinois Trade Secrets Act............................................................................11, 21, 25

Other Authorities

Restatement (Second) of Torts
    § 766 Comment m......................................................................................28
    § 768 Comment i.........................................................................................28

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff NAV Consulting, Inc. ("NAV") respectfully moves for a preliminary injunction enjoining Defendant Abhishek Kumawat ("Kumawat") from breaching his contractual obligations to NAV and from using NAV's trade secret information and enjoining Defendant Sudrania Fund Services, Corp. ("SFS") from tortiously interfering with Kumawat's valid and enforceable employment agreement.

## PRELIMINARY STATEMENT

NAV is a hedge fund administrator providing services in fund accounting in a specialized and competitive industry. Kumawat, a high-level NAV employee, resigned from NAV to join direct competitor SFS in a competing role. As a result of his position and long tenure with NAV, Kumawat has intimate knowledge of NAV's confidential information and trade secrets. In November 2020, in exchange for a $2,000 signing bonus, a significant raise, and continued access to NAV's confidential, proprietary and trade secret information, Kumawat agreed to a valid and reasonable Employment Agreement (the "Agreement") which contained a five-year employment term and reasonable post-employment protective covenants. Yet, in July 2022, Kumawat resigned from NAV to join SFS in a role that not only violates the Agreement, but risks NAV's confidential, proprietary and trade secret information.

SFS, just like NAV, is a hedge fund administrator. In fact, SFS was founded by a former NAV employee, Nilesh Sudrania ("Sudrania"), and is one of NAV's main competitors in this highly specialized and hyper-competitive space. SFS has been unfairly targeting and competing with NAV since its inception. SFS, with full knowledge of the Agreement and its non-compete provision, hired Kumawat and induced him to breach the Agreement. SFS wants to capitalize on Kumawat's deep knowledge of NAV's clients, products, offerings, pricing, growth strategy, innovations, and other processes to unfairly strengthen its competitive position and to harm NAV.

Kumawat is obligated to honor the express promises he made to NAV, and for which he was provided sufficient consideration. As Kumawat himself acknowledged, NAV will suffer irreparable harm if he breaks his promises. And, his employment with SFS will undoubtedly cause NAV irreparable harm in that it will inevitably require him to use, divulge, and rely on NAV's critical trade secrets. Without preliminary injunctive relief from the Court, NAV will suffer irreparable harm and Defendants will unjustifiably benefit from their unlawful conduct. NAV now seeks injunctive relief to protect its business from immediate and continued irreparable harm as a result of Defendants' conduct.[1]

## **RELEVANT FACTUAL BACKGROUND**

## I. **NAV'S BUSINESS.**

Nav Gupta founded NAV Fund Consulting in 1991. (Ver. Compl. at ¶ 12). NAV specializes in hedge fund administration and provides services in fund accounting and registrar and transfer agency ("RTA") functions, including portfolio accounting, bookkeeping, record keeping, net asset value calculation, daily reconciliation, daily reporting, investor statement distribution, preparation of U.S. Federal and state tax returns, preparation of financials, and other regulatory reporting and support. (*Id.*). NAV's clients are located around the world, and it provides its services globally. (*Id.*).

NAV's clients select NAV based on its customized offerings, competitive pricing, and customer service focus. (*Id.* at ¶ 15). NAV provides specialized services in different fund and compliance sectors, including crypto, private equity, and anti-money laundering. (*Id.*). In order to do this, NAV has invested years and millions of dollars in creating, in-house, unique and

---

[1] NAV stands ready to submit an additional, record-based memorandum of law in support of its Motion for Preliminary Injunctive Relief in advance of or following an evidentiary hearing on NAV's Motion, per the Court's instruction.

proprietary software, processes, and algorithms, all of which it uses daily in providing its services to clients. (*Id.* at ¶¶ 18-19).

To keep a competitive advantage against other hedge fund administrators, NAV invests in constantly adapting and updating its processes, solutions, and offerings. (*Id.* at ¶ 18). NAV utilizes a back office in Jaipur, India, NAV Back Office, to provide support to its U.S. operations. (*Id.* at ¶ 14). NAV Back Office allows NAV to offer its clients efficient solutions at competitive prices. (*Id.* at ¶ 17). NAV's U.S. employees work as the "faces" of NAV. (*Id.* at ¶ 13). NAV employs its business leaders' on-the-ground experience working directly with clients as the "faces" of NAV and their specializations in different sectors of NAV in order to shape its business plans and competitive strategy. (*Id.*).

## II. KUMAWAT'S EMPLOYMENT WITH NAV.

Kumawat worked for NAV from December 2007 to July 2022. (*Id.* at ¶¶ 20, 24). Kumawat was first hired as an Account Manager and was later promoted to a Senior Account Manager. (*Id.*). In these roles, Kumawat served as the "face" of NAV, interacting directly with clients to provide NAV's various customized and proprietary services. (*Id.*). Kumawat became intimately familiar with the granular details of his clients, including their assets under management ("AUM"), budgets, needs, goals, and pricing structure that has worked for them. (*Id.* at ¶¶ 25-26). Kumawat's knowledge of and familiarity with these details were critical in his successful performance of his account management roles. (*Id.*). As a result of his success in these roles, NAV promoted him to Vice President of Fund Accounting & Compliance in May 2020. (*Id.* at ¶ 20). Kumawat was a highly compensated employee both in terms of his salary, bonuses, and the significant raise he received in January 2021. At the time of his resignation, he earned in excess of $200,000 in salary alone. (*Id.* at ¶ 56).

In his role as NAV's Vice President of Fund Accounting & Compliance, Kumawat worked closely with sensitive client information to run due diligence on prospective clients and perform risk assessments. (*Id.* at ¶ 21). Kumawat was required to have an extensive understanding of clients' businesses and operations. (*Id.*). To provide compliance reporting services, Kumawat acquired a deep understanding of NAV's clients' processes, structures, and plans as it related to their funds. (*Id.*)

Kumawat had direct access to and intimate knowledge of NAV's confidential anti-money laundering checklists and procedures, which Kumawat used in his capacity as multiple NAV clients' deputy money laundering reporting officer. (*Id.* at ¶ 22). The anti-money laundering checklists and procedures were created in-house by NAV. (*Id.*). As the deputy money laundering reporting officer for multiple NAV clients, Kumawat used his knowledge of NAV's pricing models and strategy to independently determine pricing and fees for the anti-money laundering compliance officer and money laundering reporting officer services offered to NAV's clients. (*Id.*). He also prepared the service agreements for all anti-money laundering officer and money laundering reporting officer services, which included the granular details of the terms and scope of the business relationships between NAV and its clients. (*Id.*). Kumawat maintained the list of NAV's customers requiring anti-money laundering officer services. (*Id.*).

Kumawat was also responsible for business development, which included cross-selling NAV's services to existing and prospective clients, and participating in development of new solutions to meet client needs. (*Id.* at ¶ 23). As part of these duties, Kumawat coordinated presentations and demos for existing and prospective clients on NAV's systems, applications, and other services. (*Id.*). Kumawat developed an in-depth knowledge of NAV's client and investor

portals. Kumawat also prepared client proposals and service agreements, and had intimate knowledge of the terms of such agreements. (*Id.*).

