**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS,**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NAV CONSULTING, INC.,<br>an Illinois corporation, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:22-cv-3624 |
| v. | ) | |
| | ) | Hon. Edmond E. Chang |
| ABHISHEK KUMAWAT, an individual, | ) | |
| and SUDRANIA FUND SERVICES CORP., | ) | JURY TRIAL DEMANDED |
| an Illinois corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |
| | ) | |
| ABHISHEK KUMAWAT, | ) | |
| | ) | |
| Counter-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NAV CONSULTING, INC., | ) | |
| an Illinois corporation, | ) | |
| | ) | |
| Counter-Defendant. | ) | |

**ABHISHEK KUMAWAT'S VERIFIED ANSWER AND AFFIRMATIVE DEFENSES**
**TO THE COMPLAINT AND COUNTERCLAIMS**

Defendant Abhishek Kumawat, by his attorneys, for his Answer and Affirmative Defenses

to Plaintiff NAV Consulting, Inc.'s ("NAV") Complaint and Counterclaims, states as follows:

**INTRODUCTION**

1.      In direct violation of a valid and reasonable contract, Kumawat, NAV's Vice President of Fund Accounting & Compliance, resigned from NAV prior to completion of his agreed-to fixed term of employment to join a direct competitor, SFS. Given the competitive nature of the two companies and Kumawat's role with SFS, he will necessarily rely upon and utilize the confidential information and specialized training he acquired while employed by NAV to SFS's benefit and to NAV's significant detriment.

**ANSWER:** Denied.

-1-

2.      SFS provides the same exact hedge fund administration services NAV provides. NAV and SFS compete for the same clients in the hedge fund arena. NAV only seeks to enforce the terms of Kumawat's Employment Agreement (the "Agreement") and to prohibit Kumawat from working for a competitor in a role that is violative of the Agreement and one which will require him to inevitably use and disclose NAV's trade secrets and proprietary and confidential information.

**ANSWER:**  Denied.

3.      In his role with SFS, Kumawat will use and/or disclose NAV's hard-earned confidential and proprietary information and trade secrets for SFS's benefit. Kumawat's presence will allow SFS to unfairly compete with NAV. This is precisely what Kumawat agreed not to do when he executed his Agreement with NAV.

**ANSWER:**  Denied.

4.      Kumawat's efforts to contravene his contractual obligations to NAV will irreparably harm NAV, diminish the value of NAV's confidential and proprietary information and trade secrets, harm NAV's relationships with its clients, and undermine NAV's competitive edge in the hedge fund administration space.

**ANSWER:**  Denied.

5.      SFS, for its part, intentionally induced Kumawat to breach his post-employment commitments to NAV by knowingly hiring him in violation of his non-competition obligations. This is not the first time SFS has unfairly poached an employee from NAV in contravention of a valid and enforceable agreement. SFS continues its attempts to unfairly compete with NAV in a competitive and specialized marketplace.

**ANSWER:**  Paragraph 5 is not directed at Mr. Kumawat, so no answer is required. To the

extent an answer is required, denied.

6.      Kumawat's and SFS's unlawful actions must be enjoined before they can cause further harm to NAV's legitimate business interests, including its trade secrets, proprietary and confidential information, and customer and employee relationships.

**ANSWER:**  Denied.

## PARTIES

7.      NAV Consulting, Inc. is an Illinois corporation with its principal place of business in Oakbrook Terrace, Illinois.

**ANSWER:**  Kumawat lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 7, except that Kumawat admits that NAV has an office in

Oakbrook Terrace, Illinois.

8.    Abhishek Kumawat is a citizen and a resident of Illinois.

**ANSWER:** Admitted that Kumawat is a resident of Illinois. Kumawat denies that his is a citizen of the United States. Answering further, Kumawat states that he holds a Green Card and is a permanent resident that has been granted authorization to live and work in the United States on a permanent basis.

9.    Sudrania Fund Services, Corp. is an Illinois corporation with its principal place of business in Downers Grove, Illinois.

**ANSWER:** Paragraph 5 is not directed at Mr. Kumawat, so no answer is required. To the extent an answer is required, Kumawat lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9, except that he admits that Sudrania has an office in Downers Grove, Illinois.

## JURISDICTION AND VENUE

10.    Jurisdiction is proper in this District pursuant to 28 U.S.C. § 1331 because NAV asserts a cause of action under federal law. Specifically, NAV asserts a cause of action under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq*.

**ANSWER:** Kumawat admits that Plaintiff purports to bring this action pursuant to 28 U.S.C. § 1331, but denies that he committed any wrongful conduct or that NAV is entitled to any relief, and denies all other inferences and characterizations in paragraph 10. Answering further, Kumawat states that jurisdiction is proper for purposes of consideration of NAV's motion for preliminary injunctive relief, but denies any other basis for jurisdiction.

11.    Venue is proper in this district under 28 U.S.C. § 1391, *et seq.*, because Kumawat entered into a contract directly connected to Illinois and breached his contractual duties, the effects of which NAV felt in Illinois, and because SFS tortiously interfered with a contract in Illinois governed by Illinois law.

**ANSWER:** Kumawat denies the allegations of paragraph 11 to the extent they can be

construed as alleging liability or wrongdoing on the part of Kumawat. Answering further, Kumawat states that venue is proper for purposes of consideration of NAV's motion for preliminary injunctive relief, but denies any other basis for venue.

## GENERAL ALLEGATIONS

**NAV's Business**

12.     Nav Gupta ("Gupta") founded NAV in 1991. NAV is a hedge fund administrator providing services in fund accounting and registrar and transfer agency ("RTA") functions, including portfolio accounting, bookkeeping, record keeping, net asset value calculation, daily reconciliation, daily reporting, investor statement distribution, preparation of U.S. Federal and state tax returns, preparation of financials, anti-money laundering, and other regulatory reporting and support. NAV's clients are located around the world, and it provides its services globally.

**ANSWER:** Kumawat lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12, except that Kumawat admits that NAV is a hedge fund administrator and performs functions related to fund accounting.

13.     NAV's U.S. based employees who deal directly with NAV's clients, including account managers, senior account managers, and vice presidents, are the "face" of NAV and form direct relationships with clients while providing NAV's services.

**ANSWER:** Kumawat denies the allegations of paragraph 13, except he admits that NAV put its Anglo-American employees forward as the "face" of NAV while he and other similarly situated Indian-born employees are forced to do the brunt of the actual work and are subjected to additional, non-paid menial tasks that NAV's Anglo-American employees are not.

14.     NAV has a back office operation in Jaipur, India, NAV Back Office, that it utilizes to provide support to NAV's U.S. operations as related to its client relations and performance of services NAV offers and provides clients. NAV Back Office employees work directly with NAV's U.S. based employees to fulfill client requests, perform tasks, and service NAV's clients.

**ANSWER:** Admitted.

15.     NAV has invested an extraordinary amount of time and millions of dollars building and growing its business. NAV is well known in the hedge fund administration services industry for its competitive pricing, unique processes, and outstanding customer service. NAV's business is based on proprietary software, processes, and algorithms, which it has spent numerous years and countless dollars developing internally. Unlike most of its competitors, NAV uses its unique

software, processes, and algorithms, rather than standardized offerings and systems, to offer its clients competitive pricing and efficient services.

**ANSWER:** Kumawat lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15, except that Kumawat denies that NAV's business is based on anything "proprietary," or "unique."

16. NAV heavily invests in maintaining, adapting, and updating its software, processes, and algorithms in order to improve its output capabilities, processing time, features, enhancements, updates, and systems so as to be able to continually offer its clients cutting-edge offerings and services that meet the needs of the always-changing hedge fund landscape.

**ANSWER:** Denied.

17. NAV's clients are the center of its business, and it works diligently to provide its clients the most competitive pricing. In addition to its unique software, processes, and algorithms and competitive pricing, NAV ensures customer service is the focus of its employees' work. This has allowed NAV to retain nearly 99% of its clients.

**ANSWER:** Denied.

18. NAV goes to great lengths and expense to keep up to date with new types of funds and fund administration innovation. In late 2016 and early 2017, NAV became a leader in providing specialized services and offerings to cryptocurrency ("crypto") funds, which differ vastly from standard hedge funds. In particular, the crypto market is open 24/7 while the traditional market closes at 5:00 PM, crypto does not have a broker statement at the end of the day or month like the traditional market, requiring an individual to connect with different exchanges to pull data, the crypto market's 24/7 nature provides many challenges in valuation because the crypto market never closes with a price, unlike the traditional market, and crypto requires in-kind contribution (*i.e.*, subscribing into the fund with a form of crypto currency).

**ANSWER:** Denied.

19. NAV has expanded its offerings and services to keep up with changing laws, regulations, and requirements. For example, it provides anti-money laundering compliance services in order for funds to meet the requirements of different jurisdictions, such as the Cayman Islands.

**ANSWER:** Kumawat admits that NAV provides anti-money laundering compliance services and has done so since before Kumawat began working for that company many years ago. Kumawat further states that the remainder of the allegation in paragraph 19 are characterizations

that do not require an answer. To the extent an answer is required, Kumawat denies the same.

**Kumawat's Employment with NAV**

20.     Kumawat served as NAV's Vice President of Fund Accounting & Compliance from May 2020 until his voluntary resignation on July 11, 2022. In this role, and his prior roles, Kumawat had direct contact with NAV's clients and had intimate knowledge of NAV's clients' assets under management ("AUM"), strategies, needs, and desired service levels and NAV's product and service offerings. NAV entrusted Kumawat with sensitive confidential and proprietary information, such as its pricing models and business plans, to help him perform his duties.

**ANSWER:**  Kumawat denies the allegations of paragraph 20, except he admits that he worked for NAV for almost 15 years, and during the end of his employment, served as NAV's Vice President of Fund Accounting & Compliance from May 2020 until he resigned from NAV on July 11, 2022. Answering further, Kumawat states that the information referred to in paragraph 20 is available from public sources that can often be accessed through a simple search on an internet search engine such as Google. The information can be accessed from publicly accessible sources including, for example, the SEC, NFA, FINRA, client websites, or from paid services such as Preqin. Moreover, Kumawat is not aware of any pricing models, but understood that Nav Gupta and Ambuj Garg created and supplied pricing upon request. Furthermore, all software and processes of which Mr. Kumuwat is aware were defined in detail in an "ISAE 4302" report that was available, without special security access, to all employees and even provided to outside parties, upon request.

21.     In particular and as required by his leadership role in compliance, Kumawat worked closely with sensitive client information to run due diligence on prospective clients and prospective investors and perform risk assessments. Kumawat was required to have an extensive understanding of clients' businesses and operations. To ensure NAV's own compliance with applicable requirements and in connection with NAV's provision of anti-money laundering services, Kumawat acquired a deep understanding of NAV's clients' personal information, processes, structures, investment strategies, and plans as it related to their funds.

**ANSWER:**  Kumawat denies the allegations of paragraph 21, except he admits that he worked with some of NAV's current clients' information that was available from public sources

-6-

that could be accessed through a simple search on an internet search engine such as Google, accessing information from publicly accessible sources including, for example, the SEC, NFA, FINRA, client websites, or from paid services such as Preqin. Kumawat further admits that he participated in due diligence activities for those clients' evaluation of their own operations. Answering further, Kumawat does not maintain, nor could he possibly remember any specific details of those clients' information. Answering further, Kumawat states that, to his understanding details of all software and processes were defined in detail an "ISAE 4302" report that was available, without special security access, to all employees and even provided to outside parties, upon request.

22.     Kumawat also had direct access to and intimate knowledge of NAV's confidential checklists and workflow procedures used by NAV in the provision of anti-money laundering services, including the provision of anti-money laundering officer services for clients, for example, the anti-money laundering officer workflow checklist and procedures, which Kumawat used in his capacity as multiple NAV clients' deputy money laundering reporting officer. The anti-money laundering checklists and procedures were created in-house by NAV and allowed the development of highly customized and efficient processes for service delivery, some of which are specialized and proprietary to NAV. As the deputy money laundering reporting officer for multiple NAV clients, Kumawat used his knowledge of NAV's pricing models and strategy to independently determine pricing and fees for the anti-money laundering compliance officer and money laundering reporting officer services offered to NAV's clients. He also prepared the service agreements for all anti-money laundering officer and money laundering reporting officer services, which included the granular details of the terms and scope of the business relationships between NAV and its clients. Kumawat maintained the list of NAV's customers requiring anti-money laundering officer services.

