**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NAV CONSULTING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:22-CV-03624 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| ABHISHEK KUMAWAT and | ) | |
| FORMIDIUM CORP., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This trade-secret and employment-separation case arises out of the departure of longtime employee Abhishek Kumawat from hedge-fund services company NAV Consulting, Inc.[1] Kumawat left to join one of NAV's competitors, Formidium (formerly known as Sudrania Fund Services, or SFS). NAV moves for a preliminary injunction to enjoin Kumawat from breaching his contractual obligations to NAV and from using NAV's trade secret information, and to enjoin Formidium from tortiously interfering with Kumawat's agreement. R. 6, Prelim. Inj. Mot. For the reasons explained in this opinion, NAV's motion for a preliminary injunction is granted in part.

**I. Background**

The facts detailed here are undisputed unless otherwise noted. Nav Gupta founded NAV Fund Consulting in 1991. R. 1, Verif. Compl. at ¶ 12.[2] NAV Consulting

---

[1]The Court has subject matter jurisdiction over this case under 28 USC § 1331 for the federal trade secrets act claim, and supplemental jurisdiction under 28 USC §1367 for the state law claims.

[2]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

is a worldwide hedge-fund administrator that offers, among other things, fund ac-counting services, registrar and transfer agency functions, and regulatory compliance support. *Id.* In addition to its U.S.-based workforce, which works directly with clients, NAV is affiliated with a separate entity in Jaipur, India called NAV Back Office, which supports the U.S. team to service clients. *Id.* ¶ 14.

**Kumawat's Tenure at NAV.** Abhishek Kumawat began working for NAV Consulting (in the United States) in December 2007, and eventually left the company in July 2022. Verif. Compl. ¶¶ 20, 24; R. 70, 10/25/22 PI Tr., at 52–53. He began as an Account Manager and steadily rose the ranks to Senior Account Manager and later to Vice President of Fund Accounting & Compliance. Verif. Compl. ¶¶ 20, 24.. As an Account Manager and Senior Account Manager, Kumawat served in client-facing roles in which he was responsible for managing client relationships on over 200 ac-counts and serving as the primary contact for these accounts. *Id.* ¶ 25; 10/25/22 PI Tr. at 27, Pl. Preliminary Injunction Exh. (PI Exh.) 30. In 2020, when he became the Vice President of Fund Accounting & Compliance, Kumawat continued to have direct contact with clients and developed knowledge of their operations, needs, assets, and strategies. Verif. Compl. ¶¶ 20–22. He performed risk assessments for all new cli-ents, led due-diligence efforts of their investors, prepared anti-money laundering as-sessments, and reviewed service agreements. R. 76, Pl's. Post PI Br., at 15–17. Ku-mawat also served as the deputy money-laundering reporting officer for several cli-ents. *Id.* He also took part in business development, for which he prepared client pro-posals and service agreements. Verif. Compl. ¶ 23.

In November 2020, NAV presented Kumawat with a proposed new employment agreement in recognition of his role at NAV Consulting. Verif. Compl. ¶ 33; R. 1 Exh. A, Employment Agr. Instead of serving as a purely at-will employee, Kumawat agreed on an employment term of five years; if he was terminated without cause within the five-year period, then NAV would pay six months' salary to Kumawat. Employment Agr. ¶ 2(e). Conversely, if Kumawat voluntarily resigned before the five years were up, then he would have to pay an early-termination fee of four months' salary. Verif. Compl. ¶ 37. Also, in exchange for signing the Employment Agreement, Kumawat received additional consideration: a $17,500 raise and a $2,000 signing bonus. *Id.* . ¶¶ 34, 35, 36. For perspective, when Kumawat resigned in 2022, his base salary was $207,000. *Id.* ¶ 56.

The Employment Agreement also included a covenant not to compete. The provision specified in pertinent part, tying the non-compete to competitive business and to the duties that Kumawat performed in the most recent two years:

> Employee agrees that during the Restricted Period, Employee will not (*i*) engage in, (*ii*) own, (*iii*) manage, (*iv*) operate, (*v*) finance, (*vi*) control or (*vii*) represent, advise, or work with (whether as an officer, director, shareholder, owner, co-owner, affiliate, partner, agent, representative, employee, consultant, independent contractor, advisor, or in any other manner), in a *role substantially similar to any of the duties*, responsibilities and services provided by Employee to the Company at any time during the last twenty-four (24) months of his employment with the Company, a Competitive Business.

Verif. Compl. ¶ 38; Employment Agr. at 50–51 (emphasis added) (the page-number citations are to the PDF-pagination numbers). The Agreement also included a non-disclosure provision that protected NAV Consulting's confidential information, instructing that the "(a) Employee will not, at any time during or after Employee's

3

employment with the Company, disclose, use or permit others to use any Confidential Information, except as required in the course of Employee's employment for the benefit of the Company." Employment Agr. at 73.

