**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NAV CONSULTING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:22-CV-03624 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| ABHISHEK KUMAWAT and | ) | |
| FORMIDIUM CORP., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This trade-secret and employment-separation case arises out of the departure of longtime employee Abhishek Kumawat from hedge-fund services company NAV Consulting.[1] Kumawat left to join one of NAV's competitors, Formidium (formerly known as Sudrania Fund Services, or SFS). After NAV filed its complaint and a motion for preliminary injunction, Formidium filed counterclaims, alleging that NAV defamed Formidium, and also violated an Illinois trade statute, during a conversation between NAV President Nav Gupta and Kumawat. R. 29, Formidium Ans. and Countercl. at 37.[2] NAV moves to dismiss the counterclaims. R. 45, Mot. Dismiss. Additionally, Kumawat and Formidium (together referred to as the Defendants) move for judgment on the pleadings as to NAV's original claims that Kumawat

_____

[1]The Court has federal-question jurisdiction over this case under 28 USC § 1331 for the federal trade-secrets claim, and supplemental jurisdiction under 28 USC §1367 for the state law claims.

[2]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

misappropriated trade secret information, breached his contract, and that For-
midium tortiously interfered with NAV and Kumawat's contractual relations. R. 28,
Mot. J. Pleadings.

For the reasons explained in this Opinion, NAV's motion to dismiss For-
midium's counterclaims is granted, and the Defendants' motion for judgment on the
pleadings as to NAV's claims is denied.

## I. Background

The Court accepts all well-pleaded factual allegations in the Complaint as true.
*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550
U.S. 544, 570 (2007)). Nav Gupta founded NAV Fund Consulting (NAV) in 1991. R. 1,
Verif. Compl. ¶ 12. NAV is a worldwide hedge-fund administrator that offers, among
other things, fund accounting services, registrar and transfer agency functions, and
regulatory compliance support. *Id.* Abhishek Kumawat began working for NAV Con-
sulting (in the United States) in December 2007, and eventually left the company in
July 2022. *Id.* ¶¶ 20, 24.

Kumawat began as an Account Manager and steadily rose the ranks to Senior
Account Manager and later to Vice President of Fund Accounting & Compliance.
Verif. Compl. ¶¶ 20, 24. As an Account Manager and Senior Account Manager, Ku-
mawat served in client-facing roles in which he was responsible for managing client
relationships on over 200 accounts and serving as the primary contact for these ac-
counts. *Id.* ¶ 25. In 2020, when he became the Vice President of Fund Accounting &
Compliance, Kumawat continued to have direct contact with clients and developed

knowledge of their operations, needs, assets, and strategies. *Id.* ¶¶ 20–22. Kumawat also served as the deputy money-laundering reporting officer for several clients. *Id.* He also took part in business development, for which he prepared client proposals and service agreements. *Id.* ¶ 23.

In November 2020, NAV presented Kumawat with a proposed new employment agreement in recognition of his role at NAV Consulting. Verif. Compl. ¶ 33; R. 1 at 65, Employment Agr. Instead of serving as a purely at-will employee, Kumawat agreed on an employment term of five years; if he was terminated without cause within the five-year period, then NAV would pay six months' salary to Kumawat. Employment Agr. at 70–71. Conversely, if Kumawat voluntarily resigned before the five years were up, then he would have to pay an early-termination fee of four months' salary. Verif. Compl. ¶ 37. Also, in exchange for signing the Employment Agreement, Kumawat received additional consideration: a $17,500 raise and a $2,000 signing bonus. *Id.* ¶¶ 34, 35, 36. For perspective, when Kumawat resigned in 2022, his base salary was $207,000. *Id.* ¶ 56.

The Employment Agreement also included a covenant not to compete. In pertinent part, the provision barred Kumawat from working at competitors for two years after leaving NAV and based the scope of the ban on the duties that Kumawat performed in the most recent two years at NAV:

> Employee agrees that during the Restricted Period, Employee will not (*i*) engage in, (*ii*) own, (*iii*) manage, (*iv*) operate, (*v*) finance, (*vi*) control or (*vii*) represent, advise, or work with (whether as an officer, director, shareholder, owner, co-owner, affiliate, partner, agent, representative, employee,

consultant, independent contractor, advisor, or in any other manner), in a *role substantially similar to any of the duties*, responsibilities and services provided by Employee to the Company at any time during the last twenty-four (24) months of his employment with the Company, a Competitive Business.

Verif. Compl. ¶ 38; Employment Agr. at 79–80 (emphasis added). The Agreement also included a nondisclosure provision that protected NAV's confidential information, instructing that the "(a) Employee will not, at any time during or after Employee's employment with the Company, disclose, use or permit others to use any Confidential Information, except as required in the course of Employee's employment for the benefit of the Company." Employment Agr. at 73.

