UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NAV CONSULTING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:22-CV-03624 |
| v. | ) | |
| | ) | |
| ABHISHEK KUMAWAT and FORMIDIUM CORP., | ) | Judge Edmond E. Chang |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

NAV Consulting Inc. sued Abhishek Kumawat and Formidium Corp. (formerly known as Sudrania Fund Services, or SFS) after Kumawat left his job at NAV to join Formidium, which is one of NAV's competitors. R. 1, Compl.[1] Earlier in the case, the Court granted in part NAV's motion for a preliminary injunction on its breach of contract and trade-secret claims after holding an evidentiary hearing. R. 112, 03/31/23 Order. NAV later moved for contempt and sanctions against Kumawat and Formidium for violating the preliminary-injunction order and the pre-hearing discovery order. R. 168, Contempt Mot.; R. 237, Sanctions Mot.

As explained below, after holding an evidentiary hearing on the motions, NAV's contempt motion is denied, but the sanctions motion is granted in part and

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number. Any citations to the sealed versions of the docket entries will be identified with the parenthetical "(sealed)." Otherwise, in the absence of any parentheticals, all citations are to the public versions of the docket entries. The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 for the federal trade-secrets act claim, and supplemental jurisdiction under 28 U.S.C. § 1367 for the state law claims.

denied in part. As also explained in the Opinion, the Defendants' motion for sanctions is denied, as is their motion to file for early summary judgment. But Formidium's motion to clarify the preliminary injunction is granted. Lastly, Kumawat's motion to dissolve the preliminary injunction is granted.

## I. Background

Kumawat began working for NAV in December 2007 and left the company in July 2022. Compl. ¶¶ 20, 24. In November 2020, Kumawat entered into an Employment Agreement with NAV for an employment term of five years that included a covenant not to compete and a non-disclosure provision. *Id.* ¶ 33; R. 129-2, Fees Mot., Exh. 2, Emp. Agr. The non-compete prevented Kumawat from performing duties similar to those he had in the most recent two years of his work at NAV. Emp. Agr. at 14–15 (PDF page citation). In May 2022, before the five-year term ended, Kumawat left NAV to join Formidium, one of NAV's competitors. Compl. ¶¶ 47–48, 57, 59; Order 03/31/2023 at 4. NAV sued Kumawat and Formidium for breach of contract, violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1, violation of the federal Defend Trade Secrets Act, 18 U.S.C § 1836, and tortious interference with contractual relations. Compl. at 18–34.

NAV then moved for a preliminary injunction, R. 6, Prelim. Inj. Mot., which the Court granted in part after ordering expedited discovery and holding an evidentiary hearing, Order 03/31/2023. Considering the evidence and testimony presented, the Court enjoined Kumawat and Formidium from "contacting or soliciting any customer or prospective customer listed in NAV Consulting's shared inbox to which

Kumawat previously had access" and "contacting or maintaining customer relationships with any client of Formidium in any type of direct, client-facing sales role." *Id.* at 27. The Court also prohibited Kumawat from "perform[ing] any role at Formidium which requires customer sales, account-relationship maintenance, or direct client-facing engagement; involves anti-money laundering (AML) practices and hedge fund accounting compliance; or involves compliance-monitoring efforts." *Id.* at 28. Finally, the Court ordered Kumawat and Formidium to report Kumawat's work on new product development to NAV every 21 days, by providing "a representative sample of records" and "an interrogatory answer describing under oath what he is doing in that category of work." *Id.* at 27.

After the preliminary injunction was in place, NAV moved for the Court to hold Kumawat and Formidium in civil contempt, alleging that Kumawat performed work that was prohibited by the order and provided deficient reports about his work. R. 168, Pl.'s Contempt Mot.[2] Then, after the parties exchanged discovery, NAV moved for sanctions, alleging that Kumawat and Sudrania gave false testimony during depositions and at the preliminary-injunction hearing, and that Kumawat and Formidium withheld relevant discovery in preparation for the preliminary-injunction hearing. R. 239, Pl.'s Sanctions Mot. The Court ordered an evidentiary hearing to assess the contempt and sanctions allegations. *NAV Consulting, Inc. v. Kumawat*, 2024 WL 4333290, at *3–7 (N.D. Ill. Sept. 28, 2024).

[2]NAV's contempt motion also sought attorneys' fees, which the Court denied. *See* Pl.'s Contempt Mot.; *NAV Consulting, Inc. v. Kumawat*, 2024 WL 4333290, at *2 (N.D. Ill. Sept. 28, 2024).

## II. Legal Standard

**Contempt.** To be held in civil contempt, a party "must have violated an order that sets forth in specific detail an unequivocal command from the court." *U.S. v. Dowell*, 257 F.3d 694, 699 (7th Cir. 2001); *see Seventh Ave., Inc. v. Shaff Int'l, Inc.*, 909 F.3d 878, 880 (7th Cir. 2018). "To prevail on a request for a contempt finding, the moving party must establish by clear and convincing evidence that (1) a court order sets forth an unambiguous command; (2) the alleged contemnor violated that command; (3) the violation was significant, meaning the alleged contemnor did not substantially comply with the order; and (4) the alleged contemnor failed to make a reasonable and diligent effort to comply." *U.S. SEC v. Hyatt*, 621 F.3d 687, 692 (7th Cir. 2010).

**Sanctions.** Federal courts have inherent authority to sanction litigants "for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991). If misconduct happens, then a wide range of sanctions are available, up to and including dismissal of an action (or entry of default judgment)—but courts must exercise their inherent power to sanction "with restraint and discretion." *Id.* at 44. To impose sanctions, a federal court must find by a preponderance of the evidence that "the culpable party willfully abused the judicial process or otherwise conducted the litigation in bad faith." *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776–79 (7th Cir. 2016) (rejecting a clear-and-convincing evidence requirement for sanctions imposed under both Rule 37 and the court's inherent authority). Both hiding evidence and giving false testimony during a deposition may be sanction-worthy. *Id.* at 776.

That said, "[m]ere clumsy lawyering is not enough" to merit the imposition of sanctions. *Fuery v. City of Chicago*, 900 F.3d 450, 464 (7th Cir. 2018).

## III. Analysis

### A. Contempt

NAV asks the Court to hold Kumawat and Formidium in civil contempt for violating the preliminary-injunction order in two ways: (1) producing deficient 21-day reports; and (2) Kumawat performed work prohibited by the order. R. 408 (sealed), Pl.'s Br. at 25–28. According to NAV, the reports were superficial and incomplete, because most included the same information every time and with vague descriptions of Kumawat's work. *Id.* at 25. NAV also argues that the reports should have included Kumawat's work on two particular Formidium projects, CommonSubDoc (which the parties refer to as CSD) and Seamless; incorrectly listed projects Kumawat was not working on; and specified the wrong end date for Kumawat's Marketplace work. *Id.* at 25–27.