Kumawat had access to NAV's unique software, processes, and algorithms, pricing models, business development plans, and competitive strategies and techniques. (*Id.* at ¶ 26). This information is highly confidential, and only a select set of employees at NAV have access to this information. (*Id.*). Kumawat worked directly with NAV's leadership to develop strategies and processes to grow NAV's business and client relations. (*Id.*). Kumawat used this information to further develop NAV's growth and expansion plans as well as its offerings in order to acquire an advantage over its competitors and a larger share of the hedge fund administration services market. (*Id.*).

In addition to the information to which Kumawat was exposed in performing his duties, Kumawat also participated in multiple high-level meetings where specific performance, revenue, client, and strategy details were discussed with NAV's key leaders. (*Id.* at ¶ 28). Through these confidential meetings with NAV's leaders, Kumawat further learned about NAV's precise pricing models, growth and development plans, and competitive strategy to acquire more market share. (*Id.*). He actively participated in helping mold NAV's plans and strategies by using his role as NAV's compliance leader and experience dealing with all of NAV's clients' needs, particularly in the compliance sphere, to provide insight and shape NAV's future processes and endeavors. (*Id.*).

## A.    Kumawat's Agreement with NAV

Kumawat held a critical role in NAV's business as its Vice President of Fund Accounting & Compliance. (*Id.* at ¶ 33). Further, Kumawat's role was a key component of NAV's plans to build and grow its business. (*Id.*). NAV knew it would be difficult to replace Kumawat based on the nature of his role, his time with the company, and the critical function he served for

NAV.  (*Id.*).  Thus, in November 2020, NAV and Kumawat negotiated an Employment Agreement.  (*Id.*).

NAV offered Kumawat the security of a fixed-term of employment for five years.  (*Id.* at ¶ 36).  Kumawat was given the option to sign a four or five year term agreement, and he requested to sign a five year term agreement in exchange for a negotiated raise.  (*Id.* at ¶ 34).  The Agreement also included post-employment restrictive covenants.  (*Id.* at ¶ 38).  In consideration of a $2,000 signing bonus, access to NAV's trade secrets and proprietary and confidential information, a $17,500 raise, and guaranteed employment for a period of five years, Kumawat executed the Agreement on November 10, 2020.  (*Id.* at ¶ 36).

The Agreement contains, among other things, provisions detailing the agreed-to five year term of employment and restrictive covenants, including non-solicitation and non-competition provisions.  (*Id.* at ¶¶ 37-41).  In particular, Kumawat agreed not to compete against NAV for a period of twenty-four (24) months following his separation from NAV.  The non-competition provision provides, in pertinent part:

> (c) <u>Covenant Not to Compete</u>. Employee acknowledges the Company's legitimate interest in protecting its Confidential Information, customer relationships, and goodwill for a reasonable period of time following the termination of his employment. Employee further acknowledges that the Company, including its affiliate Back Office, has spent substantial money, time and effort on the development of the proprietary software and operational systems, that use of the proprietary software and operational systems puts the Company at a competitive advantage compared to its competitors and the Company has a legitimate interest in protecting that competitive advantage. Accordingly, Employee agrees that during the Restricted Period, Employee will not (*i*) engage in, (*ii*) own, (*iii*) manage, (*iv*) operate, (*v*) finance, (*vi*) control or (*vii*) represent, advise, or work with (whether as an officer, director, shareholder, owner, co-owner, affiliate, partner, agent, representative, employee, consultant, independent contractor, advisor, or in any other manner), in a role substantially similar to any of the duties, responsibilities and services provided by Employee to the Company at any time during the last twenty-four (24) months of his employment with the Company, a Competitive Business.

. . .

The term "*Competitive Business*" means an entity or person that sells or provides products or services that are competitive with those products and services (*i*) sold or provided by the Company or any of its affiliates at any time during the last twelve (12) months of Employee's employment with the Company or (*ii*) actively and demonstrably being planned by the Company on the effective date of Employee's termination and (*A*) for which Employee had any involvement on behalf of the Company or one of its affiliates at any time during the last twelve (12) months of Employee's employment with the Company or (*B*) for which Employee has Confidential Information; provided, where an entity has distinct organizational divisions, only those organizational divisions that are a Competitive Business shall be subject to the restrictions in this paragraph. A "Competitive Business" includes, but is not limited to, Sudrania Fund Services Corp. . . .

(*See* Ver. Compl., <u>Exhibit A</u> thereto, ¶ 7(c)).

The Agreement further prohibits Kumawat from using, disclosing or transmitting NAV's Confidential Information. (*See* Ver. Compl., <u>Ex. A</u>, ¶ 4(a)). The Agreement details Confidential Information to include:

(*A*) any information for which the Company has a contractual obligation with a customer, prospective customer or other third-party to treat as confidential or to not disclose outside of the Company; (*B*) any information for which the Company has a statutory obligation to treat as confidential or to not disclose outside of the Company; (*C*) any information designated as trade secrets or which would be considered trade secrets under the Illinois Trade Secrets Act or other applicable law; (D) any information pertaining to the customized, proprietary software, methodologies, know-how, and trade secrets developed by Back Office for the benefit of NAV Consulting, Inc. and its customers; and (*E*) information relating to the following: (*i*) the Company's production practices and methods of doing business; (*ii*) sales, marketing, and service strategies, programs, and procedures; (*iii*) customers and prospective customers, including, but not limited to, their particularized requirements and preferences, their product or service specifications, the identity and authority of their key contact persons, payment methods, and service histories and patterns; (*iv*) mail lists and e-mail lists; (*v*) pricing lists; (*vi*) pricing policies and pricing methodologies; (*vii*) prices and fees negotiated with customers and proposed to prospective customers; (viii) pricing structures; (*ix*) service, product and material costs; (*x*) profit margins; (*xi*) bids and responses to requests for proposals; (*xii*) vendors and sources of supply; (*xiii*) financial position and business plans; (xiv) computer programs, applications, databases; (*xv*) research projects; (*xvi*) new product and service developments; (*xvii*) compositions, formulas, patterns, compilations, programs, techniques, devices, processes, plans, designs, and drawings; and (*xvii*) any other information of the Company or any of its vendors, customers and prospective customers, which the Company informs

Employee, or which Employee should know by virtue of Employee's position or
the circumstances in which Employee learned it, is to be kept confidential.

(*See* Ver. Compl., Ex. A, ¶ 4.)

By executing the Agreement, Kumawat acknowledged the Agreement's covenants were
reasonable and necessary to preserve NAV's strong business interests, its present and potential
business activities, and the economic benefits derived therefrom. (*See* Ver. Compl., Ex. A, ¶ 7).
Kumawat also agreed that violations of his contractual obligations would cause permanent,
irreparable injury to NAV for which there would be no adequate remedy at law. (Ver. Compl. at
¶ 43). He further agreed NAV would be entitled to injunctive relief and/or a decree for specific
performance, and such other relief as may be proper if he violated or threatened to violate his
contractual obligations to NAV. (*See* Ver. Compl., Ex. A, ¶ 9).

### B. Kumawat's Resignation.

Kumawat announced his resignation on May 12, 2022 via email. (Ver. Compl. at ¶ 47).
He told Gupta he was leaving to join SFS, but he refused to specify the position in which he would
be working for SFS. (*Id.* at ¶ 48). Kumawat confirmed that SFS was giving him stock options.
(*Id.* at ¶ 49).

On May 16, 2022, days after announcing his intent to resign from NAV and join direct
competitor SFS, Kumawat accessed NAV's "take-over file" housed in a shared NAV Outlook
mailbox, which houses confidential and proprietary information regarding client funds which
NAV is in the process of taking over as fund administrator from a competing fund administrator,
such as SFS. (*Id.* at ¶ 51). Kumawat searched this database using the term "Sudrania." (*Id.*).
Based on the information present in this database, Kumawat accessed information regarding
pricing options made to funds moving from SFS to NAV (and others). (*Id.*). Such information is
incredibly sensitive and would significantly damage NAV if provided to a competitor like SFS.