**ANSWER:**  Mr. Kumawat denies the allegations in paragraph 22, except that he admits that he personally developed his own checklists and procedures for his work involving anti-money laundering, but denies that NAV developed these procedures or that NAV offered any training or any tools whatsoever to support his anti-money-laundering job duties. Answering further, Kumawat states that he had to use the Google search engine to access information about how to perform his job duties for anti-money-laundering services, and that he relied on government and

other publicly-available resources to provide the tools necessary to perform this function at NAV.

Moreover, as the deputy money-laundering officer his position was in the organizational structure

under the anti-money-laundering compliance office ("AMLCO") and the money-laundering

reporting officer ("MLRO") as part of the compliance service. The deputy money-laundering

officer's position was the lowest officer position in that service and Kumawat did not have any

authority on pricing or any pricing models available to him. As stated above, all pricing was given

by Nav Gupta or Ambuj Garg. The service agreements referred to in paragraph 22 were standard

agreements and the only changes made from client-to-client was a change in name and contact

information. Mr. Kumawat did not review or make changes to any terms of any such agreement.

23. Kumawat was also responsible for business development, which included cross-selling NAV's services to existing and prospective clients, and participating in development of new solutions to meet client needs. As part of these duties, Kumawat coordinated presentations and demos for existing and prospective clients on NAV's systems, applications, and other services. Kumawat developed an in-depth knowledge of NAV's client and investor portals. Kumawat also prepared client proposals and service agreements, and had intimate knowledge of the terms of such agreements.

**ANSWER:** Denied.

24. Prior to his role as Vice President of Fund Accounting & Compliance, Kumawat worked as a Senior Account Manager from November 2015 to April 2020 and an Account Manager from December 2007 to November 2015. In these roles, Kumawat served as the "face" of NAV for nearly 206 accounts. Kumawat was responsible for managing, maintaining, and building these critical relationships. Both of these roles required Kumawat to form deep relationships with NAV's clients. Kumawat learned NAV's proprietary software, processes, and algorithms to provide NAV's clients the most competitive offerings.

**ANSWER:** Kumawat denies the allegations of paragraph 24, except he admits that he

worked as a Senior Account Manager from November 2015 to April 2020 and an Account

Manager from August 2007 to November 2015.

25. In order to maintain his relationships with NAV clients, NAV exposed Kumawat to and he became familiar with, among other things, NAV's clients' needs, expectations, fund accounting strategies, and desired service levels. He also had knowledge of sensitive client information such as clients' AUMs and strategies. His intimate knowledge of NAV's pricing

models and strategy allowed him to negotiate and offer pricing to clients based on a client's AUM, strategy, needs, and desired service levels and NAV's offerings. This confidential information allowed Kumawat to maintain his relationship with NAV's clients so that he could provide them with efficient solutions and services.

**ANSWER:** Kumawat denies the allegations of paragraph 25, except that he admits he worked with NAV's clients to provide the requested services. Answering further, Kumawat does not maintain, nor could he possibly remember any specific details of those clients' information. Moreover, Kumawat states that the client's information referred to herein was available from public sources generally accessible through Google searches accessing information from the SEC, NFA, FINRA, client websites, or paid services available to the general public such as Preqin.

26.     Kumawat had access to NAV's unique software, processes, and algorithms, pricing models, business development plans, and competitive strategies and techniques. This information is highly confidential, and only a select set of employees at NAV have access to this information. Kumawat worked directly with NAV's leadership to develop strategies and processes to grow NAV's business and client relations. Kumawat used this information to further advance NAV's growth and expansion plans as well as its offerings in order to acquire an advantage over its competitors and a larger share of the hedge fund administration services market.

**ANSWER:** Mr. Kumawat denies the allegations of paragraph 26, except he admits that he used generic software while employed by NAV which are similar to other products available in the market. Answering further, Kumawat states that he is not aware of any patents relating to the software at issue. Moreover, Kumawat states that he did not have access to any algorithms or pricing models, business development plans, or competitive strategies or techniques. In fact, detail of all software and processes used by NAV were, to Kumawat's understanding available in the "ISAE 3402" report which was available, without special authorization, to all employees, auditors, and, upon request, to other outside parties. Kumawat states that he uses a different software system in his job at Sudrania.

27.     Kumawat also had access to and knowledge of NAV's proprietary, confidential and trade secret information as it relates to NAV's subsidiary, NAV Fund Services (Cayman) Ltd., including certain financial information and business plans.

**ANSWER:** Mr. Kumawat denies the allegations of paragraph 27, except that he admits that he had access to NAV Fund Service (Cayman) Ltd. financial statement and business plan, which was only given to him so that he could provide it to outside parties if it was requested.

28. In addition to the information to which Kumawat was exposed in performing his duties, Kumawat also participated in multiple high-level meetings where specific performance, revenue related to anti-money laundering officer services, client, and strategy details were discussed with NAV's key leaders. Through these confidential meetings with NAV's leaders, Kumawat further learned about NAV's precise pricing models, growth and development plans, and competitive strategy to acquire more market share.

**ANSWER:** Denied.

29. Kumawat actively participated in helping mold NAV's plans and strategies by using his role as NAV's compliance leader and experience dealing with all of NAV's clients' needs, particularly in the compliance sphere, to provide insight and shape NAV's future processes and endeavors.

**ANSWER:** Denied.

30. Kumawat directly oversaw 130 employees on the Back Office compliance team.

**ANSWER:** Denied.

31. NAV took reasonable measures to keep the business and client information discussed above known by Kumawat confidential. Access to such information is tightly controlled by NAV. Each NAV computer contains software that prohibits any external hardware, such as storage devices, from being connected to the computer to download documents or other data and information. Additionally, all NAV devices are password-protected, and NAV monitors all its systems to ensure no unauthorized activity occurs. And, only certain employees were allowed in leadership meetings and given access to certain competitive and confidential information.

**ANSWER:** Kumawat denies the allegations of paragraph 31, except he admits that his NAV laptop computer was password protected, and that NAV prohibited the use of an external storage devices.

32. NAV also requires its employees, including Kumawat, to sign confidentiality agreements in which they promise not to disclose or use NAV's trade secret, proprietary, and confidential information.

**ANSWER:** Kumawat denies the allegations of paragraph 32, except he admits that NAV

forced him and, upon information and belief, each of its other Indian-born employees to sign such agreements. Answering further, the Agreement was procured under duress, in a discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The Agreement is void and/or unenforceable as against Illinois public policy and contrary to Illinois law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that purported agreement, overbreadth, and vagueness.

**Kumawat's Agreement with NAV**

33.     Kumawat held a critical role in NAV's business as its Vice President of Fund Accounting & Compliance. Further, Kumawat's role was a key component of NAV's plans to build and grow its business. NAV knew it would be difficult to replace Kumawat based on the nature of his role, his time with the company, and the critical function he served for NAV. Based on these considerations, NAV presented Kumawat with the Agreement in November 2020 for his consideration. A true and correct copy of the Agreement is attached hereto as Exhibit A.

**ANSWER:** Kumawat denies the allegations of paragraph 33, except he admits that Exhibit A is a copy of the agreement he signed in December 2020 and refers to the document for a recitation of its contents. Answering further, Kumawat states that he was presented with the Agreement because his priority date for his Green Card application had become current, and NAV wanted to lock him into a one-sided agreement before completing the necessary steps for Mr. Kumawat to receive his Green Card. Moreover, the Agreement was procured under duress, in a discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The Agreement is void and/or unenforceable as against Illinois public policy and contrary to Illinois law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that purported agreement, overbreadth, and vagueness.

34.     NAV presented Kumawat with the option to sign a four (4) or five (5) year fixed-term agreement.  The Agreement also included post-employment restrictive covenants.

**ANSWER:** Denied. Answering further, the Agreement was procured under duress, in a discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The Agreement is void and/or unenforceable as against Illinois public policy and contrary to Illinois law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that purported agreement, overbreadth, and vagueness.

35.    Kumawat negotiated a $17,500 raise (effective January 1, 2021) in exchange for a five (5) year fixed-term Agreement.

**ANSWER:** Denied. Answering further, Kumawat states that he was presented with the Agreement because his priority date for his Green Card application had become current, and NAV wanted to lock him into a one-sided agreement before completing the necessary steps for Mr. Kumawat to receive his Green Card. Further, the Agreement was procured under duress, in a discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The Agreement is void and/or unenforceable as against Illinois public policy and contrary to Illinois law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that purported agreement, overbreadth, and vagueness.

36.    NAV presented the Agreement to Kumawat in exchange for a $2,000 signing bonus, access to NAV's trade secrets and proprietary and confidential information, and guaranteed employment for a period of five (5) years. In exchange for this valuable consideration, as well as the increase in his yearly salary, Kumawat executed the Agreement on November 10, 2020.

**ANSWER:** Mr. Kumawat denies the allegations of paragraph 36, except that he admits that he was paid $2,000 in connection with signing the Agreement. Answering further, Kumawat states that he was presented with the Agreement because his priority date for his Green Card application had become current, and NAV wanted to lock him into a one-sided agreement before

completing the necessary steps for Mr. Kumawat to receive his Green Card. Further, the Agreement was procured under duress, in a discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The Agreement is void and/or unenforceable as against Illinois public policy and contrary to Illinois law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that purported agreement, overbreadth, and vagueness.

37.     The fixed term provision provides, in pertinent part, as follows:

I.  **Term**. The term of this Agreement shall be from December 15, 2020 until November 30th, 2025 (the "Term").

If Employee's employment terminates for any reason other than those set forth in clauses (i) through (iv) of paragraph 2(a) before the fifth anniversary of the commencement of the Term, including the voluntarily resignation of Employee's employment or an involuntary termination of the Employee by the Company for Cause, Employee shall pay an early termination fee to the Company in the amount equal to four (4) months of Employee's then base salary at the time of the termination of Employee's employment ("Early Termination Fee") within thirty (30) days of the effective date of Employee's termination of employment with the Company, not as a penalty but as a reasonable estimate of the damages suffered by the Company.

*See* Exhibit A, ¶¶ 1, 2(b).

**ANSWER:** Mr. Kumawat denies the allegations of paragraph 37, except that he refers to Exhibit A for a recitation of the Agreement's contents. Answering further, the Agreement was procured under duress, in a discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The Agreement is void and/or unenforceable as against Illinois public policy, contrary to Illinois law, and contrary to Department of Labor guidance. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that purported agreement, overbreadth, and vagueness.

38.     Kumawat further agreed not to compete against NAV following his separation from NAV. Kumawat agreed to be bound by a twenty-four (24) month post-employment narrowly

tailored non-competition provision which states, in pertinent part, as follows:

> (c) <u>Covenant Not to Compete</u>. Employee acknowledges the Company's legitimate interest in protecting its Confidential Information, customer relationships, and goodwill for a reasonable period of time following the termination of his employment. Employee further acknowledges that the Company, including its affiliate Back Office, has spent substantial money, time and effort on the development of the proprietary software and operational systems, that use of the proprietary software and operational systems puts the Company at a competitive advantage compared to its competitors and the Company has a legitimate interest in protecting that competitive advantage. Accordingly, Employee agrees that during the Restricted Period, Employee will not (*i*) engage in, (*ii*) own, (*iii*) manage, (*iv*) operate, (*v*) finance, (*vi*) control or (*vii*) represent, advise, or work with (whether as an officer, director, shareholder, owner, co-owner, affiliate, partner, agent, representative, employee, consultant, independent contractor, advisor, or in any other manner), in a role substantially similar to any of the duties, responsibilities and services provided by Employee to the Company at any time during the last twenty-four (24) months of his employment with the Company, a Competitive Business.
>
> . . .
>
> The term "***Competitive Business***" means an entity or person that sells or provides products or services that are competitive with those products and services (*i*) sold or provided by the Company or any of its affiliates at any time during the last twelve (12) months of Employee's employment with the Company or (*ii*) actively and demonstrably being planned by the Company on the effective date of Employee's termination and (*A*) for which Employee had any involvement on behalf of the Company or one of its affiliates at any time during the last twelve (12) months of Employee's employment with the Company or (*B*) for which Employee has Confidential Information; provided, where an entity has distinct organizational divisions, only those organizational divisions that are a Competitive Business shall be subject to the restrictions in this paragraph. A "Competitive Business" includes, but is not limited to, Sudrania Fund Services Corp. . . .