**Kumwat's Departure to Formidium.** Kumawat did not end up staying at NAV for the full five-year term, and instead left for another fund administration services company. Formidium is a hedge-fund administrator based in Downers Grove, Illinois. The company was founded in 2015 by a former NAV employee, Nilesh Sudrania, as Sudrania, LLC; then was later renamed Sudrania Fund Services (SFS) in 2019; and is now branded as Formidium. Verif. Compl. ¶ 57. The evidence showed that Formidium provides hedge-fund administration services to similar clients as NAV Consulting, Verif. Compl. ¶ 59, 10/25/22 PI Tr. at 102, and thus is a competitor of NAV's. Formidium also has back-office operations in India. Post PI Br. at 14.  NAV has historically considered Formidium to be one of its primary competitors, and indeed explicitly lists Formidium as a Competitive Business in NAV employment agreements. Verif. Compl. ¶¶ 65, 67; Employment Agr. at 48–49.

Over the years, Kumawat had followed Nilesh Sudrania's career via LinkedIn and, in 2022, reached out to Sudrania to seek a role at his company. 10/25/22 PI Tr. at 165. After some discussion, Kumawat was offered a role at Formidium with a starting salary of $150,000 plus $55,000 in stock benefits. *Id.* at 173. Sudrania and Kumawat discussed in general terms the types of work interests that Kumawat hoped to pursue in a new role, but no specifics about Kumawat's particular duties were finalized until later. *Id.* at 212–13.

On May 12, 2022, having accepted Sudrania's offer to join Formidium, Kumawat emailed his resignation to Nav Gupta and provided a 60-day termination notice to NAV Consulting. *Id.* ¶ 47. Kumawat did say to Gupta that Kumawat would be joining Formidium, but Kumawat did not offer specifics on what his role would be there. 10/25/22 PI Tr. at 106. Gupta hoped to retain Kumawat at NAV Consulting and asked to meet shortly after receiving the email—during the ensuing in-person meeting, he offered Kumawat an immediate raise, eventually offering up to $100,000 more than his then-current salary. 10/25/22 PI Tr. at 106, 166, 180. Kumawat declined. *Id.*

During the meeting, Gupta asked what Kumawat would be doing at Formidium, but Kumawat declined to answer. 10/25/22 PI Tr. at 106. At the preliminary-injunction hearing, Kumawat testified that when he accepted the job, he was not sure exactly what he would be working on at Formidium. *Id.* at 179. He had discussed with Sudrania some possible areas in which Kumawat could make contributions, and only later did Formidium and Kumawat formally memorialize job duties in a written description (more on that below). *Id.*

According to Kumawat, Gupta implored him to do his research about the type of company he was getting involved with. 10/25/22 PI Tr. at 167–68. . Gupta told Kumawat that there were clients who had moved from Formidium to NAV Consulting, and that Kumawat should speak to other NAV Consulting staff to understand how NAV Consulting is comparatively perceived (presumably better) at industry conferences. 10/25/22 PI Tr. at 106–08. Kumawat testified that Gupta urged at various

times to do "due diligence," "do research," and "do your homework," *Id.* at 167–68, 192. Gupta denies this. *Id.* at 107.

By Gupta's account, he remained hopeful about eventually getting Kumawat to stay and testified that "I was not going to give up. I was still trying to retain him." 10/25/22 PI Tr. at 109. Hoping to convince Kumawat and or at least to keep projects running while an appropriate replacement was searched for, Gupta continued to entrust Kumawat with several responsibilities and with access to key information in the intervening time. *Id.* at 108–09. At the same time, Gupta ordered Vivek Agarwal, an employee at NAV Back Office in Jaipur, India, to monitor Kumawat's computer activity. *Id.* at 109–110.

On May 16, 2022, during the 60-day termination-notice period, Kumawat accessed a shared NAV email inbox on Microsoft Outlook. 10/25/22 PI Tr. at 170–71. . The mailbox contained confidential information on hedge funds that NAV Consulting was seeking to do businesses with or to take over from a competing fund administrator. Verif. Compl. ¶ 51. Kumawat searched the term "Sudrania" in the Outlook mailbox. *Id.*; Defs. PI Exh. 22; 10/25/22 PI Tr. at 120, 171. Gupta became aware of the search on May 27, 2022, but still elected not to terminate Kumawat's role or revoke his access at that moment, given that Kumawat "was a key employee … handling key accounts, handling key compliance role[s], and we were trying to retain him." 10/25/22 PI Tr at 110. Rather, Gupta elected to maintain Kumawat's access while remaining vigilant, and asked Agarwal to monitor Kumawat closely on a daily basis. *Id.* at 45–46, 49–50.