Kumawat did not end up staying at NAV for the full five-year term, and instead left for another fund administration services company. Formidium is a hedge-fund administrator based in Downers Grove, Illinois. The company was founded in 2015 by a former NAV employee, Nilesh Sudrania, as Sudrania, LLC; the company was later renamed Sudrania Fund Services (and went by the acronym SFS) in 2019; it is now branded as Formidium. Verif. Compl. ¶ 57. Formidium provides hedge-fund administration services to similar clients as NAV, Verif. Compl. ¶ 59, and thus is a competitor of NAV's.

So, after spending 15 years at NAV, Kumawat decided to leave to take a position at Formidium. Counterclaim ¶ 9. On May 12, 2022 Kumawat informed Gupta and NAV via email that he was resigning from his post to work at Formidium. *Id.* ¶ 2. Kumawat offered a 60-day notice before leaving. Verif. Compl. ¶ 47; Counterclaim ¶ 9–10. Kumawat did not offer specific details on what his role at Formidium

would be nor did he confirm that he would be working in a non-competitive role. *Verif. Compl.* at ¶ 48. Gupta offered Kumawat a large raise to entice him to stay at NAV, but Kumawat refused. *Id.* ¶ 49. As relevant to the Counterclaims, after submitting his resignation, Gupta also allegedly told Kumawat that all of Formidium's representations to him regarding his future employment were false. Counterclaim ¶ 21. Gupta told Kumawat that all of Formidium's clients were in the process of moving over to NAV, and that Formidium would be going out of business soon. *Id.* Formidium also alleges, on information and belief, that Gupta and other high-ranking employees of NAV also made these same statements to other NAV employees, customers, and potential customers. *Id.* ¶ 26.

A few days after submitting his resignation, Kumawat accessed (on May 16, 2022) a shared NAV email inbox on Microsoft Outlook. *Verif. Compl.* ¶ 51. The mailbox contained confidential information on hedge funds that NAV Consulting was seeking to do businesses with or to take over from a competing fund administrator. *Verif. Compl.* ¶ 51. Kumawat searched the term "Sudrania" in the Outlook mailbox. *Id.*

On Kumawat's last day on the job, NAV arranged a meeting with him to discuss his post-employment commitments. *Verif. Compl.* ¶ 54. Kumawat continued to refuse to provide NAV with any specifics about his post-departure plans. *Id.* He refused to confirm he was taking a non-competitive role at Formidium. *Id.* On July 13, 2022, two days after Kumawat's departure from NAV, NAV Consulting filed this lawsuit, alleging breach of contract; violation of the Illinois Trade Secrets Act, 765 ILCS

1065/1; violation of the federal Defend Trade Secrets Act (DTSA) 18 U.S.C. § 1836; and tortious interference with contractual relations.

The same day, NAV also moved for a preliminary injunction against Kumawat and Formidium, seeking to enjoin Kumawat from violating his contractual obligations to NAV and from using NAV's trade secrets, and to enjoin Formidium from tortiously interfering with Kumawat's employment agreement. R. 7, Prelim. Inj. Mem. at 1.[3] As discussed above, Formidium and Kumawat each filed counterclaims. Counterclaim; R. 26, Kumawat Ans. and Countercl. NAV moves to dismiss Formidium's counterclaims.[4] In turn, the Defendants move for judgment on the pleadings against NAV's complaint.

## II. Motion for Judgment on the Pleadings

### A. Legal Standard

A party may move for judgment on the pleadings after the pleadings are closed. Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings is subject to the same standard as a motion to dismiss under Rule 12(b)(6). *Hayes v. City of Chicago*, 670 F.3d 810, 813 (7th Cir. 2012). In considering a motion for judgment on the pleadings,

---

[3]Separately, this Court granted a preliminary injunction which allowed Kumawat to remain at Formidium so long as he did not participate in any roles substantially similar to those he had at NAV. R. 112, PI Order.

[4]As mentioned further below, Kumawat's counterclaims allege that NAV discriminated against him in violation of 42 U.S.C. § 1981 and request declaratory judgment that Kumawat's Employment Agreement with NAV is void *ab initio*. NAV has separately moved to compel arbitration on these counterclaims, R. 40, which Kumawat does not oppose, R. 120, given the arbitration provision in the Employment Agreement. So the motion to compel arbitration on Kumawat's counterclaims is granted.

the Court must accept all well-pleaded allegations as true and view the alleged facts in the light most favorable to the non-moving party. *Id.* Judgment on the pleadings is proper if it appears beyond doubt that the non-moving party cannot prove any set of facts sufficient to support his claim for relief. *Id.* In ruling on a motion for judgment on the pleadings, the Court considers the pleadings alone, which consist of the complaint, the answer, and any documents attached as exhibits. *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998).