Starting with Kumawat's CSD and Seamless work (which the Court will address in more detail later in this Opinion), NAV has not established that this was work on "new product development" that should have been included in the 21-day reports. NAV cites Kumawat's hearing testimony that both CSD and Seamless were *existing* products, and does not explain why that should be considered work on new product development. *Id.* at 25 (citing R. 398, 11/13/24 Hearing Tr. at 363:1–364:4). Next, NAV cites Kumawat's hearing testimony that some projects listed on the reports were inactive. *Id.* (citing R. 397, 11/12/24 Hearing Tr. at 185:1–186:7). But the

reports themselves disclosed this, so that is not contempt-worthy. *See, e.g.*, Pl.'s Hearing Exh. 70 at 34–36 (July 21, 2023 report), 39–41 (Aug. 11, 2023 report), 49–51 (Aug. 31, 2023 report), 54–56 (Sept. 22, 2023 report). On the Marketplace disclosure, the Court agrees that one specific email exchange suggests that Kumawat and Formidium reported the wrong end date for the project (April 14, 2023 instead of May 11, 2023). *See* Pl.'s Br. at 26. When Sudrania asked Kumawat why he included a later end date, Kumawat responded that he had an email communication dated May 11, so Sudrania should have corrected the report date (absent an alternative explanation than that Kumawat was still working on Marketplace). Pl.'s Hearing Exh. 63. But NAV did not elicit any testimony at the hearing establishing that the Court should draw the inference that Kumawat and Sudrania intentionally hid Kumawat's work on Marketplace (which likewise will be addressed later in this Opinion), so that also does not rise to a significant violation of the reporting requirement. *See* Pl's Br. at 25–26 (citing 11/13/24 Hearing Tr. at 336:10–337:25).

More broadly, NAV asks the Court to question the truthfulness of the reports because they reflect that Universe was the only project on which Kumawat performed substantial work, and it is not credible that he was paid a high salary for doing merely that work as it is described in the reports. Pl.'s Br. at 26 (citing 11/12/24 Hearing Tr. at 185:1–186:7). But this argument ignores that the reporting requirement was limited to work on *new* product development; Kumawat and Formidium did not represent that *all* of Kumawat's work was limited to Universe. And NAV has not identified any other *new* product development work that Kumawat performed after entry of the

preliminary injunction that should have been included in the reports. So NAV has not set forth with clear and convincing evidence that the reports materially violated the injunction order. It is true that Kumawat and Formidium could have provided more detail in their reports (and might have avoided an evidentiary hearing on the contempt motion with more thorough reports), but there is not enough evidence on the record to show that they should be held in civil contempt because of them.

Next, NAV argues that Kumawat's alleged work on compliance and on client services violated the preliminary injunction. Pl.'s Br. at 27–28. Remember that the injunction barred Kumawat from working on compliance or direct client services because his employment agreement with NAV prevented him from competing with NAV in a substantially similar role to the one he held at NAV, and because, on the record presented at the preliminary-injunction stage, NAV's compliance-related technologies constituted trade secrets (at least at that time). 03/31/23 Order at 15–16, 21–22, 26–27. On compliance, NAV argues that Kumawat's "data mapping" project to integrate the data on two Formidium platforms—CSD and Seamless—was prohibited by the preliminary injunction, as was his work on the Marketplace due-diligence questionnaire. *Id.* at 27. But the evidence presented at the hearing did not show that Kumawat did compliance work on either project.

CSD and Seamless are two separate platforms: CSD is an investor onboarding platform, 11/13/24 Hearing Tr. at 292:2–20, and Seamless is Formidium's accounting software, 11/12/24 Hearing Tr. at 172:6–8. The hearing testimony showed that CSD does have a compliance function: CSD transmits data uploaded to the platform by

investors to third-party platforms, like Lexis Nexis, which generate investor risk scores. *Id.* at 200:10–17; 11/13/24 Hearing Tr. at 288:19–290:22, 381:14–382:20. CSD also has its own investor risk-rating module, which is a questionnaire that a Formidium employee manually completes using the investors' information (including the LexisNexis report) to create an overall risk rating for the investor. 11/13/24 Hearing Tr. at 288:19–290:22, 382:3–20. But the hearing testimony did not establish that Kumawat's work involved those specific compliance functions of CSD. Instead, Kumawat worked on integrating the data from CSD and Seamless, so that data entered in the CSD platform would automatically flow to Seamless (such as a new investor subscription), and data entered in Seamless would automatically flow to CSD (such as the accounting's valuation of an investor). 11/12/24 Hearing Tr. at 172:9–173:3, 11/13/24 Hearing Tr. at 232:20–233:3, 383:3–23. Before this project, Formidium employees had to manually enter data from CSD on Seamless, and vice-versa. 11/13/24 Hearing Tr. at 383:14–20.

NAV did not show that Kumawat worked on anything involving the compliance aspect of the CSD product at Formidium. The work that Kumawat did do—automating data transfer between CSD and Seamless—was explicitly contemplated by the preliminary-injunction order. *See* 03/31/23 Order at 11 ("As represented at the hearing and *in the written job description*, Kumawat may perform duties covering data analytics, *technology integration*, mergers and acquisitions analysis, and product development—to the extent that this work does not include compliance or monitoring duties." (emphases added)); PI Hearing, Pl.'s Exh. 19 at 1 ("Technology Integration:

Plan, coordinate, and supervise all activities related to the integration of external technology with Seamless & CSD and vice versa."). NAV's argument that Kumawat necessarily worked on compliance because he accessed CSD and CSD houses compliance functions is not persuasive. *See* Pl.'s Br. at 27.

NAV also argues that because Kumawat was a senior stakeholder on the CSD and Seamless project who was a required member at daily and weekly meetings, he must have been involved in compliance work with CSD. Pl.'s Br. at 27–28. But NAV's evidence for this allegation is (a) Navneet Lakhani's testimony that Kumawat had to sign off on decisions about the project; (b) Suraj Shukla's testimony that Kumawat was the "business side" representative on the project; and (c) Rakesh Kumar's testimony that the business-side team was focused on the users of the product. *Id.* (citing 11/13/24 Hearing Tr. at 248:10–12, 264:13–19, 265:13–20, 278:10–15). When asked about Kumawat's contributions to the integration project during meetings, Lakhani could not remember any specific input or advice. 11/13/24 Hearing Tr. at 264:20–21. Lakhani's own description of the meetings—discussing "which data should flow from which product to which product," *id.* at 265:5–14—is consistent with Kumawat's own testimony that he was only involved in data integration for CSD and Seamless, *id.* at 354:20–25, 356:6–357:7. This is not clear and convincing evidence that Kumawat worked on the compliance functions of CSD in his role integrating data between CSD and Seamless.