-8-

(*Id.*).  Kumawat did not have a legitimate reason to access this database to conduct these searches.  (*Id.*).  With this information, SFS would have direct knowledge of the pricing NAV is offering prospects and could use this information to improperly compete with NAV by undercutting NAV's proposal.  (*Id.*).  In fact, one of the customer leads that Kumawat viewed during this search subsequently decided to keep its account with SFS and not move to NAV.  (*Id.* at ¶ 52).

On June 6, 2022, Kumawat again searched a shared Outlook mailbox for a specific colleague's lead, which had previously informed NAV it was not interested in moving its fund accounting services to NAV.  (*Id.* at ¶ 53).  Kumawat had no prior relationship with this lead and was not copied on emails with this lead.  (*Id.*).  Even if a lead does not become a NAV client, lead files contain intimate details on prospective clients, such as contact information, needs, and desired pricing, which may be used in later discussions with the lead should they wish to explore changing administrators again.  (*Id.*).  This is the exact information a competitor, such as SFS, could use to undercut NAV and unfairly steal its prospective clients.  (*Id.*).

Kumawat's final day at NAV was July 11, 2022.  (*Id.* at ¶ 54).  On his last day, NAV had a meeting with Kumawat to again remind him of and discuss his post-employment commitments to NAV.  (*Id.*).  Kumawat was uncooperative and again refused to confirm he was taking a non-competitive role.  (*Id.*).  Based on the highly competitive nature of NAV and SFS, the significant similarities in the services they provide to the exact same type of customers, and the critical duties Kumawat performed for NAV, it is only reasonable to believe he is joining SFS in a role that is substantially similar to the one he held at NAV.  (*Id.* at ¶ 74).  On July 11, 2022, counsel for NAV sent SFS a letter summarizing the terms of Kumawat's Agreement and attached a copy thereto.  (*Id.*).  SFS did not respond.  (*Id.* at ¶ 69).

### III.    NAV AND SFS ARE DIRECT COMPETITORS.

NAV considers SFS to be one of its primary competitors, even explicitly clarifying as much in its employment agreements.  (*See* Ver. Compl., Ex. A, ¶ 7(c)).  Sudrania, a former NAV Vice President, founded SFS in 2015.  (Ver. Compl. at ¶ 57).  SFS, like NAV, is a hedge fund administrator.  (*Id.*).  Like NAV, SFS provides hedge fund administration services such as fund accounting, net asset value calculation, daily reconciliation, daily reporting, investor statement distribution, preparation of U.S. Federal and state tax returns, preparation of financials, and other regulatory reporting and support.[2]  (*Id.* ¶ 58).

SFS mirrors NAV's services and structure, even using a back office system in India to provide support to its U.S. operations just like NAV.  (*Id.* at ¶ 60).  SFS provides the same offerings and services the same sectors in which NAV specializes, including crypto, anti-money laundering, and compliance.  (*Id.* at ¶¶ 64-65).

In order to grow its business to compete with NAV, Sudrania and SFS have targeted NAV in the past and routinely hire its employees to increase SFS's own competitive edge and to harm NAV.  (*Id.* at ¶ 62).  Sudrania and SFS particularly target employees Sudrania worked with while at NAV who have the expertise and experience to help SFS remain competitive with NAV, such as Kumawat.  (*Id.* at ¶ 69).

Finally, while working for NAV, Sudrania worked directly and closely with Kumawat.  (*Id.*).  Sudrania, just like Kumawat, also signed an employment agreement while at NAV containing similar restrictive covenants to those in the Agreement at issue here.  (*Id.*).  Through his years of employment and his role as Vice President, Sudrania and SFS are aware that NAV's

---

[2] SFS "rebranded" as Formidium, which has "two sub-brands": Formidium Fund Services and Formidium Technologies.  The "rebrand" has yet to be rolled out.  As of July 12, 2022, Formidium is not registered with the Illinois Secretary of State and Sudrania Fund Services, Corp. remains the active operating entity.

employment agreements contain post-employment obligations and restrictive covenants. (*Id.*).

## ARGUMENT

## I. LEGAL STANDARD

In order to obtain a preliminary injunction, NAV must establish: "(1) without this relief, it will suffer irreparable harm; (2) traditional legal remedies would be inadequate; and (3) it has some likelihood of prevailing on the merits of its claims." *Groupon, Inc. v. Sung Shin*, 21 C 6082, 2022 WL 60526, at *2 (N.D. Ill. Jan. 6, 2022) (citing *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020)). Upon a showing of these factors, the court "proceeds to a balancing analysis, where the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Id*. NAV is entitled to preliminary injunctive relief because it satisfies each of the requisite factors. The record evidence from both expedited discovery and the preliminary injunction hearing will further establish that NAV has satisfied each of these factors warranting an injunction against Defendants.

## II. NAV HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS.

NAV's Verified Complaint creates a strong *prima facie* showing that Kumawat has breached and will continue to breach his Agreement by virtue of his work for SFS. NAV will also likely succeed on the merits of its threatened misappropriation of trade secrets claims under the Illinois Trade Secrets Act ("ITSA") and the Defend Trade Secrets Act ("DTSA"). Finally, NAV will likely succeed on the merits of its tortious interference with contract claim against SFS.

### A. NAV is Likely to Succeed on the Merits of its Breach of Contract Claim Against Kumawat.

Kumawat unquestionably breached and will continue to breach the Agreement, which is a valid and enforceable contract. The essential elements of a breach of contract claim are: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the

defendant; and (4) resulting injury to the plaintiff. *Wolff v. Bethany N. Suburban Grp.*, 2021 IL App (1st) 191858, ¶ 62 (Ill. App. Ct. 1st Dist. 2021). NAV's Verified Complaint satisfies all four elements.

**(i)**      **Kumawat's Agreement Is a Valid and Enforceable Contract.**

*(1)*      *The Non-Competition Covenant in the Agreement is Ancillary to a Valid Relationship and Supported by Adequate Consideration.*

The Agreement's restrictive covenant is supported by valid consideration and is reasonably necessary to protect NAV's legitimate business interests. Under Illinois law, "a restrictive covenant will be upheld if it contains a reasonable restraint and the agreement is supported by consideration." *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396 (Ill. 2011). Prior to undertaking this reasonableness analysis, Illinois courts make two determinations.

Initially, the court must find that the covenant is ancillary to either a valid transaction or a valid relationship; then, "the court must determine whether there is adequate consideration to support the covenant." *Prairie Rheumatology Assocs., S.C. v. Francis*, 24 N.E.3d 58, 62 (Ill. App. Ct. 3d Dist. 2014). Both determinations are satisfied here.

The first requirement is squarely met: the restrictive covenants are contained within Kumawat's employment agreement with NAV, into which he entered based on his employment with NAV. *See Cumulus Radio Corp. v. Olson*, No. 15-cv-1067, 2015 U.S. Dist. LEXIS 199398, at *23 (C.D. Ill. Mar. 17, 2015) (holding the "ancillary" requirement is met where restrictive covenants are contained within an employment agreement and the employee agreed to the covenants as part of his employment with the employer).