*See* <u>Exhibit A</u>, ¶ 7(c).

**ANSWER:** Mr. Kumawat denies the allegations of paragraph 38, except that he refers to Exhibit A for a recitation of the Agreement's contents. Answering further, the Agreement was procured under duress, in a discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The Agreement is void and/or unenforceable as against Illinois public policy and

contrary to Illinois law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that purported agreement, overbreadth, and vagueness. Moreover, the Agreement was used to have a discriminatory impact as it was a form agreement specifically aimed for use with Indian employees and, to the extent any agreements were used with American employees, NAV did not take legal action against those American employees who left to join competitive businesses.

39.     As it relates to NAV's Confidential Information, the Agreement provides:

4.  Confidential Information and Nondisclosure

(a) Employee will not, at any time during or after Employee's employment with the Company, disclose, use or permit others to use any Confidential Information, except as required in the course of Employee's employment for the benefit of the Company.

*See* Exhibit A, ¶ 4(a).

**ANSWER:**  Mr. Kumawat denies the allegations of paragraph 39, except that he refers to Exhibit A for a recitation of the Agreement's contents. Answering further, the Agreement was procured under duress, in a discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The Agreement is void and/or unenforceable as against Illinois public policy and contrary to Illinois law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that purported agreement, overbreadth, and vagueness.

40.     Per the Agreement, Confidential Information is defined as:

(*A*) any information for which the Company has a contractual obligation with a customer, prospective customer or other third-party to treat as confidential or to not disclose outside of the Company; (*B*) any information for which the Company has a statutory obligation to treat as confidential or to not disclose outside of the Company; (*C*) any information designated as trade secrets or which would be considered trade secrets under the Illinois Trade Secrets Act or other applicable law; (D) any information pertaining

-15-

to the customized, proprietary software, methodologies, know-how, and trade secrets developed by Back Office for the benefit of NAV Consulting, Inc. and its customers; and (*E*) information relating to the following: (*i*) the Company's production practices and methods of doing business; (*ii*) sales, marketing, and service strategies, programs, and procedures; (*iii*) customers and prospective customers, including, but not limited to, their particularized requirements and preferences, their product or service specifications, the identity and authority of their key contact persons, payment methods, and service histories and patterns; (*iv*) mail lists and e-mail lists; (*v*) pricing lists; (*vi*) pricing policies and pricing methodologies; (*vii*) prices and fees negotiated with customers and proposed to prospective customers; (viii) pricing structures; (*ix*) service, product and material costs; (*x*) profit margins; (*xi*) bids and responses to requests for proposals; (*xii*) vendors and sources of supply; (*xiii*) financial position and business plans; (xiv) computer programs, applications, databases; (*xv*) research projects; (*xvi*) new product and service developments; (*xvii*) compositions, formulas, patterns, compilations, programs, techniques, devices, processes, plans, designs, and drawings; and (*xvii*) any other information of the Company or any of its vendors, customers and prospective customers, which the Company informs Employee, or which Employee should know by virtue of Employee's position or the circumstances in which Employee learned it, is to be kept confidential.

*See* <u>Exhibit A</u>, ¶ 4.

**ANSWER:** Mr. Kumawat denies the allegations of paragraph 40, except that he refers to Exhibit A for a recitation of the Agreement's contents. Answering further, the Agreement was procured under duress, in a discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The Agreement is void and/or unenforceable as against Illinois public policy and contrary to Illinois law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that purported agreement, overbreadth, and vagueness.

41.    The Agreement also contains a tolling provision regarding the covenants set forth in Section 7, and Kumawat agreed the "Restricted Period applicable to paragraphs 7(a) through 7(d) shall be tolled until such breach or violation has been cured." *See* <u>Exhibit A</u>, ¶ 7(e).

**ANSWER:** Mr. Kumawat denies the allegations of paragraph 41, except that he refers to Exhibit A for a recitation of the Agreement's contents. Answering further, the Agreement was

procured under duress, in a discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The Agreement is void and/or unenforceable as against Illinois public policy and contrary to Illinois law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that purported agreement, overbreadth, and vagueness.

42.    Kumawat acknowledged the covenants within the Agreement were reasonable and necessary to preserve NAV's strong business interests, its present and potential business activities, and the economic benefits derived therefrom. *See* Exhibit A, ¶ 7.

**ANSWER:** Mr. Kumawat denies the allegations of paragraph 42, except that he refers to Exhibit A for a recitation of the Agreement's contents. Answering further, the Agreement was procured under duress, in a discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The Agreement is void and/or unenforceable as against Illinois public policy and contrary to Illinois law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that purported agreement, overbreadth, and vagueness.

43.    Kumawat also agreed that violations of his contractual obligations would cause permanent, irreparable injury to NAV for which there would be no adequate remedy at law. He further agreed NAV would be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper if he violated or threatened to violate his contractual obligations to NAV. *See* Exhibit A, ¶ 9.

**ANSWER:** Mr. Kumawat denies the allegations of paragraph 43, except that he refers to Exhibit A for a recitation of the Agreement's contents. Answering further, the Agreement was procured under duress, in a discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The Agreement is void and/or unenforceable as against Illinois public policy and contrary to Illinois law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that

purported agreement, overbreadth, and vagueness.

44.     Kumawat further agreed that if NAV was successful in enforcing any portion of the Agreement pursuant to its Injunctive Relief provision, it would be entitled to all of its reasonable attorneys' fees and costs incurred as a result of enforcing the Agreement. *See* Exhibit A, ¶ 9.

**ANSWER:**  Mr. Kumawat denies the allegations of paragraph 44, except that he refers to Exhibit A for a recitation of the Agreement's contents. Answering further, the Agreement was procured under duress, in a discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The Agreement is void and/or unenforceable as against Illinois public policy and contrary to Illinois law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that purported agreement, overbreadth, and vagueness.

45.     Kumawat acknowledged the Agreement would be governed by Illinois law, and he irrevocably consented to the exclusive personal and subject matter jurisdiction of the federal and state courts located in Illinois. He further agreed that the forum for any disputes arising out of the Agreement would be in the federal and state courts in Illinois. *See* Exhibit A, ¶¶ 11, 12.

**ANSWER:**  Mr. Kumawat denies the allegations of paragraph 45, except that he refers to Exhibit A for a recitation of the Agreement's contents. Answering further, the Agreement was procured under duress, in a discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The Agreement is void and/or unenforceable as against Illinois public policy and contrary to Illinois law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that purported agreement, overbreadth, and vagueness.

46.     The Agreement also contains a severability clause. *See* Exhibit A, ¶ 10.

**ANSWER:**  Mr. Kumawat denies the allegations of paragraph 46, except that he refers to Exhibit A for a recitation of the Agreement's contents. Answering further, the Agreement was procured under duress, in a discriminatory manner and is thus unconscionable, and is void *ab initio*

or voidable. The Agreement is void and/or unenforceable as against Illinois public policy and contrary to Illinois law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that purported agreement, overbreadth, and vagueness.

**Kumawat's Resignation from NAV**

47.     Kumawat announced his resignation via email on May 12, 2022, and provided sixty (60) days' notice to NAV.  His official last day of employment was July 11, 2022.

**ANSWER:**  Kumawat denies the allegations of paragraph 47, except he admits that he informed NAV of his resignation by email on May 12, 2022, provided sixty days' notice to NAV, and that his last day of employment with NAV was July 11, 2022. Kumawat made no "announcement."

48.     Kumawat also told Gupta he intended to join SFS following his last day with NAV, though he refused to provide information regarding the role in which he would be working for SFS and would not confirm it was in a non-competitive role.

**ANSWER:**  Mr. Kumawat denies the allegations of paragraph 48, except he admits that he was forthright with NAV from the beginning about his intention to join SFS after working out his notice period at NAV. Answering further, Mr. Kumawat states that he informed Mr. Gupta that he was interested in changing his role from the role he had previously had with NAV.

49.     Gupta offered Kumawat a substantial raise to stay at NAV, which he refused. Kumawat also disclosed to Gupta that SFS had offered him stock options in addition to his salary.

**ANSWER:**  Mr. Kumawat denies the allegations of paragraph 49, except that he admits that NAV offered additional money, stock options, and a different role in an effort to get Mr. Kumawat to withdraw his resignation.

50.     Following the announcement of his resignation, NAV reminded him of his post-employment contractual obligations under the Agreement.

**ANSWER:** Admitted.

51.     On May 16, 2022, days after announcing his intent to resign from NAV and join direct competitor SFS, Kumawat accessed NAV's "take-over file" housed in a shared NAV Outlook mailbox, which houses confidential and proprietary information regarding client funds which NAV is in the process of taking over as fund administrator from a competing fund administrator, such as SFS.  Kumawat searched this database using the term "Sudrania." Kumawat had no legitimate reason to access this database and conduct a search for "Sudrania." Based on the information present in this database, Kumawat accessed information regarding pricing options made to funds moving from SFS to NAV (and others). Such information is incredibly sensitive and would significantly damage NAV if provided to a competitor like SFS.  With this information, SFS would have direct knowledge of the pricing NAV is offering current and prospective funds and could use this information to improperly compete with NAV for such funds.

**ANSWER:**     Kumawat denies the allegations of paragraph 51, except he admits he performed this search at Nav Gupta's direction after Kumawat informed Gupta he was resigning and joining Sudrania. Answering further, Nav Gupta told Kumawat that SFS's clients were leaving SFS and moving over to NAV, and instructed him to access that information to see for himself that SFS's customers were moving over. The information accessed was contained in a shared Outlook mailbox to which all U.S. accounting staff members had access including employees with the lowest positions in the group—"Account Managers." Any employee with access could see, change, copy, paste, or delete information and files from that mailbox. To Kumawat's knowledge, there were no restrictions placed on that mailbox and even some contractors from Back Office had access to the mailbox.  Even so, but for the express instruction from NAV leadership to access the information discussed herein, Kumawat would not have accessed it.

52.     One of the customer leads that a search for "Sudrania" uncovered during Kumawat's May 16, 2022 search activity was an SFS customer who subsequently decided to stay with SFS and not move over to NAV.

**ANSWER:** Kumawat lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52. Answering further, Kumawat states that he lacks knowledge of any specific NAV customer referred to in this paragraph and that he never identified

to SFS anything about any particular NAV customer.

53.     On June 6, 2022, Kumawat searched the shared NAV Outlook mailbox for a specific colleague's lead, which had previously informed NAV it was not interested in moving its fund accounting services to NAV. Kumawat had no prior relationship with this lead and was not copied on emails with this lead. Even if a lead does not become a NAV client, lead files contain intimate details on prospective clients, such as contact information, needs, and desired pricing, which may be used in later discussions with the lead should they wish to explore changing administrators again.  A competitor, such as SFS, could use this information to undercut NAV and unfairly steal its prospective clients.

**ANSWER:**  Denied. Answering further, a shared NAV Outlook mailbox referred to in

paragraph 53, was a mailbox to which all U.S. accounting staff members had access including

employees with the lowest positions in the group—"Account Managers." Any employee with

access could see, change, copy, paste, or delete information and files from that mailbox. To

Kumawat's knowledge, there were no restrictions placed on that mailbox and even some

contractors from Back Office had access to the mailbox.