On July 13, 2022, two days after Kumawat's departure from NAV, NAV Consulting filed this lawsuit, alleging breach of contract; violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1; violation of the federal Defend Trade Secrets Act (DTSA) 18 U.S.C. § 1836; and tortious interference with contractual relations. Verif. Compl. at 18–34. The same day, NAV moved for a preliminary injunction against Kumawat and Formidium, to enjoin Kumawat from violating his contractual obligations to NAV and from using NAV's trade secrets, and to enjoin Formidium from tortiously interfering with Kumawat's employment agreement. Prelim. Inj. Mot. at 1.

Two weeks later, on July 28, 2022, Kumawat emailed Sudrania a draft of a written job description comprising brief summaries of roles in technology integration, data analytics, mergers and acquisitions, and new product development. Defs. PI Exh. 7 at 3–4. Sudrania responded the following day with some feedback, which Kumawat integrated, asking Sudrania if he should send the description anywhere or keep it to himself. Sudrania replied that it was "[f]or HR documentation, and in case you need for any of your legal matters." *Id.* at 1.

## II. Legal Standard

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). The moving party must show: "(1) a likelihood of success on the merits; (2) a lack of an adequate remedy at law; and (3) that an irreparable harm will result if the injunction is not granted." *Lambert v. Buss*,

7

498 F.3d 446, 451 (7th Cir. 2007) (cleaned up). [3] If the moving party meets these requirements, then the court balances the nature and degree of the potential harm to each party and the public interest. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.,* 549 F.3d 1079, 1086 (7th Cir. 2008).

### III. Analysis

NAV Consulting seeks a preliminary injunction to redress what it characterizes as Formidium's "unfair[] targeting and competing with NAV." Prelim. Inj. Mot. at 8. NAV asserts that short of a complete ban preventing Kumawat from taking *any role* at Formidium, NAV will suffer irreparable harm. *See* R. 6-1, Proposed Order at 1. As explained in detail below, the Court finds that a complete ban is not necessary, because Kumawat's now-formulated duties at Formidium are roles that may largely be performed without risking irreparable harm to NAV Consulting. But a limited preliminary injunction is warranted to prevent Kumawat from violating the Employment Agreement and federal and state trade-secrets laws. At the outset, it is worth outlining the end-result preliminary injunction to lend clarity to the upcoming analysis.

Based on the record evidence and the testimony offered at the preliminary-injunction hearing, the Court finds that Kumawat's role at Formidium would have comprised substantially similar duties to what Kumawat was performing at NAV Consulting. In particular, this would include compliance, monitoring, and direct

---

[3]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

services to clients. Several key facts support this finding: first, when Kumawat announced his resignation to Gupta, and Gupta asked what his new role would be, Kumawat refused to disclose what he intended to do at Formidium. 10/25/22 PI Tr. at 106. Rather than assure NAV that he would abide by the Employment Agreement, Kumawat refused to answer. *Id.* That silence speaks volumes, because if Kumawat really intended to comply with the non-compete provision, then it would be easy to just say so. He did not.

Kumawat and Sudrania paint a picture of their pre-transition discussions that defies common sense, and unfortunately their testimony came across as just that—not credible. Kumawat asserted that he accepted the job without an understanding of what he would be working on. *Id.* at 179. Sudrania testified that he and Kumawat had generally discussed Kumawat's desire to build more experience in the technology field before Sudrania extended an offer, and that he wanted to ensure there would be a useful role for Kumawat to fulfil. 10/25/22 PI Tr. at 219–21. ("[I]f you want to build in an area for which I have no use of, then there's no reason for me to hire you."). During the early discussions—before the offer was extended—Sudrania supposedly offered job-duty suggestions based on Kumawat's accounting background and also suggested a data-analytics function. *Id.* at 220–22. Yet, despite these purported discussions, when Kumawat announced his intention to resign, Kumawat said nothing about the potential job duties, *id.* at 168, 179, even when he had every incentive to say that the non-compete would not be violated—if that was going to be true. According to Sudrania, he and Kumawat discussed further specifics of Kumawat's job duties

9

in the two weeks before Kumawat joined Formidium (so the two weeks leading up to July 11), *id.* at 203, 212–13, but again Kumawat never informed NAV what the duties would be or even just generally acknowledged that the non-compete would be in force.

Remember too that this lawsuit was filed on July 13, 2022. R. 1. That same day, NAV emailed notice of the motion to expedite discovery to Kumawat at his personal email address and Formidium at its outside counsel's email address. R. 8 at 9. On July 28, around two weeks after having started at Formidium—and around two weeks after this lawsuit's filing—Kumawat finally email Sudrania a proposed job description setting out four categories of job duties. PI Defs. Exh. 7 at 1. Sudrania responded by offering comments and saying that the description would be used "[f]or HR documentation, and in case you need for any of your legal matters." PI Defs. Exh. 7 at 1.