### B. Analysis

### 1. Breach of Contract

The Defendants first argue for judgment on the pleadings against NAV's claim for breach of contract, arguing that Kumawat's employment contract with NAV is unenforceable, contrary to public policy, or alternatively void. Mot. J. Pleadings at 5. The Defendants rely on much of the same theories put forth in their preliminary injunction briefing, so the analysis will repeat much of what was said in the opinion that granted in part the preliminary injunction.

A party seeking to establish a breach of contract must show "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) resulting injury to the plaintiff." *Freedman v. Am. Guardian Holdings, Inc.*, 2021 WL 3487335, at *11 (N.D. Ill. Aug. 9, 2021) (cleaned up)[5] ; *Wolff v.*

---

[5]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

7

*Bethany N. Suburban Grp.*, 197 N.E.3d 77, 91, (Ill. App. Ct. 2021). When analyzing postemployment restrictions in employment contracts, the Court notes that, "Under Illinois law, covenants not to compete are disfavored and held to a high standard." *Chicago Heights Glass, Inc. v. Phelps*, 2022 WL 1567026, at *3 (N.D. Ill. May 18, 2022).[6] Before addressing whether Kumawat violated his noncompetition provision, or "even considering whether a restrictive covenant is reasonable, the Court must make two determinations: (1) whether the restrictive covenant is ancillary to a valid contract; and (2) whether the restrictive covenant is supported by adequate consideration." *Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1107 (N.D. Ill. 2016).

The Defendants first argue that Kumawat's Employment Agreement is invalid because it is not supported by adequate consideration. They claim that the $2,000 signing bonus Kumawat received was illusory and insufficient. Mot. J. Pleading at 7. But the signing bonus would not have been conferred without entering into the agreement.[7] Also, just as importantly, the Employment Agreement conferred another significant piece of consideration to Kumawat: he received five years of guaranteed employment, in the sense that he would no longer be a mere at-will employee who could be fired at any time without receiving extra compensation. This is significant

---

[6]The 2022 Illinois law that places additional statutory restrictions on noncompete provisions only applies to agreements entered into after January 1, 2022. *See* Illinois Public Act 102-358, § 99 ("This Act takes effect January 1, 2022); 820 ILCS 90/10 (amended eff. Jan. 1, 2022).

[7]The Defendants also disregard that Kumawat received an additional $17,500 raise as additional consideration when he signed the agreement.

consideration. *LKQ Corp. v. Thrasher*, 785 F. Supp. 2d 737, 742 (N.D. Ill. 2011) (explaining that the Illinois traditional rule is for court not to question the adequacy of consideration, and that under the closer analysis of a post-employment covenant, continued employment can be sufficient consideration).

With those threshold conclusions in place—that is, the overall Employment Agreement was valid and the covenants were supported by adequate consideration—it is time to turn to the specific terms of the noncompete covenant itself. The Defendants argue that the restrictive covenants are unenforceable because they are patently "unreasonable" due to the geography, length, and scope of the restriction. Mot. J. Pleadings at 6–7. "In order for a restrictive covenant to be valid and enforceable, the terms of the covenant must be reasonable in geographic and temporal scope and necessary to protect an employer's legitimate business interest. The reasonableness of a restrictive covenant is determined in light of the unique factors and circumstances of the case." *Allied Waste Servs.*, 177 F. Supp. 3d at 1107. Whether the covenant protects a legitimate business interest is "based on the totality of facts and circumstances" of the particular case:

> Factors to be considered in this analysis include, but are not limited to, the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions. No factor carries any more weight than any other, but rather its importance will depend on the specific facts and circumstances of the individual case.

*Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 403 (Ill. 2011). Evaluating first the two-year length of the noncompete restriction, the Court holds that—at least at the pleading stage—this time period is reasonable based on the allegations set

forth in the Verified Complaint. Courts have upheld two-year restrictions in industries in which it can take substantial time to develop new customers and in which the nature of customer relationships is long-term. *See Steam Sales Corp. v. Summers*, 937 N.E.2d 715, 730 (Ill. 2010), *overruled on other grounds by Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393 (Ill. 2011). That is the case here, at least at the pleading stage, where Kumawat was building long-term relationships with clients through their portfolio accounting, reporting, and compliance services and developing deep knowledge of each of their changing needs. Verif. Compl. ¶ 20–27.

With regard to the unlimited geographic scope of the noncompete provision, the Court holds that this too is reasonable, again at least based on the pleadings alone. In addressing territorial scope, "courts generally look to whether the restricted area is coextensive with the area in which the employer is doing business." *Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 879 N.E.2d 512, 523 (Ill. 2007). Here, NAV Consulting's business has a global nature due to the world-wide location of its clients, offices, and competitors. Verif. Compl. ¶ 12. Based on the pleadings there seems to be no particular geographic limit on NAV's clientele.