Next, NAV makes a one-sentence argument that Kumawat gave guidance on the Marketplace due-diligence questionnaire—and thus worked on compliance—

citing two emails and no hearing testimony. Pl.'s Br. at 28 (citing Pl.'s Hearing Exhs. 62, 64). Marketplace is a Formidium product separate from CSD (though it uses CSD's technology) that is an online platform for buyers and sellers of investment products to meet. 11/12/24 Hearing Tr. at 182:3–14. Kumawat testified that he tested the product (including its due-diligence questionnaire). 11/13/24 Hearing Tr. at 311:7–12. The 21-day reports generally disclosed that Kumawat worked on Marketplace. *Id.*; *See, e.g.*, Pl.'s Hearing Exh.70 at 2. When asked about his emails showing work and a meeting about Marketplace, Kumawat testified that the meeting was to discuss investor data from a database called ADV that he was asked to provide for Marketplace. 11/13/24 Hearing Tr. at 337:23–338:4 (discussing Pl.'s Exh. 64). Sudrania also testified that Marketplace does not have a compliance function, 11/12/24 Hearing Tr. at 207:19–20, as did Kumar, 11/13/24 Hearing Tr. at 293:2–3. NAV does not offer any competing evidence, let alone clear and convincing evidence, that Kumawat's work on Marketplace involved compliance in violation of the preliminary injunction order.

On Kumawat's alleged client work, NAV cites Shukla's testimony at the hearing about one call he attended with a Columbia Heights representative and Kumawat to argue that Kumawat violated the injunction order. Pl.'s Br. at 28 (citing 11/13/24 Hearing Tr. at 235:19–238:25); *see* 11/13/24 Hearing Tr. at 251:25–252:7. Shukla could not remember the Columbia Heights representative's name, but did remember that Columbia Heights was already a client (that had left NAV for Formidium). 11/13/24 Hearing Tr. at 251:8–14, 253:3–5. Shukla testified that it was an

"introduction call" that was "short and sweet." *Id.* at 237:22–238:17. According to Shukla, they discussed the client's questions about the onboarding process at Formidium, including which documents were necessary to onboard the investors in Formidium's system. *Id*. Without giving any specifics, Shukla testified that "[he] just feel[s] they [meaning Kumawat and the Columbia Heights representative] know each other prior on that call." *Id.* at 254:20–21. In support of its contempt motion, NAV filed Shukla's declaration that "[b]etween May of 2023 and June of 2023, [Shukla] was involved in fund onboarding and worked with Kumawat on onboarding certain funds at Formidium" and "[t]hese onboarding tasks involved both [him]self and Kumawat communicating directly with new clients." R. 170-4, Shukla Decl. ¶¶ 6–7. Kumawat for his part denies that he ever participated on any call with Columbia Heights. 11/13/24 Hearing Tr. at 359:7–17. Neither Kumawat's flat denial, nor Shukla's vague testimony about a client call (and the circumstances of his declaration filed in this lawsuit, which NAV presented to Shukla *already drafted* on his first day at work at NAV after leaving Formidium, 11/13/24 Hearing Tr. at 243:1–245:1) are particularly credible. Given this shaky factual ground, NAV did not show with clear and convincing evidence that Kumawat had a client-facing role at Formidium following the entry of the preliminary injunction order.

Finally, NAV argues that Formidium put no safeguards on Kumawat's role, and indeed did not notify anyone at the company about the preliminary-injunction order, showing that the Defendants did not take reasonable steps to comply with the order. Pl.'s Br. at 29–30. Although this could support NAV's motion for contempt if

NAV had presented other clear and convincing evidence that Kumawat and Formidium violated the preliminary injunction, this gap alone does not warrant a finding of contempt, especially considering that Sudrania was Kumawat's only supervisor at Formidium, and Sudrania is well-aware of the preliminary injunction and this litigation, having now testified in two evidentiary hearings and sat for two depositions. *See* 11/12/24 Hearing Tr. at 149:23–150:2, 150:25–151:2. Ultimately, NAV has not set forth clear and convincing evidence of a material violation of the preliminary injunction, so the contempt motion is denied. *See U.S. SEC*, 621 F.3d at 692.

**B. Sanctions**

NAV seeks sanctions for Kumawat and Formidium's failure to produce certain documents during expedited discovery for the preliminary-injunction hearing and for giving false testimony during depositions and at the preliminary-injunction hearing. Pl.'s Br. at 12–13, 18–22. NAV argues that it is entitled to default judgment on the merits, attorneys' fees, and costs. *Id.* at 22–24. As explained below, NAV's motion is granted in part and denied in part. NAV has shown that Kumawat and Formidium abused the judicial process by failing to produce the NAV campaign emails. NAV is thus entitled to attorneys' fees for the cost of bringing the sanctions motion (including the briefing and the evidentiary hearing). Default judgment is not warranted on the record presented.

**1. Document Production**

During expedited discovery for the preliminary-injunction hearing, the Court ordered Kumawat to produce "Any and all Documents and Communications between

You and any other Person, including but not limited to SFS, *relating to any aspect of NAV's business*, including but not limited to its compliance services, anti-money laundering officer services, fund accounting services, and RTA functions, prospecting leads, and its Confidential Information and/or Trade Secrets." R. 31, 09/12/22 Order at 6 (emphasis added). The Court also ordered Formidium to produce "[a]ny and all Documents and Communication between You and Abhishek Kumawat that relate to NAV, NAV's operations, NAV's business plans, NAV's sales, NAV's business practices, *NAV's customers and/or clients*, and/or NAV's Confidential Information and/or Trade Secrets." *Id.* at 8 (emphasis added). NAV argues that Kumawat and Formidium should have produced three categories of responsive documents: (1) the NAV campaign emails; (2) documents related to Kumawat's work on CSD; and (3) documents related to Kumawat's work with Asana, a Formidium client. Pl.'s Br. at 12–13.