Second, adequate consideration supports the Agreement's restrictive covenant. In exchange for entering into the Agreement, NAV provided Kumawat with a guaranteed employment for five years, a $2,000 signing bonus, a significant raise, and access to NAV's trade secrets and

-12-

confidential information, as described herein. (Ver. Compl. at ¶¶ 78-80). These benefits constitute adequate consideration to support a restrictive covenant under Illinois law. *See McInnis v. OAG Motorcycle Ventures, Inc.*, 35 N.E.3d 1076, 1084 (Ill. App. Ct. 2015) (highlighting additional incentives, such as a bonus, are adequate consideration for a restrictive covenant); *Traffic Tech, Inc. v. Kreiter*, No. 14-cv-7528, 2015 U.S. Dist. LEXIS 169248, at *63 (N.D. Ill. Dec. 18, 2015) (finding consideration was likely adequate where an employer provided an employee a sign-on bonus, the employee worked for nine months, and the employee voluntarily resigned). And, the Agreement's guaranteed term of employment for five years, by itself, constitutes adequate consideration for the restrictive covenants. *See generally Creative Entm't v. Lorenz*, 638 N.E.2d 217, 220 (Ill. App. Ct. 1994) (citing *Lyle R. Jager Agency, Inc., v. Steward*, 625 N.E.2d 397 (Ill. App. Ct. 1993)) (noting an employment agreement containing restrictive covenants was valid where the agreement spelled out a definite employment term of two years).

### (2) The Non-Competition Covenant is Reasonable and Necessary to Protect NAV's Legitimate Business Interests.

The Agreement also satisfies the reasonableness requirement under Illinois law. "A noncompete agreement is valid if it is reasonable and necessary to protect the legitimate business interests of the employer." *Groupon, Inc.*, 2022 WL 60526 at *3; *see also Reliable Fire*, 965 N.E.2d at 396 (a noncompete is enforceable as long as it is "no greater than is required for the protection of a legitimate business interest of the employer-promisee…") (citations omitted). The Illinois Supreme Court has held "whether a legitimate business interest exists is based on the totality of the facts and circumstances of the individual case." *Id.* at 403. Accordingly, "[e]ach case must be determined on its own particular facts" and "[r]easonableness is gauged not just by some but by *all* of the circumstances." *Id.* (internal quotations and citation omitted); *see also Zabaneh Franchises*, 972 N.E.2d 344, 350 (Ill. App. Ct. 4th Dist. 2012) (courts determine the

reasonableness of restrictive terms in light of the competing interests between the unfair restraint of employee's trade and employer's interest in protecting proprietary information").

The non-compete obligations in Kumawat's Agreement are reasonably related to the protection of NAV's legitimate business interests. Kumawat had unfettered access to a wide array of proprietary data, specifically NAV's pricing models, proprietary products, technology and algorithms, its business plans, client identities, client AUMs, client operations, and clients' wants, needs, and budgets. (Ver. Compl. at ¶¶ 20-23). Kumawat was also familiar with NAV's growth strategies and business development initiatives. (*Id.* at ¶ 26).

Kumawat's role at NAV exposed him to the identities of NAV's former, current, and prospective clients; their needs; and the strategies, both effective and ineffective, utilized to achieve the objective of securing client spend. (*Id.* at ¶ 30). Indeed, throughout his career, Kumawat functioned as the "face of NAV" for over 200 client accounts. (*Id.* at ¶ 24). He had intimate knowledge of NAV's pricing models and strategy, which allowed him to negotiate and offer pricing to clients based on a client's budget and needs. (*Id.* at ¶ 25). This confidential information allowed Kumawat to maintain his relationship with NAV's clients so that he could provide them with outstanding service. (*Id.*).

Protecting this information constitutes a legitimate interest under Illinois law. *See, e.g., Fisher/Unitech, Inc. v. Computer Aided Tech., Inc.*, 2013 WL 1446425, at *3 (N.D. Ill. Apr. 9, 2013) ("There is no question that protecting confidential operational and customer information is a legitimate, protectable business interest of an employer"); *Mickey's Linen v. Fischer*, 2017 WL 3970593, at *17 (N.D. Ill. Sep. 8, 2017) (finding a restrictive covenant reasonable and enforceable against a former employee where an employer had a legitimate interest in confidential information). And, it is well-settled in Illinois that long-term customer relationships constitute

protectable interests justifying enforcement of a non-compete. *See, e.g.*, *Sabre Indus. v. Waller*, No. 18-CV-2111, 2021 U.S. Dist. LEXIS 248580, at *36 (C.D. Ill. Aug. 12, 2021) (finding a plaintiff has a protectable interest in its near-permanent customer relationships); *Scheffel Fin. Servs., Inc. v. Heil*, 16 N.E.3d 385, 392-93 (Ill. App. Ct. 2014) (finding a plaintiff has a protectable interest in its clients with whom it has near permanent relationships); *Millard Maint. Serv. Co. v. Bernero*, 566 N.E.2d 379, 386 (Ill. App. Ct. 1990) ("In Illinois, an employer has a protectable interest in its customers.").

Finally, Kumawat's expansive knowledge of NAV's various client offerings and pricing models gives Kumawat the precise tools and information to help SFS unfairly compete with NAV for clients' limited dollars. (Ver. Compl. at ¶¶ 51, 115). The Agreement is unquestionably necessary to protect NAV's legitimate business interests. *See McElroy, Inc. v. Delaney*, 72 Ill. App. 3d 285, 292-93 (Ill. App. Ct. 1st Dist. 1979) (holding the "advantage gained by the potential use of confidential information is a legitimate business interest protectable by [a restrictive] covenant").

### (3) The Temporal and Geographic Limits Are Reasonable Given Kumawat's Knowledge and the Scope of NAV's Business.

The tailored restrictions in Kumawat's Agreement are commensurate with those enforced by Illinois courts. Given the highly confidential and specialized nature of Kumawat's knowledge, the narrow limitations of the Agreement's non-compete provision are valid, enforceable, and "manifestly reasonable" under Illinois law. *Groupon Inc.*, 2022 WL 60526 at *3.

This Court's recent decision in *Groupon Inc. v. Shin* is illustrative. In that case, Shin, a high-level executive of Groupon, left to join competitor Yelp. *Id.* Shin was subject to a non-compete agreement which "prevent[ed] Mr. Shin from working in a position similar to his role at Groupon with any competitors of Groupon for 18 months." *Id.* The court found the agreement was "reasonable and enforceable" under "standard limitations of time and geography used by

courts in assessing such restrictions." *Id*. In fact, the court found such restrictions were "manifestly reasonable." *Id*.

Here, Kumawat is similarly restricted from competing with NAV by working for a competitor in a role "substantially similar" to the one he held with NAV for twenty-four months after his last day of employment. (Ver. Compl. at ¶ 81). Kumawat was also actively involved in the negotiation of the terms of his Agreement and had a full understanding of the obligations therein. (*Id.* at ¶¶ 33-35). As set forth in *Groupon*, these provisions are "manifestly reasonable," especially considering Kumawat's high-level role and access to confidential information. *Groupon, Inc.,* 2022 WL 60525, at *3. The information to which Kumawat had access does not have a brief "shelf-life" as he had access to not only the most critical and sensitive information relating to NAV's proprietary technology and software and its past and current client base, but also its long-term growth strategies and future innovations. (Ver. Compl. at ¶ 28). Further, Illinois courts regularly uphold time restrictions for twenty-four months or longer. *See, e.g., Mohanty*, 225 Ill. 2d at 78 (three- and five-year restrictions); *Zabaneh Franchises LLC v. Walker*, 2012 Il App (4th) 110215 (two years); *My Favorite Muffin, Too, Inc. v. Maosheng Wu*, 2002 WL 826483 (N.D. Ill. Apr. 29, 2002) (two years).