54.     On July 11, 2022, NAV had a meeting with Kumawat to again remind him of and discuss his post-employment commitments to NAV, including the non-disclosure, non-solicitation, and non-compete provisions in his Agreement. Throughout the meeting, Kumawat was uncooperative and refused to provide NAV further details about his plans following his resignation from NAV. Kumawat again refused to confirm he was taking a non-competitive role with direct competitor SFS. .

**ANSWER:**  Denied. Answering further, Kumawat states that he spoke with NAV's in-

house counsel for a very brief period of time on July 11, 2022 and was polite and cordial.

55.     In the days prior to his last day of employment, Kumawat contacted at least two clients to inform them that he was leaving NAV and asked them to "keep in touch" on LinkedIn

**ANSWER:**  Kumawat denies the allegations of paragraph 55, except he admits that at the

direction of NAV, he contacted his current clients to introduce and transition them to their new

account managers at NAV, and was friendly and cordial to those clients in the process of doing so.

56.     At the time of his resignation, Kumawat's base salary was $207,000.  He was also eligible for and received various bonus payments at NAV throughout his career. To date, Kumawat

has not paid the Early Termination Fee as required under Section 2(b) of the Agreement.[1]

**ANSWER:** Kumawat denies the allegations of paragraph 56, except he admits his base salary when he resigned was $207,000. Answering further, the Agreement was procured under duress, in a discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The Agreement is void and/or unenforceable as against Illinois public policy and contrary to Illinois law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that purported agreement, overbreadth, and vagueness.

**SFS's Competitive Business**

57.     SFS, like NAV, is a hedge fund administrator.  SFS was founded in June 2015 by a former NAV employee, Nilesh Sudrania ("Sudrania"). SFS was originally established as Sudrania, LLC.  The company was converted to Sudrania Fund Services, Corp. in December 2019, per the Illinois Secretary of State website.

**ANSWER:** Paragraph 57 is not directed at Mr. Kumawat, so no answer is required. To the extent an answer is required, Kumawat lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 57.

58.     Like NAV, SFS provides hedge fund administration services such as fund accounting, net asset value calculation, daily reconciliation, daily reporting, investor statement distribution, preparation of U.S. Federal and state tax returns, preparation of financials, anti-money

---

[1] NAV has simultaneously filed a Demand for Arbitration with the American Arbitration Association ("AAA") pursuant to Section 15 of the Agreement seeking damages for breach of contract as it relates to Kumawat's failure to fulfill his Term. *See* Exhibit A, ¶¶ 1, 2(b). As provided in the Agreement, "all disputes arising from or relating to Employee's employment with the Company, the termination of that employment, this Agreement or any other dispute between the parties that might otherwise be subject to litigation in a civil court or administrative hearing or tribunal, including, without limitation, claims alleging discrimination, harassment, the failure to pay overtime premiums as required by the Fair Labor Standards Act or analogous state laws, breach of a contractual obligation, and breach of a fiduciary duty ("Claims") must be resolved" via arbitration with the AAA. *See* Exhibit A, ¶ 15. However, the Agreement expressly carves out "actions seeking equitable relief (*e.g.*, emergency, preliminary or permanent injunctive relief) . . ." *See* Exhibit A, ¶ 15. NAV seeks equitable relief through this Verified Complaint as set forth herein.

**ANSWER:** Kumawat denies the allegations in footnote 1, except that he admits that NAV filed a Demand of Arbitration against him with the AAA. Answering further, Kumawat denies any liability or wrongdoing and denies that NAV is entitled to any relief therein.

laundering and other regulatory reporting and support.

**ANSWER:** Paragraph 58 is not directed at Mr. Kumawat, so no answer is required. To

the extent an answer is required, Kumawat denies the allegations in paragraph 58.

59. SFS is NAV's direct competitor as both companies compete for the same hedge
fund clients to provide the same hedge fund administration services.

**ANSWER:** Paragraph 59 is not directed at Mr. Kumawat, so no answer is required. To

the extent an answer is required, Kumawat denies the allegations in paragraph 59.

60. SFS, similar to NAV, has a back office operation in India. SFS's structure, like
NAV's structure, includes employees based in the U.S. who work directly with SFS's clients to
form relationships and provide direct support, meanwhile employees in SFS's back office
operations in India work to support SFS's U.S. based employees to provide multiple hedge fund
administration services.

**ANSWER:** Paragraph 60 is not directed at Mr. Kumawat, so no answer is required. To

the extent an answer is required, Kumawat denies the allegations in paragraph 60.

61. NAV has historically considered SFS to be one of its primary competitors, and, in
fact, explicitly lists SFS as a Competitive Business in its employment agreements. *See* Exhibit A,
¶ 7(c).

**ANSWER:** Paragraph 61 is not directed at Mr. Kumawat, so no answer is required. To

the extent an answer is required, Kumawat denies the allegations in paragraph 61, except that he

refers to Exhibit A and his other employment agreements for a recitation of the contents.

62. SFS has targeted NAV in the past and has hired NAV's employees to increase its
own competitive edge and to harm NAV.

**ANSWER:** Paragraph 62 is not directed at Mr. Kumawat, so no answer is required. To

the extent an answer is required, Kumawat denies the allegations in paragraph 62.

63. SFS has engaged in unfair and deceptive acts to unfairly compete with NAV, some
of which are the subject of other ongoing litigation.

**ANSWER:** Paragraph 63 is not directed at Mr. Kumawat, so no answer is required. To

the extent an answer is required, Kumawat denies the allegations in paragraph 63.

64.     SFS offers fund administration services to specialized crypto funds, developing technology specifically for such funds.[2]

**ANSWER:**  Paragraph 64 is not directed at Mr. Kumawat, so no answer is required. To the extent an answer is required, Kumawat denies the allegations in paragraph 6.

65.     SFS also provides specialized compliance support services, like NAV, and offers anti-money laundering services.[3]

**ANSWER:**  Paragraph 65 is not directed at Mr. Kumawat, so no answer is required. To the extent an answer is required, Kumawat denies the allegations in paragraph 65.

66.     Recently, SFS claims to have entered into a "hyper-growth" mode as it expands and experiences rapid growth, continuing to hire employees to provide its clients fund administration services.[4]

**ANSWER:**  Paragraph 66 is not directed at Mr. Kumawat, so no answer is required. To the extent an answer is required, Kumawat denies the allegations in paragraph 66.

67.     SFS recently "rebranded" as Formidium, which has "two sub-brands": Formidium Fund Services and Formidium Technologies. The "rebrand" will be "rolled out across the globe in coming weeks."[5]

**ANSWER:**  Paragraph 67 is not directed at Mr. Kumawat, so no answer is required. To the extent an answer is required, Kumawat denies the allegations in paragraph 67, except he admits that SFS is now known as Formidium.

68.     As of July 13, 2022, Formidium is not registered with the Illinois Secretary of State and Sudrania Fund Services, Corp. remains the active operating entity.

---

[2] *See* https://sudrania.com/unveils-cryptocurrency.html (last visited July 12, 2022).
[3] *See* https://sudrania.com/services.html (last visited July 12, 2022).
[4] *See* https://sudrania.com/Blockchain_Laboratory.html (last visited July 12, 2022).

**ANSWER:**  Footnotes 2-4 are not directed at Mr. Kumawat, so no answer is required. To the extent an answer is required, Kumawat refers to the websites for a recitation of their contents.

[5] *See*  https://www.globenewswire.com/news-release/2022/07/06/2474749/0/en/Sudrania-Fund-Services-Rebrands-As-Formidium.html (last visited on July 12, 2022).

**ANSWER:**  Footnote 5 is not directed at Mr. Kumawat, so no answer is required. To the extent an answer is required, Kumawat refers to the website for a recitation of its contents.

**ANSWER:** Paragraph 68 is not directed at Mr. Kumawat and calls for a legal conclusion, so no answer is required. To the extent an answer is required, Kumawat refers to the records of the Illinois Secretary of State.

69.     While working for NAV, Sudrania worked directly and closely with Kumawat. Sudrania, just like Kumawat, also signed an employment agreement while at NAV containing similar restrictive covenants to those in the Agreement at issue here. Through his years of employment and his role as Vice President, Sudrania and SFS are well aware that NAV's employment agreements contain post-employment obligations and restrictive covenants. And, on July 11, 2022, counsel for NAV sent SFS a letter summarizing the terms of Kumawat's Agreement and attached a copy thereto. A true and correct copy of the letter is attached hereto as Exhibit B. Sudrania did not respond to the letter.

**ANSWER:** Kumawat lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 69.

70.     Through years of experience, trial and error, and research and development, NAV has developed unique software, processes, and algorithms, pricing models, anti-money laundering checklists and procedures, business development plans, and competitive strategies and techniques that allow it to provide superior, efficient, and cost-effective fund administration and RTA services to clients. Kumawat not only had access to this information, but he helped develop much of it based on his intimate knowledge of his clients' confidential information, including their AUMs, strategies, needs, desired service levels, and pricing structure that has worked for them, especially as related to anti-money laundering compliance officer and money laundering reporting officer services.

**ANSWER:** Denied.

71.     Kumawat will necessarily use his knowledge of NAV's plans and strategies, including how to price services and offerings for clients based on their particular circumstances and needs as well as business development plans in order to maintain a competitive advantage against other fund administrators, to help SFS compete directly and indirectly with NAV for hedge fund clients.

**ANSWER:** Denied.

72.     In the days following his notice of resignation, Kumawat accessed a NAV shared Outlook mailbox containing "Sudrania," and, upon information and belief, accessed information regarding the pricing NAV provided to certain funds for which NAV and SFS compete. Kumawat had no legitimate reason to access this database and conduct a search for "Sudrania."

**ANSWER:** Kumawat denies the allegations of paragraph 72, except he admits he

performed this search at Nav Gupta's and Ambuj Garg's direction and incorporates by reference his answer to paragraphs 51 and 53.

73.     Also following his resignation, Kumawat accessed leads for other fund accounting account managers through NAV shared Outlook mailbox. Kumawat accessed information covering intimate details on prospective clients, such as contact information, needs, and desired pricing. This is the exact information a competitor, such as SFS, could use to undercut NAV and unfairly steal its prospective clients.

**ANSWER:**  Denied.  Answering further, Kumawat incorporates his answer to paragraph 51 and 53 as it relates to the nature of the NAV shared Outlook mailbox.

74.     Kumawat's expressly told Gupta he was leaving NAV to join SFS. Upon information and belief,  Kumawat joined SFS in a role substantially similar to the role he held for NAV. Kumawat would not confirm he was taking a non-competitive role.

**ANSWER:**  Kumawat denies the allegations of paragraph 74, except that he admits that he informed Nav Gupta that he was leaving NAV to join Sudrania Fund Services, Corp. ("SFS") and that he wanted to change his role.

75.     Kumawat's role at SFS will necessarily use and reference his knowledge of NAV's trade secrets and proprietary and confidential information. It is virtually impossible for Kumawat not to rely on the wealth of information he learned and accessed during his employment at NAV while working for a direct competitor.  SFS will undoubtedly advance its efforts by using Kumawat to reference or use NAV's pricing strategy as well as undercut NAV's business development plan Kumawat has helped mold.

**ANSWER:**  Denied.

### COUNT I
### Breach of Contract – Non-Compete
### (Injunctive Relief and Damages)
### Against Kumawat

76.     NAV realleges and incorporates by reference Paragraphs 1 through 75 as though fully set forth herein.

**ANSWER:**  Kumawat adopts and incorporates his answers to the paragraphs above as though fully set forth herein.

77.     The Agreement is a valid and enforceable contract.

**ANSWER:** Denied. Answering further, the Agreement was procured under duress, in a discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The Agreement is void and/or unenforceable as against Illinois public policy and contrary to Illinois law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that purported agreement, overbreadth, and vagueness.

78.    In consideration for entering into the Agreement, NAV provided Kumawat a $2,000 signing bonus, access to NAV's trade secrets and proprietary and confidential information, and guaranteed employment for a five-year term.

**ANSWER:** Mr. Kumawat denies the allegations in paragraph 78, except he admits that he received $2,000 in connection with the Agreement.