Under these circumstances, it strains credulity for Sudrania to insist that he had offered Kumawat a $150,000 salary and $55,000 worth of stock benefits for a job at Formidium with little-to-no idea on what Kumawat would be doing there. And the Court finds that it was only after this lawsuit's filing that Kumawat and Sudrania worked on a written job description. As a result, the Court infers that the newly created job description was *not* the original plan for Kumawat's role at Formidium and that they changed course after this suit was filed.

Having said that, after commencement of this suit, Formidium and Kumawat *did* indeed pivot. It does appear that, generally speaking, Formidium now has assigned Kumawat substantially different duties from his functions at NAV as

memorialized in the description. As disclosed at the hearing, Kumawat's new role will focus on technology-specific duties and data analysis. 10/25/22 PI Tr. at 220. Specifically, Kumawat also will support mergers-and-acquisitions work, new product development, data analytics, and technology integration. Defs.' Post PI Resp. at 10. . With the change in course, there need not be a complete ban against Kumawat working at Formidium. Instead, as further described in the specific preliminary injunction order later in this Opinion, Kumawat is barred from working at Formidium in roles in which he would perform compliance and monitoring duties or perform direct-client services. As represented at the hearing and in the written job description, Kumawat may perform duties covering data analytics, technology integration, mergers and acquisitions analysis, and product development—to the extent that this work does not include compliance or monitoring duties. For example, on product development, Kumawat may work on developing new products as long as they are not compliance products. With this preview in place, the Court now explains the analysis of the preliminary-injunction factors.

## A. Likelihood of Success

NAV must first "demonstrate that [its] claim has some likelihood of success on the merits, not merely a better than negligible chance." *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022) (cleaned up).

### 1. Breach of Contract

NAV Consulting first argues that by working at Formidium in any role, Kumawat is likely to violate the employment agreement between NAV Consulting and Kumawat through violating the noncompete clause. Prelim. Inj. Mot. at 19.

A party seeking to establish a breach of contract must show "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) resulting injury to the plaintiff." *Freedman v. Am. Guardian Holdings, Inc.*, 2021 WL 3487335, at *11 (N.D. Ill. Aug. 9, 2021) (cleaned up); *Wolff v. Bethany N. Suburban Grp.*, 197 N.E.3d 77, 91, 2021 IL App 191858 ¶ 62 (Ill. App. Ct. 2021). When analyzing postemployment restrictions in employment contracts, the Court notes that, "[u]nder Illinois law, covenants not to compete are disfavored and held to a high standard." *Chicago Heights Glass, Inc. v. Phelps*, 2022 WL 1567026, at *3 (N.D. Ill. May 18, 2022).[4] Before addressing whether Kumawat is likely to violate his noncompetition provision, or "even considering whether a restrictive covenant is reasonable, the Court must make two determinations: (1) whether the restrictive covenant is ancillary to a valid contract; and (2) whether the restrictive covenant is supported by adequate consideration." *Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1107 (N.D. Ill. 2016).

---

[4]The 2022 Illinois law that places additional statutory restrictions on noncompete provisions only applies to agreements entered into after January 1, 2022. *See* Illinois Public Act 102-358, § 99 ("This Act takes effect January 1, 2022); 820 ILCS 90/10 (amended eff. Jan. 1, 2022).

The Defendants argue that the restrictive covenants are unenforceable because they were not part of a valid agreement supported by adequate consideration. R. 81, Defs.' Post PI Resp. at 10. The defense argues that because the more limited delineation of the geographic limitations in the Employment Agreement were removed unilaterally, after Kumawat was already presented with a draft, the covenants constituted a significant modification that required more consideration. *Id.* at 19–20. It is true that, at the preliminary-injunction hearing, Gupta testified that he removed the geographic limitation from the draft Employment Agreement before the final presentation of the agreement to Kumawat. 10/25/22 PI Tr. at 101, 126–127. But just because NAV (through Gupta) removed the geographic limitation during negotiations does not render the Employment Agreement invalid. It is not surprising that there is back-and-forth in negotiations, and Kumawat does not convincingly argue that he was somehow compelled or tricked into accepting the removal of the geographic limit. The overall Agreement itself was validly entered into.

On consideration, the Defendants argue that the $17,500 raise that Kumawat received for electing the five-year term was insufficient because it was part of an annual performance raise. *Id.* Defs.' Post PI Resp.at 21–22. "Illinois courts analyze the adequacy of consideration in the context of postemployment restrictive covenants because it has been recognized that a promise of continued employment may be an illusory benefit where the employment is at-will." *Fifield v. Premier Dealer Servs., Inc.*, 993 N.E.2d 938, 942 (Ill. App. 2013). But the record evidence does not support the defense characterization of the consideration as inadequate. First, no convincing

13

evidence shows that the $17,500 raise would have been conferred without the restrictive covenants. Indeed, if Kumawat had picked the shorter three-year term, then the raise would have been only $15,000. 10/25/22 PI Tr. at 91. Second, and just as importantly, the Employment Agreement conferred another significant piece of consideration to Kumawat: he received *five years* of guaranteed employment, in the sense that he would no longer be a mere at-will employee who could be fired at any time without receiving extra compensation. This is significant consideration, at least as shown by the current record evidence at this preliminary stage of the case.