With regard to the scope of the duties covered, the Defendants argue that the covenants restrict Kumawat from "taking on any employment, in any company involved in the hedge-fund-accounting business, anywhere in the world, for two years." Mot. J. Pleadings at 5. NAV disagrees, arguing the covenant stops Kumawat only from serving in a substantially similar roles that would rely on confidential client information or trade secret information to protect their legitimate business interests.

10

R. 52, Mot. J. Pleadings Resp. at 5. The Defendants reply that, in any event, Kumawat is in fact not working in a substantially similar role.

The text of the Employment Agreement forbids Kumawat from competing with NAV Consulting by working "in a role substantially similar to any of the duties, responsibilities and services provided by Employee to the company at any time during the last twenty-four (24) months of his employment" with NAV. Employment Agr. at 78–79. Based on the plain text of the covenant, the Defendants are mistaken. Kumawat *may* perform roles at competitors so long as they are not substantially similar to the roles he worked on at NAV. For example, Kumawat could work in position dissimilar to Kumawat's previous roles serving clients and leading compliance efforts without violating this clause. Based on the pleadings alone, it cannot be conclusively determined that Kumawat is not working in a substantially similar role.

Finally, the Defendants argue that Kumawat signed the Agreement under duress. Mot. J. Pleadings at 2–3. They argue that the Agreement was "forced … in order for him to secure NAV's cooperation" with Kumawat's immigration process. More specifically, Kumawat was trying to secure permanent-resident status in the United States, and the Defendants claim that the immigration application had been "held over" Kumawat while working for NAV. *Id.*

"Illinois defines duress as a condition where one is induced by a wrongful act or threat of another to make a contract under circumstances which deprive him of the exercise of his free will." *Rissman v. Rissman*, 213 F.3d 381, 386 (7th Cir. 2000) (cleaned up). "The requirement that the plaintiff be deprived of free will is a stringent

one—the plaintiff must be left with no alternative but to enter into the contract."
*Dumanian v. Schwartz*, 2022 WL 2714994, at *9 (N.D. Ill. July 13, 2022). The facts
here fall well short of this high bar. As NAV points out, Kumawat's permanent-resi-
dent application was submitted on October 29, 2020, a few days *before* the Agreement
was presented to him. Mot. J. Pleadings Resp. at 13. Even assuming that a connection
of that kind would be sufficient to meet the high standard of duress, at this stage
there is nothing in the pleadings that demonstrates that the application was contin-
gent on Kumawat's cooperation with the Agreement in any way. And no other allega-
tions at this stage demonstrate that Kumawat was physically or mentally overpow-
ered in signing the Agreement. Judgment on the pleadings as to the claim for breach
of contract (Count 1) is denied.

### 2. Tortious Interference

The Defendants also seek judgment on the pleadings as to NAV's claim for
tortious interference with contractual relations (Count 4) against Formidium, pre-
senting the same arguments on the Employment Agreement's supposed invalidity. In
addition, the Defendants relatedly argue that Formidium could not have interfered
with NAV's agreement because the Defendants genuinely believed it to be an invalid,
unenforceable agreement. Mot. J. Pleadings at 3.

"To state a claim under Illinois law for tortious interference with a contract, a
plaintiff must demonstrate: (1) the existence of a valid and enforceable contract be-
tween the plaintiff and another; (2) the defendant's awareness of this contractual re-
lation; (3) the defendant's intentional and unjustified inducement of a breach of the

contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages." *Cox v. Calumet Pub. Sch. Dist. 132*, 180 F. Supp. 3d 556, 564 (N.D. Ill. 2016). There is no dispute that Formidium was aware of Kumawat's Agreement, offered him a job, and refused to confirm that Formidium would not run afoul of the restrictive covenants. Additionally, as discussed previously, the arguments that Kumawat's Agreement was generally invalid or unenforceable are unavailing at this stage.[8]

On the defense argument premised on Formidium's *belief* that the Agreement was truly invalid, "[w]hile the invalidity of a contract is a defense to tortious interference, belief in validity is irrelevant." *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 646 (2015) (citing Restatement (Second) of Torts § 766, Comment i (1979)). For their part, the Defendants point to no case establishing that *subjective* belief is a defense to tortious interference, and the Court is skeptical that the Illinois state courts would establish that given the United States Supreme Court's recitation of this general principle and the Restatement (Second) of Torts. In any event, NAV's complaint does not plead subjective belief—so this does not offer a reason to dismiss on the pleadings.

At bottom, Formidium was aware of Kumawat's Agreement with NAV and still hired him. What's more, Formidium failed to confirm that what Kumawat's role

---

[8]Formidium also argues that, in the alternative, a new proposed FTC rule would make certain covenants such as those in Kumawat's Agreement impermissible. R. 96, Mot. J. Pleadings Reply at 1–2. But the Court notes that this proposed rule is not yet in effect (if it ever will be).

would be and otherwise refused to commit that his duties at Formidium would not breach the obligations in the Employment Agreement. Judgment on the pleadings as to Count 4 is denied.