The Court agrees that Kumawat and Formidium should have produced the NAV campaign emails and attachments before the preliminary-injunction hearing, and their failure to do so warrants sanctions. In response to the expedited-discovery order, neither Kumawat nor Formidium produced any emails with the subject line "NAV Campaign – Email Template." *See* Pl.'s Hearing Exhs. 4, 5, 10, 11, 16, 23. The hearing testimony established that just after Kumawat left NAV and joined Formidium, he assisted Amit Arora (the Vice President of Formidium) on a campaign to solicit new clients for Formidium from NAV. 11/12/24 Hearing Tr. at 84:8–17, 85:15–86:9. Kumawat provided Arora a target list of fund managers whose funds NAV administered. *Id.* at 85:15–86:9. Using two databases—called ADV and Preqin—

Kumawat created spreadsheets for Arora with the fund managers' contact information and other information about the funds. *Id.* at 68:23–69:5, 86:10–22, 193:10–194:4.[3] The emails about the campaign to solicit NAV's clients were clearly responsive to the Court's order directing Kumawat to produce "[a]ny and all Documents and Communications between You and any other Person, including but not limited to SFS, *relating to any aspect of NAV's business*" and the order directing Formidium to produce ""[a]ny and all Documents and Communication between You and Abhishek Kumawat that *relate to NAV*, NAV's operations, NAV's business plans, NAV's sales, NAV's business practices, *NAV's customers and/or clients*, and/or NAV's Confidential Information and/or Trade Secrets." 09/12/22 Order at 6, 8 (emphases added). Documents evidencing Kumawat's participation in a campaign to solicit new customers from NAV's existing customer base immediately after he left Formidium and joined NAV fall squarely within the expedited-discovery order entered by the Court.

Kumawat and Formidium provide no plausible explanation for their failure to produce these documents. Kumawat first argues that NAV did not meet its burden of showing that the NAV campaign materials were within Kumawat's personal

[3]Kumawat provided spreadsheets with information about NAV's clients to Arora in three phases, though no one explained the logic of these phases clearly at the hearing. Arora testified that he gave Kumawat filters to apply to the databases to identify the clients for each phase, but neither Kumawat nor Arora could recall any of the filters used (except for the essential filter that these were NAV's clients). 11/12/24 Hearing Tr. at 86:6–9, 126:19–25, 128:18–130:25; 11/13/24 Hearing Tr. at 317:17–318:5, 318:10–13, 319:4–10, 320:7–10. Arora testified that the phases were to test different filters to get the best responses. 11/12/24 Hearing Tr. at 127:11–24. Kumawat testified that the phases were random, and only meant to save time creating the lists, and to avoid sending out a big batch of emails at once. 11/13/24 Hearing Tr. at 318:14–319:3, 370:9–371:4. There is apparently no written record of which filters Kumawat used to create the lists of NAV's clients. 11/12/24 Hearing Tr. at 128:24–129:15.

possession or control. R. 408 (sealed), Defs.' Resp. at 24–25 (citing *Burton Mechanical Contractors, Inc. v. Foreman*, 148 F.R.D. 230, 236 (N.D Ind. 1992); *Robinson v. Moskus*, 491 F.Supp.3d 359, 365 (C.D. Ill. 2020) *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1426 (7th Cir. 1993)). This argument is misplaced, given that the emails in question were in Kumawat's own email inbox. If he really was unsure (and there is no persuasive reason to think that he was) whether he had the authority to produce these documents from his work email himself, then he should have alerted Formidium to their existence, and Formidium (as explained next) should have produced the documents. He also argues that there was no "unambiguous command" to produce these materials. Defs.' Resp. at 25. The broad text of the discovery order set forth above clearly applied to these emails. Finally, Kumawat argues that because he created the spreadsheets using publicly available data, the emails did not involve NAV's confidential information, and thus were not unambiguously responsive. *Id.* But the discovery order did not limit the request for documents "relating to any aspect of NAV's business" to *only* those documents including NAV's confidential information. *See* 09/12/22 Order at 6. Instead, the discovery order broadly ordered disclosure of all documents relating to any aspect of NAV's business, with confidential information being a subset of the category of responsive documents, not the limit of it. So this too does not excuse Kumawat's failure to produce the emails.

Formidium, for its part, argues that NAV did not meet its burden of showing willful bad faith, because the hearing testimony showed that Formidium did not find these documents in its search for records responsive to the discovery order. Defs.'

Resp. at 27. Sudrania testified that a search for the term "NAV" would have returned "a few million records" because it is a commonly-used acronym in the industry for net asset value, and also because many former NAV clients have switched to Formidium. 11/12/24 Hearing Tr. at 161:16–162:1, 163:4–164:2. But Formidium easily could have search for "Kumawat *and* NAV," or limited its search to "NAV" from the date that Kumawat joined Formidium in July 2022, which was less than two months before the discovery order issued on September 12, 2022. Or at the least limit the search to emails on which Kumawat was a sender or recipient. It is simply not credible that a sophisticated company like Formidium could not have solved—if it wanted to—a simple records-search obstacle like that. Moreover, Kumawat compiled the list of NAV clients for the client campaign in July through August 2022—less than two months before the discovery order—so again it is simply not credible that Kumawat and Sudrania did not remember that the emails existed, separately from whatever results their document searches returned.[4] NAV has met its burden of showing by a preponderance of the evidence that Kumawat and Formidium abused the judicial process by failing to produce the documents showing that Kumawat worked on a campaign targeting NAV's customers. These documents were directly responsive to the discovery orders to both Kumawat and Formidium, and Kumawat and Formidium provide no persuasive explanation for the failure to disclose.

---

[4]Sudrania's lawyer instructed him not to answer a deposition question about what data analytics Kumawat worked on (addressed below), which likewise undermines the credibility of Sudrania's testimony that Kumawat and Formidium did not find or know about these documents during expedited discovery. R. 403-4, Sudrania Dep. at 118:8–15.

But NAV's other arguments on withheld discovery do not justify sanctions. Unlike for the NAV campaign emails, NAV does not identify a specific request for production that required production of the CSD and Asana documents. *See* Pl.'s Br. at 12 (citing an interrogatory question about Kumawat's role at Formidium, but not a request for production). The Defendants interpret NAV's argument to be about the request to Kumawat for "[a]ll Documents and Communications *sufficient* to describe Your duties and responsibilities for SFS. This would include any description of Your role or an employment contract that reflects Your job duties. For each of the job categories you listed in Your declaration (internal technology integration, data analytics, overseeing corporate acquisitions, and product development), R. 21-1, Kumawat Decl. ¶ 25, provide records sufficient to cover *one example of a project within each of those categories* (redacting confidential information as necessary)." 09/12/22 Order at 6 (emphases added); *see* Defs.' Resp. at 26.

NAV argues that documents about Kumawat's work on CSD should have been disclosed because CSD has compliance functions, so Kumawat's work on CSD qualified as work on compliance. Pl.'s Br. at 12, 16–18. But as already explained above, the hearing testimony did not establish NAV's allegation that Kumawat's work on CSD encompassed compliance work. Moreover, NAV does not establish that the discovery order required that Kumawat and Formidium produce every document showing client interactions. So NAV has not shown that Kumawat abused the judicial process by failing to produce the CSD-related documents during expedited discovery *before* the preliminary-injunction hearing.