Similarly, the lack of a geographic restriction in Kumawat's non-compete covenant does not render the Agreement unreasonable. *Nortek Prod. (Taicang) Ltd. v. FNA Grp., Inc.*, No. 10-cv-2813, 2011 WL 2110043, at *4 (N.D. Ill. May 24, 2011) (holding that restrictive covenants that lack geographic limitations are not *per se* unreasonable in Illinois). In general, a geographic limitation is not unreasonable if it is coextensive with the area in which the employer does business. *See, e.g.*, *Torrence v. Hewitt Assocs.*, 493 N.E.2d 74, 78 (Ill. App. Ct. 1st Dist. 1986); *McElroy*, 72 Ill. App. 3d at 293. Here, the lack of a geographic restriction is reasonable given the

global nature of NAV's business, its clients and customers, and its competitors. (Ver. Compl. at ¶ 12). Kumawat gained specialized knowledge and familiarity with these global clients and customers, further supporting such a restriction. *See W. Capra Consulting Grp., Inc. v. Snyder*, No. 19-cv-4188, 2019 WL 3935045, at *9 (N.D. Ill. Aug. 20, 2019) ("covenants containing no geographic limitations have been upheld as reasonable where the purpose of the restriction was to protect the employer from losing customers to a former employee who, by virtue of his employment, gained special knowledge and familiarity with the customers' requirements.").

The Agreement is reasonable, valid, and enforceable under Illinois law and NAV will easily satisfy this element of its breach of contract claim.

### (ii) NAV Satisfies the Remaining Elements of its Breach of Contract Claim.

NAV performed its obligations under the Agreement in employing Kumawat and providing the agreed-to compensation and benefits. Yet, despite the binding nature of this Agreement, Kumawat has and continues to materially breach the Agreement.

The Agreement's non-competition provision provides that Kumawat shall "not (*i*) engage in, (*ii*) own, (*iii*) manage, (*iv*) operate, (*v*) finance, (*vi*) control or (*vii*) represent, advise, or work with (whether as an officer, director, shareholder, owner, co-owner, affiliate, partner, agent, representative, employee, consultant, independent contractor, advisor, or in any other manner), in a role substantially similar to any of the duties, responsibilities and services provided by Employee to the Company at any time during the last twenty-four (24) months of his employment with the Company, a Competitive Business." (*See* Ver. Compl., Ex. A, ¶ 7(c)).

There is no question that SFS is a "competitive business." SFS is explicitly named in the agreement as a "Competitive Business." (*See id.*). The facts also support this conclusion. SFS, like NAV, is a hedge fund administrator. (Ver. Compl. at ¶ 57). SFS was founded by NAV's

former employee, Sudrania, in June 2015. (*Id.*). Like NAV, SFS provides hedge fund administration services such as fund accounting, net asset value calculation, daily reconciliation, daily reporting, investor statement distribution, preparation of U.S. Federal and state tax returns, preparation of financials, anti-money laundering and other regulatory reporting and support. (*Id.* at ¶ 58). SFS is NAV's direct competitor as both companies provide the same services and compete for the same hedge fund clients to provide the same hedge fund administration services. (*Id.* at ¶ 59). Ultimately, SFS and NAV compete for the same clients in a highly competitive and specialized space. (*Id.*).

Kumawat refused to confirm that he was taking a non-competitive role at SFS. (*Id.* at ¶ 48). His, and SFS's, silence speaks volumes. Based on the highly competitive nature of NAV and SFS, the significant similarities in the services they provide to the exact same type of customers, and the critical duties Kumawat performed for NAV, it is only reasonable to believe he is joining SFS in a role that is substantially similar to the one he held at NAV. (*Id.* at ¶ 74). Why else would he join a direct competitor? And in the days following his resignation but before he officially departed NAV, Kumawat accessed information regarding customer leads and files that NAV was in the process of taking over from SFS. (*Id.* at ¶¶ 100-101). This information is highly competitive and sensitive. (*Id.*). Kumawat had no legitimate reason to access this information other than to obtain information to help him compete with NAV at SFS. (*Id.*). Accordingly, upon information and belief, Kumawat's role at SFS is directly competitive, if not identical, to his former role at NAV. (*Id.* at ¶ 74).

Kumawat was NAV's client-centered specialist. (*Id.* at ¶ 20). He worked extensively and intimately with NAV's clients and prospective clients to understand their needs based upon their growth and budgeting. (*Id.*). Kumawat further used this information to develop NAV's precise

pricing models, development plans, and competitive strategy to ensure retention of NAV's clients but also to acquire more of its competitors' clients. (*Id.* at ¶ 22). Similarly in his new role, Kumawat will be client-focused, where he will work to develop and implement strategies and plans tailored to attract clients. (*Id.* at ¶ 74). These are the *same exact* clients NAV targets and for which NAV and SFS compete. (*Id.* at ¶ 72).

Second, and also in violation of the Agreement's non-competition provision, Kumawat will be responsible for and access confidential information similar or relevant to that which he had access to at NAV. (*Id.* at ¶ 75). Kumawat agreed to "not, at any time during or after Employee's employment with the Company, disclose, use or permit others to use any Confidential Information, except as required in the course of Employee's employment for the benefit of the Company." (*See* Ver. Compl., Ex. A, ¶ 4(a)). At SFS, Kumawat will use and rely on his knowledge of NAV's offerings, services, and pricing to implement strategies and pricing models to obtain new clients and undercut NAV. (Ver. Compl. at ¶ 75). Just as in his role at NAV, Kumawat will study and analyze clients' needs and wants, their budgets and goals, all in furtherance of driving revenue to SFS and away from NAV. (*Id.* at ¶¶ 28, 75). This is the very same confidential information that Kumawat was exposed to and relied upon during his tenure at NAV. (*Id.*).

Both roles require Kumawat to access and to rely upon information related to software, processes, and algorithms, pricing models, business development plans, and competitive strategies and technique, to gain client spend. (*Id.*). Ultimately, and in direct violation of the Agreement, Kumawat's role at SFS mirrors that of his former role at NAV and demands he assume responsibility for and access data relating to pricing strategies and fund administration. (*Id.*). At NAV, Kumawat not only had access to this information, but he helped develop it based on his intimate knowledge of his clients' confidential information, including their budgets, needs, and

goals. (*Id.* at ¶ 23). This was built and maintained over a number of years and required significant investment from NAV. (*Id.* at ¶¶ 28-31). Here, Kumawat will simply walk into his new role at SFS with this confidential information and rely upon it to assist SFS in unfairly competing.

Kumawat has breached his obligations under the Agreement and will continue to breach by performing substantially similar job duties and responsibilities with SFS, and by necessarily using NAV's confidential information and trade secrets. Kumawat's use and disclosure of NAV's confidential information has, and will continue to, damage NAV. Accordingly, NAV has demonstrated a substantial likelihood of success on the merits of its breach of contract claim. *See Groupon, Inc.*, 2022 WL 60526 at *3 (finding a plaintiff employer satisfied its burden in showing likelihood of success on the merits of a breach of contract claim where a former employee is employed with a competitor in a similar position to the one he held in violation of an agreement).