79.    Kumawat also negotiated and received a $17,500 raise in exchange for signing the Agreement.

**ANSWER:** Denied.

80.    Among other obligations under the Agreement, Kumawat agreed and was obligated, for a period of twenty-four (24) months following the separation of his employment, not to be employed by an entity in competition with NAV, specifically including SFS.

**ANSWER:** Denied. Answering further, the Agreement was procured under duress, in a discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The Agreement is void and/or unenforceable as against Illinois public policy and contrary to Illinois law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that purported agreement, overbreadth, and vagueness.

81.    The restriction is narrowly tailored and only applies to a role "substantially similar" to that of Kumawat's role at NAV based on the duties, responsibilities, and services provided by Kumawat at any time during the twenty-four (24) month period prior to his last day of employment. The non-competition restriction is limited to businesses that sell or provide products or services

that are competitive with NAV's products or services sold or provided during the last twelve (12) months of Kumawat's employment with NAV or was being actively and demonstrably planned by NAV for which Kumawat had involvement at any time during the last twelve (12) months of his employment or for which Kumawat has Confidential Information.

**ANSWER:** Denied. Answering further, the Agreement was procured under duress, in a discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The Agreement is void and/or unenforceable as against Illinois public policy and contrary to Illinois law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that purported agreement, overbreadth, and vagueness.

82.     The temporal scope of twenty-four (24) months is reasonable and limited to the extent necessary to protect NAV.

**ANSWER:** Denied. Answering further, the Agreement was procured under duress, in a discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The Agreement is void and/or unenforceable as against Illinois public policy and contrary to Illinois law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that purported agreement, overbreadth, and vagueness.

83.     The terms of the Agreement are not greater than required for the protection of NAV's legitimate business interests, including its trade secrets and proprietary and confidential information, and the valuable relationships it has cultured with its clients, which were developed at considerable expense, time, and difficulty.

**ANSWER:** Denied. Answering further, the Agreement was procured under duress, in a discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The Agreement is void and/or unenforceable as against Illinois public policy and contrary to Illinois law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that purported agreement,

overbreadth, and vagueness.

84.     Kumawat breached the Agreement by leaving NAV to join SFS, a direct competitor of NAV, in a position with responsibilities substantially similar to his position at NAV.  Kumawat will be acting in a competing role for a competing business. Kumawat's position at SFS will involve the use or disclosure, or the likelihood of the use or disclosure, of NAV's confidential information.

**ANSWER:**  Denied. Answering further, the Agreement was procured under duress, in a

discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The

Agreement is void and/or unenforceable as against Illinois public policy and contrary to Illinois

law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a

failure of consideration, NAV's failure to perform under the terms of that purported agreement,

overbreadth, and vagueness.

85.     SFS and NAV provide the same hedge fund administration services, and SFS competes against NAV for the same clients in the hedge fund administration arena.

**ANSWER:**  Denied.

86.     Kumawat knew he had a duty not to compete against NAV, and NAV reminded Kumawat of his post-employment obligations prior to his resignation.

**ANSWER:**  Denied.

87.     NAV has fully performed its contractual obligations to Kumawat under the Agreement.

**ANSWER:**  Denied.

88.     NAV has and will continue to suffer damages as a result of Kumawat's breach of contract, including without limitation, diminishing value of NAV's trade secrets and confidential and proprietary information, harm to NAV's relationships with its clients by unfairly competing for the same clients with whom Kumawat has deep relationships, and undermining NAV's competitive edge in the hedge fund administration arena.

**ANSWER:**  Denied. Answering further, the Agreement was procured under duress, in a

discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The

Agreement is void and/or unenforceable as against Illinois public policy and contrary to Illinois

law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that purported agreement, overbreadth, and vagueness.

89.     NAV's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

**ANSWER:**  Denied.

90.     Kumawat's actions will continue to cause harm to NAV if not restrained.

**ANSWER:**  Denied.

91.     NAV has demonstrated that Kumawat, unless enjoined, has already and will continue to engage in conduct that breaches the Agreement.

**ANSWER:**  Denied.

92.     The terms of the Agreement do not pose an undue hardship on Kumawat.

**ANSWER:**  Denied. Answering further, the Agreement was procured under duress, in a discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The Agreement is void and/or unenforceable as against Illinois public policy and contrary to Illinois law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that purported agreement, overbreadth, and vagueness.

93.     The Agreement is not injurious to the public.

**ANSWER:**  Denied. Answering further, the Agreement was procured under duress, in a discriminatory manner and is thus unconscionable, and is void *ab initio* or voidable. The Agreement is void and/or unenforceable as against Illinois public policy and contrary to Illinois law. The Agreement cannot be enforced by NAV, for instance, because of inadequacy of or a failure of consideration, NAV's failure to perform under the terms of that purported agreement,

overbreadth, and vagueness.

94.    Should this Court grant injunctive relief to NAV, the burden on Kumawat would be slight compared to the injury to NAV if it is not granted. No injury to Kumawat would result from an order requiring him to comport his actions under the Agreement.

**ANSWER:** Denied.

95.    The grant of an injunction will not disserve the public interest.

**ANSWER:** Denied.

WHEREFORE, Kumawat respectfully requests this Honorable Court enter judgment in his favor and against NAV, that NAV take nothing, and for any other further relief the Court deems just and appropriate.

### COUNT II
### Violation of the Illinois Trade Secrets Act
### (Injunctive Relief and Damages)
### Against Kumawat

96.    NAV realleges and incorporates by reference Paragraphs 1 through 95 as though fully set forth herein.

**ANSWER:** Kumawat adopts and incorporates his answers to the paragraphs above as though fully set forth herein.

97.    The Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq.*, prohibits the misappropriation of trade secrets. Under the Act, a trade secret means "information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means, by others who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Id.*

**ANSWER:** Paragraph 97 consists of purported statements of law and/or legal conclusions to which an answer is not required. To the extent that an answer is required, Mr. Kumawat denies the allegations of paragraph 97, except that he admits that NAV purports to bring this action pursuant the Illinois Trade Secrets Act, but denies any liability or wrongdoing or that NAV is

entitled to any relief.

98.     Under the Act, misappropriation means any of the following: "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; (2) Disclosure or use of a trade secret of another without the express or implied consent by a person who: (a) Used improper means to acquire knowledge of the trade secret; (b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (1) Derived from or through a person who had utilized improper means to acquire it; (2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (4) Acquired by accident or mistake." *Id.*

**ANSWER:** Paragraph 98 consists of purported statements of law and/or legal conclusions to which an answer is not required. To the extent that an answer is required, Mr. Kumawat denies the allegations of paragraph 98, except that he admits that NAV purports to bring this action pursuant the Illinois Trade Secrets Act, but denies any liability or wrongdoing or that NAV is entitled to any relief.

99.     Kumawat had access to NAV's unique software, processes, and algorithms, pricing models, anti-money laundering checklists and procedures, client lists, and growth strategy. Kumawat also had knowledge of and access to sensitive client data, including clients' identities, historical client relationships, AUMs, strategies, needs, desired service levels, and pricing structure that has worked for them, especially as related to anti-money laundering compliance officer and money laundering reporting officer services. NAV collected this information about all of its clients, and it worked to constantly update this information as it changed. These granular confidential client details were only known to the individuals who worked on the clients' accounts and were used to provide customized and competitive offerings, services, and price estimates for each specific client. Kumawat helped develop and had knowledge of NAV's plans for expansion and growth, access to which is limited to NAV's top leadership. Kumawat also had access to and knowledge of NAV's business plans and financials for certain of its subsidiaries.

**ANSWER:** Denied.

100.     Prior to his resignation, Kumawat accessed NAV's "take-over file" housed in a shared NAV Outlook mailbox, which houses confidential and proprietary information regarding client funds which NAV is in the process of taking over as fund administrator from a competing fund administrator, such as SFS. Kumawat searched these files for "Sudrania," and, upon information and belief, accessed information regarding the pricing NAV provided to certain funds in competition with SFS. This information contains intimate details on prospective clients, such as contact information, needs, and desired pricing. Kumawat had no legitimate reason to access this database and conduct a search for "Sudrania." This information is highly sensitive, confidential, and could significantly damage NAV if provided to a competitor like SFS. This information

contains independent economic value if given to a competitor.

**ANSWER:**  Kumawat denies the allegations of paragraph 100, except he admits he performed this search at Nav Gupta's direction except he admits he performed this search at Nav Gupta's direction and incorporates by reference his answer to paragraphs 51 and 53.

101.    On June 6, 2022, Kumawat searched NAV shared Outlook mailbox for a specific colleague's lead, which had previously informed NAV it was not interested in moving its fund accounting services to NAV.  Kumawat had no prior relationship with this lead and was not copied on emails with this lead. Even if a lead does not become a NAV client, lead files contain intimate details on prospective clients, such as contact information, needs, and desired pricing, which may be used in later discussions with the lead should they wish to explore changing administrators again. A competitor, such as SFS, could use this information to undercut NAV and unfairly steal its prospective clients.

**ANSWER:**  Denied.  Answering further, Kumawat incorporates his answer to paragraph 51 and 53 as it related to the nature of the NAV shared Outlook mailbox.

102.    This information constitutes trade secrets under Illinois law because it provides independent economic value from not being generally known to others, such as SFS, who can obtain economic value from its use. If a competitor, such as SFS, obtained this information, it could target NAV's current and prospective clients and, among other things, unfairly diminish NAV's market share in the hedge fund administration arena.

**ANSWER:**    Paragraph 102 consists of purported statements of law and/or legal conclusions to which an answer is not required. To the extent that an answer is required, denied.

103.    This information also gives NAV a competitive edge over its competitors, including SFS.

**ANSWER:**  Denied.

104.    One of the customer leads that a search for "Sudrania" uncovered during Kumawat's May 16, 2022 search activity was an SFS customer who subsequently decided to stay with SFS and not move over to NAV.

**ANSWER:**  Kumawat lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 104.

105.    NAV takes reasonable measures to protect the secrecy of its trade secrets.

**ANSWER:** Denied.

106.    NAV's employees, including Kumawat, are required to enter into comprehensive confidentiality agreements to protect NAV's trade secret, confidential, and proprietary information.

**ANSWER:** Denied.

107.    Access to the information is tightly controlled by NAV. Each NAV computer contains software that prohibits any external hardware, such as storage devices, from being connected to the computer to download documents or other data and information. Additionally, all NAV devices are password-protected, and NAV monitors its systems to ensure no unauthorized activity occurs.

**ANSWER:** Denied.

108.    Other information is restricted by level of employee, including information shared at senior leadership meetings and in certain shared databases.

**ANSWER:** Denied.

109.    Kumawat knew he had a duty to maintain the secrecy and confidentiality of NAV's trade secrets due, in part, to his obligations under the Agreement.  NAV reminded Kumawat, prior to his resignation, of his post-employment obligations.

**ANSWER:** Denied.

110.    Kumawat also knew he had a duty to maintain the secrecy and confidentiality of NAV's trade secrets due to his position as NAV's Vice President of Fund Accounting & Compliance.

**ANSWER:** Denied.

111.    In his role with SFS, Kumawat will be performing in a substantially similar role as he held with NAV.

**ANSWER:** Denied.

112.    In his role at SFS, it will be virtually impossible for Kumawat to not rely and draw from the knowledge he learned about NAV's trade secrets and proprietary and confidential information, including NAV's unique software, processes, and algorithms, pricing models, anti-money laundering checklists and procedures, client lists, business development plans, and competitive strategies and techniques. He further will not be able to separate himself from the intimate client information he learned throughout the course of his tenure with NAV, including the clients' identities, AUMs, strategies, needs, desired service levels, and pricing structure that has worked for them, especially as related to the compliance officer and money laundering

reporting officer services.

**ANSWER:** Denied.

113. Kumawat poses a direct threat to immediately use and continue to use NAV's trade secret information relating to NAV's pricing models and strategy, development plans, and granular client information for the benefit of SFS, NAV's direct competitor. Kumawat will inevitably and immediately use NAV's trade secrets without consent of any kind for SFS's financial gain.