With those threshold findings in place—that is, the overall Employment Agreement was valid and the covenants were supported by adequate consideration—it is time to turn to the specific terms of the noncompete covenant itself. "In order for a restrictive covenant to be valid and enforceable, the terms of the covenant must be reasonable in geographic and temporal scope and necessary to protect an employer's legitimate business interest. The reasonableness of a restrictive covenant is determined in light of the unique factors and circumstances of the case." *Allied Waste Servs.*, 177 F. Supp. 3d at 1107. Whether the covenant protects a *legitimate* business interest is "based on the totality of facts and circumstances" of the particular case:

> Factors to be considered in this analysis include, but are not limited to, the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions. No factor carries any more weight than any other, but rather its importance will depend on the specific facts and circumstances of the individual case.

*Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 403 (Ill. 2011).

Evaluating first the two-year length of the noncompete restriction, the Court finds this time period to be reasonable, at least based on the current evidence. Courts have upheld two-year restrictions in industries in which it can take substantial time to develop new customers and in which the nature of customer relationships is long-term. *See Steam Sales Corp. v. Summers*, 937 N.E.2d 715, 730 (Ill. 2010), *overruled on other grounds by Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393 (Ill. 2011). That is the case here, in which fund administrators build long-term relationships with clients through their portfolio accounting, reporting, and compliance services. 10/25/22 PI Tr. at 27–29, 100–01, 156. . Kumawat's knowledge of these clients, as well as knowledge related to NAV's growth plans, is information which will not quickly lose its value.

With regard to the unlimited geographic scope of the noncompete provision, the Court finds that this too is reasonable, again at least based on the current record. In addressing territorial scope, "courts generally look to whether the restricted area is coextensive with the area in which the employer is doing business." *Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 879 N.E.2d 512, 523 (Ill. 2007). Here, NAV Consulting's business has a global nature due to the world-wide location of its clients, offices, and competitors. 10/25/22 PI Tr. at 101. The record shows no particular geo-graphic limit on NAV's clientele.

With regard to the scope of the duties covered, Kumawat's agreement forbids him from competing with NAV Consulting by working "in a role substantially similar to any of the duties, responsibilities and services provided by Employee to the

15

company at any time during the last twenty-four (24) months of his employment"
with NAV. Kumawat Employment Agreement at 48–49. NAV Consulting argues that
under this language, *no role* at Formidium would be acceptable because any job would
necessarily cause him to rely on NAV's confidential information or trade secrets.
R. 76, Pl. Post PI Br. at 76; 10/25/22 Tr. at 110–11. As discussed later in the context
of NAV's misappropriation claim, that is not right. Information must be truly propri-
etary to qualify as a trade secret and many of the categories to which NAV points do
not meet this demanding threshold. Kumawat can permissibly work in the functions
that he and Sudrania have now agreed on in his written job description—those which
are dissimilar to Kumawat's previous roles serving clients and leading compliance
efforts—without violating this clause.

## 2. Misappropriation of Trade Secrets

The next question is whether the Defendants are likely to misappropriate NAV
Consulting's trade secrets. As a threshold matter, the federal and Illinois trade-secret
claims against the Defendants can be discussed together because the pertinent ele-
ments of those claims overlap. The federal Defend Trade Secrets Act (often referred
to as DTSA) allows an "owner of a trade secret that is misappropriated ... [to] bring a
civil action ... if the trade secret is related to a product or service used in, or intended
for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). For purposes of
the DTSA, a "trade secret" is information that the owner has taken reasonable
measures to keep secret and that derives independent economic value "from not being
generally known to, and not being readily ascertainable through proper means by,

16

another person who can obtain economic value" from its disclosure or use. 18 U.S.C. § 1839(3). "[M]isappropriation" is either "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "(B) disclosure or use of a trade secret of another without express or implied consent" under certain conditions. § 1839(5). "[I]mproper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." § 1839(6).

Similarly, the Illinois Trade Secrets Act authorizes a civil action for "[a]ctual or threatened misappropriation[s]" of trade secrets. The Illinois Act defines trade secrets, misappropriation, and improper means in materially the same way as the DTSA. *Compare* 765 ILCS 1065/2(a), (b), (d), *with* 18 U.S.C. § 1839(3), (5), (6). For both the federal and the Illinois trade-secret statutes, then, the basic question is whether the Defendants (1) misappropriated (2) NAV Consulting's trade secrets.