### 3. Trade Secrets

The Defendants next seek judgment on the pleadings as to NAV's claims (Counts 2 and 3) that Kumawat violated the Illinois Trade Secrets Act, 765 ILCS 1065/1, and the Federal Defend Trade Secrets Act, (DTSA) 18 U.S.C. § 1836.[9] Again, the defense arguments were raised at the preliminary-injunction stage, so much of this analysis is a repeat too. As a threshold matter, the federal and Illinois trade-secret claims against the Defendants can be discussed together because the pertinent elements of those claims overlap. The DSTA allows an "owner of a trade secret that is misappropriated ... [to] bring a civil action ... if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). For purposes of the DTSA, a "trade secret" is information that the owner has taken reasonable measures to keep secret and that derives independent economic value "from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value" from its disclosure or use. 18 U.S.C. § 1839(3). "[M]isappropriation" is either "(A) acquisition of a trade secret of another by a person who knows or has reason to know

---

[9]On Counts 2 and 3, the Court notes that there are allegations for damages that would seem to be covered under the arbitration clause in Kumawat's Agreement. Indeed, as mentioned previously, Kumawat does not oppose NAV's motion to compel arbitration as to his counterclaims generally.

that the trade secret was acquired by improper means" or "(B) disclosure or use of a trade secret of another without ex-press or implied consent" under certain conditions. § 1839(5). "[I]mproper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." § 1839(6).

Similarly, the Illinois Trade Secrets Act authorizes a civil action for "[a]ctual or threatened misappropriation[s]" of trade secrets. The Illinois Act defines trade secrets, misappropriation, and improper means in materially the same way as the DTSA. Compare 765 ILCS 1065/2(a), (b), (d), with 18 U.S.C. § 1839(3), (5), (6). For both the federal and the Illinois trade-secret statutes, then, the basic question is whether the Defendants (1) misappropriated (2) NAV Consulting's trade secrets.

NAV pleads that Kumawat had access to important categories of NAV's business information, including NAV's unique software, pricing models, client information, expansion plans, and compliance information (including anti-money laundering checklists and procedures). Verif. Compl. ¶ 99. Also, Kumawat accessed the shared Outlook inbox containing pricing models and takeover clients, in which he searched for the word "Sudrania." *Id*. ¶¶ 100–101. The Defendants argue that the information at issue does not constitute trade secrets. "[B]oth [Illinois and federal] statutes require that for information to be a trade secret, its owner must take reasonable measures to keep it secret." *Zeigler Auto Grp. II, Inc. v. Chavez*, 2020 WL 231087, at *4 (N.D. Ill. Jan. 15, 2020). Also, the information must be "sufficiently secret to derive economic value" and the "subject of efforts that are reasonable under the

15

circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d). *See also* 18 U.S.C. § 1839(3). The Court addresses these points in turn.

**Consumer information.** NAV points to Kumawat's knowledge of its customer information at several points in the pleadings. "Customer-specific information warrants trade secret protection so long as it was maintained in confidence." *Mickey's Linen v. Fischer*, 2017 WL 3970593, at *9 (N.D. Ill. Sept. 8, 2017). Correspondence with customers, including details on new acquisitions, discussions of client problems or needs, and contact information were all available to Kumawat through his role at the company (as well as through his access of the shared Outlook inbox). And NAV took measures to ensure the secrecy of this information. Upon Kumawat's announcement of his resignation, NAV's Verified Complaint was able to identify Kumawat's search of the shared inbox and access of certain files.

Based on the pleadings, then, the Court holds that NAV's client information qualifies as protectable trade secrets. NAV expended effort to gather and to compile the client information. There is an economic value to understanding the needs of clients that NAV has cultivated and responding to these needs with tailored solutions and technology. *See Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1131 (N.D. Ill. 2019).

**Pricing Information.** NAV also argues that Kumawat has extensive knowledge of NAV's unique pricing models used with clients. Verif. Compl. ¶¶ 20, 26. Generally, static prices that businesses charge to customers are not protectable trade secrets. *Applied Indus. Materials Corp. v. Brantjes*, 891 F. Supp. 432, 437 (N.D. Ill. 1994). "Price information which is disclosed by a business to any of its customers,

unlike a unique formula used to calculate the price information which is not disclosed to business's customers, does not constitute trade secret information." *Id.* at 437–38. *See also Carbonic Fire Extinguishers, Inc. v. Heath*, 547 N.E.2d 675, 678 (1989).