On the Asana documents, NAV argues that they show that Kumawat attended weekly meetings with a Formidium client, and thus should have been produced. Pl.'s Br. at 18. Again, NAV does not identify a specific request for production that Kumawat or Formidium violated in failing to produce these documents. And the hearing testimony did not show that the Defendants abused the judicial process by failing to disclose documents about Kumawat's interactions with Asana. Instead, only Kumawat testified that he joined these meetings to discuss the potential integration of Yardi and Seamless, a project that never came to fruition. 11/13/24 Hearing Tr. at 338:11–341:2. To argue that Kumawat must be obfuscating some other role with Asana, NAV cites meeting minutes showing that others (not Kumawat) completed the integration, in apparent contradiction to Kumawat's testimony. Pl.'s Br. at 18 (citing Pl.'s Hearing Exh. 38). But NAV did not ask Kumawat to explain the alleged discrepancy between his testimony and the content of the meeting minutes, and (in any event) that alone would not be clear and convincing evidence that NAV abused the judicial process by failing to disclose these documents during expedited discovery.

**2. Perjury**

Next, NAV argues that Kumawat and Sudrania gave false testimony during their depositions (leading up to the preliminary-injunction hearing) and during the preliminary-injunction hearing itself. Perjury is "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Montano v. City of Chicago*, 535 F.3d 558, 564 (7th Cir. 2008) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993))

(applying the definition of perjury in the federal criminal context to a motion for sanctions in a civil case). Perjury "may warrant the sanction of dismissal," *id.*, which NAV asks for here, Pl.'s Br. at 22–24.

NAV argues that Kumawat perjured himself with his testimony that "(1) he had not worked with CSD; (2) he was unaware of integration projects involving CSD; (3) he had only worked on an integration project between an internal Formidium system and an external software; (4) Business Development had not asked him for data analytics and he did not know what type of data analytics requests would come from Business Development; and (5) he had not worked with a Formidium client." Pl.'s Br. at 19 (citing R. 403-2, Kumawat Dep. at 208:2–209:17, 224:4–5, 227:1–3, 232:1–234:3, 235:5–18); *see also* Pl.'s Br. at 8 (citing R. 403-3, Prelim. Inj. Hearing Tr. at 175:24–176:1, 176:14–19, 177:6–8, 185:24–186:6). But the hearing testimony did not show that Kumawat willfully gave false testimony about material facts during his deposition or at the preliminary-injunction hearing.

First, on Kumawat's deposition testimony about CSD, as explained above, the hearing testimony showed that Kumawat worked on a data-mapping project to integrate data on CSD and Seamless. Kumawat did not outright deny that fact during his deposition, and in fact acknowledged this work. NAV cites two passages from Kumawat's deposition testimony. Pl.'s Br. at 19–20 (citing Kumawat Dep. at 208:2–209:17, 232:1–234:3).[5] In the first, Kumawat stated that he was working on "two or

[5]NAV does not supply argument on Kumawat's alleged perjury during the preliminary-injunction hearing. *See* Pl.'s Br. at 8 (citing R. 403-3, Prelim. Inj. Hearing Tr. at 175:24–176:1, 176:14–19, 177:6–8, 185:24–186:6); *id.* at .18–20. Still, none of the cited preliminary-injunction hearing testimony amounts to perjury.

three" technology-integration projects at Formidium (without specifying all of them, but acknowledging that Seamless was one of them). Kumawat Dep. at 208:2–209:17. He said "yes" when asked "you have current, two to three ongoing projects of trying to get Seamless to work with an outside technology; is that right?" *Id.* at 232:21–23. In the second passage cited by NAV, Kumawat acknowledged his integration work with CSD. *Id.* at 232:1–234:3. Just before the cited passage, Kumawat was asked "[i]s it possible that you could be asked to improve CSD or Seamless in the future as part of your role in New Product Development?" and he answered "I don't think so. That product is already developed. It is in good shape." *Id.* at 231:14–18. When asked about managing and improving existing products, he said "[y]ou can think of integration that is needed, that I can work on it, if both the systems talk to each other." *Id.* at 231:19–24. Then, in the part cited by NAV, he was asked "[s]o you may have future integration projects on CSD?" and answered "I'm not aware of anything right now." *Id.* at 232:1–3. When pressed on future integration projects with Seamless, Kumawat responded "[i]f you say integration, that, you know, is part of my job." *Id.* at 232:24–233:5. Finally, when asked if "it's possible that you would manage the development and improvement of those products [referring to CSD and Seamless] to better meet user needs in the future" Kumawat answered "[i]f you talk about, you know, integration, then I would say yes." *Id.* at 233:20–234:3.

None of this testimony supports NAV's argument that Kumawat committed perjury by denying that he worked with CSD or that he was aware of CSD integration projects. *See* Pl.'s Br. at 19–20 (citing Kumawat Dep. at 208:2–209:17, 232:1–234:3).

Instead, Kumawat repeatedly acknowledged that his work with CSD and Seamless involved integration. NAV makes much of the argument that Kumawat's testified that he would only work on "external" integration—meaning integration between CSD and a non-Formidium technology, or Seamless and a non-Formidium technology, instead of between CSD and Seamless (which are both Formidium technologies). Pl.'s Br. at 20. But even if Kumawat's testimony was confused on this point, it still does not amount to willful false testimony about a material fact. As explained above, Kumawat's work integrating CSD and Seamless does not run afoul of the order preventing Kumawat from working on compliance any more than a technology integration project involving non-Formidium technology would. So NAV has not established that Kumawat perjured himself in his testimony about CSD.

Kumawat's deposition testimony about data analytics for business development is admittedly more opaque, but it still does not rise to the level of perjury. *See* Pl.'s Br. at 21 (citing Kumawat Dep. at 235:5–18). As explained above, the hearing testimony established that Kumawat worked on data analytics to solicit new clients for Formidium, and this work included compiling lists of existing NAV clients to target. During his deposition, Kumawat was asked if he had "any interaction" with Formidium's business development department, and Kumawat answered "[i]f they ask me any kind of data analytics, then, you know, if that comes under my role, I will do that." Kumawat Dep. at 234:24–235:4. When NAV followed up with "[h]as Business Development asked you for any data analytics" Kumawat answered, "I would not say Shalin in the Business Development, so I would say no." *Id.* at 235:5–8. Lastly, when

asked "[w]hat type of data analytics would come from Business Development," Kumawat answered "I don't know. Unless I have data, I cannot say, Okay, this data. Because you can give me any data. So I cannot think of, Okay, what data you will give me, you know. But I'm only, you know—If it is data analytics, it can be, you know, any data analytics." *Id.* at 235:9–18. So Kumawat acknowledged that he did (or would do in the future) data-analytics work for business development at Formidium. He then hedged on the answer that business development did not ask for data analytics from him because *Shalin* had not asked him for data analytics. And NAV did not ask him if anyone else except Shalin had asked him for data analytics related to business development. Finally, when Kumawat answered, "I don't know" (at his deposition on October 12, 2022) when asked what data analytics would come from business development, it does seem odd that would not know that he had been asked for data analytics about NAV's clients when he performed the NAV campaign work less than three months earlier in August 2022. But still, Kumawat did not deny that he worked on data analytics for business development, so NAV has not shown that he perjured himself by willfully giving *false* testimony about a material fact.