**B.      NAV Is Likely to Succeed on the Merits of Its Misappropriation of Trade Secrets Claims Against Kumawat.**

Kumawat has already improperly accessed and likely misappropriated NAV's trade secrets and his role at SFS further threatens to misappropriate trade secrets in violation of the ITSA and DTSA. Under the ITSA, to establish trade secret misappropriation, a plaintiff must show (1) the existence of a trade secret and (2) misappropriation. *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1268 (7th Cir. 1995). Likewise, to establish trade secret misappropriation under the DTSA, a plaintiff must prove (1) that the relevant information is a trade secret and (2) that the defendant misappropriated the trade secret within the meaning of § 1836(b)(1). *See Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1066 (N.D. Ill. 2020). NAV is able to demonstrate a likelihood of success as to each of these elements because Kumawat's employment with SFS creates a real and imminent threat of misappropriation.

### (i)     NAV's Pricing, Client Information, Products, Services, Business Plans and Strategies Constitute Trade Secrets.

NAV's Verified Complaint establishes a likelihood of success on the merits of its misappropriation claims because its client identities and related sensitive information, pricing strategies and models, software processes and algorithms, and business development plans and competitive strategies, curated and developed from client-centered metrics, data, and confidential information, constitute trade secrets under Illinois and federal law. The ITSA defines a "trade secret" as:

> [I]nformation, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

735 ILCS 1065/2(d).

Illinois courts consider six factors when deciding whether a trade secret exists: (1) the extent to which the information is known outside the plaintiff's business; (2) the extent to which it is known by employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff and to the plaintiff's competitors; (5) the amount of effort or money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Liebert Corp. v. Mazur*, 357 Ill. App. 3d 265, 277 (2005).

Under the DTSA, a trade secret is defined as follows:

> "[A]ll forms and types of financial, business, scientific, technical, economic, or engineering information including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically,

photographically, or in writing if – (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]"

18 U.S.C. § 1839(3). The information at issue satisfies either definition.

Kumawat regularly and intimately accessed, reviewed, and even developed, NAV's confidential information and trade secrets. (Ver. Compl. at ¶ 26). Kumawat's role required day-to-day interaction with NAV's unique software, processes, and algorithms. (*Id*.). Kumawat's participation in NAV's high-level executive meetings exposed him to NAV's critical performance metrics, including NAV's precise pricing models, growth and development plans, and competitive strategies. (*Id.* at ¶ 28). Kumawat was also actively involved in NAV's business development endeavors, including presentations and demos of client and investor portals to prospective clients and cross-selling services to existing clients. (*Id.* at ¶ 23). Kumawat also had direct access to and intimate knowledge of NAV's confidential anti-money laundering checklists and procedures, which Kumawat used in his capacity as multiple NAV clients' deputy money laundering reporting officer. (*Id.* at ¶ 22).

On a more granular level, Kumawat had regular direct contact with NAV's clients and had intimate knowledge of NAV's clients' AUMs, needs, and goals. (*Id.* at ¶ 25). This, in turn, provided Kumawat the tools to work to develop cutting-edge and top-notch pricing models and strategies that set NAV apart from its competitors. (*Id.*).

Kumawat has already engaged in conduct demonstrating a proclivity to misappropriate. Just days after Kumawat announced his resignation, he accessed NAV's "take-over file" Outlook mailbox database, which houses confidential information regarding client funds which NAV is in the process of taking over as fund administrator from a competitor. (*Id.* at ¶¶ 51-53). Kumawat searched this database using the term "Sudrania." (*Id.*). Kumawat had no legitimate reason to

conduct these searches. (*Id.*). Based on the information present in this database, Kumawat accessed information regarding pricing options made to funds moving from SFS to NAV, and NAV subsequently lost one of these customers who opted to stay with SFS. (*Id.*). Kumawat also searched a shared Outlook mailbox a specific colleague's lead, which had previously informed NAV it was not interested in moving its fund accounting services to NAV. (*Id.*). Kumawat had no prior relationship with this lead and was not copied on emails with this lead. (*Id.*). Kumawat took these actions to obtain competitive information for the direct competitor he planned to join in a few short weeks. Why else would he access this database and run these searches? This information can be used to significantly harm NAV to SFS's benefit. (*Id.*).

NAV invested years as well as substantial resources and money to generate its specialized software processes, technology and algorithms to best meet its clients' needs and effectively compete in the industry. (*Id.* at ¶ 15). NAV derives independent economic value from these NAV-specific and non-public systems and products. (*Id.* at ¶¶ 100-102). And, of course, NAV's client pricing information and various pricing platforms and models give NAV its competitive edge and have been developed over time. (*Id.*). As a result, this information constitutes trade secrets. *See, e.g.*, *See Fire 'Em Up, Inc. v. Technocarb Equipment (2004) Ltd.*, 799 F. Supp. 2d 846, 850 (N.D. Ill. 2011) (among other things, combinations or compilations of materials necessary to create product or perform certain services; programs, methods, techniques and devices used to create product and render services; financial data, marketing plans and advertising strategies constitute trade secrets)*; PepsiCo, Inc.*, 54 F.3d at 1265-66 (strategic goals including pricing, distributing, and marketing plans and funding plans for specific markets, and plans regarding innovations in selling and delivery systems constituted trade secrets); *Inmar, Inc. v. Vargas*, 2018 WL 6716701,

at *3 (N.D. Ill. Dec. 21, 2018) (business development plans and marketing and pricing strategies constituted trade secrets).

This information undoubtedly is valuable to NAV's competitors, such as SFS, as it enables them to tailor their strategies to client-specific needs by unfairly tapping into NAV's analyses of clients' historic practices, successes, failures, and even budgets. (Ver. Compl. at ¶¶ 70-71). More specifically, SFS, through Kumawat's NAV-specific expertise, will gain insights into the metrics and data underlying NAV's business development and pricing strategies and will enable SFS to shortcut the years and substantial resources NAV invested to develop its unique software and technology, curated and particularized pricing models, client lists, and growth strategies. (*Id.*).

NAV has taken various, reasonable measures to protect the confidentiality of its pricing, client information, and its overall product and service offerings (and the data from which they are derived) including password-protecting all NAV-issued devices and applications on which a NAV employee may access NAV's confidential information. (*Id.* at ¶ 31). Further, each NAV computer contains software that prohibits any external hardware, such as storage devices, from being connected to the computer to download documents or other data and information. (*Id.*). NAV also requires employees to execute confidentiality and restrictive covenant agreements. (*Id.* at ¶ 32). Such measures are reasonable under Illinois law. *See RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 874-75 (N.D. Ill. 2001) (finding plaintiff had taken reasonable measures to maintain secrecy by providing access on a password-protected computer database and requiring employees to sign and acknowledge receipt of a non-disclosure policy). To further safeguard its information, only select, high-level executives have access to the same sensitive information to which Kumawat had access through senior leadership meetings. *See Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1135 (N.D. Ill. 2019) (sales strategies that are intended to be kept secret qualify as trade secrets).

**(ii)      Disclosure of NAV's Trade Secrets is Threatened and Imminent.**

Both the ITSA and DTSA permit injunctive relief in order to prevent actual and threatened misappropriation.   735 ILCS 1065/3(a); 18 U.S.C. § 1836(b)(3).   Here, Kumawat poses a significant threat to misappropriate NAV's trade secrets.  In Illinois, the inevitable disclosure of a plaintiff's trade secrets is enough to show threatened misappropriation under both the ITSA and DTSA.  *See, e.g.*, *Medcor, Inc. v. Garcia*, No. 21-cv-2164, 2022 U.S. Dist. LEXIS 6761, at *3 (N.D. Ill. Jan. 13, 2022); *PepsiCo., Inc.*, 54 F.3d at 1268; *Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016) (noting that under a theory of inevitable disclosure, plaintiff must merely show that the employee "cannot operate without inevitably disclosing the confidential information").