**ANSWER:** Denied.

114. Kumawat's extensive knowledge of NAV's confidential and proprietary information relating to its pricing models and strategy, development plans, and granular client information will allow a competitor, including SFS, to irreparably harm NAV's business because NAV and SFS provide the same hedge fund administration services and compete for the same clients in the hedge fund administration arena.

**ANSWER:** Denied.

115. Kumawat is armed with the technical and insider knowledge to help a competitor, particularly SFS, develop and enhance its services and offerings and target clients to unfairly compete against NAV.

**ANSWER:** Denied.

116. Kumawat's actions constitute threatened misappropriation in violation of the ITSA.

**ANSWER:** Denied.

117. Kumawat's actions constitute a willful and malicious violation of the ITSA.

**ANSWER:** Denied.

118. NAV has suffered and will continue to suffer damages and irreparable harm as a result of Kumawat's actions, including without limitation, diminishing value of NAV's trade secret, confidential, and proprietary information, harm to NAV's relationships with its clients by unfairly competing for the same clients with whom Kumawat developed deep relationships while at NAV, and undermining NAV's competitive edge in the hedge fund administration arena.

**ANSWER:** Denied.

119. NAV is entitled to actual damages and punitive damages from Kumawat as well as attorneys' fees.

**ANSWER:** Denied.

120.    NAV's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

**ANSWER:**  Denied.

121.    Kumawat's actions will continue to cause irreparable harm and damages to NAV and its trade secret information if not restrained.

**ANSWER:**  Denied.

WHEREFORE, Kumawat respectfully requests this Honorable Court enter judgment in his favor and against NAV, that NAV take nothing, and for any other further relief the Court deems just and appropriate.

**COUNT III**
**Violation of the Defend Trade Secrets Act**
**(Injunctive Relief and Damages)**
**Against Kumawat**

122.    NAV realleges and incorporates by reference Paragraphs 1 through 121 as though fully set forth herein.

**ANSWER:**  Kumawat adopts and incorporates his answers to the paragraphs above as though fully set forth herein.

123.    The Defend Trade Secrets Act ("DTSA") of 2016, Pub. L. No. 114-153, 130 Stat. 376, which was passed into law on May 11, 2016 and amends chapter 90 of Title 18 of the U.S. Code, forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

**ANSWER:**  Paragraph 123 consists of purported statements of law and/or legal conclusions to which an answer is not required. To the extent that an answer is required, Mr. Kumawat denies the allegations of paragraph 123, except that he admits that NAV purports to bring this action pursuant the Defend Trade Secrets Act, but denies any liability or wrongdoing or that NAV is entitled to any relief.

124.    Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans,

-36-

compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3) (as amended).

**ANSWER:** Paragraph 124 consists of purported statements of law and/or legal conclusions to which an answer is not required. To the extent that an answer is required, denied.

125. Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake." 18 U.S.C. § 1839(5) (as amended).

**ANSWER:** Paragraph 125 consists of purported statements of law and/or legal conclusions to which an answer is not required. To the extent that an answer is required, denied.

126. Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6) (as amended).

**ANSWER:** Paragraph 126 consists of purported statements of law and/or legal conclusions to which an answer is not required. To the extent that an answer is required, denied.

127. Kumawat had access to NAV's unique software, processes, and algorithms, pricing models, anti-money laundering checklists and procedures, client lists, and growth strategy. Kumawat also had knowledge of and access to sensitive client data, including clients' identities, AUMs, strategies, needs, desired service levels, and pricing structure that has worked for them, especially as related to the compliance officer and money laundering reporting officer services. Kumawat helped develop and had knowledge of NAV's plans for expansion and growth, access to which is limited to NAV's top leadership. Kumawat also had access to and knowledge of NAV's

business plans and financials for certain of its subsidiaries.

**ANSWER:** Denied.

128. Prior to his resignation, Kumawat accessed NAV's "take-over file" housed in a shared NAV Outlook mailbox, which houses confidential and proprietary information regarding client funds which NAV is in the process of taking over as fund administrator from a competing fund administrator, such as SFS. Kumawat searched this database using the term "Sudrania." Kumawat had no legitimate reason to access this database and conduct a search for "Sudrania." Based on the information present in this database, Kumawat accessed information regarding pricing options made to funds moving from SFS to NAV (and others). Such information is incredibly sensitive and would significantly damage NAV if provided to a competitor like SFS. With this information, SFS would have direct knowledge of the pricing NAV is offering current and prospective funds and could use this information to improperly compete with NAV for such funds.

**ANSWER:** Kumawat denies the allegations of paragraph 128, except he admits he performed this search at Nav Gupta's direction and incorporates his answer to paragraphs 51 and 53.

129. One of the customer leads that a search for "Sudrania" uncovered during Kumawat's May 16, 2022 search activity was an SFS customer who subsequently decided to stay with SFS and not move over to NAV.

**ANSWER:** Kumawat lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 129.

130. On June 6, 2022, Kumawat searched NAV shared Outlook mailbox for a specific colleague's lead, which had previously informed NAV it was not interested in moving its fund accounting services to NAV. Kumawat had no prior relationship with this lead and was not copied on emails with this lead. Even if a lead does not become a NAV client, lead files contain intimate details on prospective clients, such as contact information, needs, and desired pricing, which may be used in later discussions with the lead should they wish to explore changing administrators again. A competitor, such as SFS, could use this information to undercut NAV and unfairly steal its prospective clients.

**ANSWER:** Denied. Answering further, Kumawat incorporates his answer to paragraph 51 and 53 as it relates to the nature of the NAV shared Outlook mailbox.

131. This information derives independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. If a

competitor, particularly SFS, obtained this information, it could target NAV's current and prospective clients and, among other things, unfairly diminish NAV's market share in the hedge fund administration arena.

**ANSWER:** Denied.

132. NAV took reasonable steps to keep this information secret.

**ANSWER:** Denied.

133. Kumawat knew he had a duty to maintain the secrecy of NAV's trade secrets and proprietary information, and NAV reminded Kumawat, prior to his resignation, of his obligations to maintain the secrecy of this information.

**ANSWER:** Denied.

134. NAV employees, including Kumawat, are required to enter into comprehensive confidentiality agreements to protect NAV's trade secret, confidential, and proprietary information.

**ANSWER:** Denied.

135. Access to the information is tightly controlled by NAV. Each NAV computer contains software that prohibits any external hardware, such as storage devices, from being connected to the computer to download documents or other data and information. Additionally, all NAV devices are password-protected, and NAV monitors all its systems to ensure no unauthorized activity occurs.

**ANSWER:** Denied.

136. Other information is restricted by level of employee, including information shared at senior leadership meetings and in certain shared databases.

**ANSWER:** Denied.

137. Kumawat also knew he had a duty to maintain the secrecy and confidentiality of NAV's trade secrets due to his position as NAV's Vice President of Fund Accounting & Compliance.

**ANSWER:** Denied.

138. Kumawat's role with SFS features substantially the same or similar duties and responsibilities as his role with NAV.

**ANSWER:** Denied.

139.    In his role at SFS, it will be impossible for Kumawat not to rely on or draw upon the knowledge he learned about NAV's trade secrets and proprietary and confidential information, including NAV's unique software, processes, and algorithms, pricing models, an anti-money laundering checklists and procedures, client lists, business development plans, and competitive strategies and techniques. He further will not be able to separate himself from the intimate client information he learned throughout the course of his tenure with NAV, including the clients' identities, AUMs, strategies, needs, desired service levels, and pricing structure that has worked for them, especially as related to the compliance officer and money laundering reporting officer services.

**ANSWER:**  Denied.

140.    In violation of the Agreement, Kumawat will improperly use NAV's trade secret information in his capacity as an employee of SFS, a direct competitor to NAV, with parallel responsibilities and duties to his role at NAV. By working at SFS to develop the same strategies to acquire the hedge fund clients for which NAV and SFS compete. Kumawat will be using the data and information he learned and helped develop at NAV to unfairly compete for the same clients and to develop SFS's competitive edge against NAV.

**ANSWER:**  Denied.

141.    Kumawat will improperly use and disclose NAV's trade secret information for the purpose of unlawfully using this information to benefit himself and SFS to NAV's detriment.  SFS competes against NAV for the same clients in the hedge fund administration arena.

**ANSWER:**  Denied.

142.    Kumawat's actions constitute threatened misappropriation in violation of the DTSA.

**ANSWER:**  Denied.

143.    Kumawat's actions constitute a willful and malicious violation of the DTSA.

**ANSWER:**  Denied.

144.    As a result of Kumawat's conduct, NAV has suffered and will continue to suffer damages and irreparable harm, including without limitation, diminishing the value of NAV's trade secret, confidential, and proprietary information, harm to NAV's relationships with its clients by unfairly competing for the same clients with whom Kumawat developed deep relationships while at NAV, and undermining NAV's competitive edge in the hedge fund administration arena.

**ANSWER:**  Denied.

NAV's damages cannot be adequately compensated through remedies at law alone,thereby requiring equitable relief in addition to compensatory relief.

**ANSWER:** Denied.

145.    Kumawat will continue to cause irreparable harm and damages to NAV and its trade secrets and proprietary information if not restrained.

**ANSWER:** Denied.

WHEREFORE, Kumawat respectfully requests this Honorable Court enter judgment in his favor and against NAV, that NAV take nothing, and for any other further relief the Court deems just and appropriate.

**COUNT IV**
**Tortious Interference with Contractual Relations**
**(Injunctive Relief and Damages)**
**Against SFS**

146.    NAV realleges and incorporates by reference Paragraphs 1 through 146 as though fully set forth herein.

**ANSWER:** Kumawat adopts and incorporates his answers to the paragraphs above as though fully set forth herein.

147.    Kumawat signed a valid and enforceable Agreement in which Kumawat promised, among other things, not to compete and not to disclose NAV's trade secrets and confidential information.

**ANSWER:** Paragraph 147 is not directed at Mr. Kumawat, so no answer is required. To the extent an answer is required, denied.

148.    Kumawat resigned from NAV to join SFS in a competing role.

**ANSWER:** Paragraph 148 is not directed at Mr. Kumawat, so no answer is required. To the extent an answer is required, denied.

149.    SFS had knowledge of Kumawat's Agreement and his contractual obligations to NAV. SFS knew that its employment of Kumawat would cause him to breach his Agreement with NAV.

**ANSWER:** Paragraph 149 is not directed at Mr. Kumawat, so no answer is required. To

the extent an answer is required, denied.

150.    SFS nevertheless intentionally interfered with the contractual relationships between NAV and Kumawat by inducing him to breach his contract by joining SFS, a competitive business and in a competing role, and by disclosing trade secrets and Confidential Information.

**ANSWER:**  Paragraph 150 is not directed at Mr. Kumawat, so no answer is required. To

the extent an answer is required, denied.

151.    SFS's intentional interference with the contractual relationships between NAV and Kumawat was improper and without justification. SFS knew Kumawat was bound by the restrictive covenants in his Agreement yet, nevertheless, improperly induced and knowingly and intentionally employed him in violation of those covenants.

**ANSWER:**  Paragraph 151 is not directed at Mr. Kumawat, so no answer is required. To

the extent an answer is required, denied.

152.    SFS's actions were improper, unjustified, malicious, and in reckless disregard for NAV's rights, entitling NAV to injunctive relief and damages. SFS induced Kumawat to violate his Agreement, in furtherance of SFS's plan to unfairly compete with NAV, expand its business, gain more clients, and generate more revenue at the expense of NAV's business and with the help of Kumawat's knowledge of NAV's unique software, processes, and algorithms, pricing models, anti-money laundering checklists and procedures, client lists, business development plans, and competitive strategies and techniques as well as his deep relationships with and intimate knowledge of the granular details of NAV's clients, especially as related to the compliance officer and money laundering reporting officer services.

**ANSWER:**  Paragraph 152 is not directed at Mr. Kumawat, so no answer is required. To

the extent an answer is required, denied.

153.    NAV has suffered and will continue to suffer damages and irreparable harm as a direct result of SFS's tortious interference with contractual relations, including diminished value of its confidential information, harm to its goodwill and reputation, and loss of its competitive advantage.