The answer is no: given the record at this stage, there is no evidence that Kumawat or Sudrania misappropriated trade secrets. First, as far as the evidence shows right now, Kumawat never downloaded, improperly acquired, or otherwise took any information unlawfully. At the hearing, Gupta acknowledged that he was not aware of any document that was ever downloaded, copied, or taken. 10/25/22 PI Tr. at 121–22. Indeed, during the weeks before Kumawat left NAV, Gupta instructed Agarwal to continuously monitor Kumawat's computer activity, and NAV has provided no examples of copying files, forwarding confidential emails, or otherwise removing any confidential information or trade secrets. NAV's Chief Operating Officer, Ambuj

17

Garg, also testified that there were various written checklists that Kumawat had been involved in creating, but Garg was not aware of Kumawat taking any written documents when he left the company. *Id.* at 63.

NAV points only to two screenshots that were captured during Agarwal's surveillance of Kumawat—a four-minute period when Kumawat accessed the shared inbox and viewed search results for "sudrania" on May 16, 2022; and a one-minute period during which Kumawat accessed the shared inbox again on June 6, 2022. By NAV's own description and surveillance, the time periods spent viewing these materials were relatively short and there is no concrete evidence that Kumawat took the information and has used it in any way. Having said that, it is true, as NAV argues, that under the inevitable-disclosure doctrine, Kumawat would inevitably rely on trade-secret information learned at NAV, including pricing strategies, software, and custom client products, if Kumwat were to perform the same duties at Formidium that he had performed at NAV. So if the information is truly a trade secret, then a preliminary injunction against performing similar duties is warranted.

Moving on to the key question of whether NAV's proposed categories of information qualify as protectable trade secrets, the Court examines each in turn. "[B]oth [Illinois and federal] statutes require that for information to be a trade secret, its owner must take reasonable measures to keep it secret." *Zeigler Auto Grp. II, Inc. v. Chavez*, 2020 WL 231087, at *4 (N.D. Ill. Jan. 15, 2020). Also, the information must be "sufficiently secret to derive economic value" and the "subject of efforts that are

18

reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d). *See also* 18 U.S.C. § 1839(3).

**Consumer Information**. NAV points to Kumawat's knowledge of its customer information. "Customer-specific information warrants trade secret protection so long as it was maintained in confidence." *Mickey's Linen v. Fische*r, 2017 WL 3970593, at *9 (N.D. Ill. Sept. 8, 2017). NAV had collected specific information on the needs and issues of their clients over time and worked to address those needs. 10/25/22 PI Tr. at 39. Correspondence with customers, including information on new acquisitions and discussions on client problems and on services provided were all available in a shared Outlook mailbox to which only a fraction of employees had been granted access—including Kumawat. *Id.* . at 47. Compiling and maintaining the extensive contact information of NAV's global list of customers took regular efforts, and the information was not publicly available in this way and in this compilation.

NAV took measures to ensure the secrecy of this information. Upon Kumawat's announcement of his resignation, Gupta recognized the need to protect client details while ensuring Kumawat had the necessary access to keep performing his critical role, so Gupta assigned Agarwal to closely monitor Kumawat. 10/25/22 PI Tr. at 47–49. When Gupta was alerted to Kumawat's "sudrania" search in the Outlook mailbox, Gupta instructed that Agarwal continue to monitor Kumawat closely. *Id.*

Based on the current record, then, the Court finds that NAV's client information qualifies as protectable trade secrets. Substantial effort has been expended by NAV to gather and to compile the client information, and there is an economic

19

value to understanding the needs of clients that NAV has cultivated and responding to these needs with tailored solutions and technology. *See Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1131 (N.D. Ill. 2019). In light of the protectable trade secret information, Kumawat is enjoined from performing duties (as detailed below) for Formidium that are similar to the duties that he had performed at NAV.

**Pricing Information**. NAV next argues that Kumawat has extensive knowledge of unique pricing models used with clients and that those models constitute a trade secret. At the preliminary-injunction hearing, Kumawat testified that he "[was] not aware of any pricing model," and that if he needed to provide a price to a client, that information would come from Garg. 10/25/23 Tr. at 154. Kumawat asserted that he was never involved in setting the price charged to a customer and that after offering some details about the client, Garg would provide the pricing to be used. *Id*.

Generally, static prices that businesses charge to customers are not protectable trade secrets. *Applied Indus. Materials Corp. v. Brantjes*, 891 F. Supp. 432, 437 (N.D. Ill. 1994). "Price information which is disclosed by a business to any of its customers, unlike a unique formula used to calculate the price information which is not disclosed to business's customers, does not constitute trade secret information." *Id*. at 437–38. When price information is "available to the various customers to which it pertained," they are each "at liberty to divulge such information to a competitor of plaintiff's or anyone for that matter." *Id. See also Carbonic Fire Extinguishers, Inc. v. Heath*, 547 N.E.2d 675, 678 (1989).