Based on the pleadings (despite what preliminary facts were found at the preliminary-injunction stage), there is nothing to suggest that pricing used by NAV Consulting is *not* determined through a unique process, confidential formula, or calculating table. *Carbonic Fire Extinguishers*, 547 N.E.2d at 678; *cf. Medcor, Inc. v. Garcia*, 2022 WL 124163 at *8 (N.D. Ill. Jan. 13, 2022) (for company in which the "pricing methodologies varied depending on service needs and client levels, and were communicated to customers through confidential proposals and contracts, pricing information was a trade secret because it conveyed that information to customers only in confidential documents and there was potential value (in the shape of a market advantage) in keeping Medcor's prices and methodologies secret"). To the contrary, NAV pleads its pricing formula is indeed a secret that derives its value from its secrecy.

**Compliance-related Checklists, and Tech Products.** NAV also points to the anti-money laundering checklists and procedures that Kumawat had access to and used with NAV clients, as well as their compliance software and algorithmic solutions used in tandem. Verif. Compl. ¶¶ 15, 16, 112, 127. The Court agrees that this category of information could constitute trade secrets, at least on the pleadings. NAV describes the anti-money laundering checklists and their software products as the unique features products that allows NAV to retain customers and offer compliance services more efficiently. *Id.* ¶ 15–19.

17

In requesting judgment on the pleadings on these claims, the Defendants argue that there is no allegation of misappropriation of the various trade-secret categories. Mot. J. Pleadings at 8. NAV argues in response that Kumawat's work for Formidium does risk an imminent misappropriation of those categories for two major reasons: the Defendants' belief that the Agreement's restrictive covenants are not enforceable or valid; and Formidium and Kumawat's refusal to provide assurances that he would not perform barred duties or would not perform duties in which he would use NAV's trade secrets.

At the pleading stage, NAV has adequately alleged that Kumawat will and would misappropriate NAV's trade secrets. NAV has pleaded, with concrete facts, that Kumawat was a crucial employee who had responsibilities in several key aspects of the business. When he then left to start at a major competitor, NAV reasonably requested reassurances—yet Kumawat refused to affirm that he would not violate the restrictive covenants not to compete in his Agreement. Indeed, Kumawat and Formidium refused to say what role Kumawat would be performing at Formidium at all. The reasonable inference that arises from this is that Kumawat planned to serve in a role that would involve the misappropriation of trade secrets. Judgment on the pleadings as to Counts 2 and 3 is denied.

## II. Counterclaims

### A. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled

to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (cleaned up). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

## B. Analysis

Both Formidium and Kumawat filed counterclaims, but only the company's counterclaims are at issue here because NAV moved to compel arbitration on Kumawat's counterclaim. R. 40. Given the arbitration provision in the Employment Agreement, Kumawat does not oppose this motion. R. 120. So that leaves just Kumawat's counterclaims against NAV.

### 1. Defamation

19

Formidium's first counterclaim alleges that NAV defamed the company. Formidium points to the statements made by Gupta to Kumawat after Kumawat provided notice of his departure. In particular, Gupta alleged said that Formidium's representations to Kumawat were false; Formidium was going out of business soon; and all of Formidium's clients were leaving for NAV. Formidium argues that these statements constitute defamation *per se* or, alternatively, meet the standard of defamation *per quod*.

"Illinois recognizes five categories of statements which are considered actionable *per se*." *Madison v. Frazier*, 539 F.3d 646, 653 (7th Cir. 2008). These include "(1) those imputing an inability to perform or want of integrity in the discharge of one's duties of office or employment; and (2) those that prejudice a party, or impute lack of ability, in his or her trade, profession or business." *Id*. Such statements are so harmful that damages are presumed. *Knafel v. Chicago Sun-Times, Inc.,* 413 F.3d 637, 639 (7th Cir. 2005).

When analyzing defamation claims, context is everything. *Basile v. Prometheus Glob. Media*, 225 F. Supp. 3d 737, 744 (N.D. Ill. 2016); *Osundairo v. Geragos*, 447 F. Supp. 3d 727, 738 (N.D. Ill. 2020) (explaining that under the innocent construction rule, courts must "consider the statement in context and to give the words of the statement, and any implications arising from them, their natural and obvious meaning."). Here, Gupta made the alleged statements to Kumawat—whom Gupta considered to a key employee—right after Kumawat announced that he was leaving for a competitor after working at NAV for almost 15 years. Naturally, Gupta would

20

want Kumawat to stay, and Gupta not surprisingly would express why he believed that NAV was a superior workplace in order to convince Kumawat to stay.

In addition to that context—in which Gupta was acting as an advocate for his own company—the conversation was just between Gupta and Kumawat, *not* with any customers or anyone else present. There is zero risk that a client or potential client would change course in retaining Formidium as a result of the private discussion between Gupta and Kumawat. Formidium's only argument that the effect went beyond this exchange is "upon information and belief" that Gupta and other NAV higher-ups also made these statements customers and potential customers. Counterclaim ¶ 27. That hedge on the factual assertion is telling: there is no inferential basis offered on which to premise a belief that the statements went beyond that one private meeting between Gupta and Kumawat.