Lastly, NAV has not shown that Kumawat lied when he denied working directly with clients during his deposition. NAV cites the same passage for Kumawat's testimony about client interactions just cited above about his work on data analytics for business development, Kumawat Dep. at 235:5–18, to argue that Kumawat testified that he did not work with any Formidium clients. Pl.'s Br. at 21–22. But the cited passage does not include any questions or answers about Kumawat's interaction with

*clients*. And none of the other deposition testimony from Kumawat cited by NAV includes such a denial. *See* Pl.'s Br. at 19 (citing Kumawat Dep. at 208:2–209:17, 224:4–5, 227:1–3, 232:1–234:3, 235:5–18). So NAV has not shown any perjury in Kumawat's testimony about clients.

Moving on to Sudrania's alleged perjury NAV argues that Sudrania committed perjury by testifying that "(1) Kumawat's duties did not relate to CSD; (2) Kumawat's work on integration was focused on him acting as the liaison with an external product to integrate it with an internal Formidium product; (3) Kumawat did not work with Business Development; and (4) Kumawat did not work with any Formidium clients." Pl.'s Br. at *(*citing R. 403-4, Sudrania Dep. at 75:13–76:4, 115:10–24, 138:14–16, 141:12–14); *see also* Pl.'s Br. at 9 (citing Prelim. Inj. Hearing Tr. at 199:15–200:1). Just as for Kumawat, the hearing testimony did not show that Sudrania willfully gave false testimony about material facts during his deposition or during the preliminary-injunction hearing.

NAV argues that Sudrania gave false testimony about Kumawat's CSD and integration work because Sudrania said it was only limited to integration with external technology (meaning non-Formidium technology, according to NAV). Pl.'s Br. at 20 (citing Sudrania Dep. at 75:13–76:4; Prelim. Inj. Hearing at 199:15–200:1). In the cited deposition passage, Sudrania was asked what an "integration request is" and he answered "[s]o integration in this case is—in general is the—making our internal technology and external technology products talk to each other technologically speaking." Sudrania Dep. at 75:13–18. When asked "where is this data coming from"

Sudrania answered "[t]hat's a wide variety of sources" and "it could be any data." *Id.* at 76:5–12. During the preliminary-injunction hearing, Sudrania testified that Kumawat's technology integration job duties were "to work with those third parties and then work with our technology team to integrate the external parties', whatever it is that needs to be done." Prelim. Inj. Hearing at 199:23–200:1. Although Sudrania did describe integration with "internal" and "external" technology, none of his answers cited by NAV foreclosed the possibility that the integration would be between two separate Formidium products. And as the Court explained above, NAV has not established that the distinction is material considering the preliminary injunction order, and given that the hearing testimony did not show that the CSD and Seamless integration project involved compliance work.

NAV also did not show that Sudrania gave false testimony about Kumawat's work with business development. *See* Pl.'s Br. at 21 (citing Sudrania Dep. at 18:10–123:18, 138:14–16). When asked whether Kumawat "work[s] with business development *right now*" Sudrania answered "no." (emphasis added). Sudrania Dep. at 138:6–8. When asked if Kumawat was "anticipated to do so in his current role," Sudrania answered "[s]o I—I hesitate to guess here. You are asking to guess will he talk to this person. If he—if his job takes him there for his data analytics, then yes. If his job for data analytics takes him to business development team, then yes. Does it make him a compliance guy, no. But if he—any of these four things, if he is going to—it could be anything, okay. We may be targeting, let's say rich lawyers that are our customers. So that's his data set, rich lawyers, that's it. Now is he talking to lawyers for a specific

purpose, that's none of his business. That's the sales team and that's business development." *Id.* at 138:17–140:20. NAV does not argue that the hearing testimony showed that Kumawat's work on the NAV campaign was ongoing at the time of the deposition on September 30, 2022. And when asked if Kumawat might do that work in general, Sudrania answered affirmatively. Lastly, when asked point blank what "the data that [Kumawat is] working on so far relate to" Sudrania's lawyer directed him not to answer that question. *Id.* at 118:8–15. After a dispute between the attorneys about that question, NAV did not ultimately repeat it, and none of the follow-up questions about data analytics would have elicited the testimony that Kumawat was working on data analytics for the NAV client campaign. *See id.* at 118:16–123:20. So NAV did not show that Sudrania committed perjury by denying that Kumawat did data analytics for business development, and Sudrania did not give any false testimony about the nature of that work.

Finally, NAV's argument that Sudrania lied about Kumawat's interaction with clients also fails. *See* Pl.'s Br. at 22 (citing Sudrania Dep. at 141:12–14). In the cited passage, Sudrania answered "no" to the question "[d]oes he currently work with any Formidium's clients?" Sudrania Dep. at 141:12–14. NAV asserts that this testimony is contradicted by the hearing testimony about Asana, but NAV makes no argument that the Asana work was ongoing at the time of the deposition. *See* Pl.'s Br. at 22. And as already explained above, the hearing testimony was sparse on details about the client-facing nature of Kumawat's work with Asana.

In sum, NAV has not established by a preponderance of the evidence that either Kumawat or Sudrania gave willfully false testimony about material facts during their depositions. *See Montano v. City of Chicago*, 535 F.3d at 564. So NAV's motion for sanctions on perjury grounds is denied.

**3. Remedies**

As explained above, NAV met its burden of showing that Kumawat and Formidium abused the judicial process by failing to disclose the NAV campaign emails during expedited discovery. The hearing testimony did not support NAV's remaining allegations that Kumawat and Formidium unlawfully withheld other discovery, and that Kumawat and Sudrania perjured themselves during their depositions. This leaves the question of the appropriate remedy for the motion for sanctions. NAV argues that it is entitled to default judgment on the merits of the case, along with all of its attorneys' fees and costs. NAV relies on *DR Distributions, LLC v. 21 Century Smoking*, 2024 WL 2846035 (N.D. Ill. June 5, 2024) in support of its argument for default judgment. Pl.'s Br. at 22–24. But as Kumawat and Formidium rightly argue, that case is readily distinguishable: it involved more than a decade of litigation, and the district court had already ordered over one million dollars in sanctions that were still unpaid when the court finally ordered default judgment. *Id.* at *1: *see* Defs.' Resp. at 28–29. Here in contrast, many of NAV's allegations were ultimately unsupported by the record (including perhaps the most consequential allegation of perjury).