Courts consider three factors when evaluating whether an employee's new employment inevitably will lead to disclosure of his former employer's trade secrets: (1) the level of competition between the former employer and the new employer; (2) whether the employee's position with the new employer is comparable to the position he held with the former employer; and (3) the actions the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer.  *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, 2017 WL 1954531, at *5 (N.D. Ill. May 11, 2017) (quotation marks and citation omitted).  Courts give less weight to the third factor, because "a complaint is not likely to contain any allegations about what, if anything, the competitor did to safeguard the plaintiff's secrets."  *Id.* at *7.

NAV satisfies the requisite elements to establish the inevitable disclosure and threatened misappropriation of its trade secrets.  First, NAV and SFS are direct competitors as both companies provide the same services and compete for the same hedge fund clients to provide the same hedge fund administration services.  (Ver. Compl. at ¶ 2).  Second, SFS has hired Kumawat to function

exactly as he did at NAV, by working closely with clients to understand their budgets, needs, wants, and goals for purposes of developing pricing strategies and offerings. (*Id.* at ¶¶ 74-75). Kumawat went as far as to access pricing information directly related to the accounts and leads *for which NAV was competing against SFS* in the days after he announced his resignation. (*Id.* at ¶¶ 72-73). This is exactly the type of information that SFS can use to unfairly compete with NAV, undercut its pricing based on stolen information, and unfairly undermine NAV's competitive advantage. (*Id.).* Third, despite knowledge of Kumawat's post-employment obligations to NAV, SFS hired Kumawat in a directly competitive role. (*Id.* at ¶ 69). Thus, SFS has taken no action to prevent Kumawat's unlawful disclosure of NAV's trade secrets.

In his role at SFS, Kumawat cannot help but use and rely upon the specialized and proprietary information he learned while serving as a Vice President and former Senior Account Manager at NAV. It will simply be impossible. Kumawat inevitably will draw upon NAV's particularized pricing strategies based on analyses and performance data of NAV's former, current and prospective advertising clients to compete with NAV for clients' finite spend. *See, e.g.*, *Groupon, Inc.*, 2022 WL 60526 at \*6 ("Groupon has shown that Mr. Shin left Groupon for a substantially similar position with a competitor, and the disclosure of trade secrets . . . is inevitable"); *Mickey's Linen*, 2017 WL 3970593, at \*13 (former employer established former employee and competitor threatened misappropriation by demonstrating employee was a key account representative before joining former employer's competitor in a comparable role and failing to return former employer's confidential documents). Undoubtedly, Kumawat's role at SFS will lead to the imminent and inevitable disclosure of NAV's trade secrets.

### C.  SFS Tortiously Interfered With Kumawat's Agreement.

NAV is likely to succeed on its tortious interference with contract claim.  To prevail on a tortious interference claim, NAV must prove: (1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach of contract caused by defendant's wrongful conduct, and (5) damages.  *See Medcor, Inc. v. Garcia*, 2022 U.S. Dist. LEXIS 6761 at *10 (N.D. Ill. Jan. 13, 2022).

Here, Kumawat signed a valid and enforceable agreement with NAV prohibiting him from competing with NAV and from disclosing NAV's trade secrets and confidential information.  (Ver. Compl. at ¶¶ 34-42).  SFS had both direct and constructive knowledge of Kumawat's Agreement and knew that employment of Kumawat would cause him to breach the Agreement.  (*Id.* at ¶ 69).  In addition to SFS's long history with hiring NAV's employees subject to non-compete agreements, and Sudrania's personal history as a senior leader for NAV, NAV sent SFS a copy of Kumawat's Agreement prior to his start date with SFS.  (*Id.*).

SFS acted improperly by knowingly hiring Kumawat in the face of the Agreement.  (*Id.*).  SFS cannot "intentionally ignore" Kumawat's Agreement and hire him to directly compete with NAV. *RKI, Inc. v. Grimes*, 200 F. Supp. 2d 916, 925 (N.D. Ill. 2002) (finding a defendant acted intentionally and improperly where it encouraged an employee to breach his employment contract by leaving the plaintiff's employ and subsequently hired the employee); Restatement (Second) of Torts § 768 cmt. i (a defendant is not "justified in engaging the employee to work for him in an activity that would mean violation of the contract not to compete").  And, SFS lured Kumawat away with promises of stock options.  (Ver. Compl. at ¶ 49).  Such promises also constitute improper means.  *See* Restatement (Second) of Torts § 766 cmt. m (providing a defendant acts intentionally and improperly by inducing breach through the offer of better terms).  Upon

information and belief, SFS has or will further intentionally interfere with the contractual relationship between NAV and Kumawat by inducing him to disclose trade secrets and confidential information. (Ver. Compl. at ¶ 71).

SFS's intentional interference with the contractual relationship between NAV and Kumawat was improper. SFS knew Kumawat was bound by the restrictive covenants in his Agreement and nonetheless induced him to breach by employing him in violation of those covenants. (*Id.* at ¶ 69). SFS undertook these actions in order to interfere with NAV's business and to unlawfully compete in the marketplace. As a result of SFS's tortious interference with contractual relations, NAV has suffered and will continue to suffer damages and irreparable harm, including diminished value of its confidential information, costs to replace an employee in a highly specialized role, and loss of its competitive advantage. Because NAV is able to establish each of the elements of its tortious interference with contractual relations claim, it has demonstrated a likelihood of success on this claim. *See Medcor, Inc.*, 2022 U.S. Dist. LEXIS 6761 at *10 (finding where an employer hires an employee in violation of a valid agreement, such hire constitutes tortious interference); *RKI Grimes*, 200 F. Supp. 2d at 925 (same); *Jabil Inc. v. Essentium, Inc.*, No. 19-cv-1567, U.S. Dist. LEXIS 258736, at *20 (M.D. Fla. May 29, 2020) (inducing a breach of a non-compete in and of itself attaches liability for tortious interference).

## III.   NAV WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION.

NAV has and will continue to suffer irreparable harm as a result of Defendants' actions, and "irreparable harm is 'likely' if the Court denies its motion for preliminary injunction." *Groupon, Inc.*, 2022 WL 60526 at *6 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). NAV meets its burden of establishing irreparable harm.

First, NAV establishes actual, threatened and imminent misappropriation of its trade secrets. The facts detailed herein and in the Verified Complaint demonstrate Kumawat has accepted employment with a direct competitor where he will necessarily rely upon and divulge NAV's trade secrets. (Ver. Compl. at ¶¶ 51, 71). Kumawat went as far as to search a client database for information regarding the competitor he is joining prior to leaving NAV. (*Id.* at ¶¶ 51-53). In cases of threatened trade secret misappropriation, irreparable harm is presumed. *See, e.g.*, *Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 700 (N.D. Ill. 2004); *IDS Fin. Servs., Inc. v. Smithson*, 843 F. Supp. 415, 418 (N.D. Ill. 1994) (finding that "the threat is significant that the harm experienced by the misappropriation or misuse of trade secrets will be irreparable").