**ANSWER:**  Paragraph 153 is not directed at Mr. Kumawat, so no answer is required. To

the extent an answer is required, denied.

154.    NAV's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

**ANSWER:**  Paragraph 154 is not directed at Mr. Kumawat, so no answer is required. To

the extent an answer is required, denied.

155.    SFS's actions will continue to cause irreparable harm and damages to NAV if not restrained.

**ANSWER:**  Paragraph 155 is not directed at Mr. Kumawat, so no answer is required. To the extent an answer is required, denied.

WHEREFORE, Kumawat respectfully requests this Honorable Court enter judgment in his favor and against NAV, that NAV take nothing, and for any other further relief the Court deems just and appropriate.

## AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

Without assuming the burden of proof on any matter that would otherwise rest with NAV, and expressly denying all wrongdoing and liability, Mr. Kumawat alleges the following as his counterclaims against NAV and additional reasons why NAV is not entitled to any relief:

## FACTS COMMON TO ALL DEFENSES AND COUNTERCLAIMS

1.    Nav Gupta is NAV's founder and Chief Executive Officer. Mr. Gupta and his family members own all or nearly all of NAV's shares. Mr. Gupta exerts considerable control over all of NAV's day-to-day operations.

2.    NAV boasts on its website that it is "among the top 10 global hedge fund administrators by number of funds, servicing more than $180 billion AUA," and that the "NAV team of 2,250 professionals is highly qualified, offering expertise in fund administration, compliance, security, IT, and accounting disciplines." *See* https://www.navconsulting.net/fund-administration-hedge-funds (last visited 09/02/2022). However, NAV itself employs only two to three dozen people. The overwhelming majority of those NAV apparently counts among its "team" actually work in India for a company called Back Office IT Solutions Private Limited ("Back Office").

3. NAV subcontracts with Back Office to perform hedge fund accounting services for NAV's clients. Outsourcing those services reduces labor costs and enables NAV to charge its clients less than if American workers performed those services.

4. Kumawat is an Indian citizen whose race is Asian and whose ethnicity and national origin is Indian. Kumawat currently resides in Naperville, Illinois, with his wife and children. Kumawat and his wife are both lawful permanent residents. Kumawat's children are American citizens.

5. Kumawat worked for Back Office from about September 2006 until August 2007, when he moved to the United States to work for NAV at NAV's request. NAV sponsored Kumawat's visa and paid for an immigration lawyer to complete the necessary paperwork.

6. Several months after Kumawat joined NAV, in December 2007, NAV required him to sign the first in a series of exploitative and one-sided employment agreements. Like other similarly-situated Indian employees, the 2007 agreement locked him into working at NAV for a three-year term, while allowing NAV to terminate Kumawat's employment at any time if NAV determined that Kumawat's performance was "unsatisfactory."

7. The 2007 employment agreement that Kumawat signed made explicit the threat that NAV would send the Indian-born employee back to India if they failed to comply with all of NAV's directives. (A copy of the 2007 alleged agreement is attached hereto as Exhibit A.)

8. Specifically, Paragraph 5 of the 2007 employment agreement states:

> That if at any time during the employment the employee is found to be guilty of any misconduct or any act which is against the interest of the employer and or non compliance of the instructions given to him from time to time by the employer, the employer may without any notice put an end to the employment and can send back the employee to India. In such event, the employee will be liable for all losses/damages on account of travel, stay, salary and allowances etc, incurred by the employer.

Exhibit A, ¶ 5 (emphasis added).

9.      The agreement asserted that Kumawat would owe as $5,000 for his "travel from India to US, boarding and lodging and other miscellaneous [visa-related] expenses" and $10,000 for "various training" Kumawat was allegedly to receive.

10.     Upon information and belief, NAV did not spend anywhere close to this amount on Kumawat's travel, lodging and other expenses.

11.     Kumawat did not receive specific training from NAV, but instead used his own resources and know-how to gain the knowledge and skills necessary to perform his job duties.  In fact, Kumawat complete training and certification to gain his certifications as a CPA and CFA utilizing his own money and resources during personal time.

12.     Therefore, the recitation of this consideration was false and inaccurate.

13.     At the time, Kumawat first applied for an H1-B visa to permit him to work in the United States, his role at NAV was "Auditor-Hedge Fund." While Mr. Kumawat's role changed throughout his tenure with the company, he is not ware of actions taken by NAV to properly keep the U.S. government informed of any changes, which could have also hampered his application process.

14.     At some point during his tenure, on information and belief, in or about 2010 when he reached a milestone in the process of achieving permanent-resident status in the United States, Mr. Kumawat was required to sign another employment agreement, but he does not have a copy of that agreement.

15.     NAV makes a practice of preventing its employees from having ready access to the purported employment agreements it forces its Indian-born employees to sign.

16.     About four years into his tenure at NAV, NAV finally filed the paperwork Kumawat needed to obtain the "priority date" he would need to eventually apply for his Green Card. The7re is no legal reason NAV needed to delay for years in submitting this paperwork on Kumawat's behalf.

17.     After receiving his priority date, Kumawat still had to wait for years for his priority date to become "current" so he could actually apply to receive his Green Card.

18.     Kumawat had no way of communicating directly with the immigration attorneys working on his case. All communication with Kumawat's immigration attorneys was handled by NAV and other senior people at NAV close to Mr. Nav Gupta. Thus, Kumawat was left in the dark about his immigration status and forced solely to rely on NAV in that respect.

19.     Meanwhile, Kumawat provided NAV with years of dedicated service. Despite his dedication to the company, NAV treated Kumawat less favorably than his similarly situated peers who were not from India, as described further below.

20.     Further, there were many occasions where white, American-born employees with less knowledge and experience than Kumawat were promoted over him. Yet Kumawat's clients would often assume that he was in charge of these American employees because he was more competent than they were. After many years, Kumawat was eventually promoted to "Senior Account Manager," the second lowest and most common position at NAV for individuals who interface with accounts.

21.     In September 2020—after he had spent more than 13 years working for NAV—Kumawat received word that his priority date had finally become "current," but Kumawat still needed NAV to sponsor his application.

22. NAV was not proactive about capitalizing on Kumawat's current priority date, however. Kumawat and other NAV employees had to repeatedly follow-up with NAV to make the retained immigration lawyers take necessary steps for the Green Card process.

23. NAV instructed employees with Green Cards and those also in the process of procuring Green Cards not to communicate with others regarding their immigration status.

24. On November 4, 2020, shortly after his priority date became current, NAV presented Kumawat with another employment agreement.

25. The implication was clear: Kumawat could either sign the new employment agreement or risk losing his chance to obtain permanent residency. In other words, confronted with the prospect that Kumawat would no longer be dependent on the company for his immigration status, NAV needed another way to prevent him from going to another company.

26. In contrast to his disinterest in completing the Green Card process, Mr. Nav Gupta, NAV's founder, repeatedly followed up with Kumawat about signing the new agreement.

27. Kumawat did not believe he could consult with a lawyer concerning the terms of the new agreement and did not have an opportunity to do so. Mr. Kumawat felt he had no choice but to sign the agreement or else lose his opportunity at a Green Card.

28. Moreover, Kumawat is aware of other instances in which Mr. Gupta utilized the same agreements and practices with other colleagues employed with NAV including refusing to provide necessary letters or support for obtaining a Green Card unless the employee executed whatever agreements Mr. Gupta requested.

29. Like the other one-sided employment agreements, the 2020 Agreement was extremely one-sided in favor of NAV, and none of the provisions were discussed by or negotiated by Kumawat (despite the agreement's representations indicating otherwise). The Agreement also

provided representations concerning the consideration NAV intended to provide in support of Kumawat's obligations.

30.     Other than the payment of $2,000, however, none of those representations or the consideration supporting those representations were true, and none of the promises made by NAV were actually performed.

31.     Although Gupta told Kumawat that all NAV employees were required to sign a similar employment agreement, on information and belief, this statement was false.

32.     Among other provisions, the agreement locked Kumawat into working for NAV for another five years. During that period, if Kumawat wanted to leave NAV's service, he had to pay the equivalent of four months' salary as liquidated damages.  NAV, however, misleading referred to this provision as an "early termination fee"—something that similarly situated American employees were never forced to confront.

33.     During that same period, NAV could terminate Kumawat's employment for cause or without cause by paying his salary for six months less any unemployment insurance payments Kumawat received. At the conclusion of the five-year period, NAV would be able to terminate Kumawat's employment "at any time, with or without cause and with or without notice."

34.     The agreement also purported to prohibit Kumawat from working for any company that provides "hedge fund accounting services" anywhere in the world within two years of the termination of his employment with NAV, even if NAV fired him.

35.     Having no choice but to either sign the 2020 agreement as presented or give up his chance at a Green Card and uproot his family and return to India, Kumawat signed the agreement.

36.     The following month, NAV filed his application for permanent residency, which was eventually approved in October 2021.

37.     Contrary to the representations in the Agreement, NAV provided him with no additional training; he did not receive access to any information he did not already have before signing the document.

38.     In fact, his position did not change at all. While Kumawat earned his CPA and CFA during that same time frame, he did that with his own money and time—NAV did not contribute whatsoever.

39.     After Kumawat signed the document, NAV continued to treat him differently from white, American-born employees, knowing that Kumawat had no choice but to continue working for NAV or face possible legal action.

40.     Although a "Vice President" in name only, Kumawat's duties at NAV were not different than other senior and regular account managers.

41.     It eventually became clear to Kumawat that extricating himself from this employment relationship was the only way he would ever advance in his career. Kumawat therefore tendered his resignation on May 12, 2022, effective July 11, 2022.

42.     Upon resignation, NAV initially "reminded" Kumawat of his obligations under the Agreement, and reminded him that he would be in violation of those obligations if he left before his term was complete.

43.     Despite pressure to stay, Kumawat refused to withdraw his resignation.  Kumawat spent two months at NAV working diligently and in good faith, taking calls on early mornings, evenings, and weekends to transition his work to others.

44.     The first time Kumawat learned that NAV was alleging he had improperly accessed information was when he reviewed the complaint NAV filed in the instant action. He was shocked

to learn NAV was making such allegations because no one had ever voiced any such concerns to him while he was at NAV.

45.    Kumawat never improperly accessed or took any confidential or trade secret information of NAV's.

46.    Kumawat was not the only one to receive such treatment. Other Indian-born employees on temporary visas in the United States experienced similar treatment.

47.    These Indian-born employees did the bulk of the work, including the more difficult task, while the white, American employees were the "face" of the organization.

48.    The American-born employees also received the first opportunities for business travel and attending awards functions, conferences, seminars, client meetings and the like.

49.    On information and belief, Indian-born employees were also paid less than their white, American peers. By way of example, Kumawat's salary was $50,000 to $100,000 lower than multiple similarly situated white, American colleagues every year from 2007 through 2020.

50.    Kumawat was underpaid with each paycheck through the end of his employment with NAV.

51.    In addition, NAV disparately treated Indian-born employees through performance reviews and unequal job expectations. NAV had an informal procedure for internal promotions. NAV's leadership, including Mr. Gupta, would typically inform employees during their annual review whether they would be promoted. Kumawat regularly complained to NAV that he deserved a promotion, but NAV dismissed the complaints with vague criticisms such as "100% effort was not visible."

52.    Likewise, whenever an issue would arise with a client, Mr. Gupta and NAV's management would be quick to blame the Indian-born employees for the alleged mistakes, while

ignoring mistakes made by white, American-born employees. These criticisms were pretext for discrimination because NAV has already admitted that Kumawat was a highly-valued employee.

53.     Similarly, if work needed to be done on the weekend or late at night, only the Indian-born employees were forced to do that work. NAV also forced Indian-born employees to do the riskiest jobs in the industry (*e.g.*, Anti-Money Laundering) without any training from NAV. Because of the stakes involved in the position and the lack of training and resources provided by NAV, NAV's white, American-born employees refused to accept these responsibilities.