There is no evidence in the record to suggest that the pricing used by NAV Consulting is determined through any sort of unique, confidential formula, or calculating table. *See Carbonic Fire Extinguishers,* 547 N.E.2d at 678. Garg did not detail any process or blend of factors taken into account for determining prices. Nor has NAV Consulting demonstrated that, in actual practice, NAV requires clients to maintain confidentiality around pricing. *Cf. Medcor, Inc. v. Garcia*, 2022 WL 124163 at *8 (N.D. Ill. Jan. 13, 2022) (for company in which the "pricing methodologies varied depending on service needs and client levels, and were communicated to customers through confidential proposals and contracts, pricing information was a trade secret because it conveyed that information to customers only in confidential documents and there was potential value (in the shape of a market advantage) in keeping Medcor's prices and methodologies secret"). Although NAV argues that it did indeed require customers to keep prices confidential, NAV did not submit any evidence, exhibit, or testimony in support of this contention. Pricing information is not protected.

**Compliance-related Checklists, Processes, and Products**. NAV also argues that Kumawat should be barred from using several compliance-related technologies and procedures developed at NAV. NAV points to the anti-money laundering (AML) checklists and procedures, which Kumawat helped to develop and used in his capacity as the Designated AML Officer for several clients, as well as a unique investor-risk rating methodology and proprietary Compliance Dashboard, which again Kumawat helped build. Pl.'s Post PI Br. at 58–59. The Court agrees that this category of information constitutes trade secrets, at least on the current record.

Testimony at the preliminary-injunction hearing showed that NAV's AML checklists are unique and allow NAV to offer compliance services and perform due diligence on client anti-money laundering practices more efficiently. 10/25/22 PI Tr. at 27–28, 37–40. The "Investor Risk Rating" project represents a compilation of missing investor information, which took substantial time and effort to gather and is an improvement not readily available to other competitors that allows NAV an advantage in the marketplace. *Id.* at 36–40, 76–77. And NAV took measures to keep all of this information under wraps, including by disabling printing functionality and by putting security measures on computers to prevent file transfer. *Id.* at 39–40.

**Technology and Vendor Information.** NAV also argues that Kumawat's interactions with vendors and the knowledge that he exchanged with them during technology projects—including knowledge of which vendors NAV works with and more generally which vendors and products are compliant with NAVs internal systems—constitute trade secrets. But these assertions are unproven. There is no economic value to any other entity to know what technology or vendors might be compatible with NAV's specific systems. Nor has NAV shown that it prohibits vendors from telling others that NAV is a buyer of the vendor. This category is not protected.

**Business Plans and Expansion Strategy.** NAV's plans for expansion, including what clients or sectors of the industry NAV plans to pursue or to grow into, also qualify as trade secrets. Formidium argues that because it allegedly targets a different client segment of the industry, the company has no interest in NAV's business plans or expansion plans. R. 81, Defs.' Post PI Resp. at 42; 10/25/22 PI Tr. at

22

204. Specifically, Formidium contends that it brands itself as a more high-end service working with luxury clients, whereas NAV is allegedly more of a high-volume company serving more clients in a lower consumer segment. But whether Formidium *wants* certain information cannot disqualify the information from being a trade secret. And NAV might be a higher-volume servicer right now but could very well be planning to expand into a different space in the industry. Even under Formidium's conception of the value of business plans, it would be harmful to NAV for expansion information to be disclosed publicly.

By working on mergers and acquisitions at Formidium, if Kumawat were to cross paths with expansion targets of NAV's, then Kumawat would inevitably use NAV's trade-secret expansion information as it relates to new potential clients that NAV seeks to court, as well as companies that NAV seeks to acquire. So Kumawat may not disclose or use information of NAV Consulting's plans for expansion and Formidium may not ask for that information. Kumawat may still work on *unrelated* mergers and acquisitions, again so long as he refrains from using any knowledge of NAV's targeted clients for expansion.

The Defendants argue that even if Kumawat knows some proprietary information, NAV did not take steps to safeguard it. Defs.' Post PI Resp. at 29–30. Despite professing concern over Kumawat's "sudrania" Outlook mailbox search, the defense points out, Kumawat's access remained in place after the incident. That is true. But Gupta credibly explained, during the preliminary-injunction hearing, that Kumawat's access to sensitive emails was not restricted because Kumawat remained an

important NAV employee until his departure and, on top of that, Gupta was still try-
ing to convince Kumawat to stay. 10/25/22 PI Tr. at 49–50. As a result, Gupta and
NAV opted instead to allow Kumawat continued access but continued to monitor him
closely and remained on guard. At the same time, NAV took other measures to rea-
sonably safeguard and protect trade secrets during Kumawat's termination-notice
period. Garg testified that Kumawat's Salesforce access was revoked; Kumawat was
disallowed from being able to whitelist emails; Kumawat was no longer allowed to
approve wires; and Kumawat was taken off several distribution lists. 10/25/22 PI Tr.
at 45–46. All in all, NAV did take steps to protect this information.