Not only were Gupta's statements made away from the ears of clients and potential clients (or anyone else), the statements were also clearly not concrete *factual* assertions in the context of Gupta's pleas with Kumawat to stay. "[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 727 (7th Cir. 2004). The analysis is "whether a reasonable listener would take him to be basing his 'opinion' on knowledge of facts of the sort that can be evaluated in a defamation suit." *Sullivan v. Conway*, 157 F.3d 1092, 1097 (7th Cir. 1998); *see also Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1103 (N.D. Ill. 2016)

21

(explaining that statements that do not contain verifiable facts—such as rhetorical hyperbole or opinions—are not actionable as defamation); *Madison v. Frazier*, 539 F.3d 646, 654 (7th Cir. 2008).

Nor would the context be lost on Kumawat, a longtime employee who had just informed Gupta of the departure. Based on experience and context, it is implausible that Kumawat's reaction—compared, for example, to a client of Formidium—would be to truly believe that Formidium was going out of business and that *all* of Formidium's customers were moving to NAV. The statements by Gupta (if he made them) to Kumawat amount to exaggerations as part of the plea to convince Kumwat to stay. Nor is there any allegation in the counterclaim that Kumawat followed up with questions that a listener would ask if they actually believed that Gupta was making factual assertions, like "How do you know that Formidium is going out of business?" or "Who told you that all of Formidium's customers were moving to NAV?" Kumawat did not ask those questions because no reasonable person in his position and in those circumstances would believe that Gupta was actually making factual assertions.

What's more, it is implausible to classify Gupta's expressions as factual assertions in this context based on the simple fact that Kumawat *still elected to go to Formidium* following that exchange. This move to Formidium saps any plausibility from the notion that Kumawat interpreted Gupta's comments as factual—otherwise, Kumawat would not have left for Formidium.

In support of the counterclaim, Formidium points to the statements made in two district court cases. *Lampi Corp. v. Am. Power Prod., Inc.*, 1994 WL 501996 (N.D.

22

Ill. Sept. 12, 1994); *Nat'l Auto Parts, Inc. v. Automart Nationwide, Inc.*, 2015 WL 5693594 (N.D. Ill. Sept. 24, 2015). But in doing so, Formidium's analogy glosses over the key contextual difference of who the listener in those cases were—*customers*. In *Lampi*, the fluorescent-bulb manufacturer Lampi was accused of remarking that its competitor, American Power Products, was "going out of business, and will not be able to fill orders." *Id.* at *1. Critically, these statements were made to "both [American Power Products] and Lampi customers and potential customers in sales presentations." *Id.* In the context of a *sales presentation* to customers and to potential customers who do not otherwise know anything about the underlying situation, that type of statement indeed would be treated as factual. The same impact on sales or on customer acquisition simply cannot be said for a private, one-on-one conversation in which an employer is trying to persuade a very well-informed employee from moving to a competitor.

The same analysis applies to the statements at issue in *National Auto Parts*, where employees who left National Auto Parts (called NAP in the opinion) for competitor Automart told *customers* that "NAP is shutting down; that NAP has transferred all of its business operations to Automart, and that customers now needed to place orders for the autobody parts within Automart." 2015 WL 5693594 at *4. Again, the customer-listener context is starkly different to the context of the statements made by Gupta to Kumawat, and to Kumawat alone.

For these same reasons, Formidium's alternative argument that Gupta's statements constituted defamation *per quod* is meritless. First, as discussed above,

Gupta's expressions do not constitute factual statements given the nature of the statements and the context surrounding them. Second, "with a *per quod* action, in order to recover the plaintiff must plead and prove that it sustained actual damage of a pecuniary nature ('special damages')." *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 726 (7th Cir. 2004). Formidium has not adequately pleaded special damages at all. Kumawat still joined Formidium. And there is no allegation that Formidium lost any client or potential client due to Gupta's statements.

Instead, Formidium argues that Kumawat's legal bills resulting from this very federal court case, which the company is covering, constitute damages R. 94, Mot. Dismiss Resp. at 11–12. This makes little sense. Formidium's voluntary decision to pay for Kumawat's legal expenses are not damages that have been involuntarily suffered by Formidium. The case cited by Formidium in support, *Chang Hyun Moon v. Kang Jun Liu*, 44 N.E.3d 1134, 1140 (Ill. App. Ct. 2015), actually rejected the plaintiff's assertion that attorney's fees incurred in a divorce proceeding qualified for special damages, because there was an insufficient causal connection between the alleged defamation and the divorce. Here too there is no causal connection between the alleged defamation and Kumawat's legal expenses as paid by Formidium. The motion to dismiss the defamation counterclaim (Counterclaim 1) is granted.