Still, sanctions are nevertheless warranted, because Kumawat and Formidium did not produce documents that were clearly responsive to the discovery order. *See*

*Ramirez*, 845 F.3d at 776. They offered no persuasive reason whatsoever for that omission. The litigation over the preliminary injunction dealt squarely with Kumawat's knowledge of NAV's existing clients and those NAV clients that were targeted by Formidium. *See* 03/31/23 Order at 19–20, 22–23, 27–28. Had Kumawat and Formidium produced these documents, NAV surely would have cited them at the preliminary-injunction stage. But it would not be appropriate to award NAV's fees and costs from the preliminary injunction hearing, because—as the preliminary-injunction order explained—the Court did not ultimately credit Kumawat and Sudrania's testimony about Kumawat's role at Formidium at the time. *See id.* at 9–10. So although the records might have gone further in undermining Kumawat and Sudrania's testimony had they been produced during expedited discovery, the preliminary injunction already was fashioned to protect NAV's trade secrets and maintain the status quo under the employment contract as the parties continued to litigate the merits of this case. *See id.* at 26–28.

## IV. Other Motions

**Defense Motion for Sanctions.** The Defendants have moved to sanction NAV on a variety of purported grounds. None have merit. Overall, the motion tries to turn ordinary factual and interpretive disputes into willful misconduct even while fact discovery was ongoing, and also tries to knock down a number of straw-men factual or legal arguments that NAV never advanced.

More specifically, the Defendants initially assert that the verified complaint contains knowingly false statements averred to by Nav Gupta. R. 425 at 4–6, R. 467

at 7–9. The first target is that NAV does not really "retain nearly 99% of its clients." R. 1, Compl. ¶ 17. There is all manner of ways to interpret what that allegation means, including whether the denominator includes funds within clients, or entire companies that have multiple funds serviced by NAV, or funds terminated by NAV (instead of a relationship terminated by the fund), and on and on. And there is no time frame given in the verified complaint. This is no basis to deem the retention-rate allegation to be a willful misstatement. The same goes for the Defendants' nit-pick on the complaint's allegations that Kumawat had access to NAV's "client lists." Compl. ¶¶ 99, 112, 127 139, 153. Most substantial sales and business operations will have numerous records that relate to (and bear the names of) multiple clients, and there is no reason to interpret "client lists" to mean a singular document with a title, "Client List." The Defendants' final target in the complaint are allegations that Kumawat has access to NAV's "business plans and financials" and "pricing models." *E.g.*, Compl. ¶¶ 20, 22, 22, 26, 27. But the deposition testimony of Chief Operating Officer Ambuj Garg generally supports those allegations and Kumawat's role at NAV in attracting and retaining clients lends credence to the allegations. To be sure, the Defendants dispute this with their own evidence (including Kumawat's testimony) but a sanctions motion is not the procedural moment for a court to make a factual finding over which there is a genuine dispute of fact (at least genuine so far).

That same flaw applies to the next target in the Defendants' motion, namely, that NAV allegedly misrepresented Kumawat's job duties at NAV. R. 425 at 6–7, R. 467 at 10–11. According to the Defendants, NAV provided a different description of

job duties to Customs & Immigration Services (for work-visa purposes) and the Illinois Department of Human Rights (when responding to a complaint). Again, however, NAV offers under-oath testimony to support NAV's expansive description of Kumawat's duties, and did so even at the evidentiary hearing for the preliminary injunction. And, again, that provides a reasonable basis in fact for the allegation, so there is no occasion now for the Court to jump ahead of a summary judgment evaluation (or, worse, a trial evaluation), by crediting one side or the other definitively via a sanctions motion.

Next, the Defendants contend that NAV employee Vivek Agarwal improperly influenced former Formidium employees Navneet Lakhani and Suraj Shukla to provide false evidence of what job duties Kumawat was performing at Formidium. R. 425 at 7–12, R. 467 at 11–12. Yes, as described earlier in this Opinion, ultimately neither Lakhani's or Shukla's testimony specifically helped NAV in showing, by clear and convincing evidence, that Kumawat had knowingly violated the preliminary injunction. But that is not the same as saying that NAV in turn had no reasonable basis to offer the evidence in support. The alleged machinations that the Defendants point to in Lakhani's and Shukla's moves to NAV are fodder for cross-examination, not sanctions. Similarly, the Defendants make an argument in passing that NAV improperly influenced a former Formidium employee, George Acosta, by telling him that he did not need an attorney and showing him an incomplete email chain. R. 425 at 12–13. But the Defendants point to no rule or ethics line that was crossed by that conduct.

Moving on, the Defendants argue that there is no basis for the allegation that Kumawat misappropriated any trade secret. R. 425 at 13–15. And the Defendants also assert that NAV is pursuing monetary damages claims but there is "zero" evidence of causation. R. 425 at 15–16, R. 467 at 14. Again, discovery was ongoing at the time that the Defendants moved for sanctions, so (again) a sanctions motion is not the right platform for deciding genuine disputes of fact. Indeed, a review of the docket shows plenty of discovery disputes, so jumping a sanctions motion ahead of developing the full factual record makes little sense. Even more fundamentally, it was clear from the start that NAV's primary claim—advanced to support the preliminary-injunction motion—was that Kumawat would inevitably disclose trade secrets if he performed job duties at Formidium that he had performed for NAV. That is a form of misappropriation.

Consistent with the Court's observation that the parties have engaged in a slew of discovery disputes, the Defendants next argue that NAV has vexatiously obstructed discovery. R. 425 at 16–18, R. 467 at 12–13. This too is a procedurally puzzling request, because discovery supervision has been referred to the magistrate judge (who has supervised discovery with his customary adeptness and the patience of Job). It is not as if the Defendants cite a finding of willful discovery misconduct entered against NAV by the magistrate judge. Yes, NAV has lost some discovery disputes and has been ordered to respond to discovery requests. But, as intense as the disputes have been, it would be up to the magistrate judge in the first instance—not this Court—to impose sanctions for purported discovery misconduct.

Finally, the Defendants make a broader-brush, field-general-level attack, arguing that NAV has put Kumawat through the wringer by litigating against him in this case and in the arbitration, and has "engaged in all-out war" against Formidium. R. 425 at 18–20. It is not for the Court to opine on the merits (or lack thereof) of the arbitration or of NAV's wider business practices. And those topics are not the proper purview of a sanctions motion. The motion is denied.

**Defense Motion to File for Early Summary Judgment.** Like the sanctions motion, the Defendants' request to file a summary judgment motion before the close of all discovery, R. 497, would compel the Court to decide the issues at a procedurally inopportune time. The primary reason is the heavily fact-bound nature of the proposed summary judgment motion, which would benefit from the close of all discovery and maximize judicial efficiency by presenting the issues to the Court one time, instead of evaluating more than one round of summary judgment practice. The closest argument that could justify an early summary judgment motion is the claim-preclusion affirmative defense. But there too it would be better to wait for a single, complete presentation on all summary judgment issues at the end rather than divert the litigants' and the Court's resources. It is true that there are cases in which a surgical legal issue can be efficiently presented mid-discovery, including one that seems like a clear winner. That does not apply to the claim-preclusion argument. The motion is denied.