Further, Kumawat breached his valid non-compete to join a direct competitor. He is armed with knowledge of NAV's entire business operations, its products and offerings, it proprietary software, its clients' identities and sensitive information regarding many client accounts themselves, pricing, and other highly sensitive and competitive information. (Ver. Compl. at ¶ 71). It is simply "not possible for [Kumawat] to do his job at [SFS] without drawing on the confidential knowledge he gained at [NAV]." *Groupon, Inc.*, 2022 WL 60526 at *6. Under these circumstances, the threat of irreparable harm without injunctive relief exists. *See, e.g.*, *Groupon, Inc.*, 2022 WL 60526 at *6 (where employee violates non-compete and joins a competitor, and had access to trade secret information that would put employer "at a serious competitive disadvantage," irreparable harm is likely). And, of course, Kumawat himself agreed that violations of his Agreement would cause NAV irreparable injury. (*See* Ver. Compl., Ex. A, ¶ 9).

## IV. NAV LACKS AN ADEQUATE REMEDY AT LAW.

NAV has no adequate remedy at law. The full extent of NAV's injuries resulting from Defendants' conduct are not easily ascertainable and ongoing, and "it would almost be impossible

-29-

to calculate the extent of the harm." *Groupon, Inc.*, 2022 WL 60526 at *6. Kumawat's employment with SFS, and his imminent use and disclosure of NAV's confidential information and trade secrets, will result in ongoing harm for which money damages will not suffice. *See, e.g.*, *E\*TRADE Fin. Corp. v. Pospisil*, 2018 WL 4205401, at *5 (N.D. Ill. Sept. 4, 2018) (finding no adequate remedy at law for employee who used misappropriated trade secret information to compete with former employer because "ongoing competition itself" constitutes "a sufficient basis for relief"); *HCAFranchise Corp. v. Alisch*, 2016 WL 10706285, at *7 (N.D. Ind. Aug. 12, 2016) (former employer had no adequate remedy at law for former employee's misappropriation of trade secrets because "monetary damages are insufficient to compensate for trade secret misappropriation"). Kumawat also agreed NAV did not have an adequate remedy at law should be breach the non-competition and non-disclosure provisions of the Agreement. (*See* Ver. Compl., Ex. A, ¶ 9).

## V. THE BALANCE OF HARDSHIPS FAVORS NAV AND THE ISSUANCE OF A PRELIMINARY INJUNCTION WILL NOT HARM THE PUBLIC INTEREST.

The balance of harms weighs in NAV's favor given the clear and actual threat Kumawat's employment with SFS presents to NAV. Enforcing the Agreement to prevent misappropriation of NAV's confidential and trade secret information would not harm the public interest.

In determining whether to grant a preliminary injunction, courts "weigh[] the harm of denying an injunction [to the moving party] against the harm to [the non-moving party] of granting one." *Groupon, Inc.*, 2022 WL 60526 at *6. The Seventh Circuit "employs a sliding scale approach for this balancing: if a movant is more likely to win, the balance of hardships can weigh less heavily in its favor, but the less likely a movant is to win the more that balance would need to weigh in its favor." *W. Capra Consulting Grp., Inc. v. Snyder*, 2019 WL 3935045, at *7 (N.D. Ill. Aug. 20,

2019) (internal citations and quotations omitted). And, "[i]n balancing the harms, the Court also considers the public interest." *Groupon, Inc.*, 2022 WL 60526 at *6 (internal citation omitted).

NAV presents a strong likelihood of success on the merits of each of its claims against Defendants. And, the requested injunctive relief seeks to only ensure Kumawat abides by what he already is legally obligated to do. If entered, an injunction would merely require Kumawat to adhere to and uphold his contractual obligations under the Agreement. Kumawat is free to seek other employment, just not in a role substantially similar to the one he held at NAV and which puts NAV's confidential and trade secret information at risk. And, for its part, SFS would merely be required to honor a valid and enforceable agreement, which is proper under the law. Because the potential harm to NAV from Kumawat's employment with SFS and his use of its trade secret information is great, and the potential harm to Kumawat is negligible, the balance of harms weighs in favor of injunctive relief. *See, e.g.*, *Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th Cir. 1986) (balance of irreparable harms weighed "heavily" in employer's favor where former employee possessed confidential information directly relevant to new position with competitor); *W. Capra*, 2019 WL 3935045, at *12-13 (balance of harms weighed in favor of former employer where employee's enforceable non-compete only prohibited seeking similar employment with competitors; employee's eventual harm would be reparable and compensable, whereas former employer's harm was irreparable). Kumawat was also a highly compensated employee. (Ver. Compl. ¶ at 56).

Enforcing the Agreement to prevent misappropriation of trade secrets also will not harm the public interest. Though there is a public interest in "workplace mobility and free and fair competition," there is "an equally compelling interest in upholding valid and reasonable contracts as well as honoring obligations for which individuals bargained for and derived significant benefits." *Groupon, Inc.*, 2022 WL 60526 at *7. And, of course, "the public interest also favors

the protection of trade secret and confidential information gathered and developed by a company at significant expense." *Id*. (internal citation omitted). Here, "the public will not be harmed by holding [Kumawat] to his word and the contractual obligations for which he bargained." *Id*.; *see also Lucini Italia Co. v. Grappolini*, 2003 WL 1989605, at *18 (N.D. Ill. April 28, 2003) (public interest was served by issuance of an injunction protecting plaintiff from future misuse of its trade secret information); *Medcor, Inc.*, 2022 U.S. Dist. LEXIS 6761 at *13 ("public interest favors the enforcement of contracts and the protection of trade secrets"). NAV's request for a preliminary injunction should be granted.

## **CONCLUSION**

Through this Motion, NAV's contemporaneous Motion for Expedited Discovery, and NAV's Verified Complaint, NAV respectfully asks this Court: (i) to permit the parties to engage in limited expedited discovery prior to a preliminary injunction hearing; (ii) to schedule this matter for preliminary injunction hearing as soon as its schedule permits following a period of expedited discovery; (iii) upon completion of the hearing, to enter a preliminary injunction enjoining SFS from employing Kumawat consistent with the terms of his Agreement with NAV; (iv) upon completion of the hearing, to enter a preliminary injunction enjoining Kumawat from using or disclosing NAV's trade secrets and confidential information, and from committing further violations of his non-competition obligations to NAV; (v) upon completion of the hearing, to enter a preliminary injunction enjoining SFS from interfering with NAV's contractual and business relationships; and (vi) upon completion of the hearing, to enter a preliminary injunction enjoining SFS from unlawfully obtaining or utilizing NAV's confidential information and trade secrets.

Dated:  July 13, 2022

Respectfully submitted,

NAV CONSULTING, INC.

By:  /s/ *Kevin M. Cloutier*
One of Its Attorneys

Kevin M. Cloutier (6273805)
Mikela T. Sutrina (6311408)
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
70 West Madison Street, 48th Floor
Chicago, Illinois 60602
Tel: (312) 499-6300
Fax: (313) 499-6301
kcloutier@sheppardmullin.com
msutrina@sheppardmullin.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 13, 2022, I sent copies to the foregoing document via e-mail

and U.S. mail, postage prepaid to the following:

Abhishek Kumawat
1335 Bayou Path Ct.
Naperville, IL 60563
abhishekkumawat@gmail.com

Daniel R. Saeedi
Taft Stettinius & Hollister, LLP
111 E. Wacker Drive, Suite 2800
Chicago, IL 60601
dsaeedi@taftlaw.com

*Counsel for Defendant Sudrania Fund Services, Corp.*

/s/ Mikela T. Sutrina
One of the Attorneys for Plaintiff

-34-