54.     Meanwhile, the similarly situated white, American-born employees received meaningful and material promotions, were paid more than Kumawat despite fewer responsibilities, and were given more exposure to clients and opportunities for business development.

55.     In addition, only Indian-born employees were subjected to performing menial tasks outside their job responsibilities, such as picking up people from the airport at Mr. Gupta's direction, arranging meals for Mr. Gupta's personal guests, moving furniture on the weekends when NAV was relocating its offices, and carting Mr. Gupta's boxes and belongings to and from India while on personal vacations.

56.     Kumawat and the other Indian-born employees feared they would be terminated or face other adverse employment actions if they refused to perform these tasks, which were not expected of white, American-born employees.

57.     NAV has pursued legal action against multiple former Indian-born employees to enforce the employment agreements.

58.     On the other hand, upon information and belief, NAV does not require its white, American-born employees to sign employment agreements with similar provisions, and Mr. Kumawat is unaware of any legal action by NAV against such white employees, despite the fact

that several white, American employees have left NAV to work for one of NAV's direct competitors.

59.     Mr. Gupta was personally involved in the mistreatment Kumawat experienced as a NAV employee. As NAV's founder, primary shareholder, and CEO, Mr. Gupta signs off on all of the company's significant employment-related decisions, as evidenced by the fact that Mr. Gupta personally signed all of the employment agreements described herein. Moroever, Mr. Gupta would even pressure Mr. Kumawat to share personal details about medication, family pregnancies, and births. Mr. Gupta would also exert control over Mr. Kumwat's, and other social activities outside the office and sought to limit the individuals with whom employees like Mr. Kumawat and his family members could socialize. Gupta even asked employees of Indian-decent not to partake in certain religious activities for his own personal benefit.  At times, Mr. Gupta even threatened to send Mr. Kumawat to jail if he did not follow Mr. Gupta's instructions.

60.     Kumawat has suffered significant monetary damages including back-pay as a result of NAV and Gupta's discriminatory failure to promote him and failure to pay him as much as similarly-situated non-Indian-born employees. He has also suffered significant compensatory damages including damage to his career progress and reputation, and has suffered through anxiety, depression, mental anguish, humiliation, and embarrassment because of NAV and Gupta.

61.     Today, Kumawat works at SFS performing tasks that are different than those that he performed at NAV. Kumawat simply wants to be made whole after the years of discrimination and improper conduct NAV and Gupta subjected him to and to move on with his life.

**AFFIRMATIVE DEFENSES**

62.     Kumawat hereby incorporates the allegations in his Facts Common to All Defenses and Counterclaims as if set forth fully herein.

## FIRST AFFIRMATIVE DEFENSE – DURESS

63.     The 2020 employment agreement is void and unenforceable.

64.     Having no choice but to either sign the 2020 document as presented or give up his chances at a Green Card and uproot his family and return to India, Kumawat signed the document under duress.

65.     Kumawat was deprived of the exercise of his free will and had no option but to sign the 2020 agreement.

## SECOND AFFIRMATIVE DEFENSE – FAILURE OF CONSIDERATION

66.     As discussed above, NAV never delivered on the promises and bargained for exchange recited in the 2020 document.

67.     The only consideration received for the 2020 agreement was $2,000 and such consideration was inadequate to support the significant promises contained therein by Mr. Kumawat.

68.     The agreement is therefore unenforceable.

## THIRD AFFIRMATIVE DEFENSE – UNCLEAN HANDS

69.     As pleaded throughout, NAV has acted wrongfully and in bad faith during the course of the employment relationship, by, among other things, presenting Kumawat with an "employment agreement" under duress as a pre-condition to NAV completing Kumawat's citizenship process and has discriminated against Mr. Kumawat based on his race, ethnicity and national origin.

70.     NAV has brought its claims before this Court with unclean hands, and, therefore, its claims against Kumawat cannot stand.

## FOURTH AFFIRMATIVE DEFENSE – LACK OF INJURY

71.     NAV's requested relief is barred because it has not suffered any actual injury.

## FIFTH AFFIRMATIVE DEFENSE – DUE PROCESS

72.     NAV's claims for punitive damages, or any liability or damages based on vague or ambiguous law, violates Kumawat's right to procedural due process under the Fourteenth Amendment to the United States Constitution, and to substantive due process under the Fifth and Fourteenth Amendments of the United States Constitution, and therefore, fails to state a cause of action upon which punitive damages may be awarded.

## SIXTH AFFIRMATIVE DEFENSE – DAMAGES OR PENALTIES EXCEEDING ACTUAL DAMAGES UNCONSTITUTIONAL

73.     NAV's claims for punitive damages are unconstitutional because such damages and/or penalties would violate the Fifth and Eighth Amendments to the United States Constitution.

## SEVENTH AFFIRMATIVE DEFENSE – LACK OF ENFORCEABILITY

74.     Plaintiff's claims for breach of contract fail due to the indefiniteness, vagueness, and/or ambiguity of the alleged contract.

## EIGHTH AFFIRMATIVE DEFENSE – FAIR COMPETITION

75.     Kumawat acted with justification at all relevant times, consistent with fair competition for legitimate business purposes, in further of his lawful interests and by lawful means thus, barring Plaintiff's claims.

## NINTH AFFIRMATIVE DEFENSES - ILLEGALITY

76.     To the extent, consistent with codification in 820 ILCS 90, *et. seq.* the terms of the Agreement alleged by Plaintiff is contrary to Illinois law and/or the "Illinois Freedom to Work Act," the Agreement is unenforceable as illegal.

77.     Moreover, to the extent the terms of the Agreement alleged by Plaintiff is contrary to Federal law, as adopted by guidance from the Department of Labor prohibiting such terms, the Agreement is unenforceable as illegal.

## TENTH AFFIRMATIVE DEFENSE - LACHES

78.     Because Plaintiff was aware of Kumawat's alleged actions and conduct from the time of his notice until his ultimate departure from employment with Plaintiff and failed to take appropriate actions regarding the actions now alleged in this matter, Plaintiff's claims are barred by the equitable doctrine of laches.

79.     For instance, while Plaintiff was aware of Mr. Kumawat's intention to leave Plaintiff's employment, Plaintiff maintained a "NAV shared Outlook mailbox" that was accessed by, at least, all accounting staff employees regardless of whether or not such employee was at the most junior or senior level in the company. Any employee with access to the NAV shared Outlook mailbox could see, change, copy, paste, or delete information and files from that mailbox. To Kumawat's knowledge, there were no restrictions placed on that mailbox and even some contractors from Back Office had access to the mailbox.

80.     NAV not only permitted Kumawat to access that shared Outlook mailbox during the period after he gave notice of his impending resignation and intention to work for SFS, but directed him to access it.

81.     Plaintiff improperly delayed any action to assert its rights now complained about herein.

82.     That delay was not reasonable or excusable under the circumstances.

83.     Plaintiff acquiesced in Kumawat's resignation and assumption of a position with SFS by failing to object or take any action to prevent that change during the two months after Kumawat provided his notice.

84.     Kumawat was prejudiced by Plaintiff's conduct because Plaintiff encouraged Kumawat and, in fact, directed him to do so, including accessing certain information that Plaintiff now cites as a basis for Plaintiff's claims.

85.     Kumawat is further prejudiced because Plaintiff's delay has resulted in creating a situation where Plaintiff seeks to bar Kumawat from employment in any role in the industry where he has skills and experience.

## ELEVENTH AFFIRMATIVE DEFENSE – UNCONSCIONABILITY

86.     There is a disparity in bargaining power between NAV and Kumawat.

87.     In addition to the disparity inherent in the employee/employer relationship, additional disparity was caused by Kumawat's necessary reliance on NAV to help him complete the process of obtaining his permanent U.S. residency. This disparity was widened when NAV pressured Kumawat into signing a new employment agreement as a condition for NAV completing the paperwork for Kumawat's U.S. residency. The timing of the presentation deprived Kumawat of a meaningful choice as to whether or not to sign the 2020 agreement.

88.     In addition, the terms of the 2020 agreement are so one-sided in NAV's favor as to oppress Kumawat, or, alternatively, are imbalanced in NAV's favor.

89.     Thus, the 2020 agreement is procedurally unconscionable, substantively unconscionable, or unconscionable under a combination of the factors.

## RESERVATION OF RIGHTS

90.     Kumawat hereby reserves the right to amend his Answer to raise additional affirmative defenses as they become available or apparent to him through discovery in this matter, or otherwise.

## COUNTERCLAIMS

### COUNT I
#### 42 U.S.C. § 1981, as amended – Ethnicity/Race Discrimination Against NAV

91.     Kumawat hereby incorporates all allegations in its Facts Common to All Defenses and Counterclaims as if set forth fully herein.

92.     As a direct result of the acts and omissions described above, NAV has violated, and is continuing to violate 42 U.S.C. § 1981, and has caused and is causing injury to Kumawat, by intentionally discriminating against him because of his ethnicity and/or race.

93.     NAV, by and through Gupta and other officers and employees at his direction, has violated and is continuing to violate 42 U.S.C. Section 1981.

WHEREFORE, Kumawat requests that this Court enter judgment in his favor and against NAV, award him his damages established at trial and his attorneys' fees and costs incurred in bringing and maintaining this Counterclaim, and such other and further relief the Court deems just and equitable.

### COUNT II
#### Request for Declaratory Judgment

94.     Kumawat hereby incorporates all allegations in its Facts Common to All Defenses and Counterclaims as if set forth fully herein.

95.     As evidenced by NAV's claims against Kumawat in the instant suit and Kumawat's affirmative defenses and counterclaims, the Parties have adverse legal interests as it relates to the

2020 employment agreement. NAV claims Kumawat has breached the 2020 employment agreement, whereas Kumawat maintains that the 2020 employment agreement was void *ab initio* based, at least in part, on the fact that it was the product of duress, and the 2020 employment agreement is not supported by adequate consideration because NAV failed to perform under the agreement—*i.e.*, Kumawat never received what was promised to him under the 2020 employment agreement.

96.     Thus, there is an actual controversy between the parties as to the existence and terms of the agreement, pursuant to 28 U.S.C. § 2201.

WHEREFORE, Kumawat requests that the Court declare that the 2020 Contract was void *ab initio*. In the alternative, Kumawat requests that the Court declare that the Settlement Agreement was void for lack of performance by NAV or voidable. Further, Kumawat requests that the Court declare that Kumawat is relieved of performing any outstanding obligations under the 2020 Contract as a result of NAV's wrongful actions in procuring the 2020 Contract from him under duress and/or as a result of NAV's lack of performance under the 2020 Contract.

## **RESERVATION OF RIGHTS**

97.     Kumawat intends to add additional claims under Title VII of the Civil Rights Act of 1964 and the Illinois Human Rights Act, 775 ILCS 5/2-102 after he exhausts his administrative remedies for those claims. Kumawat has filed a claim of employment discrimination with the Illinois Department of Human Rights.

98.     Thus, Kumawat hereby reserves the right to amend his counterclaims.

## **JURY DEMAND**

Mr. Kumawat demands a trial by jury.

Dated: September 9, 2022

Respectfully submitted,

/s/ *Kristen E. Hudson*_____
Kristen E. Hudson
David S. Becker
Payne Keinarth
DICKINSON WRIGHT PLLC
55 West Monroe Street, Suite 1200
Chicago, Illinois 60603
Telephone:  312.641.0060
khudson@dickinson-wright.com
dbecker@dickinson-wright.com
pkeinarth@dickinson-wright.com

*Counsel for Defendant Abhishek Kumawat*

## VERIFICATION

I, Abhishek Kumawat, declare that I have read the Complaint and know the contents thereof. The matters and things set forth therein are true to the best of my knowledge, except as to those matters set forth upon information and belief and, as to those, I believe them to be true.

I declare under penalty of perjury that the aforesaid is true and correct.

Executed on September 7, 2022

Abhishek Kumawat

**<u>CERTIFICATE OF SERVICE</u>**

On the 9th day of September 2022, I served a copy of the foregoing document on all counsel of record by the court's e-service.


<u>/s/ Kristen E. Hudson</u>
Kristen E. Hudson