### 3. Tortious interference

NAV's initial preliminary-injunction motion also relied on the tortious-inter-
ference claim. But NAV's post-hearing opening brief contains only one cursory men-
tion of this claim, and NAV's reply has no mention of it at all. In any event, given the
injunction to be entered as to Kumawat, NAV's motion is denied with respect to For-
midium on this claim.

### B. Inadequate Remedy & Irreparable Injury

The next questions are whether a preliminary injunction is necessary to pre-
vent irreparable harm that cannot be "fully rectified by the final judgment after trial."
*Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 680 (7th Cir. 2012)
(cleaned up). "Not every conceivable injury entitles a litigant to a preliminary injunc-
tion," *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d
700, 704 (7th Cir. 2005), and "issuing a preliminary injunction based only on a

possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (cleaned up).

The Defendants argue that a preliminary injunction is unnecessary because the testimony confirmed that Kumawat is working in a "wholly different" role at Formidium and he poses no risk of misappropriating trade secrets and causing irreparable harm. Defs.' Post PI Resp. at 37–38. The Court agrees that the status quo must be preserved for now—but just that. Kumawat is not disabled completely from having any role at Formidium; he can continue contributing work on data analytics, technology integration, mergers and acquisitions, and new product development, so long as he does not disclose or use NAV's trade secrets.

As previously discussed, however, the Court finds that these roles at Formidium came about only because of the filing of this lawsuit. Before the suit's filing, there was a significant risk that Kumawat would perform the same or similar duties as those that he performed at NAV, and thus would inevitably use and disclose protected trade secrets, thus causing irreparable harm for which there is no adequate remedy. Without the guardrails of a preliminary injunction ensuring that this scope of work continues to be the case, NAV would continue to face immediate and irreparable harm without an adequate remedy at law.

## C. Balance of Harms and Public Interest

Finally, the Court, "sitting as would a chancellor in equity," must balance the risks of relative harm imposed on the parties, as well as the public interest. *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992). The Court's goal in this balancing act is to "minimize the costs of being mistaken" by "weigh[ing] the competing considerations [to] mold appropriate relief." *Stuller*, 695 F.3d at 678 (cleaned up).

For their part, the Defendants argue that a preliminary injunction barring Kumawat's employment at Formidium would deny employees their choice in the marketplace and, at the same time, restrain lawful and fair competition. Defs.' Post PI Resp. at 39–40. NAV points out that Kumawat is free to work at many other companies in the finance industry and NAV faces the loss of its trade secrets and erosion of its valid competitive edge in the marketplace.

For the reasons explained earlier, the right balance is in between the two extremes: Kumawat is not entirely barred from working at Formidium, but he cannot perform similar duties as those performed at NAV because he would inevitably disclose and use protected information. Those limits allow Kumawat to work at a competitor but still enforces the public's interest in protecting valid trade secrets. The relative harms and public interest favor maintaining the status quo.

## IV. Scope and Order

Having determined that a preliminary injunction should be issued, the Court must now set forth its scope. As already explained, NAV's client information, compliance processes and products, and business strategy are protectable trade secrets. This

leaves just the issue of new product development. Kumawat may continue his current functions in technology integration, data analytics, mergers and acquisitions, and new product development, but he may not disclose or use the protected trade-secret information. Because this risk is highest in Kumawat's work in leading the development of new products, he must regularly update NAV on the scope of his efforts in this area. Starting on April 7, 2023, and every 21 days after that (so the next report is due on April 28, 2023), Kumawat and Formidium must disclose to NAV a representative sample of records reflecting Kumawat's work on new products, as well as provide an interrogatory answer describing under oath what he is doing in this category of work. Of course the Defendants may seek a confidentiality order under which to make the disclosures and make appropriate redactions.

### Preliminary Injunction

For the reasons explained in this Opinion, it is hereby order that:

1. Sudrania Fund Services, Abhishek Kumawat, and anyone acting in concert with them, are preliminarily enjoined and restrained from directly or indirectly:

   a. contacting or soliciting any customer or prospective customer listed in NAV Consulting's shared inbox to which Kumawat previously had access.

   b. contacting or maintaining customer relationships with any client of Formidium in any type of direct, client-facing sales role.

2. Kumawat also generally may not perform any role at Formidium which requires **customer sales, account-relationship maintenance, or** direct client-facing engagement; involves anti-money laundering (AML) practices and hedge fund accounting compliance; or involves compliance-monitoring efforts.

With this decision in place, the parties shall (1) engage in renewed settlement negotiations and (2) file a joint status report by April 17, 2023, reporting on the settlement negotiation and setting forth their positions on the next steps of the litigation. (The Court notes that the parties previously agreed to stay the briefing on the motion to compel arbitration of Kumawat's counterclaims, *see* R. 91.) The tracking status hearing of April 14, 2023, is reset to April 28, 2023, at 8:30 a.m., but to track the case only (no appearance is required).

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 31, 2023