### 2. Deceptive Trade Practices Act

Finally, NAV moves to dismiss Formidium's second counterclaim, which alleges that NAV violated the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510/2, by representing to Kumawat and "on information and belief, customers" that

24

Formidium was losing all of its clients and would soon go out of business. Counter-claim at 42. Formidium also claims that NAV violated the Act by representing to customers and others that "misappropriation claims it filed against Formidium and an employee it hired from NAV, Amit Arora, had merit." *Id.* Formidium points to three specific subsections of the Act, arguing that NAV engaged in these three categories of deceptive trade practices:

> (1) passes off goods or services as those of another; …

> (3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another; …

> (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have.

815 ILCS 510/2(a)(1), (a)(3), (a)(5). For a statement to violate the Act, "a plaintiff must identify some form of communication to the public regarding the plaintiff's services that is false, misleading, or deceptive." *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 2020 WL 5642941, at *10 (N.D. Ill. Sept. 22, 2020) (cleaned up), *aff'd*, 15 F.4th 831 (7th Cir. 2021); *see also Lynch Ford, Inc. v. Ford Motor Co.*, 957 F. Supp. 142, 147 (N.D. Ill. 1997) ("[T]he defendant must make some form of a representation (or do something) to the public (or a potential buyer) regarding a good or service.")

Here, there is no *specific* service or good that was targeted by Gupta's general criticism about Formidium. He allegedly told Kumawat that Formidium was going

out of the business soon and that the company's clients would be moving to NAV. Not specific good or service was targeted by the comments. Nor does Formidium allege that Gupta's remarks to Kumawat would cause any confusion mixing up Formidium's products and services with some other entity. And there is no plausible allegation that Gupta was make any representation suggesting that Formidium was in any way approving of NAV's services. Rather, Formidium only offers the conclusory allegation that NAV violated the Act by representing that Formidium was losing its clients and would soon be out of business. But the Act "does not apply to statements that impugn a business's integrity," and instead only applies to statements that "implicate the quality of the business's goods or services." *Am. Med. Ass'n v. 3Lions Publ'g, Inc.*, 2015 WL 1399038, at *5 (N.D. Ill. Mar. 25, 2015). Many businesses (unfortunately) go out of business for reasons that have nothing to do with the quality of their goods or services. Formidium cannot turn that statement into a deceptive practice under the Act.

The other alleged statements that Formidium points to—about the merit of NAV's previous misappropriation claims involving former employee Arora—are similarly divorced from the requirements of a claim under the Deceptive Trade Practices Act. The existence of previous lawsuits against Formidium and its employees does not constitute statements directed at consumers about any specific goods or services of Formidium. *See Shuffle Tech Int'l, LLC v. Sci. Games Corp.*, 2015 WL 5934834, at *16 (N.D. Ill. Oct. 12, 2015).

Even if a specific good or service *was* being targeted by NAV in any of the statements made by Gupta to Kumawat, Gupta's remarks simply do not constitute *factual* statements given the context, as explained earlier in this Opinion. *Schering-Plough Healthcare Products, Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 512 (7th Cir. 2009) ("text must yield to context."). Indeed, as noted earlier, Gupta's statements are not even made to any customers or to the public,[10] and at most constitute puffery and pleas made to Kumawat in an effort to convince him to stay. Formidium relies again on *Lampi*, as well as another district court case, *Hoffman v. Szyszko*, 1995 WL 519815 (N.D. Ill. Aug. 30, 1995). In both cases, however, companies publicly broadcasted statements about their competitors going out of business, which the courts held was sufficient to plead a claim under the Deceptive Trade Practices Act because it called into question each businesses ability to deliver services and goods. *Lampi*, 1994 WL 501996, at *3; *Hoffman,* 1995 WL 519815, at *4. Here again Formidium falls short on a key contextual difference—the statements in both cases were made to customers and potential customers that reasonably could interpret the statements in as legitimate warnings about the ability to obtain goods from the companies that were the target of the statements. Not so here. It is implausible that Kumawat would reasonably interpret Gupta's statements as factual assertions. The claim under the Deceptive Trade Practices Act (Counterclaim 2) is dismissed.

---

[10]For the reasons discussed earlier, the Court again discounts the heavily hedged allegation "on information and belief" that Formidium's customers and potential customers heard from Gupta or NAV that Formidium was losing clients and going out of business soon.

### III. Conclusion

NAV's motion to dismiss Formidium's counterclaims is granted in its entirety. The Court is skeptical that the deficiencies can fixed with amended counterclaims. Having said that, the dismissal is without prejudice, because Formidium has yet to amend the counterclaims. If amended counterclaims are not filed by October 16, 2023, then the dismissal will convert to a dismissal *with* prejudice. The Defendants' motion for judgment on the pleadings as to NAV's claims is denied in its entirety.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 29, 2023