**Formidium's Motion to Clarify.** For the penultimate motion, R. 549, Formidium seeks to clarify the preliminary-injunction order to make sure that

Formidium is not prohibited—so long as *Kumawat* himself is not involved—from servicing its own pre-existing clients or soliciting potential clients merely because the client is listed in NAV Consulting's shared inbox to which Kumawat previously had access. Against this, NAV argues that the preliminary injunction specifies that "Sudrania Fund Services" is specified in the first restraint. R. 575 (citing R. 112 at 27 (Preliminary Injunction ¶ 1)). That is true, but in context, the remainder of the restraint makes clear that the basis for the injunction is to prevent the inevitable use of trade secrets by *Kumawat* in concert with Sudrania (now Formidium) if he were to perform the barred conduction Paragraphs 1(a) and 1(b) of the preliminary injunction. *Id.* So Formidium was bound by the preliminary injunction only to the extent that anyone else acting in concert with *Kumawat* would be, and thus only if Kumawat engaged in the barred conduct. The motion to clarify is granted with that explanation. Having said that, although the clarification may be helpful for past conduct, as explained next, it turns out to be moot, because the preliminary injunction must be dissolved for now.

**Kumawat's Motion to Dissolve.** Lastly, Kumawat argues that the preliminary injunction ought to be dissolved at this point in the litigation. Most of the arguments are not persuasive, but (as explained below) one is. On the unpersuasive arguments: he argues that the preliminary injunction ought to have included a client list rather than refer to the customers listed in NAV Consulting's shared inbox to which he previously had access. R. 112 at 27 ¶ 1(a). But the shared inbox was the subject of concrete testimony during the preliminary-injunction evidentiary hearing, and

Kumawat did not profess confusion about the meaning of the term after the injunction's entry. So there was no violation of Civil Rule 65(d)(1)(B) in stating its terms with specificity.[6]

The second unpersuasive ground for dissolution is the lack of a bond. In the Employment Agreement, however, Kumawat agreed that no bond would be necessary. Employment Agr. ¶ 9. More importantly, Kumawat did not propose a specific bond amount or offer any evidence in support of a specific bond. *See* R. 33 at 31 (in one sentence, referring to a "significant" bond in the Conclusion section of the brief). In exercising equitable discretion for an equitable remedy, the Court would have considered imposing a bond, despite the Employment Agreement provision, but Kumawat did not propose an amount or back up the "significant" request with evidence.[7]

Third, Kumawat seems to argue that a preliminary injunction can *never* be entered absent the misappropriate of a trade secret in some tangible form. But the Defend Trade Secrets Act does authorize injunctive relief impairing employment so long as the "conditions placed on such employment shall be based on evidence of *threatened misappropriation* and not merely on the information the person knows." 18 U.S.C. § 1836(b)(3)(A)(i)(I) (emphasis added). So, yes, Kumawat is right that injunctive relief cannot be "merely" based on information in the employee's head.

[6]Having said that, if the Court were not going to dissolve the injunction on the ground explained later in the Opinion, the Court would have required NAV to compile the definitive list to share with Kumawat (or his counsel) given the passage of time (possibly on an attorney's eye's-only basis to start, so that defense counsel would have a list to consult if Kumawat had questions).

[7]Again, if the preliminary injunction were not going to be dissolved, then the Court would consider a specific proposal backed up with specific evidence.

Instead, there must be threatened misappropriation, which could take the form of inevitable disclosure of trade secrets, whether in tangible, physical form or not. That was the basis for the preliminary injunction, as explained in the opinion granting it. R. 112 at 18–24.

But what is persuasive on dissolution is that the passage of time has undermined the evidence of inevitable disclosure of still-protected trade secrets. Remember that the protectable categories of trade secrets consisted of the needs of NAV's customers; NAV's anti-money-laundering and hedge-fund accounting compliance checklists, processes, and products; and NAV's own business plans and expansion strategy. R. 112 at 19–20, 21–22, 22–24. And remember that Kumawat left NAV in July 2022. It has been over four years since Kumawat had access to those categories of information. The key evidence undermining the continued protectability of the information is the time limit on the non-compete in the Employment Agreement: two years. Employment Agr. at 50–51. The two-year limit was picked by NAV as the length of time during which it would be reasonable to prevent Kumawat from performing substantially similar duties at a competitor. Double that amount of time has elapsed. Plus, the evidence offered in support of the original preliminary injunction did not focus on the protectability of the trade secrets this far out in the future. Under these circumstances, the irreparable harm element is no longer satisfied to justify the extraordinary remedy of a preliminary injunction. If NAV can muster evidence to show that the four-year-old information still retains economic values from its secrecy, then NAV can move to enter a new (almost surely much narrower) preliminary

injunction. But all likely would be better served if the parties and counsel focused on finishing the case definitively, once and for all. And, for his part, Kumawat should be cautious and deliberate before jumping feet first into new duties lest he miscalculate and create new liability. The preliminary injunction is dissolved.

## V. Conclusion

In sum, NAV's motion for a finding of contempt is denied. The motion for sanctions for failing to comply with discovery is granted in part and denied in part. NAV shall identify the fees and costs incurred in bringing the motion for sanctions (including for drafting the pre- and post-hearing briefs, taking pre-hearing depositions, and the hearing itself) and confer with the Defendants to follow the steps in Local Rule 54.3 for post-judgment fees-and-costs petitions. But the Joint Statement based on Local Rule 54.3(e) must be filed by November 16, 2026. That means the parties must shorten the interim steps and deadlines in Local Rule 54.3 to meet that deadline. Of course the Court encourages the parties to attempt to resolve the petition—and the entirety of the case. As also explained in the Opinion, the Defendants' motion for sanctions is denied, as is the motion to file for early summary judgment. Formidium's motion to clarify the preliminary injunction is granted. On Kumawat's motion, the preliminary injunction is dissolved.

To spur the case to resolution, the parties shall confer and file a joint status report on or before October 15, 2026, setting forth proposed discovery deadlines; a post-discovery summary judgment briefing deadline; and a proposed trial schedule. The magistrate judge has supervision to set the discovery deadlines, but the Court

will set the other deadlines after reviewing the report. Perhaps the broader disputes between NAV and Formidium have prevented the settlement of this case, but if any case warranted good-faith, diligent efforts to arrive at a settlement, it is this one. But if it takes a trial to end it, then the case must proceed apace to it.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 30, 2026